ACCEPTED
01-15-00390-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
6/12/2015 9:25:40 PM
CHRISTOPHER PRINE
CLERK

No. 01-15-00390-CV
_____

IN THE FIRST COURT OF APPEALS
HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
6/12/2015 9:25:40 PM
CHRISTOPHER A. PRINE
Clerk

_____

JOHN T. PRESTON and C CHANGE INVESTMENTS, LLC,
Appellants,
v.
EMJO INVESTMENTS, LTD. and H.J. VON DER GOLTZ,
Appellees.

_____

On Appeal from the 215th District Court of Harris County, Texas,
Hon. Elaine H. Palmer, presiding
Trial Court Cause No. 2011-44058

_____

**BRIEF OF APPELLANT JOHN T. PRESTON**
_____

Jane Langdell Robinson
Texas Bar No. 24062970
Monica Uddin
Texas Bar No. 24075195
Jamie A. Aycock
Texas Bar No. 24050241
AHMAD, ZAVITSANOS, ANAIPAKOS,
    ALAVI & MENSING
1221 McKinney Street, Ste. 3460
Houston, Texas 77010
Telephone:  (713) 655-1101
Facsimile:   (713) 655-0062
jrobinson@azalaw.com
muddin@azalaw.com

*Counsel for Appellant*
*Oral Argument Requested*

No. 01-14-00703-CV

JOHN T. PRESTON and C CHANGE INVESTMENTS, LLC,
Appellant,
v.
EMJO INVESTMENTS, LTD. and H.J. VON DER GOLTZ,
Appellees.

## IDENTITY OF PARTIES AND COUNSEL

| | |
|---|---|
| Appellants: | **John T. Preston** and **C Change Investments, LLC** |
| Trial counsel for appellants: | **Sean Gorman**, Texas Bar No. 08218100<br>    sgorman@azalaw.com<br>**Jamie A. Aycock**, Texas Bar No. 24050241<br>    jamieaycock@azalaw.com<br>AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING<br>1221 McKinney St., Ste. 3460, Houston, Texas 77010<br>Telephone: (713) 655-1101; Facsimile: (713) 655-0062 |
| Appellate counsel for appellants: | **Jane Langdell Robinson**, Texas Bar No. 24062970<br>    jrobinson@azalaw.com<br>**Monica Uddin**, Texas Bar No. 24075195<br>    muddin@azalaw.com<br>AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING<br>1221 McKinney St., Ste. 3460, Houston, Texas 77010<br>Telephone: (713) 655-1101; Facsimile: (713) 655-0062 |

Appellees:                 **Emjo Investments, Ltd.**
                           **H.J. von der Goltz**

Trial counsel for         **F. Eric Fryar**, Texas Bar No. 07495770
appellees:                     eric@fryarlawfirm.com
                          **Matthew Buschi**, Texas Bar No. 24064982
                               mbuschi@fryarlawfirm.com
                          **Christina Richardson**, Texas Bar No. 24070495
                               crichardson@fryarlawfirm.com
                          Fryar Law Firm, P.C.
                          1001 Texas Ave., 14th Floor, Houston, Texas 77002
                          Telephone: (281) 715-6396; Facsimile: (281) 715-6397

Trial and appellate       **Kelley M. Keller**, Texas Bar No. 11198240
counsel for                    kkeller@ellison-keller.com
appellees:                **Tracey N. Ellison**, Texas Bar No. 15054720
                               tellison@ellison-keller.com
                          ELLISON KELLER
                          5120 Woodway Dr., Ste. 6019, Houston, Texas 77056
                          Telephone: 713-266-8200; Fax: 713-266-8201

# TABLE OF CONTENTS

**IDENTITY OF PARTIES AND COUNSEL**.................................................................2

**TABLE OF CONTENTS** ............................................................................................4

**INDEX OF AUTHORITIES**......................................................................................7

**INDEX OF RECORD REFERENCES**....................................................................10

**STATEMENT OF THE CASE**................................................................................11

**STATEMENT ON ORAL ARGUMENT** ...............................................................12

**ISSUE PRESENTED** ..............................................................................................12

**I.       INTRODUCTION**.........................................................................................13

**II.      STATEMENT OF FACTS** ..........................................................................14

    A.     The lawsuit arises out of a failed coal gasification startup. .....................14

    B.     The bankruptcy court dismisses all but two causes of action. .................16

    C.     Only two claims remain against Preston..................................................18

    D.     Appellees do not allege a single act taken in Texas by Preston, much less any act in Texas that is connected to their surviving misrepresentation claims................................................................................................................18

    E.     Preston does no individual business and maintains no presence in Texas. .........................................................................................................23

       1.  Preston does not do business in Texas in his individual capacity. ....23

       2.  Preston does not maintain any presence in Texas.............................25

    F.     After two years and jurisdictional discovery, Appellees fail to allege a single act by Preston in Texas that gives rise to their surviving claims, and fail to show systematic and continuous Texas contacts that render Preston "at home" in Texas...................................................................25

**III.     SUMMARY OF THE ARGUMENT**...........................................................30

**IV.      STANDARD OF REVIEW** .........................................................................33

    A.     *De novo* review applies. ..........................................................................33

    B.     Jurisdiction over nonresidents requires allegations or proof of purposeful availment. ...............................................................................................34

1. The plaintiff bears the initial burden to plead allegations showing jurisdiction over the defendant. ........................................................34

2. The long-arm statute is limited by due process considerations. ........34

3. When the plaintiff fails to meet its initial burden of alleging sufficient purposeful minimum contacts, the fact that the defendant is a nonresident defeats personal jurisdiction. ......................................35

V.      **ARGUMENT** .......................................................................................**38**

   A.      Appellees failed to meet their initial burden of pleading facts to show that Preston is subject to personal jurisdiction in Texas. .................................38

   B.      Because Appellees do not allege that any of Preston's alleged contacts with Texas give rise the surviving claims and no evidence suggests any link, there is no specific jurisdiction as a matter of law............................40

1. Specific jurisdiction requires that the alleged jurisdictional contacts give rise to the plaintiff's alleged injury...........................................42

2. There are no allegations in the intervenors' petition that could give rise to specific jurisdiction over Preston............................................44

3. There are no allegations or evidence in Appellees' special appearance briefing that could give rise to specific jurisdiction over Preston. ........................................................................................45

4. Appellees' claim that Preston "could reasonably foresee that NC12 and its shareholders and investors would suffer direct economic injury" because of his alleged misrepresentations is not a basis for specific jurisdiction as a matter of law. ...........................................53

   C.      Because Preston's alleged contacts with Texas are not substantial, continuous, or systematic, there is no general jurisdiction as a matter of law. ........................................................................................................54

1. General jurisdiction requires the defendant to have substantial, continuous, and systematic contacts with Texas. ..............................54

2. The sporadic contacts with Texas in a representative capacity that Appellees allege are nothing like the substantial, continuous, and systematic contacts required to establish general jurisdiction..........56

5

3. Preston lacks any substantial, continuous, or systematic contact that would render him at "at home" in Texas...........................................68

**VI.    CONCLUSION AND PRAYER ............................................................70**

# INDEX OF AUTHORITIES

**Cases**

*Access Telecom, Inc. v. MCI Telecom. Corp.*,
  197 F.3d 694 (5th Cir. 1999) ..........................................................................69

*All Star Enter., Inc. v. Buchanan*,
  298 S.W.3d 404 (Tex. App.—Houston [14th Dist.] 2009, no pet).............. 36, 59

*Am. Type Culture Collection, Inc. v. Coleman*,
  83 S.W.3d 801 (Tex. 2002).............................................................................57

*Ashdon, Inc. v. Gary Brown & Assocs., Inc.*,
  260 S.W.3d 101 (Tex. App.—Houston [1st Dist.] 2008, no pet.) .......................69

*BMC Software Belgium, N.V. v. Marchand*,
  83 S.W.3d 789 (Tex. 2002)................................................. 33, 43, 46, 54

*Frank A. Smith Sales, Inc. v. Atl. Aero, Inc.*,
  31 S.W.3d 742 (Tex. App.—Corpus Christi 2000, no pet.) ...............................39

*Garza v. Alviar*,
  395 S.W.2d 821(Tex. 1965)..............................................................................68

*Glencoe Capital Partners II, L.P. v. Gernsbacher*,
  269 S.W.3d 157 (Tex. App.—Fort Worth 2008, no pet.)...................................43

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011) ............................................. 34, 42, 55

*Guardian Royal Exch. Assur., Ltd. v. English China Clays,*
  *P.L.C.*, 815 S.W.2d 223 (Tex. 1991) ......................................... 51, 55, 62, 64, 65

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408, 104 S. Ct. 1868 (1984)............................ 51, 52, 62, 64, 65, 69, 70

*Hoffmann v. Dandurand*,
  180 S.W.3d 340 (Tex. App.—Dallas 2005, no pet.) ................................... 58, 59

*Howell v. Hilton Hotels Corp.*,
  84 S.W.3d 708 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ..................67

*International Shoe Co. v. Washington*,
  326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945)................................................35

*Johnston v. Multidata Sys. Intern. Corp.*,
  523 F.3d 602 (5th Cir. 2008) .............................................................................70

*Kelly v. Gen. Interior Const., Inc.*,
  301 S.W.3d 653 (Tex. 2010)........................................................................ passim

*Kulko v. Cal. Super. Ct.*,
  436 U.S. 84, 98 S. Ct. 1690 (1978)......................................................... 62, 64, 65

*Michiana Easy Livin' Country, Inc. v. Holten*,
  168 S.W.3d 777 (Tex. 2005)................................................................... 35, 36, 54

*Moki Mac River Expeditions v. Drugg*,
  221 S.W.3d 569 (Tex. 2007)........................................................... 34, 35, 37, 42

*Nat'l Indus. Sand Ass'n v. Gibson*,
  897 S.W.2d 769 (Tex. 1995)...............................................................................44

*Perkins v. Benguet Consol. Mining Co.*,
   42 U.S. 437, 72 S. Ct. 413 (1952).............................................................. 69, 70

*PHC-Minden, L.P. v. Kimberly-Clark Corp.*,
  235 S.W.3d 163 (Tex. 2007)........................................................................ passim

*Retamco Operating, Inc. v. Republic Drilling Co.*,
  278 S.W.3d 333 (Tex. 2009)........................................................................ 35, 43

*Seiferth v. Helicopteros Atuneros, Inc.*,
  472 F.3d 266 (5th Cir. 2006) .............................................................................43

*Serv. Corp. Intern. v. Guerra*,
  348 S.W.3d 221 (Tex. 2011)...............................................................................68

*Shaffer v. Heitner*,
  433 U.S. 186, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977)................................. 45, 57

*Siskind v. Villa Found. for Educ., Inc.*,
  642 S.W.2d 434 (Tex. 1982)................................................................. 40, 44, 58

*Stuart v. Spademan*,
  772 F.2d 1185 (5th Cir. 1985) ......................................................................58

*Tryco Enter., Inc. v. Robinson*,
  390 S.W.3d 497 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd)................60

*Vosko v. Chase Manhattan Bank, N.A.*,
  909 S.W.2d 95 (Tex. App.—Houston [14th Dist.] 1995, writ denied) ........ 40, 59

*Washington DC Party Shuttle, LLC v. IGuide Tours*,
  406 S.W.3d 723 (Tex. App.—Houston [14th Dist.] 2013, pet. denied)....... 38, 58

*Waterman Steamship Corp. v. Ruiz*,
  355 S.W.3d 387 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) ... 39, 43, 69

*Wright v. Sage Eng'g, Inc.*,
  137 S.W.3d 238 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) ...............58

**Statutes**

TEX. CIV. PRAC. & REM. CODE § 17.042 ...................................................................35

**Rules**

TEX. R. CIV. P. 45 ......................................................................................................41

TEX. R. CIV. P. 120a ............................................................................................ 41, 67

**Other**

4 Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1067.5 ...........................55

## INDEX OF RECORD REFERENCES

CR                  Clerk's Record filed May 21, 2015

Citation to documents included in the Appendix are noted by "Tab #."

# STATEMENT OF THE CASE

**Nature of Case:** This is a case alleging "common law and statutory securities fraud" by investors in a failed technology startup.

**Course of Proceedings:** The intervenors, including Appellees, intervened in an original petition against Preston and other defendants. Preston specially appeared and asserted that he was not subject to personal jurisdiction in Texas because he is a nonresident, and does not have sufficient minimum contacts with Texas for the exercise of personal jurisdiction.

Because the claims involved a corporation, NC12, Inc., that subsequently declared bankruptcy, defendants removed the case to bankruptcy court. The bankruptcy court dismissed or abated all the claims in the original petition and all the claims in the intervenors' petition but two: fraud and conspiracy to commit fraud with respect to alleged misrepresentations regarding the value of NC12 shares. The bankruptcy court remanded these remaining two claims to the district court.

**Trial Court Disposition:** Of the intervenors, only Appellees opposed Preston's special appearance. Preston filed his special appearance on September 28, 2011. The court denied the special appearance on November 17, 2014. Preston appeals from that order.

# STATEMENT ON ORAL ARGUMENT

If upheld, the trial court's ruling will significantly broaden the reach of Texas long-arm jurisdiction over foreign defendants. The trial court's ruling departed considerably from existing precedent by asserting jurisdiction over a nonresident not alleged to have conducted any activity in Texas giving rise to the claims in the lawsuit, and whose only alleged contacts with Texas consists of periodic business trips on behalf of other entities over the last 25 years. This is an important issue and Appellant believes oral argument could assist the panel in considering it. Appellant therefore requests oral argument.

# ISSUE PRESENTED

Sole issue: The trial court erred by denying Preston's special appearance because Appellees failed to plead sufficient allegations to establish personal jurisdiction and because Preston is not subject to specific or general jurisdiction in Texas.

# I.    INTRODUCTION

This lawsuit was brought by disgruntled investors in a failed technology startup in an attempt to recover their investments from the now-bankrupt company's directors and officers. The investors' claims related almost exclusively to harms to the company, and when the bankruptcy court dismissed these claims as belonging to the bankruptcy trustee, the investors were left with a detailed petition that has little to do with the surviving claims, and nothing to do with any action taking place in Texas.

It is difficult to see how Texas courts have any interest in this case, much less personal jurisdiction over Preston. There is no allegation that Preston took any action in Texas connected in any way to the surviving claims. Preston is a Massachusetts resident who has never conducted business in Texas in his personal capacity, and *none* of the intervenors (the only plaintiffs remaining in this lawsuit) are Texas residents either. The only Texas contacts Appellees allege concern Preston's mere status as a board member in Nevada corporations with offices in Texas, and Preston's periodic business trips to Texas on behalf of a variety of other entities.

There are no facts that could give rise to specific jurisdiction because there are no allegations that any of the surviving claims arise from or relate to any action by Preston in Texas. There is no basis for general jurisdiction because almost all

of Preston's alleged contacts with Texas took place in his representative capacity and *still* come nowhere close to the continuous and systematic contacts with Texas that would render Preston at home here.

The mere fact that a startup with some Texas operations went out of business does not warrant the exercise of personal jurisdiction over a Massachusetts resident in a fraud suit brought by nonresident investors who do not allege he did *anything in Texas* that gives rise to their claims. The trial court's order overruling Preston's special appearance runs contrary to both Texas and federal law limiting the exercise of personal jurisdiction over nonresidents. It should be reversed.

## II.    STATEMENT OF FACTS[1]

A.    The lawsuit arises out of a failed coal gasification startup.

This suit arises out of a developmental technology intended to produce synthetic natural gas and other fuels from coal, also known as coal gasification. CR 114–16 (Tab 2).[2] A Nevada corporation, Texas Syngas, Inc. ("TSI"), acquired the technology and began seeking investors in 2007. CR 116 (Tab 2). In 2009 another Nevada corporation, NC12, Inc. ("NC12"), acquired the technology from TSI. CR 122 ¶ 63 (Tab 2). Despite extensive efforts and the partial development

---

[1] Sections II.A and II.B are the same in this brief and C Change's appellant's brief.

[2] Certain of the plaintiffs' and intervenors' allegations are recited in this statement of facts for the Court's background, but Preston does not concede any of the plaintiffs' or intervenors' allegations.

14

of a test reactor in Massachusetts, NC12 did not succeed. CR 118–19, 127–29 (Tab 2); CR 138; CR 208 (Tab 3).

As often happens when businesses fail, litigation ensued. The original plaintiffs, primarily NC12 shareholders, sued several of NC12's directors and officers on July 26, 2011, including directors Michael Sydow, Christoph Henkel, and John Preston. CR 6. NC12 declared bankruptcy in October 2011. CR 208 (Tab 3).

In November 2011, several NC12 investors, including Appellees, intervened in the lawsuit. CR 102–08 (Tab 2). The intervenors had invested variously in convertible notes and shares of TSI and NC12. CR 104–08 (Tab 2). When NC12 acquired the gasification technology and attracted more investment, the intervenors' TSI shares and notes converted into NC12 shares. Accordingly, all of the intervenors[3] are now shareholders in NC12. *Id.*

Both the original plaintiffs' and the intervenors' petitions attacked the defendants' management of TSI and NC12. *See* CR 28–37; CR 129–33 (Tab 2). The original plaintiffs alleged breach of fiduciary duty and conversion claims. CR 35–37. The intervenors alleged four causes of action: (1) breach of fiduciary duty against Sydow, Henkel, and Preston; (2) shareholder oppression by Sydow,

---

[3] One possible exception is appellee H.J. von der Goltz. It is unclear whether von der Goltz is an NC12 shareholder or simply a creditor. CR 105 ¶ 5 (Tab 2) ("all Intervenors are currently common shareholders of NC12, Inc."); CR 108 ¶ 23 (Tab 2) (stating only that von der Goltz holds an NC12 promissory note).

Henkel, and Preston; (3) "Knowing Participation/Civil Conspiracy" against all 10 defendants; and (4) "Securities Fraud—Common Law Fraud and Statutory[4] Fraud" against Sydow and Preston. CR 109–10, 129–33 (Tab 2).

B.    The bankruptcy court dismisses all but two causes of action.

The defendants removed the case to the bankruptcy court on December 15, 2011 on the grounds that the plaintiffs' and intervenors' claims alleging mismanagement of TSI / NC12 belonged to the bankruptcy estate. CR 198–205. The intervenors moved to remand the case to state court. CR 206–07 (Tab 3).

On August 31, 2012, Bankruptcy Judge Marvin Isgur granted in part and denied in part the motions to remand, significantly limiting the claims that remain in this case. CR 207, 237 (Tab 3). Judge Isgur dismissed all of the original plaintiffs' and intervenors' claims relating to harms to TSI[5] and NC12, holding that these claims belonged to the bankruptcy estate. *See* CR 198–205. Judge Isgur reasoned that any claims based on the defendants' alleged asset-stripping, self-dealing, dilution of corporate value, and misappropriation of corporate assets

---

[4] Although the title of the cause of action refers to "Statutory Fraud," the intervenors do not reference any statute. *See* CR 132–33 (Tab 2).

[5] The bankruptcy court order treats NC12 as TSI's successor and thus refers to them collectively as NC12. CR 211 ("NC12 began as a Texas limited liability company named Texas Syngas, LLC."), CR 212 ("Texas Syngas was reorganized as a new Nevada corporation, Texas Syngas, Inc., in May 2006."), CR 214 ("Also in 2009, Texas Syngas became NC12.") (Tab 3).

16

stemmed from harm to NC12 and, accordingly, may only be asserted by the bankruptcy trustee on behalf of the bankruptcy estate. CR 237 (Tab 3).

The bankruptcy court dismissed or abated all of the original plaintiffs' claims. CR 237, 225–27, 234–35 (Tab 3). As a result, none of the original plaintiffs' claims were remanded to state court and those claims are not at issue here. CR 237 (Tab 3).

With respect to the intervenors' claims, the bankruptcy court held that the intervenors' shareholder oppression and breach of fiduciary duty claims belonged to the estate and therefore dismissed those claims. CR 221–27, 237 (Tab 3). The court also dismissed the intervenors' conspiracy claim to the extent it related to the dismissed causes of action. CR 235–37 (Tab 3). This left only causes of action for fraud and conspiracy to commit fraud. CR 237 (Tab 3). In remanding the fraud and conspiracy claims, the court instructed:

> Because the Intervenors are shareholders, their fraud claim is based on the alleged difference between the price they paid in reliance on the alleged misrepresentations and the actual value of NC12's shares at the time of their investment. The Intervenors may not recover damages for the difference between the price they paid for the shares and what the shares would have been worth if not for the alleged post-purchase misconduct in the operation of the corporation.

CR 228 (Tab 3) (emphasis added).

17

C.    Only two claims remain against Preston.

The only remaining causes of action against Preston are "Securities Fraud—Common Law Fraud and Statutory[6] Fraud" asserted against Preston and Sydow, and "Knowing Participation/Civil Conspiracy,"[7] asserted against all 10 defendants. CR 237 (Tab 3); CR 132–33 ¶¶ 89–90 (Tab 2). Significantly, these claims survive only to the extent they deal with the alleged misrepresentation of NC12's value *at the time of the intervenors' investment* (hereinafter, the "surviving claims" or "misrepresentation claims"). CR 228 (Tab 3). The last alleged investment by any intervenor occurred in August 2010. CR 104–08, 105 ¶ 8 (Tab 2).

D.    Appellees do not allege a single act taken in Texas by Preston, much less any act in Texas that is connected to their surviving misrepresentation claims.

The only basis for jurisdiction over Preston in the intervenors' petition are the generic allegations that "Preston has engaged in business in Texas" and "the tortious conduct alleged herein occurred in or was directed at the State of Texas." CR 110 ¶ 33, 114 ¶ 44 (Tab 2).

The intervenors explicitly plead that Preston is a Massachusetts resident who is employed in Cambridge, Massachusetts. CR 110 ¶ 33 (Tab 2). Yet in their

---

[6] Although the title of the cause of action refers to "Statutory Fraud," the intervenors do not reference any statute. *See* CR 132–33 (Tab 2).

[7] Judge Isgur's Order also mentions "Intervenors' aiding and abetting claims" relating to fraud. CR 237 (Tab 3). Since the intervenors did not plead an aiding and abetting claim (*see* CR 129–33 (Tab 2)), it is treated here as part of the conspiracy claim.

petition, the intervenors fail to allege *any act* performed by Preston in Texas, much less an act involving the intervenors' surviving misrepresentation claims. This is perhaps unsurprising, as none of the intervenors are Texas residents who might have relied on misrepresentations in Texas. *See* CR 105–08 (Tab 2) (showing intervenors reside in Luxembourg, Guatemala, the British Virgin Islands, Panama, Germany, New York, the Bahamas, Montana, Tennessee, the Cayman Islands, and Florida, but not Texas).

The few allegations in the intervenors' petition that relate to Preston say nothing to indicate a Texas connection, as shown below:

- In fall 2007, Preston "approached the shareholders of Atomic Ordered Materials (AOM), another company in which Preston was involved" and "brought Sydow and Collins to an AOM shareholders' meeting," where Sydow presented the [TSI] technology and "solicited investments in that company." CR 116 ¶ 51 (Tab 2).

The intervenors do not allege that any of Preston's representations to AOM[8] or its shareholders were made in Texas.

- After the AOM meeting, Preston "approached" intervenor von der Goltz, who had been in attendance. CR 117 ¶ 52 (Tab 2). Preston "informed von der Goltz that [Preston] had negotiated a $100 million pre-money investment valuation for [TSI] and was trying to raise $12 million to build a demonstration reactor . . . ." *Id.*

_____

[8] The intervenors do not allege any other facts regarding AOM whatsoever, much less allege that AOM is a Texas entity or has offices in Texas.

19

- "Preston represented that the value of the technology was in excess of $100 million but suggested that von der Goltz meet with Collins and Sydow to negotiate a discounted valuation to put together an initial investor group for the $12 million needed. Preston represented that he was assisting [TSI], but never disclosed that he owned or controlled any equity interest in [TSI]." *Id.*

The intervenors do not allege that Preston's representations to von der Goltz were made or relied on in Texas. Nor is there any basis to make such an inference. Von der Goltz is a Florida resident. CR 108 ¶ 23 (Tab 2).

- "In November 2007, von der Goltz met with Collins and Sydow in Houston. Collins and Sydow agreed to accept new investors based on a pre-money valuation of $78 million and a post-money valuation of $90 million." CR 117 ¶ 52 (Tab 2).

- Von der Goltz "brought the opportunity to friends, family, and business associates, who ultimately invested $11.75 million . . . . Among this group were the Shareholder Intervenors. Sydow and Preston represented to the Shareholder Intervenors, both directly and through Mr. von der Goltz, that the value of the technology exceeded $100 million and that the money being raised would be used primarily for building the demonstration reactor." CR 117 ¶ 53 (Tab 2).

The intervenors do not allege that Preston attended the November 2007 Houston, Texas meeting or even that any misrepresentation was made to von der Goltz at this meeting. There are no allegations, or basis for any inference, that any *Preston* representation was made or relied on in Texas—whether directly or "through von der Goltz." Neither Preston nor *any* intervenor, including the Shareholder Intervenors, are residents of Texas. CR 105–08 (Tab 2). None of the intervenors'

20

detailed allegations include any suggestion that any of the alleged representations or "promises" were made in Texas:

- Preston made various representations in 2008 to "[TSI] shareholders" that the value of the company was now $300 million as a result of a gas utility contract; representations regarding new financing, and representations regarding the company's purchase of Fall River, Massachusetts property. CR 118 ¶ 55 (Tab 2).

- Preston and Sydow "had no intention of using shareholder money as represented to the shareholders," squandered shareholder money, and engaged in self-dealing. CR 119 ¶ 58 (Tab 2).

- "Despite his numerous promises and despite being compensated to do so Preston failed to raise additional funds for [TSI] in 2009, and by mid-year [TSI] desperately needed funding." CR 120 ¶ 60 (Tab 2).

Moreover, these alleged representations, as the intervenors themselves plead, were addressed to TSI's shareholders and were thus made *after* their investment in TSI. These allegations are thus relevant only to the intervenors' dismissed claims concerning the management of TSI, not their surviving misrepresentation claims. *See* CR 223–28 (Tab 3).

- "Preston and Sydow again turned to Mr. von der Goltz for assistance." CR 120 ¶ 60 (Tab 2). Von der Goltz raised $6.1 million in investment from the Note Holder Intervenors. *Id*. "Preston and Sydow, both directly and through their statements to von der Golz, represented to the Note Holder Intervenors that [TSI] was worth $300 million as of 2009, based on the value of the technology and the [gas utility] and Turkish contracts. However, Preston and Sydow failed to disclose that the [gas utility] contract had been canceled." CR 121 ¶ 61 (Tab 2).

21

- "Preston and Sydow also represented [to the Note Holder Intervenors] that the money would be used primarily to build the test reactor; however, their later conduct and misuse of the funds demonstrate that they had no intention of using the money for that purpose." *Id.*

The intervenors do not allege that any Preston representation to any Note Holder Intervenor or to von der Goltz (or to anyone) was made or relied on in Texas. And any representations regarding the ultimate use of the solicited investment funds are beyond the scope of the surviving claims. CR 223–28 (Tab 3).

Similarly, every subsequent reference to Preston in the remaining 14 pages of the intervenors' petition concerns political infighting on the TSI / NC12 board of directors, alleged mismanagement and asset-stripping of the entity, and alleged self-dealing. CR 121–29 (Tab 2). These allegations only relate to the fiduciary duty, shareholder oppression, and shareholder fraud claims that have been dismissed from this matter. The remaining references to Preston do not support any surviving claim against him. *See* CR 223–28 (Tab 3). And still, none of the remaining allegations state or suggest any action taken by Preston in Texas.

In sum, not a single allegation in the intervenors' petition—the only petition containing any live claims—connects Preston to Texas.

E.     Preston does no individual business and maintains no presence in Texas.

Preston filed a special appearance on September 28, 2011 objecting to the court's exercise of personal jurisdiction over him.[9]  CR 74 (Tab 1).

   1.     *Preston does not do business in Texas in his individual capacity.*

Preston is a resident of Massachusetts and is employed in Massachusetts. CR 86–87 ¶¶ 3, 8 (Tab 1); CR 110 ¶ 33 (Tab 2).  He has not been a resident of Texas for the last 60 years.[10]  In the last 60 years, Preston has not travelled to or visited Texas in his individual capacity.  CR 86 ¶ 4 (Tab 1).

In the last 30 years, Preston has visited Texas exclusively on behalf of entities for whom he served as a director, principal, or managing partner, including a Delaware nonprofit, Molten Metal Technologies, Inc. ("MMT"), Quantum Catalytics, LLC ("Quantum"), C Change Investments, LLC ("C Change"), NC12, and Transformative Energy & Materials Capital, Inc. ("TEM Capital"), or on behalf of the Massachusetts Institute of Technology ("MIT"), where he was a faculty member and Director of Technology and Licensing, and retains an appointment.  *See* CR 87 ¶¶ 5–6 (Tab 1); CR 330–31, 356 at 63:18–23 (Tab 4); CR 672–73 ¶¶ 3–8 (Tab 6); CR 118 ¶ 53 (Tab 2).  Preston served as a director of two

---

[9] Preston's special appearance was filed before the intervenors filed their petition. CR 74 (Tab 1); CR 102 (Tab 2).

[10] Preston, who was 61 years old at the time of his affidavit executed in 2011, resided in Texas for less than one year when he was an infant.  *See* CR 86 ¶ 4 (Tab 1); CR 672 (Tab 6) (showing date of birth).

Texas entities, one from 2004–2006 and the other from 2012–2014 and has otherwise never been a director, officer, or employee of a Texas person or company. CR 330, 388 (Tab 4); CR 87 ¶ 8 (Tab 1).

While Preston was an officer of TSI and NC12, both Nevada corporations with a Texas office, Preston participated in board meetings from Massachusetts, Switzerland, or Germany, but never Texas.[11] *See* CR 86–87 ¶¶ 2, 7 (Tab 1); CR 325, 328 (Tab 4).

Preston has never done business in Texas in his individual capacity. CR 86 ¶ 4 (Tab 1). Preston has never maintained an office in Texas, or employed any person who either resides or regularly travels to Texas in connection with his or her business. CR 87 ¶¶ 8, 9 (Tab 1). Preston has never engaged in routine sales or other profit-making activities in Texas. *Id*. ¶ 8. Preston owns no private Texas businesses. *Id*. In his individual capacity, Preston has never entered into any contracts in Texas or with Texas residents, contracts calling for performance in Texas, or contracts with mandatory venue provision in Texas, other than contracts with his defense counsel. *Id*.

Because Preston does not do business in Texas, he does not maintain a registered agent in Texas and is not required to do so. *Id.* As he does not work or

---

[11] There are no allegations that Preston made any misrepresentation, or any action in furtherance of any conspiracy to make any misrepresentation, while participating in any board meetings.

24

own property in Texas, Preston has never personally incurred or paid any taxes in Texas, nor filed a personal tax return in Texas. CR 87 ¶ 9 (Tab 1).

2. *Preston does not maintain any presence in Texas.*

As Preston's Texas ties consist exclusively of his status as director of predominantly foreign entities and business trips to Texas in his representative capacity, Preston has no presence in Texas. He has never maintained an office or any other facility, telephone listing, post office box, or mailing address in Texas. CR 87 ¶ 9 (Tab 1). Preston has never rented, owned, or possessed any real property or personal property in Texas. *Id.* He does not hold a mortgage or other lien on any real or personal property in Texas. *Id.* He does not have any investments or assets in Texas. *Id.* Preston has never taken out a loan in Texas or guaranteed any debt owed to a Texas resident. *Id.*

F. <u>After two years and jurisdictional discovery, Appellees fail to allege a single act by Preston in Texas that gives rise to their surviving claims, and fail to show systematic and continuous Texas contacts that render Preston "at home" in Texas.</u>

The intervenors had two years and the opportunity to conduct jurisdictional discovery between the bankruptcy court's remand order and the hearing on Preston's special appearance. CR 102 (Tab 2); CR 206 (Tab 3); CR 613. Yet they never amended their petition to add any allegations connecting any aspect of their surviving claims to Texas. This is because no such connection exists.

To evade this problem, Appellees concocted a tornado of smoke and innuendo in response to Preston's special appearance. They doggedly conflate the two distinct types of personal jurisdiction (specific and general), jumble allegations about dismissed claims in discussing surviving claims, confuse individual with representative actions by Preston, and mix diverse assertions of Preston's tangential links to Texas: business trips for other entities, decade-old business calls with original plaintiff and former TSI director Collins, a personal check, and a convoluted story about a 2012 Texas corporation that is allegedly an alter-ego of Preston's, allegedly created to pursue claims against Collins in a different lawsuit.

These attenuated links to Texas have nothing to do with any of the surviving claims, and fall far short of establishing the continuous contact with Texas that is otherwise required to support general personal jurisdiction.

Appellees alleged the following forum contacts by Preston:

(a) **Director of foreign entities.** Preston served as a director of three foreign entities which registered to do business in Texas. CR 287 ("MMT"), CR 281 (Texas Syngas, Inc. ("TSI")), CR 284 (NC12) (Tab 4).

There are no allegations that Preston did anything in Texas in connection with these entities that gives rise to any of the intervenors' claims.

(b) **Business trips to Texas.** In the past 25 years, Preston has allegedly made the following brief business trips to Texas:

26

o 1990s: Five board meetings in Texas for a Delaware nonprofit and three board meetings for MMT. CR 87 ¶ 5 (Tab 1).

o 1990s: Approximately three business trips for MMT.[12] CR 408 ¶ 4, CR 409 ¶ 12, CR 260 (Tab 4).

o 2004: Three trips on behalf of Quantum. CR 409 ¶¶ 6–8 (Tab 4); CR 673 ¶ 8 (Tab 6).

o 2008–11: Five one-day trips on behalf of C Change.[13] CR 319 at 25:3–28:21, 335–38, 343–48 (Tab 4); CR 672–73 ¶¶ 5–6 (Tab 6).

o 2009–10: One trip on behalf of C Change or MIT. CR 262, 323 at 49:13-24 (Tab 4).

o 2010: One trip on behalf of NC12 to testify in Sydow's divorce proceeding. CR 352–70, 339–42 (Tab 4).

o 2011: One two-day trip on behalf of TEM Capital for a foreclosure sale and to inspect a cement plant. CR 349–50 (Tab 4); CR 673 ¶ 7 (Tab 6).[14]

There is no allegation that any of these trips relate to the claims in this lawsuit.

(c) **2004: Phone calls and mail.** Collins claims that in 2004, Preston telephoned him and shipped him "records regarding

---

[12] It is not clear from the record whether these trips are distinct from those on which Preston attended MMT board meetings. CR 87 ¶ 5 (Tab 1).

[13] Preston initially mistakenly identified these trips as on behalf TEM Capital, and submitted a correction in a subsequent declaration. *See* CR 87 ¶ 5; CR 330–31 (Tab 4); CR 672 ¶ 5 (Tab 6). Former C Change director Russell Read testified C Change "effectively merged" into TEM Capital in 2011. CR 320 at 31:5–10 (Tab 4).

[14] In their special appearance briefing, Appellees refer to, but attach no evidence regarding, allegations made by nonparty EMC Cement, BV in an unrelated 2014 lawsuit suggesting that Preston made two other visits to Texas in August 2010 and January 2011 with C Change or TEM Capital. *See* CR 263–64 (Tab 4) (failing to attach EMC complaint).

MMT and its patented technology" following Preston's 2004 business trips to meet with Collins. CR 409 ¶ 9 (Tab 4). These trips and communications concerned catalytic energy processing ("CEP") technology patents belonging to Quantum. *Id.* ¶¶ 5–8; CR 673 ¶ 8 (Tab 6).

There are no allegations linking these communications to the claims in the lawsuit.

(d) **2006: Alleged address at TSI office for foreign entity Metal Catalyst Ventures.** Preston was listed as a director of Nevada corporation Metal Catalyst Ventures, Inc. in June 2006. CR 315 (Tab 4). Preston's "address" was the same as TSI's. *See id.*; CR 281 (Tab 4). Preston did not prepare the document. CR 315 (Tab 4); CR 673 ¶ 9 (Tab 6).

The intervenors allege no other facts regarding Metal Catalyst Ventures, and there are no allegations linking Metal Catalyst Ventures to the surviving claims.

(e) **2008: Personal check to foreign entity BOS, Inc.** In 2008, Preston allegedly wrote a personal check to BOS, Inc., a Turks and Caicos corporation with, allegedly, an office and bank account in Texas. CR 387 (Tab 4); CR 25 ¶ 2. In 2010, BOS, Inc. wired Preston back the same sum. CR 384 (Tab 4).

There are no allegations linking these payments to the claims in the lawsuit.

(f) **2012: Alleged purchase of claims in unrelated Kaiser Litigation via alleged alter ego JK Claims.** JK Claims was formed by Quantum to purchase the plaintiffs' claims in Cause No. 2007-38533, *Jeffrey B. Kaiser v. Texas Syngas LLC, Michael A. Collins, Michael D. Sydow and M. Sameer Ahmed*, in the 152nd District Court of Harris County, Texas (the "Kaiser Litigation").[15] CR 432, 495 at 57:2–3, 498 at 66:19–

---

[15] Kaiser brought suit on behalf of himself and "all similarly situated" members of Texas Syngas LLC. CR 432 (Tab 5). Quantum, a member of Texas Syngas LLC, had intervened in the Kaiser Litigation. CR 452 (Tab 5).

67:20 (Tab 5). After Kaiser filed for bankruptcy, JK Claims purchased the Kaiser Litigation claims from the bankruptcy estate with the approval of the bankruptcy trustee. CR 534–41, 545–47 (Tab 5).

In a supplemental response to the special appearance, Appellees assert that JK Claims is Preston's alter ego and that JK Claims' contacts with Texas should be imputed to Preston. CR 414 (Tab 5). Appellees' own evidence shows that Quantum, not Preston, is the sole owner of JK Claims. CR 495 at 57:2–3, 498 at 66:19–67:20 (Tab 5). *See also* CR 673 ¶ 10. Yet Appellees never allege that Quantum is an alter ego of Preston.

There are no allegations linking these actions to the claims in the lawsuit. *Most significantly*, all alleged JK Claims actions took place *after* this lawsuit was filed and are therefore outside of the relevant jurisdictional period, as discussed below.

Almost none of these tenuous forum contacts are pleaded in the intervenors' petition. *See* section II.D, *supra*. None have anything to do with any alleged misrepresentation to TSI or NC12 investors, and none demonstrate continuous and systematic contacts that would establish that Preston is "at home" in the state of Texas.

After briefing and argument, however, the trial court denied Preston's special appearance. CR 674–75 (Tab 7). Preston timely appealed to this Court. CR 678–80; CR 681–83.

## III.   SUMMARY OF THE ARGUMENT

There is no basis for asserting personal jurisdiction over Preston.  Appellees, neither of whom reside in Texas, bring claims of fraud and conspiracy to commit fraud in relation to representations about TSI / NC12's value.  Appellees do not allege that *any* representations were made or relied on in Texas.  The petition does not contain a *single* allegation that places Preston in Texas or describes any act that Preston is alleged to have done in Texas, much less any act in Texas that gives rise to the claims in this case.  Appellees have never amended their petition to include such allegations because no such facts exist.

**Appellees failed to meet their burden to plead sufficient allegations to establish personal jurisdiction over Preston.**  It is the plaintiff's initial burden to plead sufficient allegations to allege personal jurisdiction over a defendant. Because Appellees have failed to do so, Preston needed only to establish that he does not reside in Texas to negate personal jurisdiction.  There is no dispute: Preston resides in Massachusetts and is not a Texas resident.  The trial court erred in overruling Preston's special appearance on this basis alone.

**Appellees' special appearance evidence supports neither specific nor general jurisdiction.**   Texas courts can exercise personal jurisdiction over a nonresident only if the plaintiff's claims arise out of the defendant's contacts with the forum (specific jurisdiction) or if the defendant has continuous and systematic

contacts with the forum (general jurisdiction). Though it is not clear from their briefing below, Appellees appear to argue that there is both specific and general jurisdiction over Preston. *See* CR 270 (Tab 4). Appellees are wrong on both counts.

**There is no specific jurisdiction because Appellees fail to link any alleged action by Preston giving rise to their claims to Texas.** Appellees contend there is specific jurisdiction over Preston because "[t]he acts and events complained of in this litigation all arise directly from Preston's activities as a director of and fund raiser for TSI and NC12 – both Texas companies" and because "[i]n raiding funds for TSI and NC12, through fraudulent misrepresentations and then denuding the companies of their assets, Preston . . . could reasonably foresee that NC12 and its shareholders and investors would suffer direct economic injury." CR 269–70 (Tab 4).

The mere fact that Preston was a director of a corporation with a Texas office *while* allegedly making misrepresentations to nonresident investors *outside* of Texas is insufficient to establish that any alleged misrepresentation relates to Preston's contacts *with Texas*. The "reasonable foreseeability" test has been rejected by the Texas Supreme Court. And Appellees' "denuding" claims are not germane: the bankruptcy court dismissed all claims relating to harms to TSI and NC12. The only surviving claims regard alleged misrepresentations made by

31

Preston in connection with the value of TSI / NC12 at the time of the intervenors' investment, and conspiracy to commit those misrepresentations. For jurisdictional purposes, the relevant location for fraudulent misrepresentation is the place where the misrepresentation was *made*.

There are no allegations that Preston committed any acts giving rise to these claims in Texas, either in the petition or in Appellees' voluminous briefing below. As a matter of black-letter law, there is no specific jurisdiction over Preston.

**There is no general jurisdiction because all of Preston's forum contacts were in his representational capacity and still do not amount to continuous and systematic contacts with Texas.** Preston is a Massachusetts resident who lives and works in Massachusetts. Other than periodically traveling to Texas on business trips on behalf of foreign entities, Preston has no Texas ties at all. Preston's contacts with Texas on behalf of corporations do not subject him to general jurisdiction absent a showing either that these contacts themselves were tortious or that the corporations were his alter ego. While Appellees claim one corporation, JK Claims, is Preston's alter ego, JK Claims' alleged contacts with Texas began in June 2012—one year after the Appellees filed their suit—and are thus outside of the relevant period to determine jurisdictional contacts. There is no evidence of any purposeful contacts with Texas so substantial that it would render

Preston "at home" in the state of Texas. There is no general jurisdiction over Preston as a matter of law.

For all of these reasons, the trial court erred in overruling Preston's special appearance.

## IV. STANDARD OF REVIEW[16]

A. *De novo* review applies.

Whether a court can exercise personal jurisdiction over a nonresident defendant is a question of law reviewed *de novo* by this Court. *Kelly v. Gen. Interior Const., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010) (Tab 8). When, as here, a trial court does not issue findings of fact and conclusion of law with its special appearance ruling, this Court implies all the facts necessary to support the judgment as long as those facts are supported by the evidence. *Id.*; CR 678–80; CR 684–86. The appellant can challenge the sufficiency of the evidence to support the implied facts. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002) (Tab 9).

---

[16] Section IV is the same in both this brief and C Change's appellant's brief, excluding Section IV.B.4 of C Change's brief.

B.  Jurisdiction over nonresidents requires allegations or proof of purposeful availment.

1.  *The plaintiff bears the initial burden to plead allegations showing jurisdiction over the defendant.*

In suits involving a challenge to personal jurisdiction, the Texas Supreme Court has "consistently held that the plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute." *Kelly*, 301 S.W.3d at 658 (Tab 8). "When the pleading is wholly devoid of jurisdictional facts, the plaintiff should amend the pleading to include the necessary factual allegations." *Id.* at 659.

2.  *The long-arm statute is limited by due process considerations.*

The exercise of personal jurisdiction "exposes defendants to the State's coercive power" and therefore it must comply with the Fourteenth Amendment's due process clause. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2850, 180 L. Ed. 2d 796 (2011). "A nonresident defendant is subject to the personal jurisdiction of Texas courts if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction does not violate federal and state constitutional due process guarantees." *Kelly*, 301 S.W.3d at 657 (Tab 8). The critical inquiry is whether the exercise of jurisdiction comports with due process because the Texas long-arm statute reaches "as far as the federal constitutional requirements of due process will allow." *Id.* (quoting *Moki Mac*

34

*River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007); TEX. CIV. PRAC. & REM. CODE § 17.042. Because the due process requirement arises out of federal constitutional law, the Texas Supreme Court relies on precedent from the United States Supreme Court and other federal courts in evaluating the exercise of personal jurisdiction. *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 166 (Tex. 2007) (Tab 10).

The exercise of personal jurisdiction over a nonresident defendant is consistent with due process when the defendant "has established minimum contacts with the forum state, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice." *Kelly*, 301 S.W.3d at 657 (Tab 8) (quoting *Moki Mac*, 221 S.W.3d at 575 and *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945).

> *3.     When the plaintiff fails to meet its initial burden of alleging sufficient purposeful minimum contacts, the fact that the defendant is a nonresident defeats personal jurisdiction.*

A defendant establishes minimum contacts with a state "when it purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Kelly*, 301 S.W.3d at 657–58 (Tab 8) (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009). There are "three parts to a 'purposeful availment' inquiry." *Moki Mac*, 221 S.W.3d at 575 (quoting *Michiana Easy Livin' Country,*

35

*Inc. v. Holten*, 168 S.W.3d 777, 784–85 (Tex. 2005)). First, only the defendant's contacts with the forum are relevant, "not the unilateral activity of another party or a third person." *Id.* Second, the contacts relied on "must be purposeful rather than random, fortuitous, or attenuated." *Id.* And third, the "defendant must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Id.* (quoting *Michiana*, 168 S.W.3d at 785).

It is not enough, however, merely to take any purposeful action in Texas. The defendant's actions must satisfy the requirements of either general or specific jurisdiction. *All Star Enter., Inc. v. Buchanan*, 298 S.W.3d 404, 412 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("There are two types of personal jurisdiction: specific and general."); *PHC-Minden*, 235 S.W.3d at 166 (United States Supreme Court has "adopted the terms 'specific' and 'general' to describe the differing types of personal jurisdiction") (Tab 10). Specific jurisdiction is "based on contacts arising from the dispute at issue," while general jurisdiction is "predicated on a party's 'continuous and systematic' contacts with the forum." *PHC-Minden*, 235 S.W.3d at 165 (Tab 10).

The plaintiff has the initial burden of pleading that a nonresident defendant made purposeful minimum contacts with the state. *Kelly*, 301 S.W.3d at 658 (Tab 8). For the minimum contacts analysis, the plaintiff must allege that its claims arose out of or are substantially related to the defendant's contacts with Texas, or

that the defendant has continuous and systematic contacts with the state. *Id*.; *Moki Mac*, 221 S.W.3d at 585; *PHC-Minden*, 235 S.W.3d at 165 (Tab 10).

Only if the plaintiffs meet the initial burden—by making specific allegations sufficient to establish general or specific jurisdiction—must the defendant respond by negating all grounds of jurisdiction. *Kelly*, 301 S.W.3d at 658 (Tab 8). "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Id.*

When the plaintiffs do not meet their burden of alleging purposeful minimum contacts, the defendant need only submit an affidavit stating that it is not a Texas resident to defeat personal jurisdiction. *Id.* at 658–59 ("If the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute (*i.e.*, for a tort claim, that the defendant committed tortious acts in Texas), the defendant need only prove that it does not live in Texas to negate jurisdiction.").

Even where the plaintiffs do allege purposeful minimum contacts, the defendant can negate jurisdiction either factually or legally. *Id*. at 659. Factually, it can present evidence that it has no contacts with Texas, thus disproving the plaintiff's allegations. *Id.* The plaintiff "risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction." *Id.* Legally, "the defendant can show that even if the plaintiff's alleged facts are true,

37

the evidence is legally insufficient to establish jurisdiction." *Id.* In other words, the defendant prevails if it shows the claims do not arise from the contacts or that its contacts with the state are not continuous and systematic. *Id.*; *PHC-Minden*, 235 S.W.3d at 165 (Tab 10).

## V. ARGUMENT

Sole issue: The trial court erred by denying Preston's special appearance because Appellees failed to plead sufficient allegations to establish personal jurisdiction and because Preston is not subject to specific or general jurisdiction in Texas.

A.     <u>Appellees failed to meet their initial burden of pleading facts to show that Preston is subject to personal jurisdiction in Texas.</u>

Though it was not addressed in the intervenors' petition and not clear from their briefing, Appellees have claimed that Preston is subject both to specific and general personal jurisdiction in Texas court. CR 269–70 (Tab 4). The allegations in the petition and evidence offered in Appellees' responses to Preston's special appearance,[17] however, were insufficient to establish either.

In their petition, the intervenors failed to allege that Preston committed any act in Texas, much less any act that gave rise to their claims. As discussed in detail above, while the intervenors pleaded generally that Preston misrepresented the value of TSI/NC12 to potential investors and "all Defendants conspired to commit

---

[17] Appellees also argued that even though Preston supported his special appearance with a sworn affidavit attesting to every material fact, the special appearance was not verified. CR 264–65 (Tab 4). This argument has been explicitly rejected by this court. *Washington DC Party Shuttle, LLC v. iGuide Tours, LLC*, 406 S.W.3d 723, 731 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (en banc).

fraud," not a single allegation connects any misrepresentation or act in furtherance of any conspiracy to Texas. *See* CR 132 ¶ 89 (Tab 2); section II.D, *supra*. None of the intervenors are even Texas residents. CR 105–08 (Tab 2).

Instead, the only pleaded basis for personal jurisdiction over Preston are the generic allegations that "Preston has engaged in business in Texas" and "[p]ersonal jurisdiction over all defendants is proper in the state of Texas because NC12 is headquartered in Houston, Texas and the tortious conduct alleged herein occurred in or was directed at the State of Texas." CR 110 ¶ 33, 114 ¶ 44 (Tab 2). This type of generalization is insufficient to meet the pleading burden. *Waterman Steamship Corp. v. Ruiz*, 355 S.W.3d 387, 398, 403–04 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). *See also Frank A. Smith Sales, Inc. v. Atl. Aero, Inc.*, 31 S.W.3d 742, 747 (Tex. App.—Corpus Christi 2000, no pet.) (The "third-party petition stated only that [the defendant] had committed acts of negligence, without specifying what those negligent acts were, or where they occurred. Therefore, [the] petition fell well short of pleading sufficient allegations to show jurisdiction in Texas."). The intervenors failed to plead any facts showing that Preston in fact engaged in business, or committed any tort, in Texas. Indeed, the petition fails to allege a single action taken by Preston in Texas. *See, e.g.,* CR 114–33 (Tab 2).

Because the intervenors failed to plead facts showing that Preston made misrepresentations or conspired to make misrepresentations in Texas, or any facts

39

showing that Preston had any continuous and systematic contacts with this state, Preston needed only prove that he is not a Texas resident to defeat personal jurisdiction. *See Kelly v. Gen. Interior Const., Inc.*, 301 S.W.3d 653, 658–59 (Tex. 2010) (Tab 8) ("If the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute (i.e., for a tort claim, that the defendant committed tortious acts in Texas), the defendant need only prove that it does not live in Texas to negate jurisdiction."); *Vosko v. Chase Manhattan Bank, N.A.*, 909 S.W.2d 95, 99 (Tex. App.—Houston [14th Dist.] 1995, writ denied) (citing *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 437–38 (Tex. 1982)) (When "the plaintiff does not allege that the defendant performed a specific act in Texas, the defendant's evidence that he is a nonresident is enough to carry his burden of proof.").

Preston's unrefuted affidavit establishes he is a Massachusetts resident and not a Texas resident. CR 87 ¶ 5 (Tab 1). The intervenors affirmatively plead that Preston is a Massachusetts resident. CR 110 ¶ 33 (Tab 2). The trial court erred by denying Preston's special appearance on this basis alone.

B.    Because Appellees do not allege that any of Preston's alleged contacts with Texas give rise the surviving claims and no evidence suggests any link, there is no specific jurisdiction as a matter of law.

Although nearly two years passed between the bankruptcy court's order dismissing all other causes of action and Appellees' two briefs in opposition to

40

Preston's special appearance, Appellees never amended their petition to include any jurisdictional facts relating to the claims remanded by the bankruptcy court. CR 237 (Tab 3); CR 257 (Tab 4); CR 413 (Tab 5). *See also Kelly*, 301 S.W.3d at 659 n.6 (Tab 8) (If "the plaintiff's evidence does not fall within the scope of the factual allegations in the pleading, then the plaintiff should amend the pleading for consistency."). Appellees tried to overcome their failure to plead jurisdictional facts by including more detail in their response and supplemental response opposing Preston's special appearance, but the evidence considered by trial court in addition to the petition must comply with the requirements of Rule 120a, and even then, it "merely supports or undermines the allegations in the pleadings." *Id.* at 658 n.4; TEX. R. CIV. P. 120a, 45(a) (defining pleadings as petitions and answers).

Regardless, there is no allegation, much less any evidence, that Preston's alleged misrepresentations of TSI / NC12's value to investors, or any act in furtherance of his alleged conspiracy to commit these misrepresentations, were made in Texas. The intervenors do not make any such allegation in their petition *or* in their response or supplemental response to Preston's special appearance.

Rather, Appellees assert that there is specific jurisdiction over Preston because: "[t]he acts and events complained of in this litigation [] arise directly from Preston's activities as a director of and fundraiser for TSI and NC12 – both

41

Texas companies" and because "[i]n raiding funds for TSI and NC12, through fraudulent misrepresentations and then denuding the companies of their assets, Preston . . . could reasonably foresee that NC12 and its shareholders and investors would suffer direct economic injury." CR 269–70 (Tab 4).

Appellees mistake the law. Preston's mere status as a director of even a "Texas corporation" would be insufficient to support Texas jurisdiction for misrepresentation claims that were not made or relied on in Texas. The "reasonable foreseeability" analysis for personal jurisdiction has been explicitly rejected by the Texas Supreme Court. All claims relating to the "denuding" of corporate assets have been dismissed by the bankruptcy court. There is no allegation, much less any evidence, that any of Preston's contacts with Texas give rise to the surviving claims. There is no specific jurisdiction as a matter of law.

1.    *Specific jurisdiction requires that the alleged jurisdictional contacts give rise to the plaintiff's alleged injury.*

Specific jurisdiction exists when the defendant purposefully avails himself of conducting activities in the forum and "the cause of action arises from or is related to those contacts or activities." *Kelly*, 301 S.W.3d at 658 (Tab 8). *See also Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 576 (Tex. 2007) ("liability must have arisen from or related to those contacts."). Specific jurisdiction depends on an "activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v.*

42

*Brown*, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011) (citation omitted). In a specific jurisdiction analysis, the court thus focuses on "the relationship among the defendant, the forum[,] and the litigation." *Kelly*, 301 S.W.3d at 658 (Tab 8) (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)) (alteration in original).

Jurisdiction for each claim must stand on its own merits. *Id.* at 660. (performing claim-by-claim analysis to determine whether each claim arose out of alleged forum contacts); *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274–75 (5th Cir. 2006) (specific jurisdiction is a claim-specific inquiry). This is especially significant here, as all of the original plaintiffs' claims, and the intervenors' shareholder oppression, fiduciary duty, and related conspiracy claims, have been dismissed. CR 237 (Tab 3).

For a tort claim, the plaintiff must plead that the defendant committed a tortious act in Texas. *Waterman Steamship*, 355 S.W.3d at 403. For misrepresentation claims, the relevant location for jurisdiction is *the place where the misrepresentation was made. BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 796–97 (Tex. 2002) (Tab 9); *Kelly*, 301 S.W.3d at 660 (Tab 8); *Glencoe Capital Partners II, L.P. v. Gernsbacher*, 269 S.W.3d 157, 167 (Tex. App.—Fort Worth 2008, no pet.). "[D]ue process will not permit the plaintiff to use insignificant acts in the forum to assert jurisdiction over all co-conspirators."

*Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995) (quoting *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 438 (Tex. 1982)). Nor can the acts of co-conspirators be imputed to a nonresident defendant for the purposes of personal jurisdiction. *See id.*

2. *There are no allegations in the intervenors' petition that could give rise to specific jurisdiction over Preston.*

As discussed at length above, there is no allegation in the intervenors' petition that Preston's alleged misrepresentations of NC12's value to investors, or any act in furtherance of his alleged conspiracy to commit these misrepresentations, occurred in Texas.

Appellees do not attempt to remedy this problem in their special appearance briefing or the evidence attached thereto. Rather, Appellees compile a list of Preston's alleged business trips and director positions on behalf of a variety of entities over the last 25 years. *See, e.g.,* CR 260–64, 269 (Tab 4). Appellees make no attempt to link any of Preston's alleged forum contacts to Preston's alleged misrepresentations of the value of TSI / NC12 to potential investors, or to any conspiracy to commit such a misrepresentation.

3. *There are no allegations or evidence in Appellees' special appearance briefing that could give rise to specific jurisdiction over Preston.*

Appellees refer to the same set of alleged forum contacts to support both specific and general jurisdiction over Preston. CR 260–64, 269 (Tab 4). *See* section II.F, *supra*. Each is examined in turn below.

### a) Service as a director of foreign entities.

Appellees assert generally that their claims against Preston "arise directly from Preston's activities as a director of and fundraiser for TSI and NC12 – both Texas companies."[18] CR 269–79 (Tab 4). The United States Supreme Court has held that service as a director of a corporation, by itself, does not create personal jurisdiction over that director—even when the corporation is *organized* in the forum state. *Shaffer v. Heitner*, 433 U.S. 186, 215–16, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977) (in shareholder derivative suit against Delaware corporation's directors and officers alleging that defendants "misus[ed] their power," Delaware court did not have personal jurisdiction over defendants because plaintiffs did not allege any *acts* by the defendants in Delaware, and service as a director did not show that defendants purposefully availed themselves of conducting activities in Delaware).

---

[18] Appellees also refer generally to Preston's status as director of Nevada corporation MMT as supporting personal jurisdiction. CR 260–61, 269–70 (Tab 4). There is no allegation and no basis whatsoever to link Preston's service as director of Nevada corporation MMT in the 1990s to any claim in this matter. *See id.*; CR 287–89 (Tab 4); CR 132 ¶ 89 (Tab 2).

There is even less of a basis to claim that Preston's service as a director of a *Nevada* corporation with an office in Texas created personal jurisdiction over him.

This is because the real locus of Appellees' harm is the place where the *misrepresentations* were made. *BMC Software*, 83 S.W.3d at 796–97 (Tab 9) ("Here, Marchand alleges that his fraud and negligent misrepresentation claims arise from the alleged Watson–Ordelheide conversation in Texas. But they do not. The nature of the claims demonstrate that they can only arise from BMCB's contact with Marchand, which all occurred outside of Texas. … BMCB made no representations to Marchand in Texas, and he did not rely to his detriment on the conversation in Texas.") (citation omitted). *See also Kelly*, 301 S.W.3d at 660 (Tab 8) (in order to establish specific jurisdiction for fraud, the plaintiff must allege that the fraudulent acts occurred in Texas).

*BMC Software* involved an alleged fraudulent misrepresentation made in Europe. 83 S.W.3d at 796–97 (Tab 9). The plaintiff claimed that jurisdiction was proper in Texas because the defendant's officers met in Texas and, during that meeting, planned to defraud the plaintiff. *Id.* at 796. The Texas Supreme Court disagreed, however, noting that even if the defendant's officers discussed the plan to defraud the plaintiff in Texas, it was the *misrepresentations themselves*—made in Europe—that gave rise to the cause of action. *Id.* at 796–97.

Here, Appellees have neither pleaded nor offered evidence to show that any of the alleged misrepresentations giving rise to their claims took place in Texas. *See* sections II.D, II.F*, supra*. Further, there is no allegation or evidence that Preston ever even did business out of the TSI or NC12 Texas office. Preston participated in board meetings from Massachusetts, Switzerland, or Germany, never Texas. *See* CR 86–87 ¶¶ 2, 7 (Tab 1); CR 325, 328 (Tab 4). Appellees do not allege that Preston made any representation or undertook any action supporting any conspiracy while participating in these board meetings.

Preston is not subject to specific jurisdiction on the bare fact of his status as director for corporations with Texas offices.

### b)     Business trips to Texas.

Appellees spill much ink describing the business trips Preston took in a representative capacity over the last 25 years. CR 260–64 (Tab 4). For the most part, these trips fall well before or well after the relevant window for investment into TSI or NC12, making it impossible that they give rise to the Appellees' remaining claims. Most significant, however, is Appellees' conspicuous failure to allege *any connection* between a single one of these business trips and the alleged misrepresentations or conspiracy.

Board meetings and business trips in the 1990s. Appellees never allege that Preston's 1990s-era Texas business trips give rise to their claims. CR 87 ¶ 5 (Tab

47

1); CR 260 (Tab 4). Nor could they. Appellees themselves state that MMT's business in Texas concerned a waste recycling project using MMT's catalytic extraction processing ("CEP") technology, not potential investors in TSI or NC12. CR 260–61, 408–09 (Tab 4). TSI would not be formed until 2006, or do business in Texas until 2008. CR 281 (Tab 4). Preston's MMT business trips do not form a basis for specific jurisdiction.

Business trips with Quantum in 2004. Appellees never claim that Preston's alleged three business trips to Texas in 2004 to meet with Collins[19] give rise to their claims that Preston allegedly misrepresented the value of NC12 to potential investors. CR 408–09, 261 (Tab 4). Indeed, TSI still would not exist for another two years or do business for another four. CR 281 (Tab 4). Preston's Quantum business trips do not form a basis for specific jurisdiction.

Business trips with C Change between 2008–2011. Appellees never allege that any of Preston's business trips with C Change related in any way to misrepresentations to investors about the value of TSI / NC12. CR 262–64, 319 at 25:3–28:21, 323 at 49:13-24, 335–38, 343–48 (Tab 4); CR 672–73 ¶¶ 5–6 (Tab 6).

Appellees do not claim that Preston's 2008 meeting in Houston with Collins and Sydow related to any alleged misrepresentations to investors. CR 262, 269,

---

[19] Collins is not an intervenor, but an original plaintiff and former TSI/NC12 director whose fiduciary duty and conversion claims against Preston were dismissed and abated by the bankruptcy court. CR 234–37 (Tab 3).

319 at 25:3–28:21, 339–42 (Tab 4).  With respect to the meeting in 2009 or early 2010, Preston's C Change colleague Russell Read testified that he and Preston[20] travelled to Texas during that period for one meeting with Russian technology partners for the formation of a joint venture MIT was exploring with the Russian government.  CR 323 at 49:13–50:4 (Tab 4).  Preston gave evidence of four other approximately one-day trips for C Change between 2009–2011.[21]  There is no evidence, nor even any allegation, that *any* of these trips related in any way to the Appellees' surviving claims.

Business trip to testify regarding NC12 in divorce proceeding.  Preston traveled to Texas in October 2010 to testify in Sydow's divorce proceeding.  CR 339–42 (Tab 4).  Preston testified exclusively about NC12 assets and financial operation.  *See* CR 352–70 (Tab 4).  But there can be no connection between *any* alleged post-August 2010 contacts with Texas and misrepresentations to potential investors in NC12, including this testimony, because August 2010 is the last alleged investment giving rise to the surviving claims, and there is no allegation or

---

[20] Preston does not recall this trip.  CR 673 ¶ 6 (Tab 6).  Read discusses the matter in context with his work with Preston at C Change.  CR 323 at 49:13-24 (Tab 4).  While it is not clear from the record whether this alleged trip occurred on behalf of MIT or C Change, either way, there is no evidence that it related in any way to Appellees' surviving claims.

[21] Preston's flight records establish these trips occurred April 2–3, 2009 (Houston) (CR 335–38), May 3–4, 2009 (Houston) (CR 343–44), December 30–31, 2010 (Dallas) (CR 347–48), and March 16–17, 2011 (Austin) (CR 345–46) (Tab 4).  *See also* CR 672–73 ¶¶ 5–6 (Tab 6).  As the intervenors affirmatively plead, the last intervenor's investment was in August 2010.  CR 104–08 (Tab 2).  Preston thus could not have made any relevant misrepresentations nor furthered the alleged conspiracy to misrepresent NC12's value to the intervenors on the latter two trips.

evidence that this or any post-August 2010 Preston contact relates in any way to any conspiracy claim. CR 104–08 (Tab 2). Indeed, Appellees never allege any link between this trip to Texas and any surviving claim. CR 269 (Tab 4). Preston's October 6, 2010 trip to Texas to give testimony in Sydow's divorce proceeding does not give rise to specific jurisdiction.

Business trip with TEM Capital. Appellees never allege that Preston's May 2–4, 2011 business trip to Texas to attend a foreclosure sale and cement plant inspection for TEM Capital relates in any way to their surviving claims. *See* CR 673 ¶ 7 (Tab 6); 263–64, 269, 349–50 (Tab 4); CR 414, 427 (Tab 5); CR 673 ¶ 7 (Tab 6). Again, the last relevant investment occurred nearly a year before, and no evidence suggests this trip was related to any conspiracy to defraud NC12's investors regarding the value of NC12's shares. CR 104–08 (Tab 2).

In sum, not a single one of Preston's business trips give rise to the Appellees' surviving claims. Thus, not a single one supports specific jurisdiction.

### c) 2004: Phone calls and mail to Collins.

As discussed above, Preston's 2004 business trips to Texas to meet with Collins did not relate to the surviving claims. As Collin himself states, Preston's subsequent telephone calls and shipment of records related to the same purposes as his business trips: the commercial development of the CEP technology, not plans

to mislead investors of TSI two years later about the value of TSI.  CR 409 ¶ 9 (Tab 4).  These alleged contacts do not provide a basis for specific jurisdiction.

### d) 2006: Metal Catalyst Ventures' designation of address as TSI address.

A 2006 Nevada state record shows someone named Linda Kulik listed Preston as a director of Nevada corporation Metal Catalyst Ventures, Inc.  CR 315 (Tab 4).  Kulik listed TSI's Houston address as Preston's address.  *See id.*; CR 281 (Tab 4).  Appellees allege no other facts regarding Metal Catalyst Ventures, not even in their briefing.  *See* CR 262 (Tab 4).  Appellees never allege any link between Metal Catalyst Ventures to the claims in the lawsuit, nor do they provide any evidence that Preston actually resided at or did business at TSI's address.  *See* section II.D, II.F, *supra.*

Preston submitted an unrefuted affidavit stating that he never served as a director of Metal Catalyst Ventures and never listed the TSI address as his own.  CR 673 ¶ 9. (Tab 6).  Preston has never maintained an office in Texas.  CR 87 ¶ 8 (Tab 1).  This is not a purposeful minimum contact supporting jurisdiction over Preston because it is not a contact *by* Preston.  *See Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 227 (Tex. 1991) ("the contact must have resulted from the nonresident defendant's purposeful conduct and not the unilateral activity of the plaintiff or others").  *See also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417, 104 S. Ct. 1868, 1873

(1984) (the "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."). This alleged "contact" provides no basis for specific jurisdiction over Preston.

### e) 2008: Personal check.

In 2008, Preston allegedly wrote a personal check to BOS, Inc., a Turks and Caicos corporation with an alleged bank account in Texas. CR 387 (Tab 4); CR 25 ¶ 2. Two years later, BOS, Inc. wired Preston back the same sum. CR 384 (Tab 4). There is no indication that Preston purposefully availed himself of any Texas-related benefits by writing a personal check to a foreign entity, or that this transaction has any relationship to the litigation. *See Helicopteros*, 466 U.S. at 416–17 ("Common sense and everyday experience suggest that, absent unusual circumstances, the bank on which a check is drawn is generally of little consequence to the payee and is a matter left to the discretion of the drawer.") (footnote omitted). The BOS, Inc. payments are not a minimum contact with Texas and do not give rise to specific jurisdiction.

### f) 2012: Alleged alter-ego JK Claims' purchase of litigation claims in the Kaiser Litigation.

Appellees' fantastical story of Preston secretly purchasing the claims in the Kaiser Litigation through alleged alter-ego JK Claims still does not relate in any way to any potential misrepresentation to investors of NC12—the last of which

invested two years prior—or give any conceivable support to a conspiracy to defraud potential investors in NC12. CR 414–24 (Tab 5).

The Kaiser Litigation concerned disputes between the members of Texas Syngas *LLC*, not misrepresentations to potential investors in TSI or NC12 of TSI or NC12's value. CR 432–40 (Tab 5). The first action intervenors allege relating to JK Claims, an application to reserve its name, occurred in June 2012, two years after the last investor invested in NC12. CR 527, 414–24 (Tab 5). Even if taken as true—which they should not be—the intervenors' conspiracy theories regarding JK Claims have nothing to do with the claims at issue in this matter and do not form a basis for specific jurisdiction.

In sum, none of Preston's alleged contacts with Texas relate to the claims in this case. Appellees' allegations and evidence do not support the exercise of specific jurisdiction. *Kelly*, 301 S.W.3d at 659 (Tab 8).

4. *Appellees' claim that Preston "could reasonably foresee that NC12 and its shareholders and investors would suffer direct economic injury" because of his alleged misrepresentations is not a basis for specific jurisdiction as a matter of law.*

Appellees claim that Preston is subject to specific jurisdiction because "[i]n raiding funds for TSI and NC12, through fraudulent misrepresentations and then denuding the companies of their assets, Preston . . . could reasonably foresee that NC12 and its shareholders and investors would suffer direct economic injury." CR 269 (Tab 4). This argument echoes the intervenors' general allegation in the

53

petition that there is personal jurisdiction because tortious conduct "was directed at the State of Texas." CR 114 ¶ 44 (Tab 2).

The Texas Supreme Court has unequivocally rejected the notion that jurisdiction can arise purely because actions caused harm to Texas residents or because a tort is "directed" at Texas residents. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 788–92 (Tex. 2005) (surveying case law and constitutional considerations). And in this case, because there are no claims belonging to the original plaintiffs, and no intervenor is a Texas resident (including Appellees), the only conceivable Texas harm Appellees allege is harm to NC12, a Nevada corporation—but the bankruptcy court dismissed those claims.

There is thus no basis in the pleadings, the evidence, or the law for specific jurisdiction over Preston.

C. <u>Because Preston's alleged contacts with Texas are not substantial, continuous, or systematic, there is no general jurisdiction as a matter of law.</u>

1. *General jurisdiction requires the defendant to have substantial, continuous, and systematic contacts with Texas.*

General jurisdiction exists "when a defendant's contacts in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 796 (Tex. 2002) (Tab 9). For general jurisdiction, the

54

plaintiff must show the nonresident defendant engaged in "substantial activities" in Texas. *Guardian Royal Exch. Assur., Ltd. v. English China Clays, PLC*, 815 S.W.2d 223, 230 (Tex. 1991).

A general jurisdiction inquiry "involves a 'more demanding minimum contacts analysis'" than a specific jurisdiction inquiry, with a "substantially higher threshold." *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 168 (Tex. 2007) (Tab 10). "Usually, 'the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction.'" *Id.* (quoting 4 Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1067.5).

The defendant's activities must be so extensive that it is essentially at home in the state, and therefore should be subject to suit there for any claim—regardless of where the claim occurred—as a resident would be. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853–54, 180 L. Ed. 2d 796 (2011) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home."). As general jurisdiction is "dispute-blind," the alleged actions underlying the lawsuit "should not be the focus in assessing continuous and systematic contacts—contacts on which jurisdiction over

any claim," not just the one at issue, may be based. *PHC-Minden,* 235 S.W.3d at 169 (Tab 10). The relevant period for consideration of forum contacts for general jurisdiction ends at the time the suit is filed. *Id.*

Because it is so easy to let case-specific facts improperly weight a general jurisdiction analysis, the Texas Supreme Court has suggested a test that "properly frames the issue": would the nonresident's contacts with Texas "support jurisdiction even for a hypothetical cause of action arising from its sale of a product in Germany that injured a German citizen?" *Id.* (citation omitted). In other words: are Preston's Texas activities in Texas so pervasive that he should be sued in Texas in a case where *none* of the operative facts relate to Texas? The answer here is no.

2. *The sporadic contacts with Texas in a representative capacity that Appellees allege are nothing like the substantial, continuous, and systematic contacts required to establish general jurisdiction.*

Appellees refer to the same set of alleged forum contacts to support both specific and general jurisdiction over Preston. CR 260–64, 269 (Tab 4); section II.F, *supra*. The vast majority of alleged contacts cannot be considered contacts for purposes of establishing general jurisdiction over Preston, either because they do not demonstrate that Preston availed himself of the privilege of conducting activities in Texas (service as a director of a foreign entity) or they were made in a representative capacity (business travel). Each is examined again in turn below in

56

the context of general jurisdiction. *See Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 809 (Tex. 2002) (for general jurisdiction, all alleged forum contacts in the relevant time period must be "carefully investigated, compiled, sorted, and analyzed for proof of a pattern of continuing and systematic activity."). The quality, not quantity, of the contacts is relevant, and the relevant period ends at the date of filing of the suit—here, July 26, 2011. *Id.*; CR 6.

### a) Director of foreign entities.

The mere fact of service as a director of corporations which reside in Texas, without more, is insufficient as a matter of law to create general jurisdiction over Preston in Texas. *Shaffer v. Heitner*, 433 U.S. 186, 215–16, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977) (fact that defendants were directors and officers of Delaware corporation did not demonstrate that they had purposefully availed themselves of the privilege of conducting activities in Delaware in a way that would justify bringing them before a Delaware tribunal).

Preston participated in TSI and NC12 board meetings from Massachusetts, Switzerland, or Germany, never Texas. *See* CR 86–87 ¶¶ 2, 7 (Tab 1); CR 325, 328 (Tab 4). Indeed, Appellees allege *no* acts taken by Preston in Texas in connection with his service as a director for TSI and NC12, or any other entity. Even if they had, as discussed in detail below, any such acts would not be sufficient to subject him to general jurisdiction in Texas as an individual because

57

he did not do them in his individual capacity. *Wright v. Sage Eng'g, Inc.*, 137 S.W.3d 238, 250 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).[22]

### b) Business trips to Texas.

Preston's contacts with Texas in his representative capacity do not qualify as contacts for general jurisdiction because there is no allegation that these contacts involved tortious activities or that the entities were Preston's alter ego. Under Texas law, corporations are presumed to be separate entities from their directors, officers, and shareholders. *See Washington DC Party Shuttle, LLC v. IGuide Tours*, 406 S.W.3d 723, 738–39 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). An individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual though the state may have personam jurisdiction over the corporation. *Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985). An individual's representative contacts are not their own absent other evidence that the contact was independently tortious, or proof sufficient to pierce the corporate veil. *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex. 1982); *Hoffmann v. Dandurand*, 180 S.W.3d 340, 347 (Tex. App.—Dallas 2005, no pet.).

---

[22] This rule is sometimes referred to as the fiduciary shield doctrine. *Id.* Appellees cite *Wright* for the proposition that Preston's acts as a director can create personal jurisdiction if it is those acts which give rise to the lawsuit. CR 270 (Tab 4). However, that is only true in the case of *specific* jurisdiction, not general jurisdiction, as the *Wright* court explicitly noted. 137 S.W.3d at 250. As already discussed above, Appellees do not allege any acts by Preston in Texas—in his capacity as a director or otherwise—that relate to the claims in this case.

This Court has held that general jurisdiction over an individual may not be based on jurisdiction over an entity with which an individual is associated unless the entity is his or her alter ego. *Vosko v. Chase Manhattan Bank, N.A.*, 909 S.W.2d 95, 99 (Tex. App.—Houston [14th Dist.] 1995, writ denied). *See also Hoffmann,* 180 S.W.3d at 347. The alter ego doctrine applies only when there is such unity between the corporation and the individual that the separateness of the corporation has ceased. *Vosko*, 909 S.W.2d at 99. Courts consider evidence such as (1) the payment of alleged corporate debts with personal checks or other comingling of personal and corporate funds; (2) representations that the individual will financially back the corporation; (3) diversion of company profits to the individual for personal use; (4) inadequate capitalization; (5) other failures to keep corporate and personal assets separate. *Hoffmann,* 180 S.W.3d at 347.

Because personal jurisdiction involves due-process considerations that may not be overridden by statutes or case law, jurisdictional veil-piercing and substantive veil-piercing involve different elements of proof. *All Star Enter.,* 298 S.W.3d at 422; *PHC-Minden*, 235 S.W.3d at 174 (Tab 10). For jurisdictional purposes, the factors considered must relate to the actor's forum contacts. *See PHC Minden*, 235 S.W.3d at 174 (Tab 10) (observing that common veil-piercing factors such undercapitalization and common names between entities do "not

59

affect whether each has sufficient contacts with the forum for jurisdictional purposes.").

Notably, while Appellees occasionally suggest Preston "controls" certain entities, with the exception of JK Claims (discussed below), Appellees *never* allege nor present any evidence that the various entities Preston represented in his contacts with Texas were Preston's alter ego. Mere status as an officer, director or majority shareholder of an entity alone is insufficient to support a finding of alter ego. *Tryco Enter., Inc. v. Robinson*, 390 S.W.3d 497, 525 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd). Yet nearly all of Preston's alleged Texas contacts relate to business trips to Texas *on behalf of* entities for whom Preston was a director or manager:

Business trips with a nonprofit and MMT in the 1990s. Appellees never allege the nonprofit or MMT were alter-egos of Preston's, or that Preston committed any torts on his trips that would give rise to jurisdiction over Preston in his personal capacity. CR 288–89 (Tab 4); CR 87 ¶ 5 (Tab 1). Preston's 1990s-era Texas trips or Texas-related projects on behalf of the nonprofit and MMT do not constitute contacts supporting general jurisdiction over Preston as a matter of law.

Business trips with C Change between 2008–2011.[23]   With C Change, Preston allegedly visited Texas in November 2008 with Read to attend a meeting with Collins and Sydow; in "2009 or early 2010" with Read regarding a joint venture with MIT and Russian technology partners; and four other times between 2009–2011 for one-day business trips.  CR 319 at 25:3–28:21, 323 at 49:13-24, 335–48 (Tab 4); CR 672–73 ¶¶ 5–6 (Tab 6).  Appellees do not dispute that Preston took these trips in his representative capacity on behalf of C Change.  CR 262–64 (Tab 4).  Nor do Appellees allege that C Change is an alter ego of Preston's, or that Preston committed fraud or any other tort in the course of his contacts with Texas through C Change.  Preston's Texas trips on behalf of C Change between do not constitute contacts supporting general jurisdiction as a matter of law.

Business trip in 2010 to testify regarding NC12 in divorce proceeding.  It is undisputed that Preston traveled to Texas on October 6, 2010 to testify about NC12's assets and operations in Sydow's divorce proceeding.  CR 331–70 (Tab 4). While Appellees complain that the hearing transcript does not say "corporate representative," it is indisputable that Preston's testimony exclusively concerned NC12 assets and NC12's financial operation.  *See* CR 357 (discussing purpose of Preston's testimony as whether Sydow or NC12 owned a particular asset, or

---

[23] Preston's alleged 2004 contacts with Collins are discussed together in the next subsection. *See* section V.C.2(c), *infra*.

whether Sydow was receiving money from NC12). The transcript contains no questions whatsoever regarding Preston's personal relationship with Sydow—or indeed, anything other than NC12 financial operations and NC12 assets. CR 331–70 (Tab 4).

Even if Preston had testified in his personal capacity, it would not be evidence of purposeful availment of the benefits of acting in Texas. Preston did not file for divorce in Texas, Sydow did. *See Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 227 (Tex. 1991) ("the contact must have resulted from the nonresident defendant's purposeful conduct and not the unilateral activity of the plaintiff or others"). *See also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417–18, 104 S. Ct. 1868, 1873 (1984) (the "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."); *Kulko v. Cal. Super. Ct.*, 436 U.S. 84, 93, 98 S. Ct. 1690, 1697 (1978) (holding it arbitrary to subject one parent to suit in any state where other parent chooses to spend time while having custody of child).

One isolated trip to give testimony in a divorce proceeding is no evidence of any continuous and systematic relationship with Texas. Preston's October 6, 2010 business trip does not support general jurisdiction.

Business trip with TEM Capital. Again, there is no dispute that Preston made his May 2–4, 2011 trip to Texas to attend a foreclosure sale and inspect a cement plant in connection with that sale as a representative of TEM Capital. CR 673 ¶ 7 (Tab 6); CR 349–51 (Tab 4). And again, there is simply no allegation, much less any evidence, that TEM Capital is an alter ego of Preston's or that Preston did anything tortious on his trip that would support individual jurisdiction over him.

In sum, not a single one of Preston's business trips support general jurisdiction over Preston individually.

### c) 2004: Business trips, phone calls, and shipment of records with Quantum.

While Collins disputes whether Preston acted as a representative of Quantum during their 2004 interactions,[24] there is no dispute that these 2004 contacts pertained to the development of MMT's patented CEP technology. CR 408–09 ¶¶ 3–9 (Tab 4); CR 673 ¶¶ 6–8 (Tab 6). The intervenors affirmatively assert that Quantum, not Preston, acquired MMT's CEP technology in 1999 and that Quantum, not Preston, licensed the CEP patents CR 115–16 ¶¶ 48, 50 (Tab 2).

---

[24] Preston's sworn declaration states that all his interactions with Collins during this time period were as a representative of Quantum. CR 673 ¶ 8 (Tab 6). Collins claims he believed Preston to be operating in his personal capacity, rather than as a representative of Quantum during these 2004 meetings and communications. CR 408–09 ¶¶ 3–9, 11 (Tab 4).

While intervenors allege Quantum is "controlled" by Preston, there are no allegations or evidence that Quantum is Preston's alter ago. *See, e.g.,* CR 115 ¶ 48 (Tab 2); CR 673 ¶ 10 (Tab 6) (Preston is one of 21 shareholders of Quantum). There are no allegations or evidence, for example, that Preston comingled his funds with Quantum, or personally diverted Quantum's assets, or used Quantum's corporate form for his personal benefit. Despite Collins' claims about his beliefs, there is no evidence Preston was acting in anything other than his representative capacity in his dealings with Collins in 2004, and there are no allegations that Preston committed any tortious acts in the course of these 2004 dealings.

Moreover, none of the alleged 2004 contacts indicate Preston *purposefully* availed himself of the privileges of acting within Texas. Even if Preston were acting in his individual capacity, nothing indicates that Collins' state of residence was anything but incidental. Collins, not Preston, chose to reside in Texas. *See Guardian Royal Exch.*, 815 S.W.2d at 227; *Helicopteros*, 466 U.S. at 417–18; *Kulko,* 436 U.S. at 93.

Even if these limited 2004 contacts—three trips, some telephone calls, and one shipment of technical records—were included in a general jurisdiction analysis, they hardly support the continuous and systematic contacts necessary to give rise to general jurisdiction. *See Helicopteros*, 466 U.S. at 417–18.

### d) 2006: Metal Catalyst Ventures' designation of business address at TSI address

The fact that an unrelated individual listed TSI's Texas office address as Preston's address on a Nevada document regarding a Nevada corporation is not minimum contact with Texas, much less one that would support general jurisdiction. CR 315, 281 (Tab 4); CR 673 ¶ 9 (Tab 6). *See Guardian Royal Exch.*, 815 S.W.2d at 227; *Helicopteros*, 466 U.S. at 417–18; *Kulko,* 436 U.S. at 93.

### e) 2008: Personal check

Appellees present no evidence regarding the context surrounding the personal check Preston allegedly wrote to BOS, Inc., a Turks and Caicos corporation. CR 387 (Tab 4); CR 25 ¶ 2. Certainly, they present no explanation as to why Preston would know the foreign entity had a Texas bank account, or how Preston could be said to have purposefully availed himself of benefits of doing business in Texas by writing a check to such an entity. *Guardian Royal Exch.*, 815 S.W.2d at 227; *Helicopteros*, 466 U.S. at 417–18; *Kulko,* 436 U.S. at 93. This is not the type of purposeful, continuous, and systemic contact with Texas that gives rise to general jurisdiction.

### f) 2012: Alleged alter-ego JK Claims' purchase of litigation claims in the Kaiser Litigation

As a matter of law, Preston's alleged Texas contacts in connection with JK Claims occur too late to qualify for a general jurisdiction analysis in this case. *PHC-Minden*, 235 S.W.3d at 169 ("the relevant period ends at the time suit is filed.") (Tab 10). Not only do Appellees fail to establish that JK Claims is an alter ego of Preston's, most significantly, they ignore the damning fact that the earliest of JK Claims' alleged activities, its application for name reservation with the Texas Secretary of State, dates back to June 2012. CR 417, 527 (Tab 6). This is over a year after the original plaintiffs filed suit, and nearly a year after Appellees themselves filed their suit in intervention. CR 6; CR 102 (Tab 2).

Appellees' convoluted alter-ego story amounts to nothing more than an allegation that JK Claims kept poor records. Appellees fail entirely to establish JK Claims as an alter ego of Preston's. Preston's declaration and Sydow's deposition testimony are unrefuted and establish that Quantum is the sole owner of JK Claims. CR 432, 495 at 57:2–3, 498 at 66:19–67:20 (Tab 5); CR 673 ¶ 10 (Tab 6). Appellees do not allege that Quantum is an alter ego of Preston. Rather, Appellees simply assert that JK Claims is Preston's alter ego on the bases that: half of the funds for the Kaiser claims purchase came "from Boston" and half from Sydow; certain JK Claims corporate documents are unsigned; and certain JK Claims

corporate documents do not reflect the ownership of shares in JK Claims (though others do).  CR 415–24, 529–31 (Tab 5).

There is no evidence that Preston personally supplied any funds for JK Claims.  Rather, Sydow testified the funds came from Quantum.  CR 495 at 57:2–3, 498 at 66:19–67:20 (Tab 5).  And failure to comply with corporate formalities is not a factor in considering whether alter ego exists.  *Howell v. Hilton Hotels Corp.*, 84 S.W.3d 708, 714 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

There is no evidence that Preston comingled his personal debts or assets with JK Claims or any of the others indicia of an alter ego entity.  There is *no* evidence that Preston personally funded the acquisition of the Kaiser litigation and no evidence that the bankruptcy trustee would have objected if he had.[25]  There is no *evidence* that Preston (or JK Claims or Quantum) did anything improper with respect to JK Claims' formation, or its acquisition or management of the Kaiser claims.  TEX. R. CIV. P. 120a(3) (requiring the trial court to consider the pleadings and the evidence, not speculation and inference).

---

[25] Appellees rely heavily on documents produced in the Kaiser litigation showing discussions between JK Claims' counsel and the bankruptcy trustee's counsel, Gretchen McCord, in connection with the sale.  CR 421–24 (Tab 5) (referencing "Ex. I," at CR 548–80).  While one half of the source of the funding is unclear, the other half is explicitly from Sydow.  CR 564 (Tab 5).  If the trustee objected to a defendant in the Kaiser litigation funding JK Claims' acquisition of the Kaiser claims, the trustee would have objected to Sydow, who was also a defendant in the Kaiser litigation.  CR 432 (Tab 5).

Therefore, even if the alleged JK Claims activity were *not* too late to support jurisdiction of a matter of law, there would still be insufficient evidence to support any finding that JK Claims was Preston's alter ego. *Serv. Corp. Intern. v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011) (evidence is legally insufficient if there is there is a complete absence of evidence of a vital fact, or the evidence offered to prove a vital fact is no more than a mere scintilla); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965) (evidence is factually insufficient if it is so weak that the finding should be set aside).

3. *Preston lacks any substantial, continuous, or systematic contact that would render him at "at home" in Texas.*

Standing against these tenuous Texas contacts are the following facts: Preston has not lived in Texas since his infancy; has never done business in Texas in his individual capacity; has never maintained an office in Texas; has never engaged in any routine sales or other profit-making activities in Texas; does not rent, own, or possess any real or personal property in Texas; has never taken out a loan in Texas or guaranteed a debt owed to a Texas resident; does not maintain a telephone, post office box, or other address in Texas; does not employ any persons who live in or regularly travel to Texas for work; and has never incurred or paid taxes in Texas. CR 86–89 ¶¶ 2–14, 74–85 (Tab 1). An out-of-state defendant who merely does business with Texas businesses or customers will not be subject to general jurisdiction if he does not have a lasting physical presence in the state.

*Access Telecom, Inc. v. MCI Telecom. Corp*., 197 F.3d 694, 717 (5th Cir. 1999). Preston indisputably does not.

The Texas and United States Supreme Courts have made clear that brief, sporadic trips to a forum state are insufficient to create general jurisdiction, particularly when they are made in a representative capacity. *PHC-Minden*, 235 S.W.3d at 170 (Tab 9); *Ashdon, Inc. v. Gary Brown & Assocs., Inc*., 260 S.W.3d 101, 113 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (Florida business owner's 20+ sales meetings in Texas over 13-year period insufficient to establish general jurisdiction); *Waterman Steamship*, 355 S.W.3d at 406 (18 port calls over a seven-year period "is better characterized as sporadic rather than 'continuous and systematic' contacts").

In *Helicopteros*, the United States Supreme Court overturned the Texas Supreme Court, holding that because Helicol lacked any place of business in Texas, lacked a license to do business in Texas, took only sporadic trips to Texas through its CEO and employees, purchased products in Texas, and accepted checks drawn on Texas bank accounts, Helicol's Texas contacts were insufficient for general personal jurisdiction. *Helicopteros*, 466 U.S. at 416–19.

By contrast, in *Perkins v. Benguet Consol. Mining Co.,* the nonresident defendant's mining properties were located in the Philippines, but its operations were stopped by the Japanese occupation of the islands. 42 U.S. 437, 446–49, 72

69

S. Ct. 413, 419–20 (1952). During the occupation, the president and general manager returned to his home in Ohio and operated his business from there. *See id.* The United States Supreme Court determined that the company's Ohio contacts supported a finding of general jurisdiction because the company's president and general manager maintained an Ohio office, maintained company files in Ohio, corresponded from Ohio, drew and distributed salary checks from his Ohio office, used two Ohio bank accounts for company funds, had an Ohio bank act as transfer agent for the company's stock, held directors' meetings in Ohio, and supervised company Philippines property from Ohio. *Id.*

Preston's brief, sporadic, and representative contacts with Texas do not approach the level of forum contacts in *Helicopteros*, much less those in *Perkins*. Preston's forum contacts are not so substantial that Preston "should have reasonably expected to be sued in Texas on any matter, however remote" from those contacts. *Johnston v. Multidata Sys. Intern. Corp.*, 523 F.3d 602, 613 (5th Cir. 2008). There is no basis for general jurisdiction over Preston as a matter of law.

## VI.   CONCLUSION AND PRAYER

Appellees, disgruntled out-of-state investors in TSI and NC12, have not demonstrated why Texas courts should entertain their claims seeking to recover their lost investment against a Massachusetts resident who is not alleged to have

done *anything* in Texas connected to their claims.  Appellees failed to meet their initial pleading burden, and there is no basis for the exercise of specific or general jurisdiction.  Therefore, Preston requests that this Court reverse the trial court's order overruling his special appearance, render a judgment granting his special appearance, and order that he be dismissed from the lawsuit.

Respectfully submitted,

**AHMAD, ZAVITSANOS, ANAIPAKOS,**
**ALAVI & MENSING, P.C.**

By: ___*/s/ Jane Langdell Robinson*_____
Jane Langdell Robinson
Texas Bar No. 24062970
Monica Uddin
Texas Bar No. 24075195
Jamie A. Aycock
Texas Bar No. 24050241
1221 McKinney Street, Suite 3460
Houston, Texas  77010
Telephone: 713-655-1101
Fax: 713-655-0062

**ATTORNEYS FOR APPELLANT**
**JOHN T. PRESTON**

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface and word-count requirements set forth in the Rules of Appellate Procedure. This brief has been prepared, using Microsoft Word, in 14-point Times New Roman font for the text and 12-point Times New Roman font for any footnotes. This brief contains 14,507 words, as determined by the word count feature of the word processing program used to prepare this document, excluding those portions exempted by TEX. R. APP. P. 9.4(i)(1).

*/s/ Jane Langdell Robinson*
Jane Langdell Robinson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this document was served on all counsel of record in this case, identified below, on June 12, 2015, by the electronic filing manager and/or via email:

Kelley M. Keller
State Bar No. 11198240
kkeller@ellison-keller.com
Tracey N. Ellison
State Bar No. 15054720
ELLISON KELLER
5120 Woodway Dr., Suite 6019
Houston, Texas 77056
Telephone: 713-266-8200
Fax: 713-266-8201
***Attorneys for Appellees Emjo Investments, Ltd. and H.J. von der Goltz***

F. Eric Fryar
State Bar No. 07495770
eric@fryarlawfirm.com
Matthew Buschi
State Bar No. 24064982
mbuschi@fryarlawfirm.com
Christina Richardson
FRYAR LAW FIRM, P.C.
State Bar No. 24070495
912 Prairie, Suite 100
Houston, Texas 77002-3145
Fax: 281-605-1888
***Attorneys for all Intervenors/ Plaintiffs***

Asher Griffin
Chris Sileo
Sean Flammer
SCOTT, DOUGLASS & MCCONNICO, LLP
600 Congress Ave., Ste 1500
Austin, Texas 78701-2589
Fax: 512-474-0731
***Attorneys for Appellees Chalsys, MET, and Lo***

 */s/ Jane Langdell Robinson*
Jane Langdell Robinson

4834-5746-0004, v. 7

# TAB 1

CAUSE NO. 2011-44058

| | | |
|---|---|---|
| MICHAEL COLLINS, ELLEN COLLINS, | § | IN THE DISTRICT COURT OF |
| BOS, INC., ENVEN, INC., | § | |
| METAL CATALYST VENTURES, INC., | § | |
| FALL RIVER REALTY, LTD., | § | |
| M. SAMEER AHMED, AND | § | |
| TSBC SOUTH TEXAS INVESTORS, L.P., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| MICHAEL SYDOW, JOHN T. PRESTON, | § | |
| CHRISTOPH HENKEL, C. CHANGE | § | |
| INVESTMENTS, LLC, SONIA LO, CHALSYS | § | |
| CAPITAL PARTNERS, L.L.P., | § | |
| BRILLIANT NOVELTY, L.L.C., | § | |
| and MELIORA ENERGY | § | |
| TECHNOLOGIES, S.A.R.L., | § | |
| | § | |
| Defendants. | § | 215TH JUDICIAL DISTRICT |

### DEFENDANT JOHN T. PRESTON'S AMENDED SPECIAL APPEARANCE AND, SUBJECT THERETO, ORIGINAL ANSWER

Pursuant to Texas Rule of Civil Procedure 120a, Defendant John T. Preston ("Preston") files this Amended Special Appearance, and Subject Thereto, Original Answer, objecting to this Court's personal jurisdiction over him, and in support states as follows:

### PRESTON'S SPECIAL APPEARANCE

1.      Plaintiffs have sued eight defendants in Texas even though there is no basis for personal jurisdiction over all of them. Specifically, Preston does not belong in this lawsuit because he has not had contact with the state of Texas in his individual capacity in the past 60 years, nor has he ever done business in Texas in his individual capacity. Preston's limited contacts with Texas have been made on behalf of companies for which he is a director. The contacts of these companies cannot be imputed to Preston to subject him to personal jurisdiction

1

74

in Texas. Thus, Preston does not have the requisite minimum contacts required by Texas and federal law to exercise personal jurisdiction over him. Similarly, because Preston has had no contact with Texas in the past 60 years, subjecting him to the jurisdiction of a Texas court would not comport with notions of fair play and justice. Therefore, Preston respectfully requests that this Court find that asserting jurisdiction over him in Texas is improper and dismiss all claims against him.

**Argument and Authorities**

**I.      Texas law requires that the exercise of personal jurisdiction be consistent with federal due process.**

2.      A Texas court may only exercise personal jurisdiction over a defendant if it would be consistent with federal constitutional requirements of due process. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991). The Texas long-arm statute authorizes the exercise of jurisdiction over nonresidents who are "doing business" in Texas, but this statute can only reach as far as the federal constitutional requirements of due process will allow. TEX. CIV. PRAC. & REM. CODE § 17.042; *Guardian Royal*, 815 S.W.2d at 226. Thus, Texas courts must look to due process requirements to determine if personal jurisdiction is proper. *Guardian Royal*, 815 S.W.2d at 226.

3.      Personal jurisdiction is consistent with due process if 1) the defendant has purposely established "minimum contacts" with Texas; and 2) the exercise of personal jurisdiction comports with "fair play and substantial justice." *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 772 (Tex. 1995); *Guardian Royal*, 815 S.W.2d at 226.

## II. Preston does not have the requisite minimum contacts with Texas to give rise to personal jurisdiction.

4. The essential goal of the minimum contacts test is to protect the defendant. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990). Thus, the defendant's minimum contacts must constitute a "substantial connection" between the defendant and Texas. *Guardian Royal*, 815 S.W.2d at 231. A defendant is not subject to jurisdiction if his Texas contacts are random, fortuitous or attenuated. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). Instead, to be subject to personal jurisdiction the defendant must have sufficient minimum contacts with Texas such that he could reasonably anticipate that his activities would subject him to the jurisdiction of a Texas court. *Nat'l Indus. Sand Ass'n*, 897 S.W.2d at 772.

5. Moreover, an individual defendant's contacts with Texas on behalf of a corporation or company cannot be the basis for personal jurisdiction over the person, absent a showing that the company is the alter ego of the individual defendant. *Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985) (applying Texas law in a diversity action and refusing to impute the company's jurisdictional contacts with Texas to the individual defendant who was president of the company); *Leon Ltd. v. Albuquerque Commons P'ship*, 862 S.W.2d 693, 708 (Tex. App.— El Paso 1993, no writ) (holding there was no personal jurisdiction over individual defendant after finding that the corporation was not his alter ego, and thus, jurisdiction over him could not be predicated upon jurisdiction over the corporation).

6. If a defendant has had purposeful minimum contacts with Texas, then he can be subject to specific or general jurisdiction. *Guardian Royal*, 815 S.W.2d at 227-28. Specific jurisdiction arises when: 1) the defendant "purposefully avails" himself of conducting activities in Texas; and 2) the cause of action "arises from or is related to those contacts or activities."

*Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). General jurisdiction arises if the defendant's contacts with Texas are so "continuous and systematic" that the defendant can fairly be said to be present in Texas. *Id.* at 227.

A. **Because Plaintiffs do not allege that Preston has had any contacts with Texas, Preston negates all bases for personal jurisdiction by establishing that he is a nonresident of Texas.**

7. The plaintiff has the initial burden of pleading sufficient allegations to bring the nonresident defendant within the provisions of the Texas long-arm statute. *C-Loc Retention Sys., Inc. v. Hendrix*, 993 S.W.2d 473, 476 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *Frank A. Smith Sales, Inc. v. Atlantic Aero, Inc.*, 31 S.W.3d 742, 747 (Tex. App.—Corpus Christi 2000, no pet.) (holding that because the petition stated only that defendant had committed acts of negligence, without specifying where the acts occurred or alleging that they were committed in Texas, the petition "fell well short of pleading sufficient allegations to show jurisdiction in Texas").

8. At his special appearance, the defendant bears the burden of negating all bases of personal jurisdiction. *C-Loc Retention Sys., Inc.*, 993 S.W.2d at 476 (citing *Nat'l Indus. Sand Ass'n*, 897 S.W.2d at 772). But, if the plaintiff does not plead that the defendant committed any act in Texas, the defendant can negate all bases of personal jurisdiction by presenting evidence that he is a nonresident. *C-Loc Retention Sys., Inc.*, 993 S.W.2d at 476; *Hotel Partners v. KPMG Peat Mearwick*, 847 S.W.2d 630, 634 (Tex. App.—Dallas 1993, writ denied).

9. In their First Amended Petition ("Petition"), Plaintiffs do not plead that Preston committed any acts in Texas nor do they make any specific allegations that Preston engaged in business in Texas. Instead, in the Statement of Facts, Plaintiffs state that Preston "wrote a check to BOS" and that BOS later returned this amount to Preston. *See* First Am. Pet. ¶ 25. Plaintiff

BOS, Inc. is a Turks and Caicos corporation. *See* First Am. Pet. ¶ 2. Thus, Plaintiffs merely allege that Preston transacted with a foreign corporation and do not allege that this activity occurred in Texas. Thus, this act cannot constitute "doing business" in Texas. TEX. CIV. PRAC. & REM. CODE § 17.042.

10. Plaintiffs also allege that Preston "engineered the transfer of assets and liabilities" from Texas Syngas, Inc. ("TSI") to NC12, Inc. *See* First Am. Pet. ¶ 28. TSI is a Nevada corporation. *See* First Am. Pet. ¶ 21. NC12, Inc. is also a Nevada corporation. Exh. A, Preston Aff. at 2. Thus, Plaintiffs only allege that Preston transferred assets between two Nevada corporations – an act that also does not involve Texas, much less constitute "doing business" in Texas.

11. Plaintiffs allege that Preston removed Plaintiff Michael Collins as a director of NC12, Inc. and that he, along with other defendants, "systematically strip[ped] NC12 of its assets and transfer[ed] the assets" to a company in Luxembourg. *See* First Am. Pet. ¶ 30. Plaintiffs present no evidence or allegations that these acts occurred in Texas or that Preston committed any of these acts in Texas.

12. Moreover, Plaintiffs summarily state in the "Parties" and "Jurisdiction" sections of the Petition that the Preston and the other defendants have engaged in or done business in Texas, without providing any basis for this statement or alleging any acts that constitute business in Texas. *See* First Am. Pet. ¶¶ 9, 16.

13. To meet their burden of pleading a sufficient basis for personal jurisdiction, Plaintiffs must allege Preston committed a specific act in Texas. *See Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434 (Tex. 1982) (finding no personal jurisdiction over nonresident defendants because there were no allegations of specific acts in Texas). Thus, Plaintiffs' petition

falls "well short of pleading sufficient allegations to show jurisdiction in Texas." *Frank A. Smith Sales, Inc.*, 31 S.W.3d at 747.

14.    Because Plaintiffs have not pled that Preston committed any act in Texas, Preston can negate all bases of personal jurisdiction by presenting evidence that he is a nonresident of Texas. *C-Loc Retention Sys., Inc.*, 993 S.W.2d at 476; *Temperature Sys., Inc. v. Bill Pepper, Inc.*, 854 S.W.2d 669, 673 (Tex. App.—Dallas 1993, writ dism'd by agr.) (holding that proof that a defendant is a nonresident is sufficient to meet the defendant's burden of negating jurisdiction when a plaintiff pleads only conclusory jurisdictional allegations in the petition).

15.    Preston is indeed a nonresident of Texas; he is a resident of Massachusetts. Exh. A, Preston Aff. at 3. Thus, Preston has negated all bases for personal jurisdiction and has satisfied his burden regarding his special appearance. *Temperature Sys., Inc.*, 854 S.W.2d at 673. This Court should therefore grant Preston's special appearance and dismiss all claims against him.

B.    <u>Preston has not purposely availed himself of conducting activities in Texas to give rise to specific jurisdiction.</u>

16.    Even if Plaintiffs had alleged that Preston committed acts in Texas, he is not subject to specific jurisdiction because he has not purposefully availed himself of conducting activities in Texas. Specific jurisdiction arises when: 1) the defendant "purposefully avails" himself of conducting activities in Texas; and 2) the cause of action "arises from or is related to those contacts or activities." *Kelly*, 301 S.W.3d at 658.

17.    Preston has never done business in Texas in his individual capacity. Exh. A, Preston Aff. at 4. He has not travelled to or visited Texas in his individual capacity in the past 60 years. *Id.*

18.     Preston has only had limited contacts with Texas, and all of these contacts were made in his representative capacity and on behalf of a company for which he was a board member, director or a principal. *Id.* at 5, 6.  Specifically, Preston visited Texas approximately 8 times 20 years ago, as a representative board member for two different companies. *Id.* at 5.  In the late 1980's, Preston attended no more than 5 board meetings in Texas as a representative and board member of a nonprofit organization. *Id.* at 5.  In the early 1990's, Preston attended no more than 3 board meetings in Texas as a representative of a Delaware company of which he was a board member. *Id.* at 5.

19.     In the past 5 years, Preston has visited Texas a very limited number of times, and again only as a representative and on behalf of a company for which he was a director or principal. *Id.* at 6.  Preston visited Texas approximately 3 times in the past 5 years on behalf of TEM Capital, a company for which he is managing partner. *Id.* at 6.  These visits consisted of touring facilities in which TEM Capital invests. *Id.* at 6.  Preston's only other activity in Texas has been to appear as a witness in Michael Sydow's divorce proceedings in 2010. *Id.* at 6.  He appeared as a representative of NC12, Inc. and testified regarding an asset (a building) owned by NC12, Inc. *Id.* at 6.

20.     Preston's contacts with Texas on behalf of these companies cannot be the basis for personal jurisdiction over him absent a showing that these companies are his alter egos. *Stuart*, 772 F.2d at 1197; *Leon Ltd.*, 862 S.W.2d at 708.  Plaintiffs do not, and cannot, allege that any of the companies that Preston has travelled to Texas on behalf of are his alter egos.  Thus, none of the visits or contacts with Texas that Preston has had with Texas in the past 60 years can be attributed to him for jurisdictional purposes.

21.    Other than these limited contacts with Texas on behalf of these companies, Preston has had no other contacts with Texas. Preston has never maintained an office in Texas, and has never employed any person or company located in Texas. *Id*. at 8. Preston has never been engaged in routine sales or other profit making activities in Texas. *Id*. Preston does not maintain a registered agent on whom service of process can be made in Texas. *Id*. Other than engaging defense counsel in the present action, Preston has never entered into any contracts in Texas: with any Texas residents, any contracts calling for performance in Texas, or any contracts that contain a mandatory venue provision in Texas. *Id*.

22.    Preston does not rent, own, or possess any real or personal property in Texas, nor does he hold a mortgage or other lien on any real or personal property in Texas. *Id*. at 9. Preston does not have any investments in Texas, and he has never taken out a loan in Texas or guaranteed any debt owed to a Texas resident. *Id*.

23.    Preston does not maintain a telephone listing, post office box, or registered address in Texas. *Id*. at 10. Preston does not employ any persons who reside in Texas, or who regularly travel to Texas in connection with their individual business. *Id*. at 11. Preston has never incurred or paid any taxes in Texas. *Id*. at 12.

24.    Except for this lawsuit, Preston has never been a party to litigation in any state or federal court in Texas. *Id*. at 13. Preston has never committed a tort in whole or in part in Texas. *Id*. at 14.

25.    Because Preston has had no contacts with Texas in the past 60 years that can be attributed to him personally, Preston cannot plausibly be found to have "purposefully availed" himself of conducting activities in Texas. Moreover, because Preston has not had contact with Texas in his individual capacity, Plaintiffs' alleged causes of action could not "arise from or be

related to" any contacts Preston had with Texas. Thus, Preston cannot be subject to specific jurisdiction in Texas.

C. Preston has not had any contacts with Texas to give rise to general jurisdiction.

26. Because Preston has had no contact with Texas in the past 60 years, he similarly does not have "continuous and systematic" contacts with Texas that would subject him to general jurisdiction. *Guardian Royal*, 815 S.W.2d at 227. To assert general jurisdiction over a defendant, usually the defendant must be engaged in longstanding business in Texas, such as regularly marketing or shipping products to Texas or maintaining one or more offices here. *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 168 (Tex. 2007). Less extensive activities will not qualify for general jurisdiction. *Id.* As stated in paragraphs 17 – 24 above, Preston has had no contact with Texas in the past 60 years; thus, there is no basis for general jurisdiction.

27. Moreover, Preston has not had sufficient minimum contacts with Texas such that he could reasonably anticipate being subject to the jurisdiction of a Texas court. *Nat'l Indus. Sand Ass'n*, 897 S.W.2d at 772. Due to a complete lack of contact with Texas in the past 60 years, Preston is not subject to either specific or general personal jurisdiction, and his special appearance should be granted. *Nat'l Indus. Sand Ass'n*, 897 S.W.2d at 776 (conditionally granting writ of mandamus and holding that trial court abused its discretion in denying a defendant's special appearance where the defendant lacked the minimum contacts necessary for the trial court to exercise either specific or general personal jurisdiction).

III. **Exercising jurisdiction over Preston would not comport with fair play and justice.**

28. Because of Preston's lack of contact with Texas, exercising personal jurisdiction over him would not comport "with traditional notions of fair play and substantial justice."

*Guardian Royal*, 815 S.W.2d at 228. Only after a court determines that a nonresident defendant has purposefully established minimum contacts with the forum state — and Preston has not — then the Court evaluates these contacts in light of other factors to determine whether the assertion of personal jurisdiction comports with fair play and justice. *Id.* These factors include: 1) the burden on the defendant, 2) the interests of the forum state in adjudicating the dispute, 3) the plaintiff's interest in obtaining convenient and effective relief, 4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and 5) the shared interest of the several States in furthering fundamental substantive social policies. *Id.*

29.    In addition to Preston not having minimum contacts with Texas, these 5 factors also dictate against the exercise of jurisdiction over Preston. As to the first factor, the burden to Preston in defending this case is substantial. Preston would be required to travel to Texas to attend court proceedings and stay there, perhaps for extended periods of time. Exh. A, Preston Aff. at 15. The costs and time associated with such travel are considerable. *Id.*

30.    As to factors 2 and 3, Texas has little interest in providing a forum to litigate any alleged injuries that occurred outside of Texas (First Am. Pet. ¶¶ 25, 28, 30, 31), and further, evidence in this litigation related to Preston is likely outside the subpoena power of a Texas court, which would greatly compromise Plaintiffs' ability to obtain convenient and effective relief. *Lonza AG v. Blum*, 70 S.W.3d 184, 193 (Tex. App.—San Antonio 2001, pet. denied) (holding that the exercise of long-arm jurisdiction would not comport with fair play and justice after noting that evidence existed outside the subpoena power of the court). Also, any interests of factors 4 and 5 do not outweigh the mandate from factors 1, 2, and 3 to not exercise jurisdiction over Preston.

31. Thus, this Court would offend traditional notions of fair play and substantial justice if it asserted jurisdiction over Preston, and further, would deprive Preston of due process. As such, Plaintiffs' claims against Preston should be dismissed. *Guardian Royal*, 815 S.W.2d at 233 (finding that it would offend traditional notions of fair play and justice to subject a nonresident defendant to personal jurisdiction in Texas because it would be burdensome for the defendant to submit to a foreign judicial system when the alleged acts occurred outside of Texas).

## SUBJECT TO SPECIAL APPEARANCE, PRESTON'S ORIGINAL ANSWER

Defendant John T. Preston, subject to and without waiver of his special appearance, files this Original Answer to Plaintiffs' First Amended Original Petition and shows the Court as follows:

### General Denial

Preston denies generally every allegation contained in Plaintiffs' petition and demands strict proof of the allegations in accordance with the Texas Rule of Civil Procedure and the Texas Constitution. Preston reserves the right to plead further and with greater particularity as this case progresses.

THEREFORE, Defendant John T. Preston respectfully requests that the Court dismiss Plaintiffs' claims against him, assess all costs against Plaintiffs, and grant him such other and further relief as is just and proper.

Respectfully submitted,

*/s/ Amir Alavi*
_____
Amir Alavi
State Bar No. 00793239
Ashley Frankson
State Bar No. 24059776
AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI &
MENSING P.C
3460 One Houston Center
1221 McKinney Street
Houston, Texas 77010
Telephone:    (713) 655-1101
Telecopier:   (713) 655-0062

ATTORNEYS FOR DEFENDANTS
MICHAEL SYDOW, JOHN T. PRESTON, C
CHANGE INVESTMENTS, LLC and BRILLIANT
NOVELTY, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of September, 2011, I sent by facsimile transmission, by first class mail, postage prepaid, or by email, a true and correct copy of the above and foregoing document to counsel as follows:

Randall O. Sorrels
Clyde J. "Jay" Jackson, III
800 Commerce Street
Houston, Texas  77002
Facsimile:  713-225-0827

Brent C. Perry
800 Commerce Street
Houston, Texas  77002
Facsimile:  713-237-0415

Asher Griffin
Chris Sileo
Scott, Douglass & McConnico, L.L.P.
600 Congress Avenue, Suite 1500
Austin, Texas 78701-2589
Facsimile: 512-474-0731

*/s/ Amir Alavi*
_____
Amir Alavi

| | | |
|---|---|---|
| MICHAEL COLLINS, ELLEN COLLINS, | § | IN THE DISTRICT COURT OF |
| BOS, INC., ENVEN, INC., | § | |
| METAL CATALYST VENTURES, INC., | § | |
| FALL RIVER REALTY, LTD., | § | |
| M. SAMEER AHMED, AND | § | |
| TSBC SOUTH TEXAS INVESTORS, L.P., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| MICHAEL SYDOW, JOHN T. PRESTON, | § | |
| CHRISTOPH HENKEL, C. CHANGE | § | |
| INVESTMENTS, LLC, SONIA LO, CHALSYS | § | |
| CAPITAL PARTNERS, L.L.P., | § | |
| BRILLIANT NOVELTY, L.L.C., | § | |
| and MELIORA ENERGY | § | |
| TECHNOLOGIES, S.A.R.L., | § | |
| | § | |
| Defendants. | § | 215TH JUDICIAL DISTRICT |

Filed 11 September 28 P2:44
Chris Daniel - District Clerk
Harris County
ED101J016518693
By: jeanetta spencer

## AFFIDAVIT OF JOHN T. PRESTON

| | |
|---|---|
| STATE OF MASSACHUSETTS | § |
| | § |
| COUNTY OF MIDDLESEX | § |

BEFORE ME, the undersigned official, on this day personally appeared John T. Preston, who is personally known to me, and who first being sworn by me, according to law, upon his oath deposed and stated the following:

1. My name is John T. Preston. I am over the age of 21. I have never been convicted of a felony or crime involving moral turpitude. I am of sound mind and am fully competent to make this affidavit.

2. I am a Director of NC12, Inc, a Nevada corporation. I have personal knowledge of all of the facts stated herein, and they are all true and correct now, and for all applicable time frames involving the Plaintiffs' allegations in this case.

3. I am a resident of Massachusetts. I am not a Texas resident.

4. I have never done business in Texas in my individual capacity. In the past sixty years, I have not travelled to or visited Texas in my individual capacity. As an infant, I lived in Texas for less than one year.

EXHIBIT A

86

5. I visited Texas a limited number of times approximately twenty years ago, and each of these visits was made in my representative capacity and on behalf of a company for which I was a board member. Specifically, in the 1990's, I attended no more than five board meetings in Texas as a representative and board member of a nonprofit organization. Also in the 1990's, I attended no more than three board meetings in Texas as a representative of a Delaware company of which I was a board member. These visits were not made by me in my individual capacity, but as a representative and board member of these companies.

6. In the past approximately five years, I have visited Texas a very limited number of times, and again only as a representative and on behalf of a company for which I was a director or principal. I visited Texas approximately three times in the past five years on behalf of TEM Capital, a company for which I am managing partner. These visits consisted of touring facilities in which TEM Capital invests. My only other activity in Texas has been to appear as a witness in Michael Sydow's divorce proceedings in 2010. I appeared as a representative of NC12, Inc. and testified regarding an asset (a building) owned by NC12, Inc.

7. Any board meetings I have attended related to NC12, Inc. have occurred in Massachusetts.

8. I am employed outside of Texas, have never maintained an office in Texas, and have never been employed by any person or company located in Texas. I have never been engaged in routine sales or other profit making activities in Texas, and I do not own any private Texas business. I am not required to nor do I maintain a registered agent on whom service of process can be made in Texas. Other than engaging defense counsel in the present action, I have never entered into any contracts individually in Texas: with any Texas residents, any contracts calling for performance in Texas, or any contracts with a mandatory venue provision in Texas.

9. I do not rent, own, or possess any real or personal property in Texas, nor do I hold a mortgage or other lien on any real or personal property in Texas. I do not have any investments or assets in Texas, and I have never taken out a loan in Texas or guaranteed any debt owed to a Texas resident.

10. I do not maintain an individual telephone listing, post office box, or registered address in Texas.

11. I do not employ any persons who reside in Texas, or who regularly travel to Texas in connection with their individual business.

12. I have never personally incurred or paid any taxes in Texas or filed a personal tax return in Texas.

13. Except for this lawsuit, I have never been a party to litigation in any state or federal court in Texas.

14. I have never committed a tort in whole or in part in Texas.

15. If this lawsuit were allowed to continue in Texas, I would be forced to travel to Texas and stay there, perhaps for extended periods of time. The costs and time associated with such travel are considerable. As a result, there would be numerous practical and logistical problems associated with defending Plaintiffs' claims in Texas. Under the circumstances, the continued prosecution of Plaintiffs' claims against me in Texas will be unduly burdensome, extremely difficult, very time consuming, and expensive.

Further, affiant sayeth not.

_____
John T. Preston

Sworn to and subscribed before me this 26 day of September, 2011.

_____
Notary Public in the State of Massachusetts



KATHERINE B. FRISINA
Notary Public
Massachusetts
Commission Expires May 6, 2016

# TAB 2

**Cause No. 2011-44058**

| | | |
|---|---|---|
| MICHAEL COLLINS, ET AL., | § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § | |
| | § | |
| vs. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| MICHAEL SYDOW, ET AL., | § | |
| DEFENDANTS. | § | 215th JUDICIAL DISTRICT |

| | | |
|---|---|---|
| AKILA FINANCE, S.A.; BOSQUES DEL MOLINO, | § | IN THE DISTRICT COURT |
| S.A.; CENTRANS ENERGY SERVICES, INC.; | § | |
| CHESTER MESTER HOLDINGS, LTD.; DELTEC | § | |
| BANK & TRUST, LTD.; EMJO INVESTMENTS, | § | |
| LTD.; WILLIAM END; EVANS & PETREE 401K | § | |
| PLAN; FIRST BAY INTERTRADE; GM PARTNERS; | § | |
| MARAIR CORP.; W.L. NICHOL, IV; | § | |
| PANORAMA INVESTMENT, LTD.; PC01 | § | |
| VERMOEGENS VERW.; ALEJANDRO SANTO | § | |
| DOMINGO; SINCHI INVESTMENT; VENTURI | § | |
| GLOBAL INVESTMENTS, LTD., and H.J. VON DER | § | |
| GOLTZ, | § | |
| INTERVENORS/PLAINTIFFS, | § | |
| | § | |
| vs. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| MICHAEL SYDOW; JOHN PRESTON; CHRISTOPH | § | |
| HENKEL; C CHANGE INVESTMENTS, L.L.C.; | § | |
| CHALSYS CAPITAL PARTNERS, L.L.P.; SONIA | § | |
| LO; BRILLIANT NOVELTY, L.L.C.; OSCURA, INC.; | § | |
| MELIORA ENERGY TECHNOLOGIES, S.à.r.l; and | § | |
| FALL RIVER REALTY, LTD., | § | |
| DEFENDANTS. | § | 215th JUDICIAL DISTRICT |

## ORIGINAL PETITION IN INTERVENTION

TO THE HONORABLE DISTRICT COURT:

COME NOW Intervenors Akila Finance, S.A., Bosques del Molino, S.A., Centrans Energy Services, Inc., Chester Mester Holdings, Ltd., Deltec Bank & Trust, Ltd., Emjo Investments, Ltd., William End, Evans and Petree 401K Plan, First Bay Intertrade, GM Partners, Marair Corporation, W.L. Nichol, IV, Panorama Investment, Ltd., PC 01 Vermoegens Verw.,

102

Alejandro Santo Domingo, Sinchi Investment, Venturi Global Investments, Ltd., and H.J. von der Goltz, and file this Original Petition in Intervention to intervene as parties plaintiff in this action, and in support thereof, would show the Court the following:

## I. Nature of This Action

1.      This is a fraud and shareholder oppression action. Intervenors are minority shareholders of NC12, Inc., a Nevada corporation headquartered in Houston, Texas. Intervenors assert claims and seek remedies based solely on their individual rights. It now appears that the entire corporate enterprise of NC12 was a massive fraudulent scheme perpetrated by John Preston, Michael Sydow, and others who conspired with them. The story begins with a multi-million dollar research facility and a technology portfolio created with investor dollars by another Preston company in the 1990s. When that company failed and went bankrupt, its investors lost everything. Preston purchased the assets out of the bankruptcy for a fraction of their value and sold some of the acquired intellectual property later to NC12's corporate predecessor—a company founded by Sydow and Michael Collins and later controlled by Sydow and Preston.

2.      Between late 2007 and early 2010, Intervenors invested more than $11 million in NC12 and its corporate predecessor, Texas Syngas. This money was squandered and misappropriated by Sydow and Preston. When the NC12 Board of Directors attempted to stop the mismanagement and theft, Defendants proceeded to eliminate all independent oversight on the board of directors by removing Mr. H.J. von der Goltz and Dr. Aydin Muderrisoglu as directors. Defendants then divested the corporation of its principal assets: the research facility worth millions of dollars and the patented technology worth hundreds of millions of dollars. These assets were sold for a fraction of their true worth to entities in which Defendants had personal interests. NC12 became a defunct shell and is now in bankruptcy.

103

3. Thus, the story ends much as it began. The shareholders are left with nothing but a bankrupt and empty shell. Preston and Sydow abused their control over the corporation, misappropriated the bulk of the value in the company for their own benefit, and Sydow, Preston, and their co-conspirators wind up with ownership of the technology and physical facilities. The shareholders, however, have nothing to show for their millions of dollars other than ownership of diluted stock in a worthless, bankrupt shell. Intervenors seek equitable relief from the Court as a result of Defendants' oppressive conduct, who constitute the controlling shareholders, the individuals who seized control of the NC12 Board of Directors on August 13, 2010, and those acting with them. Intervenors also seek monetary damages resulting from fraud and breaches of fiduciary duties owed directly to the shareholders by the directors and controlling shareholders and by those Defendants who aided, abetted, and conspired with them.

## II. Discovery Control Plan

4. Intervenors intend that discovery be conducted under Level 3.

## III. Parties

5. The Intervenors comprise two groups of investors in NC12. The "Shareholder Intervenors" invested $5,250,000 in cash from late 2007 until early 2008. These Intervenors were issued preferred shares in Texas Syngas, Inc., a Nevada corporation and the corporate predecessor of NC12. The "Note Holder Intervenors" invested $6,104,000 million from late 2009 until mid-2010. These Intervenors were issued promissory notes that were automatically convertible into common shares if at least a $5 million additional investment was obtained from an investor by September 30, 2010. In late 2009, Texas Syngas, Inc. was liquidated, and all of its assets and liabilities were assumed by NC12, Inc. The Texas Syngas, Inc. preferred shares were exchanged for common stock in NC12. The Convertible Notes were assumed by NC12. On

104

September 28, 2010, the Note Holder Intervenors were informed that their promissory notes had converted into common shares. Therefore, all Intervenors are currently common shareholders of NC12, Inc.

**A. Shareholder Intervenors**

6.     Intervenor Akila Finance, S.A. is a Luxembourg corporation with its principal place of business located in Luxembourg. Akila Finance, S.A. invested $2,500,000 on or about December 19, 2007, and received preferred shares in Texas Syngas, Inc., which were exchanged for common shares in NC12. Intervenor Akila Finance, S.A. further invested $500,000 on April 30, 2010, for which equity was supposed to be issued; however, no shares were issued, and NC12 treated Akila Finance, S.A. as a note holder.

7.     Intervenor Centrans Energy Services, Inc. is a Grand Cayman corporation with its principal place of business located in Guatemala. Centrans Energy Service, Inc. invested $1 million on or about January 3, 2008, and received preferred shares in Texas Syngas, Inc., which were exchanged for common shares in NC12.

8.     Intervenor Emjo Investments, Ltd. is a British Virgin Islands corporation, whose principal place of business is located in Panama. Emjo Investments, Ltd. invested $500,000 in January 2008 and $400,000 in July 2008 and received preferred shares in Texas Syngas, Inc., which were exchanged for common shares in NC12. Emjo Investments, Ltd. also invested $200,000 in Texas Syngas, Inc. on September 15, 2009, and received a Convertible Note, which was assumed by NC12 and converted into NC12 common shares on September 28, 2010. Emjo Investments, Ltd. also invested an additional $160,000 in May 2010 and $100,000 in August 2010, for which demand notes were issued. Additionally, the following NC12 shareholders have assigned Emjo Investments, Ltd. their shares, claims, and causes of action: Dr. Aydin

Muderrisoglu, who invested $100,000 in Texas Syngas, Inc. and received preferred shares of Texas Syngas, Inc., which were exchanged for shares of NC12 common stock; Ilona Graefin von Krockow, who invested $250,000 and received preferred shares of Texas Syngas, Inc., which were exchanged for shares of NC12 common stock; Dr. Lawrence Cohn, who invested $100,000 in Texas Syngas, Inc. on or about November 11, 2009, and received a Convertible Note, which was assumed by NC12 and converted into NC12 common shares on September 28, 2010; and Vendome Enterprises, Ltd., a British Virgin Islands corporation, which invested $250,000 and received preferred shares in Texas Syngas, Inc. that were exchanged for common shares in NC12.

9.     Intervenor PC 01 Vermoegens Verw. is a German corporation with its principal place of business located in Thumby, Germany. PC 01 Vermoegens Verw. invested $100,000 on or about December 12, 2007, and received preferred shares in Texas Syngas, Inc., which were exchanged for common shares in NC12.

10.    Intervenor Alejandro Santo Domingo is a natural person residing in New York, New York. Mr. Santo Domingo invested $250,000 on or about September 24, 2008, and received preferred shares in Texas Syngas, Inc., which were exchanged for common shares in NC12.

**B. Note Holder Intervenors**

11.    Intervenor Bosques del Molino, S.A. is a corporation with its principal place of business located in Guatemala. Bosques del Molino, S.A. invested $1,000,000 in NC12, Inc. on March 31, 2010, and received a Convertible Note, which was converted into NC12 common shares on September 28, 2010.

12.    Intervenor Chester Mester Holdings, Ltd. is a British Virgin Islands corporation with its principal place of business located in the British Virgin Islands. Chester Mester Holdings, Ltd.

106

invested $500,000 in NC12, Inc. on June 29, 2010, and received a Convertible Note, which was converted into NC12 common shares on September 28, 2010.

13.    Intervenor Deltec Bank & Trust, Ltd., is a Bahamian bank and trust corporation with its principal place of business located in the Bahamas. Deltec Bank & Trust, Ltd. invested $500,000 in Texas Syngas, Inc. and received a Convertible Note, which was assumed by NC12 and converted into NC12 common shares on September 28, 2010.

14.    Intervenor William End is a natural person residing in Montana. Mr. End invested $504,000 in NC12, Inc. on January 20, 2010, and received a Convertible Note, which was converted into NC12 common shares on September 28, 2010.

15.    Intervenor Evans & Petree 401K Plan (Evans & Petree 401K Plan FBO Woods Weathersby and Evans & Petree 401K Plan FBO W.L. Nichol IV) is a Tennessee trust with its principal place of business located in Tennessee, the beneficiaries of which are natural persons residing in Tennessee. Evans & Petree 401K Plan invested a total of $300,000 in NC12, Inc. on December 24, 2009, and received three Convertible Notes, which were converted into NC12 common shares on September 28, 2010.

16.    Intervenor First Bay Intertrade is a British Virgin Islands corporation with its principal place of business located in the British Virgin Islands. First Bay Intertrade invested $200,000 in NC12, Inc. on June 29, 2010, and received a Convertible Note, which was converted into NC12 common shares on September 28, 2010.

17.    Intervenor GM Partners is a Tennessee general partnership with its principal place of business located in Memphis, Tennessee. GM Partners invested $60,000 in NC12, Inc. on December 24, 2009, and received a Convertible Note, which was converted into NC12 common shares on September 28, 2010.

107

18.    Intervenor Marair Corporation is a Panamanian corporation with its principal place of business located in Guatemala. Marair Corporation invested $200,000 in Texas Syngas, Inc. on November 16, 2009, and received a Convertible Note, which was assumed by NC12 and converted into NC12 common shares on September 28, 2010.

19.    Intervenor W.L. Nichol, IV is a natural person residing in Memphis, Tennessee. Mr. Nichol invested $50,000 in NC12, Inc. on December 24, 2009, and received a Convertible Note, which was converted into NC12 common shares on September 28, 2010.

20.    Intervenor Panorama Investment, Ltd. is a Cayman Islands corporation with its principal place of business located in the Cayman Islands. Panorama Investment, Ltd. invested $300,000 in NC12, Inc. on December 30, 2009, and received a Convertible Note, which was converted into NC12 common shares on September 28, 2010.

21.    Intervenor Sinchi Investment is a Panamanian company with its principal place of business located in Panama. Sinchi Investment invested $1,000,000 in Texas Syngas, Inc. on or about September 15, 2009, and received a Convertible Note, which was assumed by NC12 and converted into NC12 common shares on September 28, 2010.

22.    Intervenor Venturi Global Investments, Ltd. is a Bahamian international business company with its principal place of business located in the Bahamas. Venturi Global Investments, Ltd. invested $300,000 in NC12, Inc. on December 30, 2009, and received a Convertible Note, which was converted into NC12 common shares on September 28, 2010.

23.    Intervenor H.J. von der Goltz is a natural person residing in Florida. Mr. von der Goltz invested $130,000 in March 2010, for which he received a promissory note from NC12.

24.    Shareholder Intervenors Akila Finance, S.A. and Emjo Investments, Ltd. are also Note Holder Intervenors, as alleged above.

108

## C. Plaintiffs in Original Action

25. Plaintiffs Michael Collins and Ellen Collins reside in The Woodlands, Texas.

26. Plaintiff BOS, Inc. is a Turks & Caicos corporation having its principal place of business in Harris County, Texas.

27. Plaintiff EnVen, Inc. is a Nevada corporation having its principal place of business in Harris County, Texas.

28. Plaintiff Metal Catalyst Ventures, Inc. is a Nevada corporation having its principal place of business in Harris County, Texas.

29. Plaintiff Fall River Realty, Ltd. is a foreign corporation with its principal place of business in Fall River, Massachusetts. Plaintiffs in the Original Action allege that Plaintiff Fall River is an entity in which Michael Collins is the largest shareholder. Intervenors have named as a defendant Fall River Realty, Ltd., an entity Intervenors believe is owned and controlled by Michael Sydow. It is not known presently whether these two entities are the same. All references to "Fall River Realty" in this Petition in Intervention hereafter refer only to the entity named as a defendant by Intervenors.

30. Plaintiff Sameer Ahmed is an individual residing in Edinburg, Texas.

31. Plaintiff TSBC South Texas Investors, L.L.P. is a Texas limited liability partnership having its principal place of business in Edinburg Texas.

## D. The Controlling Shareholder Defendants

32. Defendant Michael Sydow, an individual and a resident of the state of Texas, may be served with process at his place of employment: 1980 Post Oak Blvd., Suite 2100, Houston, Texas 77056. Sydow is a Houston attorney and businessman. Sydow was at all relevant times the CEO, secretary, and director of Texas Syngas, Inc., and then the president, CEO, and director of

NC12, and represented that he exercised control 69% of the common stock of NC12 as of August 13, 2010. Upon information and belief, Sydow is an officer and director of Defendant Fall River Realty, Ltd.; is a director of Defendant Meliora Energy Technologies, S.à.r.l; and is an officer and director of Defendant Oscura, Inc. Sydow is named as a defendant in the Original Action and has entered an appearance. All service will be through his counsel of record.

33.     Defendant John Preston, an individual and a resident of the state of Massachusetts, may be served with process by serving the Texas Secretary of State, 1019 Brazos St., Austin, Texas, 78701, as Defendant's agent for service of process because Defendant Preston has engaged in business in Texas but has not designated or maintained a resident agent for service of process in Texas. Tex. Civ. Prac. & Rem. Code § 17.044(b). Service may be forwarded to his place of employment: C Change Investments, L.L.C., One Main Street, 14th Floor, Cambridge, Massachusetts, 02142. Preston is an internationally known business leader and stock promoter. Preston was at various relevant times a director of Texas Syngas, Inc. and of NC12 as of August 13, 2010. Upon information and belief, Preston was also at all relevant times a manager of Defendant Brilliant Novelty, L.L.C.; a managing partner of Defendant C Change Investments, L.L.C., and a director of Defendant Meliora Technologies, S.à.r.l. Preston is named as a defendant in the Original Action and has entered an appearance. All service will be through his counsel of record.

34.     Defendant Christoph Henkel, an individual and citizen of Germany, may be served with process by serving the Texas Secretary of State, 1019 Brazos St., Austin, Texas 78701, as Defendant's agent for service of process because Defendant Henkel has engaged in business in Texas, but has not designated or maintained a resident agent for service of process in Texas. Tex. Civ. Prac. & Rem. Code § 17.044(b). Service may be forwarded to his residence at 2-4 Lambton

110

Place, London W11 2SH, Great Britain. At various relevant times, Henkel served on the board of directors of Texas Syngas, Inc. and later on the board of directors of NC12. Upon information and belief, Henkel is or has been a director of Defendant Meliora Technologies, S.à.r.l. Henkel is named as a defendant in the Original Action and has entered an appearance. All service will be through his counsel of record.

**E. The Conspiracy Defendants**

35.     Defendant C Change Investments, L.L.C. is a Delaware limited liability company with its principal place of business in the state of Massachusetts, and may be served with process by serving the Texas Secretary of State, 1019 Brazos St., Austin, Texas, 78701, as Defendant's agent for service of process because Defendant C Change has engaged in business in Texas but has not designated or maintained a resident agent for service of process in Texas. Tex. Civ. Prac. & Rem. Code § 17.044(b). Service may be forwarded to its registered agent Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808. Upon information and belief, C Change is controlled by Defendant Preston and is an equity owner of Defendant Meliora Technologies, S.à.r.l. C Change is named as a defendant in the Original Action and has entered an appearance. All service will be through its counsel of record.

36.     Defendant Chalsys Capital Partners, L.L.P. is a limited liability partnership organized under the laws of the United Kingdom with its principal office in London, England. Chalsys Capital Partners, L.L.P. may be served with process by serving the Texas Secretary of State, 1019 Brazos St., Austin, Texas, 78701, as Defendant's agent for service of process because Defendant Chalsys has engaged in business in Texas but has not designated or maintained a resident agent for service of process in Texas. Tex. Civ. Prac. & Rem. Code § 17.044(b). Service may be forwarded to its principal office located at 1 Regent St., London, SW1 4NS, United

Kingdom. Upon information and belief, Defendant Chalsys is an equity owner of Defendant Meliora Technologies, S.à.r.l. Chalsys is named as a defendant in the Original Action and has entered an appearance. All service will be through its counsel of record.

37. Defendant Sonia Lo is an individual residing in California. She may be served with process by serving the Texas Secretary of State, 1019 Brazos St., Austin, Texas, 78701, as Defendant's agent for service of process because Defendant has engaged in business in Texas but has not designated or maintained a resident agent for service of process in Texas. Tex. Civ. Prac. & Rem. Code § 17.044(b). Service may be forwarded to her place of business, Chalsys Capital Partners, LLP, 1 Regent St., London, SW1 4NS, United Kingdom. Upon information and belief, Defendant Lo controls Defendant Chalsys and is a director of Defendant Meliora Technologies, S.à.r.l. Lo is named as a defendant in the Original Action and has entered an appearance. All service will be through her counsel of record.

38. Defendant Brilliant Novelty, L.L.C. is a Massachusetts limited liability company with its principal place of business in Cambridge, Massachusetts. Brilliant Novelty may be served with process by serving the Texas Secretary of State, 1019 Brazos St., Austin, Texas 78701, as Defendant's agent for service of process because Defendant has engaged in business in Texas but has not designated or maintained a resident agent for service of process in Texas. Tex. Civ. Prac. & Rem. Code § 17.044(b). Service may be forwarded to its principal office, 75 Cambridge Pkwy. Ste. 100, Cambridge, Massachusetts 02142. Brilliant Novelty is named as a defendant in the Original Action and has entered an appearance. All service will be through its counsel of record.

39. Defendant, Meliora Energy Technologies, S.à.r.l, (MET) is a private limited liability company organized under the laws of the Grand Duchy of Luxembourg, with its principal place

112

of business in Luxembourg. Defendant MET may be served with process by serving the Texas Secretary of State, 1019 Brazos St., Austin, Texas 78701, as Defendant's agent for service of process because Defendant has engaged in business in Texas but has not designated or maintained a resident agent for service of process in Texas. Tex. Civ. Prac. & Rem. Code § 17.044(b). Service may be forwarded to its principal office, L-2540 Luxembourg, 15, rue Edward Steichen. R.C.S. Luxembourg B 155.708. Defendant MET may also be served through its officer and director, Michael Sydow, 1980 Post Oak Blvd., Suite 2100, Houston, Texas, 77056 and its director John Preston. Upon information and belief, Defendant MET is controlled by Sydow, Lo, and Preston and is owned 50% by Defendant C Change and 50% by Defendant Chalsys. MET is named as a defendant in the Original Action and has entered an appearance. All service will be through its counsel of record.

40.    Defendant Oscura, Inc. is a Delaware corporation whose principal office is located in Houston, Texas. Defendant Oscura may be served at its principal office, 4400 Post Oak Parkway, Ste. 2360, Houston, Texas, 77027. Defendant Oscura may also be served through its officer and director, Michael Sydow, 1980 Post Oak Blvd., Suite 2100, Houston, Texas, 77056.

41.    Defendant Fall River Realty, Ltd. is a Turks & Caicos Islands corporation whose principal office is located in the Turks & Caicos Islands. Fall River Realty may be served with process through its officer and director, Michael Sydow, 1980 Post Oak Blvd., Suite 2100, Houston, Texas, 77056.

#### IV. Original Action and Basis for Intervention

42.    On July 27, 2011, Michael Collins and other original plaintiffs filed the Original Action, suing Michael Sydow and the other original defendants named herein. The Original Action asserts claims arising out of the Defendants' control and misconduct relating to NC12 and its

113

predecessors and relating to the share ownership of the original plaintiffs in NC12 and its predecessors. Intervenors file this Petition in Intervention pursuant to Rules 40 and 60 of the Texas Rules of Civil Procedure. Intervenors have shareholders and investors in the same corporations and assert interests in the same relief sought by the original plaintiffs. The claims asserted by Intervenors arise out of the same transactions and occurrences as the Original Action and present common questions of law and fact.

## V. Subject Matter Jurisdiction

43. The court has jurisdiction over the lawsuit because the matter in controversy is within this court's general jurisdiction and the amount in controversy exceeds this court's minimum jurisdictional limits.

## VI. Personal Jurisdiction and Venue

44. Personal jurisdiction over all defendants is proper in the state of Texas because NC12 is headquartered in Houston, Texas, and the tortious conduct alleged herein occurred in or was directed at the State of Texas.

45. Venue is proper in Harris County because a substantial part of the transactions, acts, and omissions giving rise to the claims occurred in Harris County. *See* Tex. Civ. Prac. & Rem. Code § 15.002(a)(1). Venue is also proper in Harris County because the principal office of Defendant NC12 is in Harris County. *See id.* at § 15.002(a)(3).

## VII. Facts

### A. Formation of Texas Syngas

46. This case involves revolutionary new energy technology developed by Texas inventor and businessman Michael Collins for producing synthetic natural gas and other fuels from coal.

114

Collins worked for almost a decade in South Africa during the 1970s and became familiar with Sasol's Lurgi fluidized bed gasification process—a technology that dates back to World War II.

47. In 1989, Molten Metal Technology, Inc. was founded in Massachusetts. Defendant John Preston, a former Director of Technology Development at the Massachusetts Institute of Technology, was instrumental in founding that company. Preston widely promoted its stock and served as one of its directors throughout its existence. Molten Metal Technology developed Catalytic Extraction Processing technology, which used high-temperatures and molten metals to dispose of hazardous waste. In large part due to Preston's efforts, Molten Metal Technology raised millions of investment dollars, and in 1992, the company built and completed 86,000 square foot facility in Fall River, Massachusetts, at a cost of approximately $25 million.

48. Molten Metals Technology imploded in 1997 under an avalanche of investor lawsuits, many of which named Preston individually. The company was put into bankruptcy in 1998 and was ultimately liquidated. In 1999, Quantum Catalytics, L.L.C., an entity controlled by Preston, purchased the patents, technology, and intellectual property portfolio of Molten Metals Technology out of bankruptcy. Molten Metals Technology's $25 million facility in Fall River was also purchased out of the bankruptcy by the Meissner Trust, an entity owned by Preston and Paul Lohnes.

49. In the late 1990s, Collins began researching new technological approaches to the process of creating synthetic fuels. In 2001, Collins approached Preston to gain access to the catalytic technology developed by Molten Metal Technology. Collins developed improvements on the molten metal catalytic processes to be used in converting carbon-based feedstock into synthetic natural gas and other fuels. Collins ultimately created a totally new process involving high temperatures and high pressures to create clean-burning synthetic fuels from coal, petroleum

115

coke, and biomass. An independent consulting engineer later described the new technology as "substantially different in theory of operation and design from more common entrained flow systems (such as the Chevron-Texaco process, Shell gasifier, etc.) or the fixed bed (Lurgi) systems." Collins, along with retired University of Maryland professor Robert Bach, formally patented the process in 2009.

50.     In 2004, Collins met Houston lawyer Michael Sydow, who persuaded Collins that he had the legal and business expertise Collins needed to exploit the new technology commercially. In October 2004, Collins, Preston, and Sydow agreed to create Texas Syngas, L.L.C., a Texas limited liability company to be headquartered in Houston, Texas. The business was reorganized as a new Nevada corporation, Texas Syngas, Inc., in May 2006. Preston, through Quantum Catalytics, licensed the Molten Metals Technology, Inc. patents and intellectual property to Texas Syngas, Inc. in exchange for 10% of the shares. Sydow became the chief executive officer and received 5% of the shares. Collins contributed his intellectual property and expertise to the company and received approximately 75% of the shares. Preston, Collins, and Sydow served as the Texas Syngas, Inc. board of directors.

**B. Investment by the Shareholder Intervenors**

51.     In the fall of 2007, Preston and Sydow began serious efforts to raise capital for Texas Syngas. Preston approached the shareholders of Atomic Ordered Materials (AOM), another company in which Preston was involved and in which a number of the Intervenors had invested. Preston brought Sydow and Collins to an AOM shareholders' meeting, where Sydow made a presentation on the Texas Syngas technology and solicited investments in the company. This green energy startup company, with what seemed to be a technology ripe for success in a time

116

when the world was embracing environmental conservation and carbon reduction, offered a compelling investment opportunity.

52. After this meeting Preston approached Mr. H.J. von der Goltz, who had been present at the meeting. Preston informed Mr. von der Goltz that he had negotiated a $100 million pre-money investment valuation for Texas Syngas and was trying to raise $12 million to build a demonstration reactor to prove and implement the technology. Preston represented that the value of the technology was in excess of $100 million, but he suggested that von der Goltz meet with Collins and Sydow to negotiate a discounted valuation to put together an initial investor group for the $12 million needed. Preston represented that he was assisting Texas Syngas in raising money, but never disclosed that he owned or controlled any equity interest in the company. In November 2007, von der Goltz met with Collins and Sydow in Houston. Collins and Sydow agreed to accept new investors based on a pre-money valuation of $78 million and a post-money valuation of $90 million.

53. Mr. von der Goltz brought the opportunity to friends, family, and business associates, who ultimately invested $11.75 million in exchange for which they received preferred shares in Texas Syngas, representing approximately 13% of the company. Among this group were the Shareholder Intervenors. Sydow and Preston represented to the Shareholder Intervenors, both directly and through Mr. von der Goltz, that the value of the technology exceeded $100 million and that the money being raised would be used primarily for building the demonstration reactor. The Shareholder Intervenors relied on these representations in making their investments and, more importantly, trusted in Preston's integrity and technical expertise, as Preston had pre-existing relationships with Mr. von der Goltz and with many of the Shareholder Intervenors and

117

who held himself out as having special expertise in valuing new technologies, based largely on his former position on the faculty and as Director of Licensing at MIT.

**C. Growth of Texas Syngas**

54. After the Shareholder Intervenors' funds were received, it was agreed that one of these new shareholders, German businessman Christoph Henkel, would serve on the board of directors as the representative of the new investors, along with existing directors Collins, Preston, and Sydow. Furthermore, Sydow agreed to become a full-time officer of Texas Syngas at an annual salary of $360,000 and agreed to stop practicing law and to devote himself full time to building Texas Syngas. Collins was to focus his efforts on selecting a suitable facility and building the demonstration reactor.

55. In early 2008, Texas Syngas negotiated a deal with Central Louisiana Electric Company (CLECO), a New Orleans gas utility company, for a 10-reactor plant to begin operations in the fall of 2012. Based on these developments, Preston now represented to Texas Syngas shareholders that the company was worth $300 million, and in the summer of 2008, Preston claimed that he had secured financing through his venture capital group C Change Investments. C Change made a written $30 million commitment to Texas Syngas at a $300 million valuation. The committed money from C Change was repeatedly delayed and ultimately never materialized.

56. In September 2008, Preston and Sydow represented to the shareholders that Texas Syngas had purchased the Fall River facility where the test reactor would be built. The Fall River facility had originally been built by Molten Metal Technology and had been purchased out of bankruptcy by the Meissner Realty Trust, a Preston-controlled entity. Texas Syngas paid the Meissner Realty Trust, an entity owned by Preston and Paul Lohnes, $3.5 million cash. The deed recorded with the Bristol County, Fall River Register of Deeds, however, shows that the property

118

was never actually transferred to Texas Syngas. In September 2008, the property was put in the name of Fall River Realty, Ltd., an entity in which Sydow owned an individual interest, and for which Sydow served as the managing director. Defendants never disclosed to the shareholders that Texas Syngas (and later NC12) did not own the building. Title to the building remained in Fall River Realty, Ltd., which then proceeded to charge Texas Syngas a monthly rent of $28,000 for use of the facility it should have owned.

57.     In February 2009, MPR, an independent engineering firm, concluded its review of the Texas Syngas technology. MPR confirmed the viability of the reactor's science and theoretical basis, its design, and the gasification process chemistry. On or about May 14, 2009, Collins and Robert Bach formally assigned the patented technology to Texas Syngas in the records of the United States Patent and Trademark Office.

**D. Fraud on Texas Syngas and Its Shareholders**

58.     On information and belief, Preston and Sydow had no intention of using shareholder money as represented to the shareholders. Preston is a classic stock promoter and has raised (and spent) millions upon millions of shareholder dollars, but has never actually built a commercially successful company. Sydow is a lawyer skilled at hiding assets and corporate manipulation. During the time that Preston and Sydow controlled the board of directors, they made sure that the bulk of the money actually went to them or to several of their related entities, rather than to build the demonstration reactor. In addition to the fraudulent acquisition of the Fall River facility, on information and belief, C Change was apparently paid a $40,000 per month consulting fee. Additionally, Sydow and Preston had the company pay tens of thousands of dollars every month to lawyers and consultants and as well as other expenses that did not benefit the shareholders or

119

the corporation, but actually provided benefit for Sydow and his law firm and was apparently used by Preston to solicit investors for C Change.

59. During 2009, Sydow moved the Texas Syngas corporate headquarters in Houston from 4900 Woodway to more luxurious accommodations on Post Oak Boulevard. Sydow never devoted his full attention to Texas Syngas as promised, but relocated his law practice to the Texas Syngas office space, spent most of his time on his own law practice, and used Texas Syngas employees to do work for his firm. Two of Sydow's children worked full time as lawyers in Sydow's law firm at Texas Syngas' expense. Texas Syngas was not compensated for use of its space, supplies, resources, or personnel. Texas Syngas also paid for the maintenance, storage, and cleaning for Sydow's airplane. When Texas Syngas was finally ready to construct the test reactor, Sydow and Preston had largely squandered the money raised for that purpose.

**E. Investment by the Note Holder Intervenors**

60. Despite his numerous promises and despite being compensated to do so, Preston failed to raise additional funds for Texas Syngas in 2009, and by mid-year Texas Syngas desperately needed funding. In 2009, Preston and Sydow again turned to Mr. von der Goltz for assistance. Mr. von der Goltz was able, through mid-2010, to raise a total of $6,104,000 in additional funds from friends, family, and business associates. These investors, the Note Holder Intervenors, were issued convertible promissory notes, which provided for automatic conversion into common shares at a 20% discount of the new investor's valuation if Texas Syngas obtained qualified financing from a single investor of at least $5 million on or before September 30, 2010. If no qualified financing occurred, the notes would become due and payable within five days after a demand was made on or after the September 30, 2010, maturity date.

120

61.     Preston and Sydow, both directly and through their statements to von der Goltz, represented to the Note Holder Intervenors that Texas Syngas was worth $300 million as of 2009, based on the value of the technology and the CLECO and Turkish contracts. However, Preston and Sydow failed to disclose that the CLECO contract had been cancelled. Preston and Sydow also represented that the money would be used primarily to build the test reactor; however, their later conduct and misuse of the funds demonstrate that they had no intention of using the money for that purpose.

**F. Formation of NC12**

62.     During 2009, Sydow, Henkel, and Preston became increasingly at odds with Collins, who still owned or controlled over 60% of the shares. By the end of 2009, Preston, Sydow, and Henkel attempted to wrest control of the company from Collins through a scheme to dilute his interest. C Change had received an investment of $15 million from Corinna von Schoenau, which was intended for investment in Texas Syngas; however, Preston withheld $10 million of these funds and proposed that C Change would invest $5 million at a pre-money valuation of $10 million and post-money valuation of $15 million in exchange for a 33% interest in the company. Collins, as the majority shareholder, blocked this effort, and tension among the board members reached a boiling point—to the point where moving the business forward seemed impossible. Collins and Sydow approached Mr. von der Goltz to mediate a settlement to save the company. Ultimately, Preston, Sydow, and Collins agreed that Texas Syngas would be reorganized and that a new three-person board of directors comprised of Sydow and two new directors acceptable to Collins would govern the new corporation. Collins was very hesitant to relinquish his position as a director, but agreed to a new board on the conditions that the new board members retained their positions for two years and that no funds would be accepted from C Change. (Preston ultimately

121

took von Schoenau's $15 million intended for Texas Syngas and invested it in a different Preston scheme).

63. In late 2009, as part of the reorganization, Sydow liquidated Texas Syngas before a new board was named. Sydow transferred Texas Syngas' assets to a new Nevada corporation, NC12, Inc. The preferred shares of the Shareholder Intervenors in Texas Syngas were converted to common shares in NC12 and the convertible promissory notes held by the Note Holder Intervenors were assumed by NC12. With Collins' agreement, Sydow remained as CEO of NC12 and was joined on the board of directors by Mr. H.J. von der Goltz and Dr. Aydin Muderrisoglu. Von der Goltz was elected to serve as non-executive chairman of the board of directors. Von der Goltz hoped the reorganization would relieve tension between Sydow and Collins, allowing Collins to focus on building the reactor at the Fall River, Massachusetts, facility that supposedly had been purchased by Texas Syngas, and allowing Sydow to focus on managing the company from the Houston headquarters and negotiating contracts with potential customers.

64. Sydow apparently believed that he would be able to manipulate the new board members and assume greater control. When the new board members made clear their independence and intent to act in the best interest of the corporation and its shareholders, Sydow enlisted Preston and immediately began to undercut the authority of the new board members and to withhold information from them until they could be removed. Sydow maintained sole signatory authority over all NC12 bank accounts and refused requests by von der Goltz that certain expenditures require two signatures.

65. Mr. von der Goltz took seriously his new role as a chairman of the board of directors. He met personally with all the Houston and Fall River employees in January 2010 and sought to

122

clean up NC12's finances, streamline operations based on his vast operational experience, and above all, see that the demonstration reactor was built. Collins, in the meantime, had moved full-time to Massachusetts and made meaningful progress on constructing the reactor and purchasing necessary equipment with the funds raised by von der Goltz. Sydow retained control of the corporation's money and continued his misappropriation and profligate spending, which included approximately $46,000 that he spent during a nine-day trip to London in mid-2010, a $20,000 per month lease payment that Sydow charged NC12 for Sydow's private aircraft, and other wasteful personal expenses and benefits, which were never divulged to the board of directors. While Sydow saw that all of the expenses incurred for his benefit were paid immediately, he refused to pay for the actual expenses incurred for building the reactor in Fall River, resulting in numerous disputes with vendors, work stoppages, and delays.

66.     Sydow continually blamed Collins for NC12's financial problems and shortages of funds. Sydow vehemently opposed any review or financial controls over his own handling of corporate funds and never supplied financial statements to the board of directors. With board approval, von der Goltz engaged Elder, Gaffey & Paine, P.C. (EGP), a Boston-based accounting firm, to review both Fall River's and Houston's books and fiscal procedures. EGP's investigation showed that adequate oversight measures were in place at Fall River and that all expenditures were supported by approved purchase orders sent to the Houston office for payment and filing.

67.     Sydow stonewalled and delayed providing EGP the accounting records and QuickBooks files relating to operations in Houston for almost eight weeks in mid-2010. After finally obtaining records from the Houston office, EGP discovered numerous excessive expenditures for travel, professional fees, outside consultants, and the undisclosed lease payments for Sydow's airplane—all expenses neither known to nor approved by NC12's board of directors. EGP's

report issued in August 2010 recommended that a forensic accountant review records from the Houston office to sort out the discrepancies.

68.     In response to the discovery of financial mismanagement and misappropriation, von der Goltz wrote to Sydow on August 3, 2010, stating that he had "never been associated with a company with so many nebulous and secret transactions." Von der Goltz demanded that Sydow provide a correct and complete accounting of Sydow's handling of the company's funds, and subsequently set a board of directors' meeting for August 20 to address these issues, to retain a forensic accountant to audit Sydow's books, to vote on closing the Houston office, and to remove Sydow as CEO.

69.     Also during 2010, Preston brought in Sonia Lo and her investment holding company, Chalsys Capital Partners, L.L.P., as potential investors. In fact, Lo and Chalsys were Preston's new partners for the next stage of the fraud in which the research facility and the technology would wind up in another Preston-controlled entity once the NC12 investors had lost all their money. In early 2010, Preston and Sydow pushed for a deal in which Chalsys would obtain a security interest in NC12's technology in exchange for a $10 million loan. Von der Goltz and Muderrisoglu revised the terms of the proposed deal with Chalsys, and after numerous discussions, the NC12 Board directed Sydow to negotiate the final transaction so that Chalsys would pay NC12 royalties on the exclusive use of its technology in Europe. While Sydow repeatedly represented to von der Goltz and Muderrisoglu that Lo and Chalsys had no connection to Preston and C Change, it later became clear that Lo and Chalsys had conspired with Sydow and Preston from the beginning to divest NC12 of its technology assets and to put them into a corporate entity in Luxembourg in which Sydow and Preston and their co-conspirators (but not NC12 or its shareholders) would have an interest.

124

### G. Ouster of von der Goltz and Muderrisoglu

70.     In response to the NC12's board of directors' demand for an audit of Sydow's books and an investigation of Sydow's mismanagement and misappropriation, Sydow moved quickly to obtain complete control of the corporation. Sydow secretly created a "Written Consent of Shareholders" purportedly executed by 69% of the "voting power" of the corporation. Sydow has never shown this document to any of the affected parties, but if the document exists, it is believed that the majority of the 69% that Sydow claimed to control was actually Collins' shares, over which Sydow claimed to hold the voting power—although Sydow acted without Collins' consent and against Collins' interests—and contrary to the prior agreements governing the corporate reorganization. Sydow also enlisted Preston and Henkel, who agreed to support the ouster of von der Goltz and Muderrisoglu, and agreed individually to serve as replacement directors and to vote in favor of Sydow's takeover of the company, which resulted in the theft of its assets.

71.     Based on his claim to control 69% of the shareholder votes, Sydow secretly and unilaterally removed von der Goltz and Muderrisoglu from the board of directors and replaced them with Preston and Henkel. Then, Sydow, Preston, and Henkel, as a board, voted to fire Collins and bar him from company property. The new board also revoked all access that von der Goltz and Muderrisoglu had to corporate bank accounts and records. As president and CEO, Sydow specifically ordered corporate counsel Tim Maguire not to permit von der Goltz or Muderrisoglu or any other minority shareholder to have access to the corporate minutes, bank accounts, or other records—and later ordered him to return all corporate records to Sydow and to destroy all copies. Sydow also attempted to force NC12's financial advisor, EGP, which was to

take over the accounting for NC12, to destroy all financial records it received during the investigation of mismanagement and misappropriation in the Houston office.

72.     Preston sent employees of one of his other companies to raid the Fall River facility on the evening of August 12, 2010, where they copied electronic records containing NC12 intellectual property and took technical drawings and other paper records out of the facility. Early the next morning, on August 13, 2010, Sydow and Preston appeared at the Fall River facility accompanied by police officers. Sydow announced that he had been empowered by a written resolution signed by 69% of the shareholders to take over the board of directors, to fire Collins and his son, and to remove them from all corporate offices. Collins and his son (also an NC12 employee) were locked out of their company-provided apartment and barred from the company premises. Sydow went so far as to have Collins' son arrested when he appeared and entered onto company property to report to work that morning.

**H. Loss of Contracts in Turkey**

73.     During the time that von der Goltz and Muderrisoglu were on the NC12 Board of Directors, they both worked extremely hard on an initiative to obtain contracts with TKI, the Turkish national coal company. Muderrisoglu is a prominent Turkish businessman with extensive contacts in the Turkish government, and von der Goltz's great-uncle was a German Field Marshall who commanded Turkish troops in World War I and was an extremely important and well-loved figure in Turkish history. With the efforts and assistance of von der Goltz and Muderrisoglu, who both made two trips to Turkey, NC12 obtained a commitment from TKI to buy 40 reactors to be installed in Turkey. A delegation from TKI visited the Fall River facility in 2010 to inspect the progress being made on the demonstration reactor and confirmed the first

126

contract to build the first reactor. As a result of the Sydow-Preston-Henkel takeover, and the failure to complete the Fall River reactor, NC12 lost the Turkish contracts.

## I. Loss of Valuable Technology

74.     On August 26, 2010, in a last attempt to find a solution to the problems caused by the Sydow-Preston-Henkel takeover, von der Goltz flew with his personal counsel to Houston to attempt to negotiate an agreement between Sydow and Collins that would resolve the disputes and allow for the corporation's survival. Initially, Sydow and Collins reached an agreement for the buyout of Collins' stock on terms favorable to NC12 and which would allow NC12 to finish the reactor and exploit the technology. Preston and Henkel vetoed the settlement. Whether Sydow was ever acting in good faith regarding the settlement or not, Preston undoubtedly was putting into play the same strategy from which he had benefitted at Molten Metals and other companies—raise money, bilk the company and its shareholders, run the company into the ground, buy the assets for pennies on the dollar, and start over with another company.

75.     Immediately after the takeover, Sydow, Preston, and Henkel agreed to the deal with Chalsys and Sonia Lo that von der Goltz and Muderrisoglu had opposed, except on terms much less favorable to NC12 than originally proposed. Sometime prior to the takeover, Sydow, Preston, Henkel, and Lo had created Meliora Energy Technologies, S.à.r.l (MET), a Luxembourg corporation controlled by the four of them and owned by C Change, Chalsys, and Henkel. The new NC12 board, Sydow, Preston, and Henkel, represented to the NC12 shareholders that MET had provided NC12 with a $1.5 million bridge loan and a commitment for an additional investment of $5 million in equity in exchange for the license to use the technology in Europe, Asia and Africa—a license that was exclusive and did not provide for MET to pay any royalties to NC12.

76. On September 1, 2010, Sydow, Preston, and Henkel assigned all of NC12's technology to a company called Oscura, Inc. Upon information and belief, Sydow created and controlled Oscura, Inc., as that company has the same Houston address as NC12 and Sydow's law practice. Oscura then assigned the patents to Defendant MET via a security agreement. Additionally, MET began paying Sydow a monthly fee of $15,000.

77. The supposed MET financing for $5 million also resulted in the automatic conversion of the promissory notes into common shares. The NC12 board of directors, consisting of Preston, Henkel, and Sydow, informed the Note Holder Intervenors on September 28, 2010, that they were now common shareholders with 39.4% ownership, while MET owned 30.3% for its $5 million investment, and the "old" shareholder group would be diluted to 30.3%—down from 100%.

78. MET never made the $5 million investment; rather, it is believed that the Defendants transferred NC12's most valuable asset, the patented technology worth potentially hundreds of millions of dollars, to MET and that NC12 received no more than $500,000—which was exhausted paying NC12 personnel and other expenses, which largely benefited Sydow and Preston. In December 2010, all employees were terminated and all business operations of NC12 ceased. Because the MET financing never took place and because Sydow, Preston, and Henkel transferred all of the assets out of NC12, both the Shareholder Intervenors and the Note Holder Intervenors now own stock in a defunct and worthless shell.

**J. Loss of Fall River Property and Reactor**

79. NC12's other valuable assets were the building, the partially completed reactor, and the extensive equipment that had been purchased for the reactor—all located in Fall River, Massachusetts. While von der Goltz and Muderrisoglu were on the NC12 board of directors and

Collins worked full time in Fall River on building the reactor, NC12 paid approximately $2 million of the money invested by the Note Holders to vendors for work on the reactor, and substantial progress had been made on its construction. Prior to the ouster of von der Goltz and Muderrisoglu, NC12 had reached an agreement with its vendor, Hub Technologies, for the completion and installation of the reactor in Fall River by September 30, 2010. A shareholder meeting had been scheduled for the end of October 2010 so that the shareholders could inspect the progress that had been made. At the time of the Sydow-Preston takeover, a payment schedule was in place with NC12's vendors, and an outstanding balance of only about $300,000 remained. Immediately after Sydow, Preston, and Henkel took over control of NC12 and fired Collins, all progress on the reactor halted, and the new board refused to pay the outstanding bills. The vendor subsequently repossessed the reactor and sold it for scrap.

80. On or about May 20, 2011, Fall River Realty, Ltd. sold the building and transferred the deed to Brilliant Novelty, L.L.C. for $2.6 million. Upon information and belief, NC12 never received any proceeds from this sale. Paul Lohnes and John Preston signed the deed as managers of Brilliant Novelty, L.L.C.

## K. Bankruptcy and Destruction of the Company

81. On October 14, 2011, Sydow filed a Voluntary Petition placing NC12 into Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas. The bankruptcy petition states that NC12 has no assets.

## VIII. Causes of Action

## A. Controlling Shareholder Defendants' Breach of Fiduciary Duty to Shareholders

82. Intervenors incorporate by reference and re-assert each and every allegation above, as though fully set forth herein.

129

83. Directors' power to act on the corporation's behalf is governed by the directors' fiduciary relationship with the corporation and its shareholders, which imparts upon the directors the duties of care and loyalty. *Shoen v. SAC Holding Corp.*, 137 P.3d 1171, 1178 (Nev. 2006) (citing *Foster v. Arata*, 325 P.2d 759, 765 (Nev. 1958)); *see* Nev. Rev. Stat. § 78.138. The Controlling Shareholder Defendants violated and breached their fiduciary duties to the shareholders of care, loyalty, reasonable inquiry, oversight, and good faith. *Horwitz v. Southwest Forest Indus.*, 604 F.Supp. 1130, 1134 (D. Nev. 1985). These breaches involved intentional misconduct and fraud. Nev. Rev. Stat. § 78.138(7). These acts include:

a. Sydow's theft and misappropriation of corporate assets, including but not limited to use of corporate funds to pay for his private plane, use of corporate resources for his law practice without compensation to the company, the use of corporate funds for personal expenses, and bogus fees for lawyers, consultants, and services that did not benefit NC12;

b. Failure to transfer title of the Fall River property to the corporation and instead transferring it to an entity in which Sydow and Preston held an individual interest, and charging the corporation rent for use of its own property;

c. Transfer of the technology of the corporation—its most valuable asset, worth hundreds of millions of dollars—for grossly inadequate consideration to an entity in which Sydow, Preston, and other Defendants had individual interests.

84. Each of the Controlling Shareholder Defendants authorized, or by abdication of duty, permitted and allowed these bad acts to occur. These actions were not a good faith exercise of prudent business judgment to promote and protect NC12's corporate interests. *See* Nev. Rev. Stat. § 78.138; *In re Western World Funding, Inc.*, 52 B.R. 743, 764 (Bkrtcy. D. Nev. 1985)

130

("An officer who or director who participates, ratifies, aids or approves of the breach of duty of a co-fiduciary, or fails to repudiate the wrongdoing, may be jointly liable for the violation.").

85.    Intervenors are entitled to their actual damages for this breach of fiduciary duty and further equitable relief including buy-out, disgorgement, and constructive trust. While NC12 may also have claims arising out of the same conduct, Intervenors do not seek to assert any claims owned by NC12 or to assert any remedy on behalf of NC12. Intervenors assert only their individual claims for violations of fiduciary duties owed directly to them as shareholders and seek only those damages for injuries suffered by Intervenors directly as shareholders. Because the Controlling Shareholder Defendants acted knowingly, intentionally, maliciously, and with reckless disregard of Intervenors' rights, Intervenors are further entitled to exemplary damages.

**B. Shareholder Oppression**

86.    The Controlling Shareholder Defendants are subject to legal duties to Intervenors, including fiduciary duties, duties not to oppress, and duties of good faith and fair dealing. Defendants committed a continuing pattern of oppressive acts that have the purpose and effect of substantially defeating Intervenors' objectively reasonable expectations of share ownership, of systematically violating their rights and interests as shareholders, and of denying them the economic value of share ownership and return on their investment.

87.    Examples of but a few of these oppressive acts include, but are not limited to: instituting a plan to gain unfettered control of the company with the intent of stealing its assets, stripping the company of its most valuable assets for their own personal gain, and the secretive and questionable removal of directors von der Goltz and Muderrisoglu, who were reputable, independent of Preston and Sydow, and trusted by the shareholders. Sydow thwarted these directors' investigative efforts into the company's accounting practices. Sydow, Preston, and

Henkel illegally exercised dominion and control over the corporation by removing these directors in direct violation of a previous agreement among a super-majority of the shares. Sydow also misappropriated corporate assets for personal expenses, and engaged in numerous undisclosed self-dealing transactions at the expense of NC12 shareholders. Defendants' conduct rendered Intervenors' share ownership worthless, meaningless, and financially punitive. Defendants' burdensome, harsh, and wrongful conduct visibly departs from standards of fair dealing and constitutes shareholder oppression.

88.　　Intervenors are entitled to equitable relief to remedy the oppressive conduct, including but not limited to, having the Court order a buy-out at a fair price, together with actual and exemplary damages, disgorgement, restitution, and other equitable relief. Furthermore, Defendants' conduct was committed willfully and maliciously and Intervenors are entitled to punitive damages. Intervenors are without adequate remedy at law.

**C. Knowing Participation/Civil Conspiracy**

89.　　As alleged herein, all Defendants conspired to commit fraud and breaches of their fiduciary duties, and thus are jointly and severally liable for all actual damages and equitable relief. Furthermore, all Defendants acted knowingly, intentionally, maliciously, and with reckless disregard of Intervenors' rights and the company's rights, and Intervenors are entitled to exemplary damages.

**D. Securities Fraud—Common Law Fraud and Statutory Fraud**

90.　　Sydow and Preston committed common law and statutory fraud on each of the Intervenors in connection with the sale and purchase of the shares and convertible notes. As alleged herein, Sydow and Preston solicited the Intervenors' investments and directly or indirectly communicated false representations of fact to the Intervenors—including that the

132

company was worth $100 million or later $300 million, that the corporation would use the investment money primarily to build the reactor (when Sydow and Preston intended to utilize the money primarily for other purposes or to misappropriate it and to delay the construction of the reactor), and that the CLECO deal was in place when in fact it had been cancelled. Additionally, Sydow and Preston failed to disclose facts that they were under a duty to disclose to new investors—including the cancellation of the CLECO deal. Sydow and Preston made the misrepresentations, false promises, and omissions with knowledge of the falsity, with the intent to deceive, and with the intent that the Intervenors rely on those misrepresentations. The Intervenors did in fact reasonably rely on the fraudulent representations and non-disclosures of Preston and Sydow by investing in Texas Syngas and NC12. Intervenors suffered actual damages proximately caused by Preston and Sydow's fraud. Furthermore, Preston and Sydow acted willfully, intentionally, and maliciously and are liable for exemplary damages.

## IX. Jury Demand

91.    Intervenors wish to exercise their right to trial by jury.

## X. Prayer

92.    For these reasons, Intervenors request that the Defendants be cited to appear and answer and that Intervenors have judgment against the Defendants for the following:

   a.  Actual and exemplary damages as allowed by law;

   b.  Equitable relief including buy-out or return of investment;

   c.  Prejudgment and post-judgment interest as allowed by law;

   d.  Attorney fees and expenses;

   e.  Costs of suit;

133

f. All other relief, general and special, legal and equitable, to which Intervenors may be entitled.

Respectfully Submitted,

FRYAR LAW FIRM, P.C.

_____
F. Eric Fryar
Texas Bar No. 07495770
Email: eric@fryarlawfirm.com
Matthew Buschi
Texas Bar No. 24064982
Email: mbuschi@fryarlawfirm.com
Christina Richardson
Texas Bar No. 24070495
1001 Texas Ave., 14th Floor
Houston, Texas 77002-3194
Tel. (281) 715-6396
Fax (281) 715-6397
ATTORNEYS FOR INTERVENORS

134

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing instrument was served on all parties and counsel of record pursuant to the Texas Rules of Civil Procedure as indicated below:

[] Telephonic document transfer on 11 November 2011 before 5:00 p.m.

[] Email or eservice by agreement on 11 November 2011.

[X] First Class United States Mail, CMRRR, on 11 November 2011.

Randall O. Sorrels
Clyde J. "Jay" Jackson, III
Abraham Watkins, Nichols, Sorrels, Matthews & Friend
800 Commerce Street
Houston, Texas 77002-1776
Fax: 713-225-0827
*Attorneys for Original Plaintiffs*

Brent C. Perry
Law Offices of Brent C. Perry
800 Commerce Street
Houston, Texas 77002
Fax: 713-237-0415
*Attorney for Original Plaintiffs*

Asher Griffin
Chris Sileo
Sean Flammer
Scott, Douglass & McConnico, LLP
600 Congress Ave., Ste 1500
Austin, Texas 78701-2589
Fax: 512-474-0731
*Attorneys for Defendants Chalsys, MET, and Lo*

Amir Alavi
Ashley Frankson
Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing P.C.
3460 One Houston Center
1221 McKinney Street
Houston, Texas 77010
Fax: 713-658-0062
*Attorneys for Defendants Sydow, Preston, Henkel, C Change, and Brilliant Novelty*

Eric Fryar

# TAB 3



FILED
Chris Daniel
District Clerk
AUG 31 2012

Time ____
By ____
Harris County, Texas
Deputy

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 11-38794 |
| NC12, INC. | § | CHAPTER 7 |
| | § | |
| Debtor(s). | § | JUDGE ISGUR |
| | § | |
| | § | |
| MICHAEL COLLINS, *et al* | § | |
| | § | |
| Plaintiff(s), | § | |
| | § | |
| vs. | § | ADVERSARY NO. 11-3634 |
| | § | |
| SYDOW, *et al* | § | |
| | § | |
| Defendant(s). | § | |

### MEMORANDUM OPINION

The Plaintiffs and Intervenors assert claims against former officers and directors of NC12, the debtor in the underlying bankruptcy case. NC12 was a technology company engaged in developing catalytic gasification processes. Plaintiffs and Intervenors allege that the Defendants stripped NC12 of assets, misappropriated corporate assets, engaged in self-dealing, and improperly removed other directors from NC12's board. The Plaintiffs sue for breach of fiduciary duty, and Plaintiff Michael Collins sues for conversion. The Intervenors sue for breach of fiduciary duty, shareholder oppression, statutory and common law securities fraud, and conspiracy.

The Court grants, in part, and denies, in part, the Intervenors' motion to remand. The Court remands the Intervenors' securities fraud claims, including the aiding and abetting and conspiracy to commit fraud claims, as they are the Intervenors' property; the Court declines to

1 / 31

206

exercise subject matter jurisdiction over the claims. The remainder of the Intervenors' claims are the estate's property, and the Court dismisses them for lack of standing.

The Court denies, in part, and abates, in part, the Plaintiffs' motion to remand. Plaintiff Michael Collins' conversion claim is arguable property of the estate. If the claim belongs to Collins, the Court may lack subject matter jurisdiction or the claim's potential effects on the estate may be so remote that the Court should discretionarily abstain. If the claim is property of the estate, Collins lacks standing to assert the claim. Until the issue is decided, the Court cannot remand the claim; Collins' pursuit of the conversion claim in state court would violate the automatic stay. The remainder of the Plaintiffs' claims are property of the estate, and the Court dismisses them for lack of standing.

## Background

This proceeding involves numerous Plaintiffs, Defendants, and Intervenors. The Plaintiffs are Michael Collins, individually and on behalf of NC12, Inc. and Fall River Realty, Ltd.; Ellen Collins, on behalf of BOS, Inc., EnVen, Inc. and Metal Catalyst Ventures, Inc.; BOS, Inc., as a shareholder of NC12; EnVen, Inc., as a shareholder of NC12; Metal Catalyst Ventures, Inc., as a shareholder of NC12; M. Sameer Ahmed, individually and on behalf of NC12 and TSBC South Texas Investors, L.P., as a shareholder of NC12.

The Defendants are Michael Sydow; John T. Preston; Christoph Henkel; C Change Investments, L.L.C.; Sonia Lo; Chalsys Capital Partners L.L.P.; Oscura, Inc.; Brilliant Novelty, L.L.C.; and Meliora Energy Technologies, S.A.R.L. The Plaintiffs sued the Defendants in Harris County District Court on July 26, 2011. ECF No. 1-1.

The Plaintiffs assert claims for breach of fiduciary duty, alleging that Sydow, Preston, and Henkel breached their fiduciary duty to the Plaintiffs as shareholders of NC12 by

2 / 31

misappropriating corporate funds. They seek "their proportionate share of economic injuries" as shareholders of NC12. The Plaintiffs sue the other Defendants for aiding and abetting breach of fiduciary duty. The Plaintiffs sue Sydow, Preston, C Change Investments, and Brilliant Novelty for conversion of Collins' interest in Fall River Realty.

The Intervenors filed a petition in intervention on November 11, 2011. The Intervenors are Akila Finance, S.A.; Bosques del Molino, S.A.; Centrans Energy Services, Inc.; Chester Mester Holdings, Ltd.; Deltec Bank & Trust, Ltd.; Emjo Investments, Ltd.; William End; Evans and Petree 401K Plan; First Bay Intertrade; GM Partners; Marair Corporation; W.L. Nichol, IV; Panorama Investment, Ltd.; PC 01 Vermoegens Verw.; Alejandro Santo Domingo; Sinchi Investment; Venturi Global Investments, Ltd.; and H.J. von der Goltz. ECF No. 1-3.

The Intervenors sue Sydow, Preston, and Henkel for breach of fiduciary duty to shareholders and for shareholder oppression. They also sue all Defendants for knowing participation/civil conspiracy to commit fraud and breach of fiduciary duties. The Intervenors sue Sydow and Preston for common law fraud and statutory fraud.

NC12 filed for chapter 11 bankruptcy on October 14, 2011. On December 22, 2011, the Court granted the United States Trustee's motion to appoint an examiner in the case. ECF No. 28. Walter Bissex was appointed examiner. ECF No. 30. Bissex filed a status report on February 15, 2012. ECF No. 41.

The Defendants removed this proceeding on December 15, 2011. The Intervenors filed a motion to remand or abstain on January 17, 2012, arguing that they asserted only direct claims against the Defendants. ECF No. 6. The Plaintiffs joined in the motion to remand on the same day. ECF No. 7.

3 / 31

At a hearing on February 2, 2012, the Court required parties to file briefs on whether the estate owned the claims asserted in this proceeding. The Intervenors and Defendants Sydow, Preston, Henkel, C Change Investments, LLC, and Brilliant Novelty, LLC (collectively, "Sydow Defendants") filed briefs on March 2, 2012. ECF Nos. 12 & 14. The Sydow Defendants also filed a response to the motion to remand on the same day, arguing that the claims were property of the estate. ECF No. 13. The Sydow Defendants also argue that the existence of a joint directors and officers insurance policy with a maximum coverage limit of $1,000,000.00 for defense costs provides another basis for "related to" jurisdiction. ECF No. 13, at 21-22. Additionally, the Intervenors' requested relief of a forced buy-out, they argue, would affect the bankruptcy estate by affecting ownership of the debtor and rearranging bankruptcy priorities. ECF No. 13, at 23. Finally, mandatory abstention does not apply, they argue, because remand would violate the automatic stay. ECF No. 13, at 23.

Defendants Sonia Lo; Chalsys Capital Partners, LLP, and Meliora Energy Technologies, S.A.R.L. (collectively, "Lo Defendants") filed a joinder with the Sydow Defendants' briefing on March 5, 2012. ECF No. 15. The Lo Defendants filed a joinder with the Sydow Defendants' response to the motion to remand on March 7, 2012. ECF No. 17. The Intervenors filed a reply to the Sydow Defendants' brief on March 9, 2012. ECF No. 18.

In NC12's main bankruptcy case, the United States Trustee filed a motion to convert the case to a chapter 7 case on February 28, 2012. No. 11-38794, ECF No. 43. The Intervenors joined in the motion on March 22, 2012. No. 11-38794, ECF No. 51. NC12 filed a response on March 22, 2012, opposing the conversion to chapter 7. No. 11-38794, ECF No. 52. The Court held a hearing on the motion to convert on March 26, 2012 and March 27, 2012. After hearing testimony from Bissex, Sameer Ahmed, Sydow, and Preston, the Court concluded that NC12

4 / 31

was not operating in a meaningful way and had limited assets of an unknown value. The Court granted the motion to convert, and Janet S. Casciato-Northrup was appointed chapter 7 Trustee.

The Court set a hearing on the ownership of the claims in this adversary proceeding for May 15, 2012. Prior to the hearing, the Trustee and the Intervenors filed briefs. ECF Nos. 25 & 26. At the May 15, 2012 hearing, the Court heard arguments as to the ownership of the claims. The Intervenors filed an additional brief on May 25, 2012. ECF No. 27.

The Trustee filed a separate adversary proceeding against Michael Collins, Ellen Collins, and BOS, Inc. on June 5, 2012, seeking a determination of the extent and validity of the estate's interest in real property in Fall River, Massachusetts and a determination that the property was subject to either a resulting or a constructive trust. The Trustee also sued Michael Collins for breach of fiduciary duty. Adv. No. 12-3266, ECF No. 1.

The Trustee filed another adversary proceeding against Michael Collins on August 13, 2012. Adv. No. 12-3376, ECF No. 1. In Adv. No. 12-3376, the Trustee sues for a declaratory judgment that Collins does not own any interest in U.S. Patent Application No. 12/363,398 and the underlying technology; breach of fiduciary duty; and unjust enrichment.

On August 21, 2012, the Court ordered the parties to this adversary proceeding to file a copy of NC12's Philadelphia Indemnity Insurance Company policy and to stipulate whether the copy was true and correct. ECF No. 28. The Trustee filed a copy of the policy on August 27, 2012, with a stipulation signed by the Trustee, the Plaintiffs, the Intervenors, Sydow, Preston, Henkel, and the other Defendants. ECF No. 30. The Trustee, the Plaintiffs, the Intervenors, Sydow, Preston, and Henkel stipulate that the copy of the policy is a true and correct copy. ECF No. 30, at 1. The other Defendants have no basis either to dispute the authenticity of the policy or to stipulate that the copy is true and correct. ECF No. 30, at 2.

5 / 31

### The Plaintiffs' and Intervenors' Allegations

The Plaintiffs and Intervenors allege that the Defendants, who were directors and officers of NC12, engaged in self-dealing and mismanagement with the ultimate result of stripping NC12 of its most valuable assets. For context, the Court summarizes the allegations made by the Plaintiffs and Intervenors. By summarizing the allegations, the Court does not find that the allegations are meritorious. Nevertheless, the Court must assume that the allegations are true for the purpose of ruling on the pending motions.

NC12 was involved in the development of catalytic gasification technology. ECF No. 1-2, at 6. The technology was developed by Plaintiff Michael Collins for producing synthetic natural gas and other fuels from coal. ECF No. 1-3, at 14. Collins' technology involved using high temperatures and high pressures to create clean-burning synthetic fuels from coal, petroleum coke, and biomass. ECF No. 1-3, at 15-16. Collins, along with retired University of Maryland professor Robert Bach, patented the process in 2009. ECF No. 1-3, at 16.

NC12 began as a Texas limited liability company named Texas Syngas, LLC. ECF No. 1-2, at 7-8. Texas Syngas was formed in October 2004 to exploit the technology portfolio of a defunct company called Molten Metal Technology, Inc., which had been founded and promoted by Defendant John Preston. ECF No. 1-2, at 7; ECF No. 1-3, at 15. Quantum Catalytics, Inc., another entity controlled by Preston, purchased Molten Metal Technology's portfolio in 1999. ECF No. 1-2, at 7; ECF No. 1-3, at 15. In May 2006, Quantum Catalytics licensed its technology to Texas Syngas in return for 10% of the available shares. ECF No. 1-2, at 8. Collins agreed to contribute his intellectual property to Texas Syngas in exchange for 754,500 shares (approximately 75%) of Texas Syngas. ECF No. 1-2, at 8; ECF No. 1-3, at 16. Collins

6 / 31

211

kept 100,000 shares personally and transferred the other shares to EnVen, Inc. and Metal Catalyst Ventures, Inc., Nevada companies owned by his wife, Ellen Collins. ECF No. 1-2, at 8.

Texas Syngas was reorganized as a new Nevada corporation, Texas Syngas, Inc., in May 2006. ECF No. 1-3, at 16.

Texas Syngas began raising significant capital in 2007. ECF No. 1-2, at 9; ECF No. 1-3, at 16. Through Preston and his contact Johan von der Goltz, Texas Syngas raised at least $12 million from European investors. ECF No. 1-2, at 9. Von der Goltz's friends, family, and business associates invested $11.75 million in exchange for approximately 13% of the company. ECF No. 1-3, at 17. These investors included some of the Intervenors ("Shareholder Intervenors"). ECF No. 1-3, at 17.

Sydow and Preston represented to the Shareholder Intervenors that the value of the technology exceeded $100 million and that the funds would be used for building a demonstration reactor. ECF No. 1-3, at 17.

The funds were also intended to be used to acquire a research and development facility in Fall River, Massachusetts. EFC No. 1-2, at 9. The facility was formerly owned by Molten Metal Technology and was acquired by the Meissner Trust, an entity owned by Preston and Paul Lohnes. ECF No. 1-3, at 15. Texas Syngas structured the acquisition of the facility by Fall River Realty, Ltd. ECF No. 1-2, at 9. Preston and Lohnes retained an ownership interest in Fall River Realty. ECF No. 1-2, at 9-10. Preston and Lohnes, through a complex transaction, transferred to Collins an interest in Fall River Realty in exchange for $3.5 million and Texas Syngas shares. ECF No. 1-2, at 10.

Preston and Sydow told the shareholders that Texas Syngas had purchased the Fall River facility, but the property was never actually transferred to Texas Syngas. ECF No. 1-3, at 18-19.

7/31

212

Sydow became the Chief Executive Officer of Texas Syngas with an annual salary of $360,000. ECF No. 1-2, at 9. Sydow, a lawyer, agreed to stop practicing law and devote his full efforts to building Texas Syngas. ECF No. 1-2, at 9. Sydow worked from office space in Houston, paying salaries to officers and employees and pursuing execution of Texas Syngas's business plan. ECF No. 1-2, at 9.

Collins began working at the Fall River facility to build a full scale gasification system prior to commercial development, retaining the necessary consultants and employees. ECF No. 1-2, at 10. Collins and Bach assigned the patented gasification technology to Texas Syngas on May 14, 2009. ECF No. 1-3, at 19.

Texas Syngas negotiated a deal with the Central Louisiana Electric Company (CLECO) in early 2008, for a 10-reactor plant to begin operations in the fall of 2012. ECF No. 1-3, at 18. In the summer of 2008, Preston claimed that he had secured $30 million in financing through C Change, but the money never materialized. ECF No. 1-3, at 18.

By 2009, Texas Syngas needed additional funding. Von der Goltz raised a total of $6,104,000.00 from friends, family, and business associates. ECF No. 1-3, at 20. These investors, who included the remainder of the Intervenors ("Note Holder Intervenors"), were issued convertible promissory notes, which provided for automatic conversion into common shares at a 20% discount if the company obtained qualified financing from a single investor of at least $5 million on or before September 30, 2010. ECF No. 1-3, at 20. Preston and Sydow represented to the Note Holder Intervenors that the company was worth $300 million as of 2009, based on the value of the technology and the CLECO contract and prospective contracts with the Turkish national coal company. ECF No. 1-3, at 21, 26. The prospective Turkish contracts were

to be obtained through the efforts of von der Goltz and Dr. Aydin Muderrisoglu. ECF No. 1-3, at 26.

However, the CLECO contract had already been canceled. Preston and Sydow did not disclose the cancellation of the contract. ECF No. 1-3, at 21. Preston and Sydow represented that the money would be used primarily to build the test reactor. ECF No. 1-3, at 21.

The Intervenors allege that Preston and Sydow had no intention of using shareholder money as represented to the shareholders. ECF No. 1-3, at 19. While they controlled the board of directors, they "made sure that the bulk of the money actually went to them or to several of their related entities, rather than to build the demonstration reactor." ECF No. 1-3, at 19. C Change, Preston's company, was "apparently" paid a $40,000 per month consulting fee. ECF No. 1-3, at 19. Sydow and Preston had the company pay tens of thousands of dollars every month to lawyers and consultants and for other expenses that did not benefit the shareholders or the corporation, but instead benefited Sydow and Preston. ECF No. 1-3, at 19-20.

Although Sydow had agreed to devote all of his time to Texas Syngas when he was hired as CEO, he continued practicing law, spending most of his time on his own law practice and using Texas Syngas employees to do work for his firm. ECF No. 1-3, at 20.

Also in 2009, Texas Syngas became NC12. ECF No. 1-2, at 11. Sydow and Preston managed the transfer of assets and liabilities to the new entity. ECF No. 1-2, at 11. TSI was dissolved. ECF No. 1-2, at 11. Sydow remained as CEO and was joined on the board of directors by von der Goltz and Muderrisoglu. ECF No. 1-3, at 22.

In March 2009, C Change Investments, Preston's investment company, acquired a small interest in NC12. Through 2009, Preston and Sydow developed the prospects for a Louisiana

9 / 31

214

production facility, and Collins oversaw research and development of the reactor in Fall River. ECF No. 1-2, at 11.

Collins began having problems with contractors at the Fall River facility by late 2009. ECF No. 1-2, at 11. One contractor placed a stop on all work until NC12 paid over $1.2 million in past due invoices.

Von der Goltz began investigating the funding issues, contacting an accountant to review NC12's financial records. ECF No. 1-2, at 12. The accountant did a limited review of the Fall River accounting process and then requested a set of books for NC12. ECF No. 1-2, at 12. After obtaining the Quickbooks file, the accountant raised concerns about NC12's use of funds, including large amounts of professional fees and expenses. ECF No. 1-2, at 12. The accountant recommended a forensic audit and noted that very little of the money raised had been spent on developing the reactor at the Fall River facility. ECF No. 1-2, at 12. Instead, much of the money had been spent on travel, offices, professional fees, outside consultants, and undisclosed lease payments for an airplane. ECF No. 1-2, at 12; ECF No. 1-3, at 23.

Collins and von der Goltz were aligned. After von der Goltz delivered the audit request to Sydow, Sydow obtained an injunction in Montgomery County against Collins. ECF No. 1-2, at 12. Sydow removed Collins from all company operations in August 2010 and closed off access to company records. ECF No. 1-2, at 12. Sydow and Preston removed Collins, von der Goltz, and Muderrisoglu as directors and named Christoph Henkel as a director. ECF No. 1-2, at 12; ECF No. 1-3, at 25. Sydow, Preston, and Henkel, as a board, voted to fire Collins and bar him from company property. ECF No. 1-3, at 25. The board also revoked all access to company bank accounts and records for von der Goltz and Muderrisoglu. ECF No. 1-3, at 25. As a result of Preston, Sydow, and Henkel's takeover, NC12 lost the Turkish contracts.

10 / 31

215

About $300,000 remained to be paid to vendors for the cost of the reactor. After Sydow, Preston, and Henkel fired Collins, all progress on the reactor halted, and the board refused to pay the outstanding bills. A vendor repossessed the reactor and sold it for scrap. ECF No. 1-3, at 29.

Preston, Sydow, and Henkel, along with their companies, worked with Sonia Lo and Chalsys Capital Partners, LLP, to strip NC12 of its assets and transfer the assets to Meliora Energy Technologies, S.A.R.L., a Luxembourg limited liability company established on September 14, 2010 and controlled by Sydow, Preston, Henkel and Lo and owned by C Change, Chalsys, and Henkel. ECF No. 1-2, at 12-13; ECF No. 1-3, at 27. Sydow, Preston, and Henkel represented to shareholders that Meliora would provide a $1.5 million bridge loan to NC12, along with a commitment of an additional $5 million investment, in exchange for the license to use NC12's technology in Europe, Asia, and Africa. ECF No. 1-3, at 27.

However, Sydow, Preston, and Henkel assigned all of NC12's technology to Oscura, Inc., a company believed to have been created and controlled by Sydow, on September 1, 2010. ECF No. 1-3, at 28. Oscura assigned the patents to Meliora via a security agreement. ECF No. 1-3, at 28. Meliora began paying Sydow a monthly fee of $15,000. ECF No. 1-3, at 28.

Meliora's supposed $5 million financing resulted in the automatic conversion of the promissory notes into common shares. The conversion diluted the "old" shareholder group's ownership from 100% to 30.3%. ECF No. 1-3, at 28. However, Meliora never made the $5 million investment. ECF No. 1-3, at 28. According to the Intervenors, it is believed that NC12 received no more than $500,000 for its patented technology. ECF No. 1-3, at 28.

In December 2010, all employees of NC12 were terminated and all business operations ceased. ECF No. 1-3, at 28.

In May 2011, Fall River Realty sold the Fall River facility to Brilliant Novelty, LLC for $2.6 million. Lohnes and Preston are members and managers of Brilliant Novelty, and Brilliant Novelty obtained a $2.6 million mortgage on the property. ECF No. 1-2, at 13. Sydow filed a certificate of vote stating that the Fall River Realty shareholders had approved the transaction. However, Collins, the majority shareholder in Fall River Realty, was never consulted about the sale. ECF No. 1-2, at 13.

On October 14, 2011, Sydow caused a voluntary chapter 11 petition to be filed on behalf of NC12. The petition states that NC12 has no assets. ECF No. 1-3, at 29.

### Analysis

If a cause of action belongs to the estate, then the Trustee has exclusive standing to assert the claim. *Schertz-Cibolo-Universal City, Indep. Sch. Dist. (In re Educators Grp. Health Trust)*, 25 F.3d 1281, 1284 (5th Cir. 1994). If, on the other hand, a cause of action belongs to the Plaintiffs and Intervenors, the Court must consider whether it has subject matter jurisdiction over the claims. If the Court lacks subject matter jurisdiction over claims because the claims do not relate to NC12's bankruptcy, then the Court must remand the claims.

If the Plaintiffs and Intervenors lack standing to bring claims, the Court must dismiss the claims for lack of subject matter jurisdiction. *See Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum)*, 522 F.3d 575, 583 (5th Cir. 2008) ("If the claims belong to the estate, then it was not error for the bankruptcy court to deny remand (because it has jurisdiction over all property of the estate) and dismiss the claims (because the trustee has exclusive standing to assert claims belonging to the estate)."); *Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006) ("[T]he issue of standing is one of subject matter jurisdiction.").

12 / 31

Whether a particular cause of action belongs to the estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case. *Educators Grp.*, 25 F.3d at 1284. If a cause of action alleges only indirect harm to a creditor (i.e., an injury that derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate. *Id.*

NC12 is incorporated under Nevada law. Nevada law therefore governs the internal affairs of NC12. Tex. Bus. Org. Code § 1.102 ("[T]he law of the state [in which an entity is formed] . . . governs the formation and internal affairs of the entity."); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941) (holding that a federal court sitting in diversity applies the conflict of laws rules of the forum state); *Hollis v. Hill*, 232 F.3d 460, 465 (5th Cir. 2000) (applying Texas choice of law rules and concluding that Nevada law governs internal affairs of corporation incorporated in Nevada); *Reed v. Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 396 (Bankr. N.D. Tex. 2011) (applying Texas choice of law rules, which provide that internal affairs of a foreign corporation a governed by the law of the state of incorporation).

Although the Court first considers whether NC12 could have raised claims outside of bankruptcy, the Court also looks at the underlying injury for which relief is sought.

> [S]ome claims that are usually brought by creditors outside of bankruptcy (and thus in a sense may be said to "belong to" the creditors and not the debtor) are nonetheless vested exclusively in the trustee in bankruptcy. This is so not merely because the claims are common to a number of creditors, but because they ultimately seek to recover assets of the estate that are not under the debtor's control—by reason of a fraudulent transfer, for instance, or because of the existence of separate corporate entities that are a sham.

*Seven Seas*, 522 F.3d at 589.

The Trustee's exclusive standing protects the Bankruptcy Code's distribution scheme. "Since one of the goals of the Bankruptcy Code is to preserve property of the bankruptcy estate and ensure that similarly situated creditors receive equal distributions, if a cause of action belongs to the debtor, only the trustee or debtor in possession may pursue it." *In re Cabrini Med. Ctr.*, 2012 WL 2254386, at *6 (Bankr. S.D.N.Y. June 15, 2012) (citing *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142, 1152 (5th Cir. 1987)) (citations omitted).

If claims are not owned by the bankruptcy estate, the Court must consider whether it has subject matter jurisdiction over the claims. The Bankruptcy Court's subject matter jurisdiction is limited to bankruptcy cases and proceedings that arise under the Bankruptcy Code, arise in a bankruptcy case, or are related to a bankruptcy case. 28 U.S.C. § 1334. The Court therefore has subject matter jurisdiction only over claims that arise under the Bankruptcy Code, arises in the NC12 bankruptcy case, or are related to NC12's bankruptcy case.

A proceeding arises under the Bankruptcy Code when a plaintiff asserts a right created by the Bankruptcy Code. *Wilborn v. Wells Fargo Bank (In re Wilborn)*, 609 F.3d 748, 752 (5th Cir. 2010). When a plaintiff asserts a claim that could not exist outside of bankruptcy, the proceeding arises in a bankruptcy case. *Id.*

An action is related to a bankruptcy case if the outcome could conceivably affect the bankruptcy estate. *Edge Petroleum Operating Co. v. GPR Holdings, LLC (In re TXNB Internal Case)*, 483 F.3d 292, 298 (5th Cir. 2007). "Certainty is unnecessary; an action is 'related to' bankruptcy if the outcome could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankruptcy estate." *Id.*

14 / 31

If the Court has only "related-to" jurisdiction over a claim, the claim may be subject to mandatory abstention. Mandatory abstention applies when a proceeding: (i) is based upon a state law claim or state law cause of action; (ii) is related to a bankruptcy case but not arising under the Bankruptcy Code or arising in the bankruptcy case; (iii) could not have been commenced in a federal court other than through bankruptcy jurisdiction; and (iv) was commenced and can be timely adjudicated in a state court. 28 U.S.C. § 1334(c)(2).

Even if the requirements for mandatory abstention are not met, the Court may discretionarily abstain from hearing a proceeding "in the interest of justice, or in the interest of comity with State courts or respect for State law." 28 U.S.C. § 1334(c)(1). "Nothing . . . prevents a court from permissively abstaining under § 1334(c)(1) where some, but not all, of the requirements for mandatory abstention are met. The decision to abstain or not to abstain is committed to the discretion of the district court[.]" *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1207 (5th Cir. 1996). In exercising its "broad discretion" to decide whether to abstain under § 1334(c)(1), a court may consider the following non-exclusive factors:

(1)     the effect or lack thereof on the efficient administration of the estate;

(2)     the extent to which state law issues predominate over bankruptcy issues;

(3)     the difficult or unsettled nature of applicable law;

(4)     the presence of related proceeding commenced in state court or other nonbankruptcy proceeding;

(5)     the jurisdictional basis, if any, other than § 1334;

(6)     the degree of relatedness or remoteness of proceeding to main bankruptcy case;

(7)     the substance rather than the form of an asserted core proceeding;

(8)     the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

(9)    the burden of the bankruptcy docket;

(10)    the likelihood that commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

(11)    the existence of a right to a jury trial;

(12)    the presence in the proceeding of non-debtor parties;

(13)    comity; and

(14)    the possibility of prejudice to other parties in the action.

*Shipley Garcia Enters., LLC v. Cureton*, 2012 WL 3249544, at *12 (S.D. Tex. Aug. 7, 2012) (quoting *Ramirez v. Rodriguez (In re Ramirez)*, 413 B.R. 621, 631-32 (Bankr. S.D. Tex. 2009)).

### *Intervenors' Shareholder Oppression Claim*

To determine whether the shareholder oppression claim is property of the estate, the Court looks at whether, under state law, the claim could have been asserted by NC12 and whether, under the test set forth in *Educators Group* and *Seven Seas*, the Intervenors assert an injury that is not merely derivative of injury to NC12.

NC12 could have asserted any claims that, under Nevada state law, enforced the corporation's rights. This is true both for rights normally enforced directly by the corporation or normally enforced through a shareholder derivative action. *See San Mateo Plaintiffs v. At Home Corp. (In re At Home Corp.)*, 154 F. App'x 666, 668 (9th Cir. 2005) ("A bankruptcy court may enjoin a derivative claim brought by shareholders because the claim is the property of the bankrupt estate."); *In re AgriBioTech*, 319 B.R. 216, 223 (D. Nev. 2004) (holding that, pre-bankruptcy, a breach of fiduciary duty claim had belonged to the corporation, because the claim was enforceable directly by the corporation or through a derivative action) (citing *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939)); *Sobchak v. Am. Nat'l Bank & Trust Co. of Chicago (In re*

16 / 31

*Ionosphere Clubs, Inc.)*, 17 F.3d 600, 604 (2d Cir. 1994) (holding that claims that were classified as derivative under Delaware law, the governing law, belonged exclusively to the bankruptcy estate). Therefore, the Court first examines Nevada law.

Under Nevada law, allegations of generalized injury to the corporation give rise to a derivative claim, not a direct claim. *See Cohen v. Mirage Resorts, Inc.*, 62 P.3d 720, 734 (Nev. 2003) ("This is harm to the corporation, shared by all stockholders and not related to an individual stockholder. To the extent these allegations were intended to state a cause of action, the district court was correct in dismissing the allegations as derivative claims barred by lack of standing."). The Court therefore looks at the nature of the injury alleged to determine whether the action was derivative under Nevada law—and thus, assuming it was a valid claim, could have been asserted by NC12.

The parties have extensively argued the issue of whether Nevada law recognizes a claim for shareholder oppression and whether such a claim would be a direct claim. Two federal cases—one from the Fifth Circuit and one from the District of Nevada—predict that the Nevada Supreme Court would recognize a claim for shareholder oppression. *Hollis*, 232 F.3d at 468 (holding that there was "strong indication that the Nevada Supreme Court would find fiduciary obligations between shareholders in a corporation such as FFUSA operated by shareholder-directors"); *Simon v. Mann*, 373 F.2d 1196, 1199-1200 (D. Nev. 2005) (holding that shareholders of a closely-held corporation could assert a direct suit against majority shareholders). In 2011, however, the Nevada Supreme Court stated in dicta that "Nevada does not recognize a cause of action for abuse of control, and in the case to which appellants cite, claims for abuse of control are essentially claims for breach of the fiduciary duty of loyalty." *In re Amerco Deriv. Litig.*, 252 P.3d 681, 700 n.11 (Nev. 2011).

It is unclear whether the "abuse of control" cause of action referred to in *Amerco* is the same cause of action that the courts in *Hollis* and *Simon* predicted the Nevada Supreme Court would recognize. Because this area of Nevada law is uncertain, the Court does not make an unnecessary pronouncement of whether there is a shareholder oppression claim under Nevada law and, if so, whether such a claim is available to shareholders of NC12. The Court merely concludes that under *Cohen*, the specific injuries pleaded by the Intervenors in this case should be classified as derivative, not direct.

The *Educators Group* and *Seven Seas* test produces the same result. If the nature of the alleged injury is purely derivative of injury to NC12, the claims are property of the estate even if they could normally be asserted by creditors outside of bankruptcy. *Seven Seas*, 522 F.3d at 589; *see Schimmelpenninck v. Byrne (In re Schimmelpenninck)*, 183 F.3d 347, 355 (5th Cir. 1999) (holding that even though alter ego and veil-piercing claims are typically brought by a creditor, corporations can bring such claims on their own behalf and in bankruptcy, the claims may be asserted only by the estate) (citing *S.I. Acquisition*, 817 F.2d at 1152).

The Intervenors' shareholder oppression claim in this case is property of the estate. In their statement of the shareholder oppression cause of action, the Intervenors assert that the Defendants oppressed them as shareholders by:

- Taking control of the corporation, stripping it of its assets for their own personal gain, misappropriating corporate assets, and self-dealing;

- Secretly and questionably removing von der Goltz and Muderrisoglu, who were reputable, independent of Preston and Sydow, and trusted by the shareholders, in direct violation of a previous agreement among a super-majority of the shares; and

- Thwarting investigative efforts into the company's accounting practices.

18 / 31

ECF No. 1-3, at 31-32. The Intervenors seek the following remedies:

- A court-ordered buy-out of their shares at a fair price;

- Actual and exemplary damages;

- Disgorgement;

- Restitution;

- Other equitable relief; and

- Punitive damages.

ECF No. 1-3, at 32.

Even if Nevada law allows a claim for shareholder oppression, any claim based on the Defendants' alleged stripping of corporate assets is property of the estate. Any injury suffered by the alleged misappropriation, asset-stripping, and self-dealing was derivative of the harm to NC12. The Intervenors may seek damages for the violation of their shareholder rights, but only for damages not derivative of damages to the corporation; they may not seek damages for dilution of corporate value due to the alleged stripping or misappropriation of corporate assets. Any claim for damages due to stripping or misappropriation of corporate assets belongs to the estate and may be asserted only by the Trustee.

The alleged violation of the shareholders' rights by the removal of von der Goltz and Muderrisoglu and the alleged thwarting of shareholders' rights to investigate accounting practices do not give rise to direct claims. Although it is possible that a loss of shareholder influence or the violation of shareholders' investigative rights could result in a direct injury to shareholders, the Intervenors have not stated such circumstances here. The Intervenors do not allege any particularized injury arising from the removal of von der Goltz and Muderrisoglu independent of the harm caused to the corporation—e.g., through the alleged loss of the Turkish

19 / 31

224

contracts. Because all injuries allegedly caused by the removal of von der Goltz and Muderrisoglu were incurred by the corporation, and any injury to the shareholders was derivative of the injury to NC12, the claim belongs to the estate.

Similarly, the alleged injury from the thwarting of investigative efforts was the inability to discover and remedy harms to the corporation caused by the misappropriation of assets and self-dealing. This injury is derivative of the injury to the corporation and therefore belongs to the estate.

The shareholder oppression claim is property of the estate. Therefore, it is dismissed for lack of standing.

*Plaintiffs' and Intervenors' Breach of Fiduciary Duty Claims*

The Plaintiffs and Intervenors allege that the Defendants breached their fiduciary duties to NC12 by self-dealing and mismanagement. The Plaintiffs refer to their general allegations of mismanagement and assert that the Plaintiffs are, "as shareholders of NC12, . . . entitled to recover from [the Defendants] *their proportionate share* of economic injuries in an amount in excess of the jurisdictional minimum of this court." ECF No. 1-2, at 14 (emphasis added).

The Intervenors refer to their general allegations of mismanagement and also allege three specific breaches of fiduciary duty:

- Sydow's theft and misappropriation of corporate assets, including but not limited to use of corporate funds to pay for his private plane, use of corporate resources for his law practice without compensation to the company, the use of corporate funds for personal expenses, and bogus fees for lawyers, consultants, and services that did not benefit NC12;

- Failure to transfer title of the Fall River property to the corporation and instead transferring it to an entity in which Sydow and Preston held an individual interest, and charging the corporation rent for use of its own property;

20 / 31

225

- Transfer of the technology of the corporation—its most valuable asset, worth hundreds of millions of dollars—for grossly inadequate consideration to an entity in which Sydow, Preston, and other Defendants had individual interests.

ECF No. 1-3, at 30.

Neither the Plaintiffs' general allegations of mismanagement nor the Intervenors' specific alleged breaches of fiduciary duty involve any alleged injury directly to the shareholders. All of the Plaintiffs' and Intervenors' allegations pertain to injuries to NC12. The generalized allegations of mismanagement and self-dealing, which refer back to the Plaintiffs' and Intervenors' overall narrative of NC12's collapse, all relate to injuries to the corporation. There is no indication of any harm to shareholders *other than* the harm to the corporation.

Similarly, the specific alleged breaches of fiduciary duty do not state any injury to shareholders other than through the corporation. The alleged theft and misappropriation of corporate assets is an alleged injury to NC12, not the shareholders. Similarly, the alleged failure to transfer title of the Fall River property to NC12 is an alleged injury directly to NC12. Finally, the alleged transfer of NC12's technology is an alleged harm to NC12; the only harm to the shareholders is derivative of the alleged harm to NC12.

The essence of Plaintiffs' and Intervenors' breach of fiduciary duty claims is that the Defendants stripped NC12 of assets to the detriment of NC12's creditors and shareholders. The claims are fundamentally derivative, predicated on injury to NC12, not on injury to individual Plaintiffs or Intervenors. The Plaintiffs' complaint states that the shareholders' injury as a result of the economic harm to NC12 is "proportionate." Such proportionate injuries must be recovered through the estate.

21 / 31

226

The breach of fiduciary duty claim is property of the estate. Only the Trustee has standing to assert the claim, and therefore the Court dismisses the claim for lack of subject matter jurisdiction.

The Plaintiffs' claim for aiding and abetting breach of fiduciary duty is dependent on the underlying breach of fiduciary duty claim. Because the breach of fiduciary duty claim is property of the estate, the aiding and abetting claim is also property of the estate. *Deep Marine Holdings, Inc. v. FLI Deep Marine LLC (In re Deep Marine Holdings, Inc.)*, 2011 WL 2420274, at *10 (Bankr. S.D. Tex. June 13, 2011) ("The aiding and abetting claims are derivative claims to the extent that the actions that were aided and abetted resulted in derivative injuries[.]").

### *Intervenors' Statutory and Common Law Fraud Claim*

The Intervenors allege that the Defendants made false representations upon which the Intervenors relied when they invested in NC12. ECF No. 1-3, at 21, 32-33. The Intervenors allege that the Defendants solicited investments by falsely representing that the company was worth $100 million and, later, $300 million, that the corporations would use the investment money to build the reactor, and that the CLECO deal was in place when it had been cancelled. ECF No. 1-3, at 32-33. The Intervenors allege that they "suffered actual damages proximately caused by Preston and Sydow's fraud."

The Trustee concedes that the securities fraud claims, as pleaded, are direct claims owned by the Intervenors. The Court agrees.

The Fifth Circuit held in *Seven Seas* that a conspiracy to defraud claim based on allegations that defendants employed material misrepresentations to induce potential investors to acquire unsecured notes was "a direct injury to the bondholders that was independent of any injury to Seven Seas." 522 F.3d at 586. The Fifth Circuit further noted that it "doubt[ed] that,

22 / 31

227

under applicable state law, Seven Seas could have raised either claim as of the commencement of the bankruptcy case." *Id.* The bondholders' fraud claims were therefore property of the bondholders, not the bankruptcy estate.

The Intervenors' fraud claims are similar; the only material distinction is that the *Seven Seas* claims were brought by bondholders and the Intervenors are shareholders of NC12. Because the Intevenors are shareholders, their fraud claim is based on the alleged difference between the price they paid in reliance on the alleged misrepresentations and the actual value of NC12's shares at the time of their investment. The Intervenors may not recover damages for the difference between the price they paid for the shares and what the shares would have been worth if not for the alleged post-purchase misconduct in the operation of the corporation. However, they may recover damages for the amount they allegedly overpaid as a result of Sydow and Preston's alleged misrepresentations.[1] With these limitations, the Intervenors' claims for harm due to fraudulently induced investment are independent of any harm directly to NC12; indeed, NC12 benefited from the Intervenors' investments by having their cash.

Because the Intervenors' fraud claims allege an injury to the Intervenors that is not merely derivative of the alleged harm to NC12, the Intervenors own the claims resulting from fraud or misrepresentations that occurred at the time that they made their investment.

The Court discretionarily abstains from hearing the Intervenors' fraud claim because it is only remotely related to the NC12 bankruptcy case.

The Defendants argue that the claim is related to the bankruptcy case because the Intervenors' potential recovery may draw from NC12's directors and officers' liability policy.

---

[1] The Intervenors do not state, and this Court does not decide, which jurisdiction's law governs their fraud claims. The Court's ruling regarding the recoverable damages relates solely to the issue of which injuries give rise to claims belonging to the Intervenors. The Court does not rule on the appropriate measure of damages for the Intervenors' fraud claims.

23 / 31

NC12's insurance policy with Philadelphia Indemnity Insurance Company covers both the corporation and its directors and officers against losses due to claims against the directors and officers or against NC12 relating to alleged malfeasance by directors and officers. ECF No. 30, at 31. The policy's proceeds are capped at $1,000,000.00, with an additional $1,000,000.00 available for defense fees. ECF No. 30, at 15, 56. Because the proceeds are capped at $1,000,000.00, the Defendants argue, any recovery by the Intervenors will reduce the amount available to NC12 for its own claims against directors and officers.

Insurance proceeds that are applied to a claim against directors and officers are not property of the estate, and actions to collect such proceeds are not barred by the automatic stay. *See Unsecured Creditors Disbursement Committee v. Antill Pipeline Constr. Co. (In re Equinox Oil Co.)*, 300 F.3d 614, 618 (5th Cir. 2002) ("An insurance policy owned by the debtor is generally considered property of the estate. But, whether the proceeds of a particular insurance policy is property of the estate depends on the nature of the policy.") (citing *In re Edgeworth*, 993 F.2d 51, 55 n.13 (5th Cir. 1993)). "The overriding question when determining whether proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim. When a payment by the insurer cannot inure to the debtor's pecuniary benefit, then that payment should neither enhance nor decrease the bankruptcy estate." *Edgeworth*, 993 F.2d at 55.

The Philadelphia Indemnity policy applies to claims against the directors and officers or against NC12. ECF No. 30, at 31. The policy provides liability coverage for the directors and officers and NC12 and indemnity coverage for NC12 for claims against the directors and officers. Although NC12 could be the beneficiary of the indemnity coverage, any payment to the directors and officers for liability coverage would offset a potential indemnification claim. *See*

24 / 31

*Louisiana World Exposition, Inc. v. Federal Ins. Co. (In re Louisiana World Exposition, Inc.)*, 832 F.2d 1391, 1400 (5th Cir. 1987) (holding that proceeds were not property of the estate, despite cap on the total of liability and indemnity coverage, where "any payment under the liability coverage reduces the amount of the potential indemnification claim to the same extent that policy amounts available for indemnification are thus reduced. There is not the potential for increasing the estate's exposure by payment of liability proceeds due.").

NC12 would not have a right to receive and keep the proceeds of claims against the liability coverage for losses caused to third parties (such as the Intervenors) by the directors and officers. *See Edgeworth*, 993 F.2d at 56 ("[U]nder the typical liability policy, the debtor will not have a cognizable interest in the proceeds of the policy. Those proceeds will normally be payable only for the benefit of those harmed by the debtor under the terms of the insurance contract.").

The estate could have a right to receive proceeds on account of its own claims against the directors and officers. However, the estate has only a contractual right to recover if certain conditions are met; the proceeds do not become property of the estate until the contractual conditions are met. *Maxwell v. Meglioga (In re marchFIRST, Inc.)*, 288 B.R. 526, 530 (Bankr. N.D. Ill. 2002) ("The Debtors had and the Trustee has contractual rights governed by the terms of the insurance policies. Unless and until the terms are met, which they may never be, the proceeds are not property of the estate.").

The directors and officers' liability proceeds are not the kind of proceeds that *Edgeworth* holds may be included as property of the estate. 993 F.2d at 56 ("Examples of insurance policies whose proceeds are property of the estate include casualty, collision, life, and fire insurance policies in which the debtor is a beneficiary. Proceeds of such insurance policies, if made

25 / 31

payable to the debtor rather than a third party such as a creditor, are property of the estate and may inure to all bankruptcy creditors."). The policies listed in *Edgeworth* are those for which the debtor is the designated beneficiary and the party to whom proceeds would be paid. This is not the case with the NC12's directors and officers' liability coverage. The estate may be entitled to proceeds from the policy, but so may other parties. If the estate recovers from the directors and officers' liability coverage, its recovery will be on the same terms as other injured parties' recovery. The estate's ownership of the policy does not affect the outcome. The estate does not have a greater interest in the proceeds than any other person suing on an indemnified claim. *See Boles v. Turner (In re Enivid, Inc.)*, 364 B.R. 139, 157 (Bankr. D. Mass. 2007) (denying liquidating trustee's motion for an injunction to prevent shareholders from entering into a settlement of fraud claims against directors and officers where the settlement was payable from the directors and officers' liability policies and might affect trustee's ability to recover); *Reliance Acceptance Grp., Inc. v. Levin (In re Reliance Acceptance Grp., Inc.)*, 235 B.R. 548, 561 (D. Del. 1999) ("The difficulty the Debtors have is in identifying a right to the relief; that is, they have been unable to identify a legal principle that stands for the proposition that the Estate's claims for relief should take precedence over the Shareholders' claims.").

Because the estate does not own the proceeds, the Court must consider whether the potential diminution of the proceeds is sufficient to establish related-to jurisdiction.

The burden is on the Defendants, as the removing parties, to establish federal jurisdiction. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) ("[T]he party asserting federal jurisdiction when it is challenged has the burden of establishing it."). Even if the Intervenors prevail and collect against the insurance proceeds, their claim will affect the estate only if (i) there are not sufficient funds remaining under the insurance policy to satisfy the estate's claims;

26 / 31

231

and (ii) the estate successfully asserts claims against directors and officers;[2] and (iii) the directors or officers have insufficient assets to satisfy the claims.

The Court recognizes the possibility that (i) the Intervenor's claim could exhaust the insurance policy; and (ii) the estate could prevail against the Defendants; and (iii) the Defendants could have inadequate other resources to pay a judgment. Should these events occur, the outcome of the shareholder oppression claim could affect the amount of proceeds available to the estate for its own claims against officers and directors. This remote effect is, at most, on the outer fringes of the Court's related-to jurisdiction. *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 752 (5th Cir. 1995) (noting that a bankruptcy court's related-to jurisdiction "cannot be limitless" and stating that an action "is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and . . . in any way impacts upon the handling and administration of the bankruptcy estate.") (quoting *Walker v. Cadle Co. (In re Walker)*, 51 F.3d 562, 569 (5th Cir. 1995)). However, a related proceeding's effect on the bankruptcy estate may be contingent. *See TXNB Internal Case*, 483 F.3d at 298 (holding that court had related-to jurisdiction over a dispute between two non-debtor parties when, depending on the outcome, either the defendant or the debtors owed money to the plaintiff).

The Court cannot conclude that the outcome of the fraud claims could have no "conceivable effect" on the estate. *See Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579, 587 (5th Cir. 1999) ([T]he law is well established in this Circuit, as in others, that, when testing 'related to' jurisdiction, an effect is not required to a certainty. Rather, jurisdiction will attach on a finding of any *conceivable* effect."). Contingent or tangential effects may be

---

[2] The Trustee has sued Michael Collins in a separate adversary proceeding. It is unclear whether the claim against Collins would be covered by the Philadelphia Indemnity policy.

sufficient in the Fifth Circuit to establish related-to jurisdiction. *Id.* at 587 n.30 ("[E]ven a proceeding which portends a mere contingent to tangential effect on a debtor's estate meets the broad jurisdictional test[.]") (quoting *National Union Fire Ins. Co. v. Titan Energy, Inc. (In re Titan Energy, Inc.)*, 837 F.2d 325, 330 (8th Cir. 1988)).

The Court does not apply mandatory abstention, because there is no evidence before the Court as to whether the fraud claims could be timely adjudicated before the state court. *See Carriage Credit Corp. v. Flanagan (In re Draper)*, 2010 WL 4736168, at *3 (Bankr. S.D. Tex. Nov. 15, 2010) ("A party moving for mandatory abstention must provide the court with more than a 'naked assertion' that the action can be timely adjudicated in state court.") (quoting *Mugica v. Helena Chem. Co. (In re Mugica)*, 362 B.R. 782, 793 (Bankr. S.D. Tex. 2007)).

Nevertheless, the Court discretionarily abstains from hearing the fraud claims. *See Shipley Garcia Enters.*, 2012 WL 3249544, at *12 (listing non-exclusive factors a court may consider in exercising its "broad discretion" to abstain under 28 U.S.C. § 1334(c)(1)). The fraud claims, at most, remotely relate to the bankruptcy proceedings, and the efficient administration of the estate will not be affected by the remand. The estate is not a party to the litigation. It is true that the depletion of the insurance proceeds may affect the estate; however, the Court does not have the authority to prevent this effect. There is no jurisdictional basis other than bankruptcy related-to jurisdiction, and the claim involves solely state law issues. Moreover, this Court's constitutional authority to enter a final judgment with respect to the fraud claim is doubtful under *Stern v. Marshall*, 131 S.Ct. 2594, 2620 (2011). The Court therefore remands the Intervenors' fraud claims.

*Collins' Conversion Claim*

Michael Collins' conversion claim against Sydow, Preston, C Change Investments, and Brilliant Novelty may be either direct or derivative, depending on whether Collins has an interest in Fall River Realty. Collins alleges that he suffered damages from the sale of the real property as an owner of Fall River Realty. Collins seeks actual and exemplary damages.

The Trustee concedes that Collins' conversion claim, as currently pleaded, is a direct claim. ECF No. 25, at 9. If Collins is an owner of Fall River Realty, this conclusion is correct.

However, the Trustee contends in Adv. No. 12-3266 that 100% of Fall River Realty is owned by the estate. In that adversary proceeding, the Trustee seeks declaratory judgment against Michael Collins, Ellen Collins, and BOS, Inc. stating that no Defendant owns an interest in Fall River Realty or the Fall River property. The Trustee also seeks a judgment that the Fall River property is subject to a resulting trust in favor of the Trustee for the benefit of the bankruptcy case.

If the estate is the owner of 100% of Fall River Realty, any claim for conversion of an interest in Fall River Realty belongs to the estate.

Property that is "arguable property" of the estate is protected by the automatic stay from unilateral action by creditors. *Brown v. Chesnut (In re Chesnut)*, 356 F. App'x 732, 734 (5th Cir. 2009) (citing *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 303-04 (5th Cir. 2005)). Because the Trustee's complaint asserts a plausible claim, as between the estate and Collins, to ownership of Fall River Realty, Fall River Realty is arguable property of the estate. Claims for conversion of interests in Fall River Realty are therefore also arguable property of the estate.

The Court will not presently remand the conversion claim, because Collins' pursuit of the conversion claim in state court would violate the automatic stay. At the same time, if the claim

is actually owned by Collins, the Court may lack subject matter jurisdiction or the claim may be so remotely related to the NC12 bankruptcy that the Court should discretionarily abstain. The Court therefore abates consideration of the conversion claim or its remand pending the resolution of Adv. No. 12-3266.

### *Intervenors' Conspiracy Claims*

The Intervenors' claim for conspiracy to commit fraud and breach of fiduciary duty is dependent on the underlying claims. Because the underlying breach of fiduciary duty claim is property of the estate, the conspiracy to commit breach of fiduciary duty claim is also property of the estate. *See Deep Marine Holdings*, 2011 WL 2420274, at *10 (holding that aiding and abetting claims were property of the estate where the underlying conduct gave rise to a claim that was property of the estate). The Court dismisses the conspiracy to commit breach of fiduciary duty claim for lack of standing.

Because the remanded fraud claim is the Intervenors' property, the Intervenors own the claim for conspiracy to defraud. *See Seven Seas*, 522 F.3d at 585 (holding that conspiracy to defraud claim was owned by bondholders, not estate); *Deep Marine Holdings*, 2011 WL 2420274, at *10 (holding that aiding and abetting claims were not property the estate where underlying conduct did not give rise to a claim that was property of the estate). The Court lacks subject matter jurisdiction over the Intervenors' conspiracy to commit fraud claim. Therefore the Court remands the conspiracy to commit fraud claim.

### Conclusion

The Court dismisses the following claims for lack of standing:

- Plaintiffs' and Intervenors' claims for breach of fiduciary duty;
- Intervenors' claim for shareholder oppression; and

30 / 31

235

- Intervenors' claim for conspiracy to commit breach of fiduciary duty.

The Court remands the following claims:

- Intervenors' claims for common law and statutory securities fraud and conspiracy to commit fraud; and

- Intervenors' aiding and abetting claim related to the common law and statutory securities fraud.

Plaintiff Michael Collins' conversion claim and the remand of the conversion claim are abated pending resolution of Adv. No. 12-3266.

SIGNED **August 28, 2012.**

Marvin Isgur,
UNITED STATES BANKRUPTCY JUDGE

TRUE COPY I CERTIFY
ATTEST:

Clerk of Court

By _____ Deputy Clerk

31 / 31

236

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO: 11-38794 |
| | § | |
| NC12, INC. | § | CHAPTER 7 |
| | § | |
| Debtor(s). | § | JUDGE ISGUR |
| | § | |
| | § | |
| MICHAEL COLLINS, *et al* | § | |
| | § | |
| Plaintiff(s), | § | |
| | § | |
| vs. | § | ADVERSARY NO. 11-3634 |
| | § | |
| SYDOW, *et al* | § | |
| | § | |
| Defendant(s). | § | |

## ORDER

The Court dismisses the following claims:

- Plaintiffs' and Intervenors' claims for breach of fiduciary duty;

- Intervenors' claim for shareholder oppression; and

- Intervenors' claim for conspiracy to commit breach of fiduciary duty.

The dismissals are without prejudice to the Trustee's ability to assert the dismissed claims on behalf of the Estate.

The Court remands the following claims to 215th Judicial District Court of Harris County, Texas:

- Intervenors' claims for common law and statutory securities fraud and conspiracy to commit fraud; and

- Intervenors' aiding and abetting claim related to the common law and statutory securities fraud.

Michael Collins' conversion claim and the remand of the conversion claim are abated pending resolution of Adv. No. 12-3266.

SIGNED **August 28, 2012.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

1 / 1

TRUE COPY I CERTIFY
ATTEST:

By _____ Clerk of Court

Deputy Clerk

237

# TAB 4

Cause No. 2011-44058

| | | |
|---|---|---|
| MICHAEL COLLINS; ET AL., | § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § | |
| | § | |
| VS. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| MICHAEL SYDOW; ET AL., | § | |
| DEFENDANTS. | § | 215th JUDICIAL DISTRICT |

| | | |
|---|---|---|
| AKILA FINANCE, S.A.; ET AL., | § | IN THE DISTRICT COURT |
| INTERVENORS/PLAINTIFFS, | § | |
| | § | |
| VS. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| MICHAEL SYDOW; ET AL., | § | |
| DEFENDANTS. | § | 215th JUDICIAL DISTRICT |

**INTERVENORS' RESPONSE TO THE SPECIAL APPEARANCES OF
JOHN D. PRESTON, BRILLIANT NOVELTY, L.L.C.,
AND C CHANGE INVESTMENTS, LLC**

## I.    INTRODUCTION

Intervenors sued John Preston ("Preston") alleging, among other things, that Preston fraudulently induced investments in Texas Syngas, Inc. ("TSI") and NC12, Inc. ("NC12") while systematically misappropriating the invested funds and company assets for his personal gain. Preston's service as a director of and purported fundraiser for TSI and NC12 unquestionably *involved Texas* and constituted doing business in this state – although incorporated in Nevada, TSI and NC12 have at all times called Houston, Texas home. The impact in Texas of Preston's fraudulent scheme, in which he was aided by his companies C Change Investments, LLC ("C Change") and Brilliant Novelty, L.L.C. ("Brilliant Novelty"), is evident – NC12 is now the debtor in a chapter 7 bankruptcy pending in a federal bankruptcy court in Houston.

Preston, C Change, and Brilliant Novelty (collectively, the "Preston Defendants") have purposefully established sufficient minimum contacts with Texas, through their contacts with TSI and/or NC12 as well as other Texas residents, sufficient to permit the exercise of personal

257

jurisdiction over them in this Court. Moreover, the Preston Defendants' Special Appearances are unverified, and so fail to comply with TEX. R. CIV. P. 120a. Accordingly, the Preston Defendants' Special Appearance should be denied.

## II. BACKGROUND

**A. The Parties.**

NC12, Inc. ("NC12") was incorporated in Nevada in April 2008. Nevada Secretary of State records reflect that the original directors of NC12 were Preston, Michael D. Sydow ("Sydow") and Michael Collins ("Collins"). (*See* Exhibit A-1[1]). Sydow is also identified as the president of NC12. (*Id.*). The address given for Sydow and Collins in the initial list of officers and directors is 4900 Woodway, Suite 900, Houston, Texas 77056. (*Id.*). Sydow, Preston, and Collins are identified as the NC12 directors again in NC12's May 2009 filing with the Nevada Secretary of State. (*Id.*).

In 2009, NC12 acquired the assets of Texas Syngas, Inc. ("TSI"). TSI was incorporated under the laws of the State of Nevada in May 2006 and registered to do business in the State of Texas in June 2008. (*See* Exhibit A-2). TSI identified Preston, Sydow, Collins, and Christoph Henkel ("Henkel") as its directors in its Application for Registration filed with the Texas Secretary of State. (*Id.*). TSI identified its principal office as 4900 Woodway, Suite 900, Houston, Texas 77056. (*Id.*).

NC12 registered to do business in Texas on August 28, 2009. (*See* Exhibit A-3). The company's principal office address is identified as 4400 Post Oak Parkway, Suite 2360, Houston, Texas 77027. (*Id.*). The company directors identified in the Texas registration in 2009 were Sydow, Preston, and Collins. (*Id.*). Both Sydow and Collins are Texas residents.

---

[1] The Affidavit of Kelley M. Keller, dated July 2, 2014, is attached hereto as Exhibit A and incorporated herein by reference.

2

NC12 filed for bankruptcy protection on October 14, 2011, under chapter 11. On February 28, 2012, the United States Trustee filed a motion to convert the case to chapter 7. On March 22, 2012, NCI2 filed a response opposing the conversion to chapter 7. The Bankruptcy Court granted the motion to convert on March 27, 2012.

C Change and Brilliant Novelty are Preston's companies and participated in certain of the fraudulent acts of Preston.[2] (*See* Pet. in Interv. ¶ 33).

**B.     The Lawsuit.**

This action was filed in 2011 as a fraud and shareholder oppression action by shareholders of NC12. Intervenors joined the litigation, asserting claims based solely on their individual rights as investors in NC12. The Intervenors assert that Sydow and Preston, along with others conspiring with them, engaged in a fraudulent scheme to raise millions in investment dollars on behalf of TSI and then NC12 for the development of revolutionary new energy technology that Collins had developed for producing synthetic natural gas and other fuels from coal, while denuding the company of its assets – its valuable technology, research and development facility, and cash. Intervenors were left holding only their claims in the bankruptcy proceedings, after Sydow and Preston enjoyed years of cash rolling in to TSI and NC12 which they used to their personal benefit.

**C.     Preston's Contacts with Texas.**

By Preston's own admission, his contacts with Texas are long-standing, reaching back at least 20 years. However, Preston has misrepresented the extent and nature of his contacts with Texas in his attempt to avoid the exercise of personal jurisdiction over him by this Court.

---

[2]    Brilliant Novelty has not denied the allegation that Preston was at all relevant times a manager of Brilliant Novelty, and C Change has not denied the allegation that Preston was a managing partner of C Change and controlled that company.

3

259

Whether inadvertently or intentionally, Preston has failed to disclose purposeful continuous and on-going contacts with and activity *in* Texas.

In his affidavit filed in support of his Special Appearance, Preston identifies his "only [ ] activity in Texas" as (1) a "limited number" of visits approximately 20 years ago; (2) a "very limited number" of visits to Texas in the past five years on behalf of TEM Capital; and (3) a visit to Texas in 2010 to testify in the divorce proceedings of Michael D. Sydow ("Sydow"). (*See* Preston Aff. at ¶¶ 5-6[3]).

The evidence, however, reflects much more than the "limited" activity that Preston has selectively disclosed. The following is a chronology of Preston's contacts with Texas – including those to which he admits and those which he has neglected to disclose.

- Preston claims that he visited Texas "a limited number of times" approximately 20 years ago, allegedly in a representative capacity on behalf of a company for which he was a board member. (Preston Aff. at ¶ 5[4]).

  o Preston does not identify that company in his Affidavit, but states, "specifically" that he made up to eight visits to Texas – five for board meetings of a nonprofit organization and "no more than three" for board meetings of a Delaware corporation. (Preston Aff. at ¶ 5).

- Preston failed to disclose meetings he attended in Texas in the late 1990s on behalf of Molten Metal Technology, Inc. ("MMT"), a Delaware corporation, registered to do business in Texas.[5] Preston was a board member of MMT, and the company's chief executive officer. (*See* Exhibit A-4).

  o Preston visited Texas on numerous occasions to negotiate a contract between MMT and Hoescht Celanese to develop and operate a waste recycling facility for Hoescht Celanese. (*See* Exhibit B at ¶ 12[6]).

---

[3]    Affidavit of John T. Preston, submitted as Exhibit A to Preston's Amended Special Appearance, filed September 28, 2011.

[4]    Affidavit of John T. Preston, submitted as Exhibit A to Preston's Amended Special Appearance, filed September 28, 2011.

[5]    MMT's Texas existence was forfeited in 1999. (*See* Ex. A-4).

[6]    The Affidavit of Michael Collins, dated July 2, 2014, is attached hereto as Exhibit B and incorporated herein by reference.

4

- MMT had developed certain technology called Catalytic Extraction Processing ("CEP"). CEP is a process for breaking down hazardous and radioactive waste and recycling them into marketable products. (*See* Ex. B at ¶ 3).

- MMT filed for bankruptcy protection in 1997. Preston and/or his company, Quantum Catalytics, LLC ("Quantum"), acquired MMT's patents from the MMT bankruptcy estate. (*See* Ex. A-5 at ¶¶ 15-17; Exhibit A-15 at pp. 4-5).

- In 2004, Preston flew to Houston, Texas to meet with Collins near Collins's home in The Woodlands. (Ex. B at ¶ 6). During that meeting, Preston touted the patented technology that he had acquired from MMT and encouraged Collins's participation in the commercial development of that technology. (*Id.*).

  - Preston flew to Texas to meet with Collins again a few months after that first meeting in The Woodlands. (Ex. B at ¶ 7). During that second meeting, Preston and Collins travelled to Bay City, Texas to meet with Hoescht Celanese to continue discussions regarding the development and operation of a CEP facility for Hoescht Celanese that had begun with MMT. (*Id.*).

  - Preston returned to Texas again about two months later, when Preston and Collins met with Hoescht Celanese in Baytown, Texas. (Ex. B at ¶ 7).

  - During these three meetings in Texas, Preston and Collins discussed the commercial opportunities possible utilizing the MMT technology and the technology that Collins had developed. (Ex. B at ¶ 8).

  - Preston continued to talk with Collins by telephone over the course of the ensuing months. Preston initiated a number of those calls, either to Collins at his home in The Woodlands, Texas, or to Houston offices where Collins would occasionally work, including the law offices of Sydow, McDonald, Kaiser & Ahmed, on Bagby Street in Houston, Texas. Preston also shipped records to Collins at the Bagby Street office for Collins's review and use in connection with the work he was undertaking with Preston. (*Id.*).

  - At all times during Collins's discussions and business relationship with Preston, Collins was a resident of The Woodlands, Texas. (Ex. B at ¶ 12). In his discussions with Preston, Collins learned that Preston had been to Texas on multiple occasions prior to their introduction. Preston advised Collins that he had previously travelled to Texas on numerous occasions for meetings with Hoescht Celanese and with Flour Daniel in Clear Lake, Texas. Preston also told Collins that he had made numerous visits to the Houston Area Research Center, or HARC, on Research Forrest Drive in The Woodlands, Texas to study new technologies in the late 1990s. As a result, Preston was very familiar with The Woodlands. (*Id.*).

- In July 2004, Collins formed Texas Syngas LLC ("Syngas LLC") for the purpose of exploiting his technology. Collins was the original sole member of Syngas LLC. (Ex.

5

261

B at ¶ 2). Preston joined Syngas LLC as a member after his discussions with Collins. (Ex. B at ¶ 10, 11; Exhibit A-6 at ¶ 3[7]). Although Preston ultimately executed the Syngas LLC Operating Agreement on behalf of Quantum, the investment was clearly Preston's. (*See id*; Ex. B at ¶ 11).

- On June 19, 2006, Metal Catalyst Ventures, Inc. ("Metal Catalyst") filed Articles of Incorporation with the Nevada Secretary of State. (Exhibit A-7). The Metal Catalyst Articles of Incorporation identify only one director – Preston – and lists his address as 4900 Woodway, Suite 900, Houston, Texas 77056.

- On November 10, 2008, Preston traveled to Houston, Texas to meet with Collins to discuss a financing proposal by Preston's company C Change. (*See* Ex. B at ¶ 13; Exhibit A-8 at 25:8-26:4, 30:4-15; Exhibit A-9 at p. 13).

- On November 10, 2008, Preston wrote a personal check in the amount of $1,100,000, payable to BOS, Inc. ("BOS"). (*See* Exhibit A-13 at 01158).

  o BOS is identified in its banking records as officing at 4900 Woodway Dr., Suite 900, Houston, Texas 77056 – the same address as NC12/TSI. (*See* Ex. A-13 at 00448, 00501). That same banking record reflects a wire transfer from BOS's Texas bank account to Preston in the amount of $1,100,000 on January 15, 2009. (*Id.* at 00448, 01142).

  o TSI apparently paid for the incorporation of BOS. (*See* Ex. A-13 at 00501-502).

- On April 2, 2009 and May 3, 2009, Preston traveled to Houston, Texas. (*See* Ex. A-9 at p. 13; Exhibit A-10).

  o Preston contends that his travel to Texas on those occasions was "as a representative on behalf of TEM Capital." (*See* Ex. A-9 at p. 12). However, according to Russell Read ("Read"), Preston's former partner in C Change and TEM Capital, TEM Capital was not formed until 2011. (*See* Ex. A-8 at 33:2-12). Accordingly, Preston's travel to Texas in April and May of 2009 would not have been as a representative and on behalf of TEM Capital.

- Preston traveled to Texas with Read in "either 2009 or early 2010" allegedly "for meetings with Russian technology partners for the formation of a joint venture M.I.T. was entering into with the Russian government." (*See* Ex. A-8 at 49:13-50:4).

---

[7] Preston submitted an Affidavit dated December 6, 2013, in Cause No. 2007-38533, *Kaiser v. Collins*, pending in the 152 Judicial District Court, Harris County, Texas, in support of Plaintiff's Opposition to Collins's Motion for Summary Judgment. In that Affidavit, Preston discusses *his* decision to invest in "Texas Syngas and to become a member in the Texas Limited Liability Company into which it ultimately was formed."

6

262

- o Preston did not disclose this visit to Texas in his Affidavit filed in support of his Special Appearance or in the discovery responses he served in this action. (*See* Ex. A-9 at pp. 12-13).[8]

- In the summer of 2009, Preston's C Change was looking at another company with operations in Texas, EMC Cement BV ("EMC").

  - o In its Original Complaint recently filed in the United States District Court for the Western District of Texas, Waco Division, under Civil Action No. 6:14-cv-149 (the "EMC Litigation"), against Preston[9] and others, EMC alleges that in August 2010, Preston visited a cement plant in Jewett, Texas operated by Texas EMC Products, EMC's exclusive licensee for the use of EMC's patents in the state of Texas. (*See* Exhibit A-11 at ¶ 36).

    - Preston did not disclose a visit to Texas in August 2010 in his Affidavit filed in support of his Special Appearance or in the discovery responses he served in this action. (*See* Ex. A-9 at pp. 12-13).

- On October 6, 2010, Preston appeared as a witness on behalf of Sydow in the divorce proceedings filed by Sydow in the 308th Judicial District Court, Harris County, Texas. (Exhibit A-12).

  - o Although Preston contends that his testimony in the Sydow divorce proceedings was "as the corporate representative for NC12,"[10] there is nothing in the record of those proceedings indicating that Preston appeared as a "corporate representative." Rather, it appears he simply traveled to Texas to support his colleague and co-conspirator Michael Sydow.

- EMC alleges that Preston visited Texas again in January 2011 to discuss a potential investment by C Change/TEM Capital in EMC's line of business and technology. (Ex. A-11 at ¶ 48).

  - o Preston did not disclose a visit to Texas in January 2011. (*See* Ex. A-9 at pp. 12-13).

- EMC alleges that Preston appeared at a foreclosure sale in Texas on May 3, 2011, on behalf of the defendants in the EMC Litigation during which the EMC Defendants are alleged to have acquired the cement plant in Jewett, Texas, that Preston had visited a year earlier. (Ex. A-11 at 53).

---

[8] Preston was asked to identify "all" travel to Texas since 2000. (Ex. A-9 at p. 14).

[9] Preston asserts in his Affidavit filed in support of his Special Appearance that "[e]xcept for this lawsuit, [he has] never been a party to litigation in any state or federal court in Texas." The lawsuit filed by EMC on May 5, 2014, now changes that fact.

[10] *See* Ex. A-9 at p.13.

7

263

o Preston did not disclose this visit to Texas in May 2011 in response to the Intervenors' Interrogatories. (*See* Ex. A-9 at pp. 12-13). However, Preston produced flight records that confirm a flight to Dallas/Fort Worth on May 2, 2011, with a return flight to Boston, Massachusetts on May 4, 2011. (*See* Ex. A-10 at Preston 000025-26).

o Preston claims that his visit to Texas in May 2011 was for the purpose of testifying "as the corporate representative for NC12, Inc. regarding an asset owned by the company in Michael Sydow's divorce proceedings." (Ex. A-9 at p. 13). However, as noted, above, Preston came to Houston (not Dallas/Fort Worth as the flight records for May 2011 reflect) to testify for Sydow in October 2010. Accordingly, Preston's travel records for May 2011, likely reflect this visit to attend the foreclosure sale related to the EMC Cement property.

- EMC alleges that Preston visited Jewett, Texas again within days of the May 3, 2011, foreclosure sale to inspect the cement plant. (Ex. A-11 at ¶ 53).

- On August 22, 2012, JK Claims Investment Corporation ("JK Claims") filed a Certificate of Formation with the Texas Secretary of State as a domestic for-profit corporation. (Exhibit A-14). Preston is identified in the Texas Secretary of State records as the sole director of JK Claims.[11] (*Id.*).

o JK Claims purchased from the bankruptcy estate of Jeffery Kaiser ("Kaiser") the claims asserted by Kaiser in Cause No. 2007-38533, *Kaiser v. Collins*, pending in the 152 Judicial District Court, Harris County, Texas (the "Kaiser Litigation").

o Preston is now pursuing relief in a Texas state court, under the guise of JK Claims and Quantum, through an amended petition in the Kaiser Litigation reframing the complaint to one complaining about alleged misrepresentations by Collins regarding his educational background and professional licensing to induce the plaintiffs' investment in Syngas LLC.

## III. ARGUMENT AND AUTHORITIES

### A. The Preston Defendants' Special Appearances Fail to Comply with Rule 120a.

A defendant desiring to challenge the exercise of personal jurisdiction over him in a Texas court must file a sworn motion challenging jurisdiction. TEX. R. CIV. P. 120a. Although

---

[11] Note that Preston asserted in response to Interrogatories served in this matter that "Texas Syngas LLC is the only company with its principal place of business in Texas *or incorporated in Texas* for which Preston was a director, officer, or employee." (Ex. A-9 at p. 12). According to the records of the Texas Secretary of State, Preston's statement is incorrect.

264

the Preston Defendants' have each submitted an affidavit in support of their special appearance, the special appearances themselves are not verified and so fail to comply with Rule 120a.

## B. State and Federal Due Process Considerations and "Minimum Contacts."

Courts sitting in Texas may assert personal jurisdiction over a nonresident if the Texas Long-Arm statute authorizes jurisdiction and the exercise of jurisdiction "is consistent with the state and federal due process standards." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). The Texas Long-Arm statute authorizes the exercise of jurisdiction over "those who do business in Texas, which includes contracting with a Texas resident where *either party* is to perform the contract *in whole or in part* in Texas." *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1067 (5th Cir. 1992) (emphasis added); *see* TEX. CIV. PRAC. & REM. CODE ANN. at § 17.042.

Texas courts have generally held that the "broad language of the [Texas] long-arm statute permits an expansive reach, limited only by the federal constitutional requirements of due process." *Daimler-Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 714 (Tex. App.—Austin 2000, pet. dism'd w.o.j.). Accordingly, the court may consider solely "whether it is consistent with federal due process for Texas courts to assert personal jurisdiction over" the foreign defendant. *Daimler-Benz*, 21 S.W.3d at 714.

Federal due process considerations ask whether the nonresident defendant has "purposefully established minimum contacts with the forum state" such that the exercise of personal jurisdiction over the nonresident "comports with traditional notions of fair play and substantial justice." *Daimler-Benz*, 21 S.W.3d at 714.

9

265

Jurisdiction will be proper "where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

"The ultimate test of minimum contacts is whether the defendant purposefully availed itself of the privilege of conducting activities in Texas, thereby invoking the benefits and protection of Texas laws." *Daimler-Benz*, 21 S.W.3d at 714. When a defendant has deliberately engaged in "significant" activities with a state, "*or* has created 'continuing obligations' between himself and residents of the forum," he has availed himself of the privilege of conducting business in that state. *Burger King*, 471 U.S. at 475-76 (emphasis added). "[B]ecause his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.*

Accordingly, a finding of "minimum contacts" requires a "substantial connect between the nonresident defendant and the forum state" brought about "by action or conduct of the nonresident defendant purposefully directed toward the forum state." *Guardian Royal Exchange Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991); *see also Cartlidge v. Hernandez*, 9 S.W.3d 341, 347 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("The exercise of personal jurisdiction is proper when the contacts proximately result from actions of the nonresident defendant which create a substantial connection with the forum state."). Requiring that the non-resident's actions be "purposeful" ensures that a nonresident defendant "will not be haled into a jurisdiction based solely upon 'random,' 'fortuitous' or 'attenuated' contacts or the 'unilateral activity of another party or a third person.'" *Guardian Royal*, 815 S.W.2d at 226 (*quoting Burger King*, 471 U.S. at 475).

266

Implicit in the requirement of a purposeful action and a "substantial connection" is the concept of "foreseeability." *Guardian Royal*, 815 S.W.2d at 227. "Indeed, so long as it creates a substantial connection with the forum State, even a single act can support jurisdiction." *Cartlidge*, 9 S.W.3d at 348; *see also WesternGeco L.L.C. v. Ion Geophysical Corp.*, 776 F. Supp. 2d 342, 355 (S.D. Tex. 2011) (same).

The Supreme Court in *Burger King* instructs that personal jurisdiction does not turn on "'mechanical' tests" or "'conceptualistic . . . theories of the place of contracting or of performance." *Burger King*, 471 U.S. at 479. Instead, the court "must review the quality and nature of the defendant's activities in the forum in their totality to decide whether the defendant purposefully availed itself of the privileges offered by the forum state." *Microseismic, Inc. v. TRAC Charitable Remainder Trust*, No. H-12-0118, 2012 U.S. Dist. LEXIS 101108, *19-20 (S.D. Tex. July 20, 2012).

Fair play and substantial justice factors include: "(1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several States in furthering fundamental substantive social policies." *Villagomez v. Rockwood Specialties, Inc.*, 210 S.W.3d 720, 742 (Tex. App.—Corpus Christi-Edinburg 2006, pet. denied).

## C. General and Specific Jurisdiction.

A defendant's contacts with a forum can support the exercise of either specific or general jurisdiction. *J.D. Fields & Co., Inc. v. W.H. Streit, Inc.*, 21 S.W.3d 599, 602 (Tex. App.—Houston [1st Dist.] 2000, no pet.).

Under a specific jurisdictional analysis, the court will focus on "the relationship among the defendants, the forum, and the litigation." *J.D. Fields*, 21 S.W.3d at 603 (citations omitted). "This analysis requires courts to inquire '(1) whether the defendant has purposefully directed his activities at residents of the forum; and (2) whether the litigation results from the alleged injuries that arise out of *or relate to* those activities." *ReedHycalog UK. Ltd. v. United Diamond Drilling Servs.*, No. 6:07 CV 251, 2009 U.S. Dist. LEXIS 77654, *9-10 (E.D. Tex. Aug. 31, 2009). Accordingly, even if the defendant has relatively few contacts with a forum, "the court may still exercise personal jurisdiction over that party if the suit "'arises out of' or is related to the defendant's contacts with the forum.'" *Microseismic*, 2012 U.S. Dist. LEXIS 101108 at *15.

The Court may exercise general jurisdiction over a nonresident defendant when the "nonresident defendant's contacts are continuous and systematic," regardless of whether the alleged liability arises from those contacts. *J.D. Fields*, 21 S.W.3d at 602; *see also Twister B.V. v. Newton Research Partners, LP*, 364 S.W.3d 428, 434 (Tex. App.—Dallas 2012, no pet.). "General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Villagomez*, 210 S.W.3d at 729.

A defendant objecting to the exercise of jurisdiction bears the burden of presenting "a compelling case that the presence of some other consideration would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477; *see also Jones*, 954 F.2d at 1068. "Only in rare cases will the exercise of personal jurisdiction not comport with fair play and substantial justice when a nonresident defendant has purposefully availed itself of the privilege of conducting business with a forum." *Critin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 280 (Tex. App.—14th Dist. 2009, no pet.). This case does not present that rare circumstance.

268

**D.** **The Preston Defendants Have Purposefully Availed Themselves of the Privilege of Conducting Business With Texas and Are Subject to This Court's Jurisdiction.**

As demonstrated above, Preston has purposefully availed himself of the privilege of doing business in Texas by, among other things:

- Actively engaging in business with MMT to pursue a business opportunity in Bay City, Texas;

- Actively engaging in business with Collins, a Texas resident, for the development of a business based in Texas;

- Shipping materials to Collins in Texas for his use in connection with business with Preston;

- Serving as a director of TSI and NC12, companies having their principal place of business in Texas;

- Visiting Texas on numerous occasions as he worked to build business relationships with Collins as well as with the parties involved in the EMC Litigation;

- Engaging in a million dollar financial transaction with BOS, Inc.;

- Appearing as a witness in the personal divorce proceedings of his business colleague Michael Sydow; and

- Forming a Texas corporation to purchase litigation claims out of Kaiser's Texas bankruptcy estate to pursue those claims in a Texas court.

All of the contacts identified herein directly resulted from Preston's own purposeful conduct which created a substantial connection with the State of Texas. Preston and his controlled companies cannot reasonably contend that they have not availed themselves of the privilege of conducting business in Texas or that they could not have reasonably anticipated that they could be haled into a Texas court as a result of their own purposeful activities in or directed to Texas.

The acts and events complained of in this litigation all arise directly from Preston's activities as a director of and fund raiser for TSI and NC12 – both Texas companies. In raising funds for a TSI and NC12, through fraudulent misrepresentations and then denuding the

13

269

companies of their assets, Preston, C Change, Brilliant Novelty (which took title to the company's research facility), could reasonably foresee that NC12 and its shareholders and investors would suffer direct economic injury. Accordingly, Preston, C Change, and Brilliant Novelty are subject to the exercise of personal jurisdiction by this Court under a specific jurisdictional analysis.

Additionally, the Court may exercise general jurisdiction over Preston and C Change as a result of their continuous and systematic business dealings in Texas with TSI, NC12, and EMC.

## E. Preston Is Not Protected by the Fiduciary Shield.

The fiduciary shield doctrine is expressly limited in application to questions of *general jurisdiction* and will not protect an individual from the exercise of *specific jurisdiction* to shield the individual from a claim for intentional torts or fraudulent acts for which he may be held individually liable. *Wright v. Sage Eng'g, Inc.*, 137 S.W.3d 238, 250 (Tex. App.—Houston [1st Dist.] 2004, pet. denied). Accordingly, if the claims asserted against individual defendants are ones for which they may be held individually liable, the fiduciary shield doctrine will not preclude the exercise of specific personal jurisdiction over them. *Wright*, 137 S.W.3d at 251.

"It is well-settled that a corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a corporate representative." *Wright*, 137 S.W.3d at 250. Accordingly, regardless of whether Preston's allegedly fraudulent conduct was made in the capacity of an officer or director of TSI, NC12, C Change, or Brilliant Novelty, Preston is subject to *personal* liability for his actions and may not hide behind the fiduciary shield to avoid this Court's jurisdiction.

14

270

**F. Traditional Notions of Fair Play and Substantial Justice Support the Exercise of Jurisdiction Over the Preston Defendants.**

The Preston Defendants contend that it would be burdensome for them to participate in this litigation in Texas. By way of example, the Preston Defendants complain that a representative of C Change and Brilliant Novelty and Preston "would be required to travel to Texas to attend court proceedings." (*See* C Change Spec. App. at ¶ 21, Brilliant Novelty Spec. App. at ¶ 22, Preston Spec. App. at 29). However, as noted above, Preston was at all relevant times a manager of Brilliant Novelty and was a managing partner of and controlled C Change. In reality, only Preston will need to travel to Texas.

Moreover, in any multi-state dispute, "someone will always be inconvenienced." *Tobasso v. Bearcom Group, Inc.*, No. 05-11-01674-CV, 2013 Tex. App. LEXIS 7866, *11 (Tex. App.—Dallas June 26, 2013, no pet.). Accordingly, the argument is frequently rejected as a basis for denying jurisdiction. *Id.*

The Preston Defendants further claim that Texas has little interest in providing a forum for this litigation, asserting that the "injury occurred outside of Texas." (*See* Brilliant Novelty Spec. App. at ¶ 23). The argument is simply wrong. NC12 – the company driven into bankruptcy by the Preston Defendants' fraudulent conduct – was doing business *in Texas* and is now a chapter 7 debtor in a federal court here in this state. Accordingly, this Court has an interest in adjudicating the claims asserted herein which arise from NC12's operations in this state. *See Tobasso*, 2013 Tex. App. LEXIS 7866, at *11.

Although the Preston Defendants complain about the restrictions on the subpoena power of this Court, they have failed to identify any witnesses or evidence that would be necessary for the litigation of this matter beyond the range of this Court's subpoena power. Moreover, given

15

the pending bankruptcy proceedings, the logical presumption is that the books and records of the company and other evidence relevant to these proceedings reside here in Houston.

## IV.   CONCLUSION AND PRAYER

The Preston Defendants have established sufficient minimum contacts with Texas to support the exercise of jurisdiction over them by this Court. Accordingly, Intervenors Emjo Investments, Ltd. and H.J. von der Goltz respectfully request that this Court deny the Special Appearances filed by John T. Preston, C Change Investments, LLC, and Brilliant Novelty, L.L.C. and grant Intervenors such other and further relief to which they may be entitled.

Respectfully submitted,

ELLISON • KELLER, P.C.

Kelley M. Keller
State Bar No. 11198240
Tracey N. Ellison
State Bar No. 150541720
5120 Woodway Drive, Suite 6019
Houston, Texas 77056
Telephone: 713-266-8200
Facsimile: 713-266-2801

*Attorneys for Intervenors/Plaintiffs Emjo Investments, Ltd. and .H.J. von der Goltz.*

16

272

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 2nd day of July, 2014 a true and correct copy of the above Response to the Special Appearances filed by John T. Preston, Brilliant Novelty, L.L.C., and C Change Investments LLC was served on all interested parties, by and through their attorney of record indicated below via email.

Randall O. Sorrels
Clyde J. "Jay" Jackson. Ill
Abraham Watkins. Nichols, Sorrels,
    Matthews & Friend
800 Commerce Street
Houston, Texas 77002-1770
Facsimile: 713-225-0827
*Attorneys for Original Plaintiffs*

Brent C. Perry
Law Offices of Brent C. Perry
800 Commerce Street
Houston. Texas 77002
Facsimile: 713-237-0415
*Attorney for Original Plaintiffs*

Asher Griffin
Chris Sileo
Sean Flammer
Scott. Douglass & McConnico, LLP
600 Congress Ave., Ste 1500
Austin, Texas 78701-2589
Facsimile: 512-474-0731
*Attorneys for Defendants*
*Chalsys, MET, and Lo*

Amir Alavi
Ashley Frankson
Ahmad. Zavitsanos, Anaipakos, Alavi &
Mensing P.C.
3460 One Houston Center
1221 McKinney Street
Houston. Texas 77010
Facsimile: 713-658-0062
*Attorneys for Defendants Sydow, Preston,*
*Henkel, C Change, and Brilliant Novelty*

F. Eric Fryar
State Bar No. 07495770
eric@fryarlawfirm.com
Matthew Buschi
State Bar No. 24064982
mbusch@fryarlawfirm.com
Christina Richardson
FRYAR LAW FIRM, P.C.
State Bar No. 24070495
912 Prairie. Suite 100
Houston, Texas 77002-3145
Facsimile: 281-605-1888
*Attorneys for all Intervenors/Plaintiffs*

Kelley M. Keller

17

273

Cause No. 2011-44058

| | | |
|---|---|---|
| MICHAEL COLLINS; ET AL., <br> PLAINTIFFS, | § <br> § | IN THE DISTRICT COURT |
| VS. | § <br> § | OF HARRIS COUNTY, TEXAS |
| MICHAEL SYDOW; ET AL., <br> DEFENDANTS. | § <br> § <br> § | 215th JUDICIAL DISTRICT |

| | | |
|---|---|---|
| AKILA FINANCE, S.A.; ET AL., <br> INTERVENORS/PLAINTIFFS, | § <br> § | IN THE DISTRICT COURT |
| VS. | § <br> § | OF HARRIS COUNTY, TEXAS |
| MICHAEL SYDOW; ET AL., <br> DEFENDANTS. | § <br> § <br> § | 215th JUDICIAL DISTRICT |

## AFFIDAVIT OF KELLEY M. KELLER

Before me, the undersigned notary, on this day personally appeared KELLEY M. KELLER, who is personally known to me, and first being duly sworn to law upon her oath deposed and said:

1. My name is Kelley M. Keller. I am over the age of 19 years old and am fully competent to make this affidavit. I am an attorney licensed to practice law in the state of Texas. I am lead counsel for Johan von der Goltz in the above referenced action. The information contained herein is true and correct and is based on my personal knowledge as it relates to my representation of Mr. Von der Goltz.

2. Attached to the Intervenors' Response to the Special Appearance of John T. Preston (the "Response") as Exhibit A-1 is a true and correct copy of the Initial List of Officers, Directors, and Registered Agent of NC12, Inc. ("NC12"), filed with the Nevada Secretary of State on July 29, 2008 and the Annual List of Officers, Directors and Registered Agent of NC12, filed with the Nevada Secretary of State on May 20, 2009.

3. Attached to the Response as Exhibit A-2 is a true and correct copy of the Application for Registration of a Foreign For-Profit Corporation filed by Texas Syngas, Inc. ("TSI") with the Texas Secretary of State on June 19, 2008.

4. Attached to the Response as Exhibit A-3 is a true and correct copy of the Application for Registration of a Foreign For-Profit Corporation filed by NC12 with the Texas Secretary of State on August 28, 2009.

5. Attached to the Response as Exhibit A-4 is a true and correct copy of the Business Organizations Inquiry – View Entity for Molten Metal Technology, Inc. ("MMT"),

**EXHIBIT A**

274

reflecting the "Filing History" and "Management," which includes John T. Preston, Director and Chief Executive Offer, 238 Main Street, Suite 201, Cambridge, MA.

6. Attached to the Response as Exhibit A-5 is a true and correct copy of the First Amended Complaint filed January 9, 2009 under Case No. 1:08-cv-11456, *Quantum Catalytics, LLC and Texas Syngas, Inc. v. Ze-Gen, Inc., et al*, in the United States District Court of Massachusetts, Eastern Division.

7. Attached to the Response as Exhibit A-6 is a true and correct copy of the Affidavit of John T. Preston, dated December 6, 2013, filed in Cause No. 2007-38533, *Kaiser v. Collins*, pending in the 152 Judicial District Court, Harris County, Texas, (the "Kaiser Litigation") in support of Plaintiff's Opposition to Collins's Motion for Summary Judgment.

8. Attached to the Response as Exhibit A-7 is a true and correct copy of the Articles of Incorporation for Metal Catalyst Ventures, Inc., filed with the Nevada Secretary of State on June 19, 2006.

9. Attached to the Response as Exhibit A-8 is a true and correct copy of excerpts from the deposition of Russell Read, taken April 21, 2014 in the Kaiser Litigation.

10. Attached to the Response as Exhibit A-9 is a true and correct copy of excerpts from the Amended Answers of John T. Preston to Intervenors' First Set of Interrogatories.

11. Attached to the Response as Exhibit A-10 are true and correct copies the documents produced by Preston in response to Intervenors' Request for Production.

12. Attached to the Response as Exhibit A-11 is a true and correct copy of the Original Complaint filed May 5, 2014, under Case No. 6:14-cv-149, *Procedo Enterprises Establishment and EMC Cement, BV v. Quadrant Management, Inc., et al.*, in the United States District Court for the Western District of Texas, Waco Division.

13. Attached to the Response as Exhibit A-12 is a true and correct copy of excerpts from the transcript of the proceedings held October 6, 2010, in Cause No. 2010-02710, *Sydow v. Sydow*, In the 308th Judicial District Court, Harris County, Texas.

14. Attached to the Response as Exhibit A-13 are true and correct copies of excerpts from the document production of BBVA Compass in Cause No. 2010-02710, *Sydow v. Sydow*, In the 308th Judicial District Court, Harris County, Texas.

15. Attached to the Response as Exhibit A-13 is a true and correct copy of the Business Organizations Inquiry – View Entity for JK Claims Investment Corporation, a Texas domestic for-profit corporation, reflecting the following "Management": John T. Preston, Director, 421 Currant Rd., Fall River, MA 02720 USA.

16. Attached to the Response as Exhibit A-15 is a true and correct copy of a Memorandum filed by Quantum Catalytics, LLC, John Preston, and Christopher Nagel in Case No. 05-10077-RGS, in the United States District Court of Massachusetts.

275

Dated: July 2, 2014.

Kelley M. Keller

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

BEFORE ME, the undersigned authority, on this day personally appeared Kelley M. Keller, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she read the Affidavit of Kelley M. Keller and that the facts stated therein were within her personal knowledge and were true and correct.

GIVEN UNDER MY HAND AND SEAL OF OFFICE on July 2, 2014.



BARBARA DAVIS
My Commission Expires
November 14, 2015

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

MY COMMISSION EXPIRES: _____11/14/2015_____

3

276

# (PROFIT) INITIAL LIST OF OFFICERS, DIRECTORS AND REGISTERED AGENT OF

NC12, INC.

**FILE NUMBER**

E0274482008-8

(Name of Corporation)

FOR THE FILING PERIOD OF: 4/2008  TO 4/2009

The corporation's duly appointed registered agent in the State of Nevada upon whom process can be served is:

CSC SERVICES OF NEVADA, INC. (Commercial Registered Agent)
502 EAST JOHN STREET
CARSON CITY, NV 89706  USA

Filed in the office of

Ross Miller
Secretary of State
State of Nevada

Document Number
20080501016-83
Filing Date and Time
07/29/2008 9:44 AM
Entity Number
E0274482008-8

(This document was filed electronically.)
THE ABOVE SPACE IS FOR OFFICE USE ONLY

☐ CHECK BOX IF YOU REQUIRE A FORM TO UPDATE YOUR REGISTERED AGENT INFORMATION

Important : Read Instructions before completing and returning this form.

1. Print or type names and addresses either residence or business, for all officers and directors. A President, Secretary, Treasurer, or equivalent of and all Directors must be named. Have an officer sign the form FORM WILL BE RETURNED IF UNSIGNED
2. If there are additional directors attach a list of them to this form.
3. Return the completed form with the $125.00 filing fee. A $75.00 penalty must be added for failure to file this form by the last day of first month following the incorporation/initial registration with this office.
4. Make your check payable to the Secretary of State. Your cancelled check will constitute a certificate to transact business per NRS 78.155. To receive a certified copy, enclose an additional $30.00 and appropriate instructions.
5. Return the completed form to: Secretary of State, 202 North Carson Street, Carson City, NV 89701 4201, (775) 684-5708.
6. Form must be in the possession of the Secretary of State on or before the last day of the first month following the incorporation/initial registration date. (Postmark date is not accepted as receipt date.) Forms received after due date will be returned for additional fees and penalties.

FILING FEE $125.00     LATE PENALTY: $75.00

## CHECK ONLY IF APPLICABLE

☐ This corporation is a publicly traded corporation. The Central Index Key number is:

☐ This publicly traded corporation is not required to have a Central Index Key number.

| NAME | TITLE(S) |
|------|----------|
| MICHAEL D SYDOW | **PRESIDENT** (OR EQUIVALENT OF) |

| ADDRESS | CITY | ST | ZIP |
|---------|------|-----|-----|
| 4900 WOODWAY, SUITE 900  , USA | HOUSTON | TX | 77056 |

| NAME | TITLE(S) |
|------|----------|
| MICHAEL COLLINS | **SECRETARY** (OR EQUIVALENT OF) |

| ADDRESS | CITY | ST | ZIP |
|---------|------|-----|-----|
| 4900 WOODWAY, SUITE 900  , USA | HOUSTON | TX | 77056 |

| NAME | TITLE(S) |
|------|----------|
| DAN P SHELLEDY | **TREASURER** (OR EQUIVALENT OF) |

| ADDRESS | CITY | ST | ZIP |
|---------|------|-----|-----|
| 4900 WOODWAY, SUITE 900  , USA | HOUSTON | TX | 77056 |

| NAME | TITLE(S) |
|------|----------|
| MICHAEL COLLINS | **DIRECTOR** |

| ADDRESS | CITY | ST | ZIP |
|---------|------|-----|-----|
| 4900 WOODWAY, SUITE 900  , USA | HOUSTON | TX | 77056 |

I declare, to the best of my knowledge under penalty of perjury, that the above mentioned entity has complied with the provisions of NRS 360.780 and acknowledge that pursuant to NRS 239.330 it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

X Signature of Officer MICHAEL D SYDOW   Title PRESIDENT   Date 7/29/2008 9:57:32 AM

Nevada Secretary of State Form INITIAL LIST PROFIT 2008
GOLTZ0172

**EXHIBIT A-1**

277

# (PROFIT) INITIAL LIST OF OFFICERS, DIRECTORS AND REGISTERED AGENT OF

NC12, INC.

FILE NUMBER: E0274482008-8

| NAME | TITLE(S) |
|------|----------|
| JOHN T PRESTON | DIRECTOR |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
| 421 CURRANT ROAD , USA | FALL RIVER | MA | 02720 |

| NAME | TITLE(S) |
|------|----------|
| MICHAEL D SYDOW | DIRECTOR |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
| 4900 WOODWAY, SUITE 900 , USA | HOUSTON | TX | 77056 |

| NAME | TITLE(S) |
|------|----------|
|  |  |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
|  |  |  |  |

| NAME | TITLE(S) |
|------|----------|
|  |  |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
|  |  |  |  |

| NAME | TITLE(S) |
|------|----------|
|  |  |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
|  |  |  |  |

| NAME | TITLE(S) |
|------|----------|
|  |  |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
|  |  |  |  |

| NAME | TITLE(S) |
|------|----------|
|  |  |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
|  |  |  |  |

| NAME | TITLE(S) |
|------|----------|
|  |  |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
|  |  |  |  |

| NAME | TITLE(S) |
|------|----------|
|  |  |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
|  |  |  |  |

| NAME | TITLE(S) |
|------|----------|
|  |  |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
|  |  |  |  |

GOLTZ0773

278

# (PROFIT) ANNUAL LIST OF OFFICERS, DIRECTORS AND REGISTERED AGENT OF

FILE NUMBER
E0274482008-8

NC12, INC.

(Name of Corporation)

FOR THE FILING PERIOD OF 4/2009    TC 4/2010

The corporation's duly appointed registered agent in the State of Nevada upon whom process can be served is:

CSC SERVICES OF NEVADA, INC. (Commercial Registered Agent)
502 EAST JOHN STREET
CARSON CITY, NV 89706 USA

| Filed in the office of | Document Number |
| --- | --- |
| *Ross Miller* | 20090446244-85 |
| Ross Miller | Filing Date and Time |
| Secretary of State | 05/29/2009 8:20 AM |
| State of Nevada | Entity Number |
| | E0274482008-8 |

☐ CHECK BOX IF YOU REQUIRE A FORM TO UPDATE YOUR REGISTERED AGENT INFORMATION

Important: Read instructions before completing and returning this form.

[This document was filed electronically.]
THE ABOVE SPACE IS FOR OFFICE USE ONLY

1. Print or type names and addresses either residence or business, for all officers and directors. A President, Secretary, Treasurer, or equivalent of and all Directors and all directors must be named. Have an officer sign the form. FORM WILL BE RETURNED IF UNSIGNED
2. If there are additional directors attach a list of them to this form.
3. Return the completed to" with the filing fee. A $75.00 penalty must be added for failure to file this form by the deadline. An annual list received more than 90 days before its due date shall be deemed an amended list for the previous year.
4. Make your check payable to the Secretary of State. Your cancelled check will constitute a certificate to transact business per NRS 78.155. To receive a certified copy, enclose an additional $30.00 and appropriate instructions.
5. Return the completed form to: Secretary of State, 202 North Carson Street, Carson City, NV 897014201, (775) 884-5708.
6. Form must be in the possession of the Secretary of State on or before the last day of the month in which it is due. (Postmark date is not accepted as receipt date.) Forms received after due date will be returned for additional fees and penalties.

## CHECK ONLY IF APPLICABLE

☐ This corporation is a publicly traded corporation. The Central Index Key number is: _____

☐ This publicly traded corporation is not required to have a Central Index Key number.

| NAME | TITLE(S) | | |
| --- | --- | --- | --- |
| MICHAEL D SYDOW | PRESIDENT (OR EQUIVALENT OF) | | |
| ADDRESS | CITY | St | Zip |
| 4900 WOODWAY, SUITE 900 , USA | HOUSTON | TX | 77056 |

| NAME | TITLE(S) | | |
| --- | --- | --- | --- |
| MICHAEL COLLINS | SECRETARY (OR EQUIVALENT OF) | | |
| ADDRESS | CITY | St | Zip |
| 4900 WOODWAY, SUITE 900 , USA | HOUSTON | TX | 77056 |

| NAME | TITLE(S) | | |
| --- | --- | --- | --- |
| DAN P SHELLEDY | TREASURER (OR EQUIVALENT OF) | | |
| ADDRESS | CITY | St | Zip |
| 4900 WOODWAY, SUITE 900 , USA | HOUSTON | TX | 77056 |

| NAME | TITLE(S) | | |
| --- | --- | --- | --- |
| MICHAEL COLLINS | DIRECTOR | | |
| ADDRESS | CITY | St | Zip |
| 4900 WOODWAY, SUITE 900 , USA | HOUSTON | TX | 77056 |

I declare, to the best of my knowledge under penalty of perjury, that the above mentioned entity has complied with the provisions of NRS 360.780 and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

X Signature of Officer      Title PRESIDENT      Date 5/29/2009 8:15:10 AM
MICHAEL SYDOW

Nevada Secretary of State Form ANNUAL LIST PROFIT 2003
GOLTZ0774

279

# (PROFIT) ANNUAL LIST OF OFFICERS, DIRECTORS AND REGISTERED AGENT OF

**FILE NUMBER**

NC12, INC.

E0274482008-8

| NAME | TITLE(S) |
|------|----------|
| JOHN T PRESTON | DIRECTOR |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
| 421 CURRANT ROAD , USA | FALL RIVER | MA | 2720 |

| NAME | TITLE(S) |
|------|----------|
| MICHAEL D SYDOW | DIRECTOR |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
| 4900 WOODWAY, SUITE 900 , USA | HOUSTON | TX | 77056 |

| NAME | TITLE(S) |
|------|----------|
| | |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
| | | | |

| NAME | TITLE(S) |
|------|----------|
| | |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
| | | | |

| NAME | TITLE(S) |
|------|----------|
| | |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
| | | | |

| NAME | TITLE(S) |
|------|----------|
| | |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
| | | | |

| NAME | TITLE(S) |
|------|----------|
| | |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
| | | | |

| NAME | TITLE(S) |
|------|----------|
| | |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
| | | | |

| NAME | TITLE(S) |
|------|----------|
| | |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
| | | | |

| NAME | TITLE(S) |
|------|----------|
| | |

| ADDRESS | CITY | ST | ZIP |
|---------|------|----|----|
| | | | |

GOLTZ0775

280

Form **301**
(Revised 1/06)

Return in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512/463-5709
Filing Fee: $750



**Application for
Registration of a
Foreign For-Profit
Corporation**

This space reserved for office use.

**FILED**
In the Office of the
Secretary of State of Texas

**JUN 19 2008**

**Corporations Section**

1. The entity is a foreign for-profit corporation. The name of the entity is:

Texas Syngas, Inc.

2A. The name of the corporation in its jurisdiction of formation does not contain the word "corporation," "company," "incorporated," or "limited" (or an abbreviation thereof). The name of the corporation with the word or abbreviation that it elects to add for use in Texas is:

2B. The corporation name is not available in Texas. The assumed name under which the corporation will qualify and transact business in Texas is:

Txsyn, Inc.

3. Its federal employer identification number is:   20-8246493

☐ Federal employer identification number information is not available at this time.

4. It is incorporated under the laws of: (set forth state or foreign country) Nevada

and the date of its formation in that jurisdiction is:   05/22/2006
*mm/dd/yyyy*

5. As of the date of filing, the undersigned certifies that the foreign corporation currently exists as a valid corporation under the laws of the jurisdiction of its formation.

6. The purpose or purposes of the corporation that it proposes to pursue in the transaction of business in Texas are set forth below. The corporation also certifies that it is authorized to pursue such stated purpose or purposes in the state or country under which it is incorporated.

Transact any business permitted by Law.

7. The date on which the foreign entity intends to transact business in Texas, or the date on which the foreign entity first transacted business in Texas is: 04/15/2008
*mm/dd/yyyy*

8. The principal office address of the corporation is:

| 4900 Woodway, Suite 900 | Houston | TX | US | 77056 |
|---|---|---|---|---|
| *Address* | *City* | *State* | *Country* | *ZipCode* |

**EXHIBIT A-2**

281

Complete Item 9A or 9B, but not both. Complete Item 9C.

☐ 9A. The initial registered agent is an organization (cannot be entity named above) by the name of:

OR

☑ 9B. The initial registered agent is an individual resident of the state whose name is:

| Michael | C. | Collins | |
|---|---|---|---|
| First Name | M.I. | Last Name | Suffix |

9C. The business address of the registered agent and the registered office address is:

| 4900 Woodway, Suite 900 | Houston | TX | 77056 |
|---|---|---|---|
| Street Address | City | State | Zip Code |

10. The corporation hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in section 5.251 of the Texas Business Organizations Code.

11. The name and address of each person on the board of directors is:

| Michael | C. | Collins | | | |
|---|---|---|---|---|---|
| First Name | M.I. | Last Name | | | Suffix |
| 4900 Woodway, Suite 900 | Houston | TX | US | 77056 | |
| Street or Mailing Address | City | State | Country | Zip Code | |

| Michael | D. | Sydow | | | |
|---|---|---|---|---|---|
| First Name | M.I. | Last Name | | | Suffix |
| 4900 Woodway, Suite 900 | Houston | TX | US | 77056 | |
| Street or Mailing Address | City | State | Country | Zip Code | |

| John | | Preston | | | |
|---|---|---|---|---|---|
| First Name | M.I. | Last Name | | | Suffix |
| 421 Currant Road | Fall River | MA | US | 02720 | |
| Street or Mailing Address | City | State | Country | Zip Code | |

| Christoph | | Henkel | | | |
|---|---|---|---|---|---|
| First Name | M.I. | Last Name | | | Suffix |
| 421 Currant Road | Fall River | MA | US | 02720 | |
| Street or Mailing Address | City | State | Country | Zip Code | |

282

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

_____

_____

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date:    June 18, 2008

Chief Executive Officer

Signature and title of authorized person on behalf of the foreign entity

283

Form 301
(Revised 1/06)

Return in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512/463-5709
Filing Fee: $750



**Application for
Registration of a
Foreign For-Profit
Corporation**

This space reserved for office use.

**FILED**
In the Office of the
Secretary of State of Texas

AUG 28 2009

**Corporations Section**

1. The entity is a foreign for-profit corporation. The name of the entity is:

NC12, Inc.

2A. The name of the corporation in its jurisdiction of formation does not contain the word "corporation," "company," "incorporated," or "limited" (or an abbreviation thereof). The name of the corporation with the word or abbreviation that it elects to add for use in Texas is:

2B. The corporation name is not available in Texas. The assumed name under which the corporation will qualify and transact business in Texas is:

3. Its federal employer identification number is: **21-0644534**

☒ Federal employer identification number information is not available at this time.

4. It is incorporated under the laws of: (set forth state or foreign country) State of Nevada

and the date of its formation in that jurisdiction is: 04/28/2008
mm/dd/yyyy

5. As of the date of filing, the undersigned certifies that the foreign corporation currently exists as a valid corporation under the laws of the jurisdiction of its formation.

6. The purpose or purposes of the corporation that it proposes to pursue in the transaction of business in Texas are set forth below. The corporation also certifies that it is authorized to pursue such stated purpose or purposes in the state or country under which it is incorporated.

Transact any business permitted by Law.

7. The date on which the foreign entity intends to transact business in Texas, or the date on which the foreign entity first transacted business in Texas is: 07/29/2009
mm/dd/yyyy

8. The principal office address of the corporation is:

| 4400 Post Oak Parkway, Ste 2360 | Houston | | TX | USA | 77027 |
|---|---|---|---|---|---|
| Address | City | | State | Country | ZipCode |

Form 301

5

**EXHIBIT A-3**

284

☐ 9A. The initial registered agent is an organization (cannot be entity named above) by the name of:

OR

☑ 9B. The initial registered agent is an individual resident of the state whose name is:

| Michael | D. | Sydow | |
|---|---|---|---|
| First Name | M.I. | Last Name | Suffix |

9C. The business address of the registered agent and the registered office address is:

| 4400 Post Oak Parkway, Ste 2360 | Houston | TX | 77027 |
|---|---|---|---|
| Street Address | City | State | Zip Code |

10. The corporation hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in section 5.251 of the Texas Business Organizations Code.

11. The name and address of each person on the board of directors is:

| Director 1 | | | | | |
|---|---|---|---|---|---|
| Michael | D. | Sydow | | | |
| First Name | M.I. | Last Name | | | Suffix |
| 4400 Post Oak Parkway, Ste 2360 | Houston | | TX | USA | 77027 |
| Street or Mailing Address | City | | State | Country | Zip Code |
| Director 2 | | | | | |
| Michael | | Collins | | | |
| First Name | M.I. | Last Name | | | Suffix |
| 4400 Post Oak Parkway, Ste 2360 | Houston | | TX | USA | 77027 |
| Street or Mailing Address | City | | State | Country | Zip Code |
| Director 3 | | | | | |
| John | | Preston | | | |
| First Name | M.I. | Last Name | | | Suffix |
| 421 Currant Road | Fall River | | MA | USA | 02720 |
| Street or Mailing Address | City | | State | Country | Zip Code |
| Director 4 | | | | | |
| | | | | | |
| First Name | M.I. | Last Name | | | Suffix |
| | | | | | |
| Street or Mailing Address | City | | State | Country | Zip Code |

285

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

_____

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date: 07-30-09

President

Signature and title of authorized person on behalf of the foreign entity

# TEXAS SECRETARY of STATE
# NANDITA BERRY

### BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| Filing Number: | 9112306 | Entity Type: | Foreign For-Profit Corporation |
| Original Date of Filing: | April 3, 1992 | Entity Status: | Forfeited existence |
| Formation Date: | N/A | | |
| Tax ID: | 15216599595 | FEIN: | |

| | |
|---|---|
| Name: | MOLTEN METAL TECHNOLOGY, INC. |
| Address: | 400-2 TOTTEN POND RD<br>Waltham, MA 02154 USA |
| Fictitious Name: | N/A |
| Jurisdiction: | DE, USA |
| Foreign Formation Date: | N/A |

REGISTERED AGENT    FILING HISTORY    NAMES    MANAGEMENT    ASSUMED NAMES    ASSOCIATED ENTITIES

| View Image | Document Number | Filing Type | Filing Date | Effective Date | Eff. Cond | Page Count |
|---|---|---|---|---|---|---|
| N/A | 3237287 | Application For Certificate Of Authority | April 3, 1992 | April 3, 1992 | No | N/A |
| N/A | 3237288 | Tax Forfeiture | August 20, 1999 | August 20, 1999 | No | N/A |
| ✍ | 284887020003 | Resignation of Registered Agent | November 16, 2009 | November 16, 2009 | No | 2 |

[ Order ]    [ Return to Search ]

Instructions:
- To place an order for additional information about a filing press the 'Order' button.

## EXHIBIT A-4

287

# TEXAS SECRETARY of STATE
# NANDITA BERRY

### BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| **Filing Number:** | 9112306 | **Entity Type:** | Foreign For-Profit Corporation |
| **Original Date of Filing:** | April 3, 1992 | **Entity Status:** | Forfeited existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 15216599595 | **FEIN:** | |

| | |
|---|---|
| **Name:** | MOLTEN METAL TECHNOLOGY, INC. |
| **Address:** | 400-2 TOTTEN POND RD<br>Waltham, MA 02154 USA |
| **Fictitious Name:** | N/A |
| **Jurisdiction:** | DE, USA |
| **Foreign Formation Date:** | N/A |

REGISTERED AGENT    FILING HISTORY    NAMES    MANAGEMENT    ASSUMED NAMES    ASSOCIATED ENTITIES

| Last Update | Name | Title | Address |
|---|---|---|---|
| | James B Anderson | Director | ONE TOWER SQUARE<br>Hartford, CT 06183 USA |
| | Eugene Berman | VP | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| | Benjamin T Downs | T | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| | Bill Garner | VP | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| | William M Haney III | Director | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| | William M Haney III | P | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| | William M Haney III | Director | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| | Ethan Jacks | VP | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| | Earl Mcconchie | VP | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| | Peter A Lewis | Director | 30 ROCKEFELLER CENTER<br>New York, NY 10020 USA |
| | Robert A Swanson | Director | 400 SOUTH EL CAMINO REAL, SUITE 1288<br>San Mateo, CA 94402 USA |
| | Maurice F Strong | Director | 207 QUEENS QUAY WEST, SUITE 510<br>Toronto, Ontari, CD CAN |
| | Charlie Shaver | VP | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| | Kathy Santoro | VP | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| | John T Preston | P | 238 MAIN STREET, SUITE 201<br>Cambridge, MA 02141 USA |
| | John T Preston | Director | 238 MAIN STREET, SUITE 201<br>Cambridge, MA 02141 USA |
| | John T Preston | CEO | 238 MAIN STREET, SUITE 201<br>Cambridge, MA 02141 USA |

288

| | | |
|---|---|---|
| John T Preston | Director | 238 MAIN STREET, SUITE 201<br>Cambridge, MA 02141 USA |
| NAGEL, CHRISTOPHER J*SCD | SRVP | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| NAGEL, CHRISTOPHER J*SCD | Director | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| NAGEL, CHRISTOPHER J*SCD | Director | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| Ethan Jacks | GENCSL | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| William M Haney III | CEO | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| William M Haney III | Director | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| GATTO, VICTOR E*EDD | VP | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |
| Benjamin T Downs | VPFIN | 400-2 TOTTEN ROAD<br>Waltham, MA 02154 USA |

Order　　Return to Search

Instructions:
- To place an order for additional information about a filing press the 'Order' button.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Eastern Division

| | |
|---|---|
| QUANTUM CATALYTICS, LLC, and TEXAS SYNGAS, INC.,<br>               Plaintiffs,<br><br>v.<br><br>ZE-GEN, INC.; WILLIAM ("BILL") DAVIS; NEW BEDFORD WASTE SERVICES, LLC; VANTAGE POINT VENTURE PARTNERS; FLAGSHIP VENTURES 2004 FUND LLC; and IRV MORROW,<br>               Defendants. | C.A. No.1:08-cv-11456<br><br>**FIRST AMENDED COMPLAINT AND JURY DEMAND**<br><br>(Leave to file granted December 18, 2008) |

Plaintiffs Quantum Catalytics, LLC (formerly referred to as Quantum Catalytics, Inc.), and Texas Syngas, Inc. (collectively "Plaintiffs") bring this complaint against Defendants Ze-Gen, Inc.; William ("Bill") Davis; New Bedford Waste Services, LLC; Vantage Point Venture Partners, Flagship Ventures 2004 Fund LLC; and Irv Morrow (collectively "Defendants"), alleging as follows:

## THE PARTIES

1.      Quantum Catalytics, LLC (hereinafter "Quantum") is a Delaware limited liability company with its principal place of business in Fall River, Massachusetts.

2.      Texas Syngas, Inc. (hereinafter "TSI", and collectively with Quantum, "Plaintiffs"), is a Nevada corporation with its principal place of business in Houston, Texas.

3.      On information and belief, Ze-Gen, Inc. (herein "Ze-Gen") is a Delaware corporation with its principal place of business in Boston, Massachusetts and may be located for service of process through its president:

**EXHIBIT A-5**                                            290

STATE OF MASSACHUSETTS

COUNTY OF MIDDLESEX

AFFIDAVIT

Before me, the undersigned authority, on this day personally appeared John T. Preston who being by me first duly sworn upon oath did depose and say:

1. 'My name is John Preston. I am over the age of 21, am under no legal disability, and am competent to make this affidavit. The facts recited herein are true based upon my personal knowledge. I am President of Plaintiff Quantum Catalytics LLC.

2. I previously noted in an affidavit that beginning in the middle of 2004 Michael A.C. Collins solicited Quantum Catalytics to license technology to a company he had formed called Texas Syngas. In addition Mr. Collins solicited me to assist him as a Director of Texas Syngas. He offered Quantum Catalytics an interest in the company in exchange for the license of technology. The technology licensed to Texas Syngas LLC was granted on an exclusive basis for the desired application.

3. Before I decided to invest in Texas Syngas and to become a member in the Texas Limited Liability Company into which it ultimately was formed, Mr. Collins represented to me that he held engineering degrees in electrical and mechanical engineering from Carnegie-Melon University, and an MBA from Furman University, and that he had extensive experience in the design and operation of coal gasification

**EXHIBIT A-6**

310

systems, having been employed as an engineer at a well known coal to liquids company named SASOL. He also represented to me prior to the time that I executed the Texas Syngas LLC Operating Agreement on behalf of Quantum Catalytics LLC that he was a Registered Professional Engineer in the State of Texas and had conducted experiments that demonstrated the viability of using Quantum Catalytics technology to convert coal to synthetic gas (a clean fuel that can replace natural gas).

4.     Had Quantum known that Collins' representations were untrue, Quantum would not have granted a license to Texas Syngas.

5.     Although Mr. Kaiser states in his affidavit that he did not rely on Collins' representations of his academic background, the existence of the entire company was built around the Quantum Catalytics license and therefore every investor after Quantum's license (including Kaiser) had at a minimum an indirect reliance on Collins' representations to Quantum.

6.     In late 2008 and early 2009, C Change Investments was preparing to facilitate an investment in NC12. In that context, C Change hired Kroll Inc to conduct background checks on the key managers. The reports were written on November 26, 2008 and January 21, 2009. Mr. Collins failed to provide consent for his background check and therefore Kroll was limited in its ability to access information. Both reports state that Kroll was unable to confirm Mr. Collins' degrees from Carnegie Mellon and Furman Universities. Carnegie Mellon was unwilling to check their database without authorization from Mr. Collins. Since that

311

authorization was not granted, no conclusions could be drawn on whether or not Mr. Collins had a degree from Carnegie Mellon at that time.

7. Similarly, it appeared that Furman checked a database, but did not find Collins as a graduate. Accordingly, the Kroll reports were inconclusive and equivocal.

8. Shortly after the second of the Kroll reports, I confronted Collins on his educational background. Collins emphatically stated that he had graduated from both schools and promised to generate proof. He repeated an earlier statement that because Furman and Clemson had a joint MBA program, he was certain that his records were somewhere between Clemson and Furman, but in any case he would straighten out the matter. I took him at his word and assumed that proof would be forthcoming.

9. Later in 2009, I left the Board of NC12 and did not know until early 2010 that Collins had not followed through on providing proof of his degrees to NC12. In early 2010, I became concerned over another transaction at NC12 involving the purchase of used computer equipment at what appeared to be a highly inflated price. When I checked on whether Collins' background had been validated, I found out that he never provided the proof of his degrees. I asked a student at Carnegie Mellon if he would check the alumni database for Michael Collins. The check showed no record of Mr. Collins being a graduate of Carnegie Mellon.

10. Confronted with this added evidence of potential misrepresentations by Collins and his failure to provide the proof of his degrees that he promised, I asked a lawyer to send a letter to the Board of Directors of NC12 to check out

312

possible misrepresentations made by Mr. Collins (see Attachment 1 dated May 5, 2010). My biggest concern was that Mr. Collins was overseeing a multi-million dollar research program that he claimed was going very well, but the outside experts were relying on data provided by Collins and the company had no independent verification of the data. Therefore, Collins' integrity was critical to the development effort, and I was now becoming concerned that Collins might not be trustworthy.

11. Although I had concerns in 2009, it was not until I realized I that Collins had not followed up on his emphatic promise to provide proof of his degrees that I realized that there might be a problem. The realization occurred in early 2010. I acted shortly after coming to this conclusion by having the legal letter sent to the Board of Directors of NC12 on May 5, 2010 (Attachment 1).

12. In August of 2010, the shareholders of NC12 changed the Board of Directors and I rejoined the Board. Immediately the new Board backed up all computer systems and started an analysis of the viability of the technology development effort. By November 2010, we realized that a critical experiment he claimed to have conducted by Collins had not occurred. We conducted the experiment and found that the data was about 100 times lower than the number used by Collins to justify his reactor design. This change made his design unworkable.

13. In addition, one of the investors in NC12, Meliora, conducted its own investigations and shared the results with me in late November 2010 and early December 2010. Those results indicated significant personal use of company funds

313

by Collins as well as many other concerns about company purchases of used equipment that was not needed or purchased at an excessive price.

14. By the end of November 2010, I was totally convinced that Collins had made numerous misrepresentations.

Further affiant sayeth not."



John Preston

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned, on the ___ day of December, 2013.

Notary Public

KATHERINE B. FIRGINA
Notary Public
Massachusetts
Commission Expires May 6, 2016



DEAN HELLER
Secretary of State
206 North Carson Street
Carson City, Nevada 89701-4299
(775) 684 5708
Website: secretaryofstate.biz

## Articles of Incorporation
(PURSUANT TO NRS 78)

| Filed in the office of | Document Number |
|---|---|
| *[signature]* Dean Heller Secretary of State State of Nevada | 20060389437-32 |
| | Filing Date and Time 06/19/2006 3:05 PM |
| | Entity Number E0457312006-8 |

ABOVE SPACE IS FOR OFFICE USE ONLY

| | |
|---|---|
| 1. *Name of Corporation:* | Metal Catalyst Ventures, Inc. |
| 2. *Resident Agent Name and Street Address:* (must be a Nevada address where process may be served) | State Agent & Transfer Syndicate, Inc. Name |
| | 112 North Curry Street — Street Address — Carson City City — Nevada 89703-4121 Zip Code |
| | Optional Mailing Address — City — State Zip Code |
| 3. *Shares:* (number of shares corporation is authorized to issue) | Number of shares with par value: 10,000,000 — Par value: $ 0.001 — Number of shares without par value: |
| 4. *Names & Addresses of Board of Directors/Trustees:* (attach additional page, see 6 may list 3 Incorporators) | 1. John Preston Name |
| | 4980 Woodway, Suite 900 — Street Address — Houston City — TX 77056 State Zip Code |
| | 2. Name |
| | Street Address — City — State Zip Code |
| | 3. Name |
| | Street Address — City — State Zip Code |
| 5. *Purpose:* (optional see instructions) | The purpose of this Corporation shall be: |
| 6. *Names, Address and Signature of Incorporator.* (attach additional page, if more than 1 incorporator) | Linda Kulik (for Attorneys Corporation Service, Inc.) Name — *[signature]* Signature |
| | 3021 W. Magnolia Blvd — Address — Burbank City — CA 91505 State Zip Code |
| 7. *Certificate of Acceptance of Appointment of Resident Agent:* | I hereby accept appointment as Resident Agent for the above named corporation. *[signature]* Authorized Signature of R.A. or On Behalf of R.A. Company — 6/19/06 Date |

GOLTZ0701

## EXHIBIT A-7

315



# CONFIDENTIAL COMMUNICATIONS INTERNATIONAL, LTD.

## Transcript of the Testimony
## of
## Russell Read, CFA, Ph.D.

### Volume: I

### Date of Deposition:
April 21, 2014

**Case:** Jeffrey B. Kaiser v. Texas Syngas, LCC

Confidential Communications Int. Ltd.
Phone: 713.365.0777
Fax: 713.365.0808
Email: scheduling@recordsdiscovery.com
Internet: www.recordsdiscovery.com
4777

**EXHIBIT A-8**

316

## Page 1

Volume I
Pages 1 to 59
Exhibits 1

Cause No. 2007-38533

-----------------x

JEFFREY B. KAISER through his : IN THE DISTRICT
assignee JK CLAIMS INVESTMENT : COURT
CORPORATION, individually and :
derivatively; QUANTUM :
CATALYTICS, LLC, individually
and derivatively; and MICHAEL :
SYDOW, individually and : 152ND JUDICIAL
derivatively, : DISTRICT
        Plaintiffs, :

    vs.     :

TEXAS SYNGAS, LLC and MICHAEL. : OF HARRIS COUNTY,
A. COLLINS, : TEXAS
        Defendants. :

-----------------x

VIDEOTAPED DEPOSITION OF RUSSELL READ, CFA,
Ph.D., a witness called on behalf of the Plaintiffs,
taken pursuant to the Federal Rules of Civil
Procedure, before Jane M. Williamson, Registered
Merit Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of TEM
Capital, 175 Federal Street, Boston, Massachusetts,
on Monday, April 21, 2014, commencing at 11:23 a.m.

PRESENT:

(Via teleconference)
Reich & Binstock, LLP
    (by Charles Clinton Hunter, Esq.)
    4265 San Felipe, Suite 1000, Houston, TX
    77027, for the Plaintiffs.
    chunter@rbfirm.net
    281.768.4746

(Continued)

## Page 2

PRESENT: (Continued)

(Via teleconference)
Ellison Keller, P.C.
    (by Kelly M. Keller, Esq.)
    5120 Woodway Drive, Suite 6019, Houston, TX
    77056, for the Defendant Michael Collins.|
    kkeller@ellison-keller.com
    713.266.8218


Also Present: Jason Martin, National Video
        Reporters, Inc.

* * * * *

## Page 3

INDEX

WITNESS        DIRECT CROSS  REDIRECT RECROSS

RUSSELL READ, CFA, Ph.D.
BY MR. HUNTER        6        56
BY MS. KELLER        29

* * * *

EXHIBITS

NO.        DESCRIPTION        PAGE
1    Document entitled "Notice of        6
     Intention to Take Oral Deposition of
     Russel Read"

* * * *

## Page 4

PROCEEDINGS

THE VIDEOGRAPHER: We are now recording and on the record. My name is Jason Martin. I am a legal video specialist for Confidential Communications.

Today is April 21, 2014. The time is 11:23 a.m. This is the deposition of Russell Read in the matter of Kaiser, et al., Plaintiffs, versus Texas Syngas, LCC, et al., Defendants, in the District Court, 152nd Judicial District of Harris County, Texas, Case No. 2007-38533.

This deposition is being taken at 175 Federal Street, Boston, Mass. The court reporter is Jane Williamson.

Counsel will state their appearances, and the court reporter will administer the oath.

MR. HUNTER: All right. This is Charles Hunter of Reich & Binstock LLP. I am at 4265 San Filipe Street, Suite 1000, in Houston, Texas 77027.

I'm present with counsel for the defendants, who will state her appearance.

MS. KELLER: Kelly Keller, present for Michael Collins.

MR. HUNTER: Ms. Keller is of the law firm Ellison Keller of Houston, Texas.

Page 5

The lawsuit for which this deposition is being taken has already been described by the videographer. This deposition is taken pursuant to notice. Mr. Read has not been subpoenaed; but instead, appears voluntarily.

Can you hear us on this end?

THE WITNESS: I can hear you perfectly.

MR. HUNTER: Okay, great.

All parties entitled to notice under the Texas Rules of Civil Procedure have been notified and are present. The has the witness has been sworn, correct?

THE COURT REPORTER: No.

MR. HUNTER: Will the reporter swear the witness, please.

Page 6

RUSSELL READ, CFA, Ph.D.
a witness called for examination by counsel for the Plaintiffs, having been satisfactorily identified by the production of his driver's license and being first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. HUNTER:

Q. Thank you, Mr. Read.

MR. HUNTER: Ms. Williamson, do you have a copy of the deposition notice? I ask that you mark it as Exhibit 1 of this deposition. I don't have any additional exhibits.

(Document marked as Read Exhibit 1 for identification)

Q. Mr. Read, would you please state your full legal name for the record.

A. Russell Read.

Q. I thank you for taking time today, Mr. Read, from your day and from your stay in the United States to give the Court and the Jury your testimony in this action.

Have you ever been deposed before?

A. I have been.

Q. I am sure that you will recall from your

Page 7

other depositions these guidelines. Let me review some things with you before we get started.

From this point forward, the stenographer will write down everything that is said during the deposition.

Do you understand that you are under oath and must tell the truth?

A. Yes.

Q. Do you understand that the transcript and video recording of your testimony may be used at trial and read or played to the jury?

A. I do.

Q. Is there any reason, such as a medical condition, that you cannot testify truthfully today?

A. No, there is none.

Q. I'm going to ask you questions that you must answer with audible answers, so that the court reporter can write your answers down.

Please do not respond to my questions with a nod or shake of your head, because I can't see that, and the court reporter is not allowed to interpret it. So just spoken words. And, please, no "uh-hum" or "uh-huh," for the same reason.

Do you understand that?

A. I understand.

Page 8

Q. What is your residence, please?

A. My U.S. residence is 38 Mercer Street, Jersey City, New Jersey, 07302.

Q. Thank you. And what is your work address?

A. I work in Kuwait City for Gulf Investment Corporation, P.O. Box 3402 Safat, S-A-F-A-T, Kuwait City, 13035, Country of Kuwait.

Q. Thank you. After this deposition, which address or what method should the court reporter send you your testimony?

A. My preferred method of receipt is by email. The second would be to mail at my work address in Kuwait.

Q. Can you give us — or give the court reporter your email address.

A. My email address is rread, the No. 5, at Yahoo.com.

Q. Thank you, Mr. Read.

When you receive the transcript, it will either be in a booklet or in an electronic format. Please review your testimony and correct any clerical errors and return the transcript to me.

Will you do that for me, please?

A. Yes, I will.

Q. Do you understand that if you make any

Page 25

on the educational backgrounds was a matter of public record. So this was a red flag.

In general, if we can't verify some of the key training and professional accreditations of a professional, that's a very negative signal for being able to raise money around a company or an investment.

Q. And did you approach Mr. Collins about providing his release and Social Security number so Kroll could do a better investigation?

A. We did. This was a real source of concern. Keep in mind that we were big fans of the concept. If this panned out, this could truly be a wonderfully transformative and profitable investment, not only for us, but for everyone involved.

We went down to Houston -- that is, John Preston and I traveled to Houston, met at the Houstonian Hotel sometime in November of 2008 and met with both Michael Collins and Michael Sydow.

At that dinner, we impressed upon them both that without being able to get a successful clean bill of health and verification from Kroll, it would be difficult or actually impossible for us to continue solicitation and effectively raise money

Page 26

around Texas Syngas. And even more importantly, we would be unable to consider an investment in Texas Syngas from the fund that we were raising, the Transformative Energy and Materials Fund.

What happened with Michael Collins is he seemed uncomfortable. He said that he had withheld his signature and Social Security number for two reasons.

The two reasons were one, is that he had an ongoing tax dispute with the IRS. And he also mentioned that there was some medical reason why he did not want to disclose that information.

In the conversation with him, because we impressed the importance of his signature and Social Security number for conducting a successful Kroll report, he had agreed during that dinner with him, that he would sign the Kroll release and provide his Social Security number the following morning.

When we actually went back to Boston, we waited. The follow morning nothing happened. Over the course of the coming week, we received nothing. And essentially, Mr. Collins would not sign his name or provide his Social Security number.

The final Kroll report was produced in February. It was the second Kroll report in

Page 27

February of 2008 -- sorry, 2009, February of 2009. And based on not being able to get a clear due diligence on him, we were unable to proceed with any further solicitation or consideration of an investment in Texas Syngas.

Q. Did Mr. Collins describe in any detail his medical condition that was keeping him from cooperating?

A. I don't recall anything at the time. It seemed murky. I have no knowledge of any medical condition that he has. He did mention that there was a medical condition. I am not -- I have no knowledge of any specifics.

Q. Regarding the tax problem, did he describe it in any detail?

A. He did go into some more detail regarding the tax lien situation. He ascribed it to earning income in Africa in which he disputed what was taxable and what was not taxable with the IRS.

The IRS, according to him, made a determination that he owed a certain amount of tax money based upon his earned income in Africa. Again, he disputed it. But he said that a tax lien had been placed on him by the Internal Revenue Service.

Page 28

Q. Referring again to your affidavit that you filed in this case previously, did you attach a Kroll report or one or more of the reports to that affidavit?

A. I attached the two Kroll reports; the one that was produced in November of 2008, as well as the follow-on and final report that was needed by us in February of 2009.

Q. And as a result of the Kroll reports, were you able to promote Texas Syngas anymore?

A. No. Effectively, our involvement with Texas Syngas ended at that point. Again, we were very enthusiastic about the potential for an investment in Texas Syngas, both by institutional investors directly and by our fund that we were raising. This was going to be a cornerstone investment for the fund that we were raising, the Transformative Energy and Materials Fund. And we weren't even able to get to the engineering due diligence -- the independent due diligence once the Kroll report on the principals failed.

MR. HUNTER: Thank you, Mr. Read. Thank you for your testimony. Let's take a break for a few minutes and give Ms. Keller time to get her notes together. She'll ask you some questions. How

about five minutes?

MS. KELLER: Sounds good. Okay, thank you.

MR. HUNTER: Off the record.

THE VIDEOGRAPHER: The time is 12 p.m., and we are off the record.

(Recess taken from 12:00 to 12:06)

THE VIDEOGRAPHER: The time is 12:06 p.m., and we are on the record.

CROSS EXAMINATION

BY MS. KELLER:

Q. Mr. Read, my name is Kelly Keller, and you understand I represent the defendant in this case, Michael Collins, correct?

A. I do.

Q. I want to go briefly -- just some brief questions about your background.

When did you leave CalPERS?

A. I left CalPERS June 30, 2008.

Q. And what was your reason for leaving?

A. It was to move on to another opportunity, one that I saw as particularly interesting, to start a fund with John Preston. It was dedicated to investing in transformative energy and materials opportunities.

Q. Was that a full-time position when you left

to join Mr. Preston?

A. Yes, it was.

Q. Who was your employer?

A. So after employment from CalPERS, we formed a new company, called "C Change Investments." So C Change Investments was my employer.

Q. And were there any other principals in C Change other than you and Mr. Preston?

A. When we founded C Change Investments, John Preston and I were the founders and the only principals.

Q. Did any other principals ultimately join C Change?

A. We hired some senior people who were junior partners, who cover law and operations.

Q. And who are they?

A. They included David Brown, who served as our general counsel. They included Norm LeBlanc. Norm LeBlanc was our chief operating officer. They also included Mr. John Sylvia, an investment professional out of San Francisco.

Q. Any others?

A. Later on, we also hired someone who became a partner, who was Roger Berry, B-E-R-R-Y, I believe. And later on, also our chief operating

officer was replaced, and Norm LeBlanc was replaced by Gina Foote, F-O-O-T-E. In addition, we had another operational person who came on, who was Joe Saldana. Each of them were junior partners.

Q. Is C Change Investments still in operation?

A. C Change Investments is not operating now. It was effectively merged into a new company, called "Transformative Energy and Materials Capital, which was formed as a combination of C Change and a group out of New York City, called "Quadrant Capital."

Q. Were you affiliated with Quadrant Capital?

A. No, I had no relationship or affiliation with Quadrant Capital.

Q. Do you know if Mr. Preston has an affiliation with Quadrant Capital?

A. He is now a partner with Quadrant Capital with respect to the Transformative Energy and Materials Fund.

Q. Do you know how large the Transformative Energy and Materials Fund is now?

A. My understanding is that the initial raise was $100 million, and there was likely on the order of $50 million invested additionally in related opportunities.

Q. Do you know what that initial 100 million

was invested in?

A. It's a little bit beyond when I was there. But certainly, there were several investments which we had in our pipeline. One was a power from a biomass company or a project in Hawaii. A second was a cement company, to be able to activate cement more quickly than is conventionally possible. A third had to do with housing, the creation of very rapidly built, low income housing for the emerging markets. And of course, the investment in Texas Syngas would have -- I believe would have been an investment if it hadn't have been X'd out in 2009.

Q. Do you know if any of the initial capital or the additional 50 million was invested in any entities with which John Preston was affiliated?

A. I'm not aware of any investments in which that fund invested in a John Preston-related entity.

Q. How long were you at C Change?

A. I was with C Change as a partner and employee from July 1st, 2008 until I joined as chief investment officer and deputy chief executive of the Gulf Investment Corporation in the summer of 2011.

That being said, because of difficulties in fund-raising beginning in 2011, I ceased to take salary beginning on January 1st of 2011 and sought

Page 33

other opportunities, beginning in the summer.

Q. I'm sorry, what was the reason you stopped taking a salary?

A. Effectively, we were unable to raise our fund. It was a very difficult fund-raising environment after the financial crisis in 2008. And to John Preston's credit, he was able to reach a partnership agreement in 2011 to merge C Change into a new entity, called "TEM Capital," "Transformative Energy and Materials Capital," in combination with Quadrant Capital out of New York City. I was not part of that merger.

Q. At the time you left in the summer of 2011, how much investment funds had C Change raised?

A. Effectively, C Change only raised its money, that 100 million, for a fund investment in a partnership agreement with Quadrant Capital out of New York City. So at that point, I would say that the number was $100 million, and it was predicated upon a merger of C Change into TEM Capital.

Q. So prior to that agreement, that merger that you referred to with Quadrant, how was C Change paying its officers and employees for the fund?

A. Sure. We received our cash capital investments into C Change from Tripex Corporation

Page 34

out of Switzerland, primarily, as well as from an investment from Christof Henkel.

Q. So is it correct to say that at least from 2008, from inception, up until the point prior to the agreement that was reached with Quadrant, had C Change only succeeded, I guess, in raising enough capital to pay officers and employees or was additional funds raised that were actually invested?

MR. HUNTER: Objection, form.

A. So of the money that was invested by Tripex and also Christof Henkel, we were able to make -- we were able to both pay employees and also pay for marketing partners to help us to identify institutional investors. And also, we did make some investments to warehouse -- we made some investments on behalf of C Change to warehouse for a potential fund investment.

One of those investments was a million-dollar investment into Texas Syngas/NC12. We also made some additional investments, which included the warehousing of the investment for biomass to electricity in Hawaii, as well as an investment in Africa for transformative and sustainable agriculture in the Sub-Sahara.

Q. What was the amount received from Tripex?

Page 35

A. The amount received from Tripex to fund C Change was $25 million.

Q. And what was the amount received from Mr. Henkel?

A. To my recollection, the amount was one and a half million dollars.

Q. So of the 26.5 million, did you say that 1 million was warehoused, and that was ultimately targeted for TSI; is that correct?

A. 1 million was actually directed to and invested into Texas Syngas at the request of Tripex.

Q. Okay.

A. Okay. One million was invested. The other investments, the investments into FAME Africa, the sustainable agriculture investment was $400,000. And the investment into the biomass electricity project into Hawaii was a few million dollars. The exact amount, I do not recall.

Q. And this was raised and used in some way during -- was it January of '08 you say you joined and formed the entity?

A. I formed the entity on July 1st, 2008.

Q. So in roughly three years, C Change had raised approximately 26.5 million; is that correct?

A. In the three years, I look at it as C

Page 36

Change had raised its capital of $26 and a half million, plus the 100 million in combination with Quadrant Capital out of New York City.

The 100 million really was appropriated I'd say in the last -- of those three years that you mentioned, that three-year period from the middle of 2008 to the middle of 2011, the 100 million came on the scene in that last year.

Q. Okay. So of the 26.5 million -- we're not looking at the 100 million. But of the 26.5 million, 1 million went to TSI, correct?

A. Correct.

Q. A few million to the biomass project in Hawaii, correct?

A. Yes.

Q. 400,000 to a project in Africa, correct?

A. Yes.

Q. And of those -- I've just listed three investments. Were there any other investments that were made with the 26.5 million or did the remainder go to funding the operations of C Change?

MR. HUNTER: Objection, form.

A. Primarily, the rest went into the operations and marketing of C Change and its fund. It is possible I am misremembering a specific

Confidential Communications Int. Ltd.

321

investment that might have been made with respect to cement or to the sustainable housing technologies. But at that point in time, I do not believe we had made the investments. I believe those came later.

Q. Was the full 26.5 million actually consumed in some form or another through operational expenses or was there some amount remaining when the transaction with Quadrant closed?

A. I believe that C Change Investments still exists legally. I think it is a relatively -- I think there's a relatively small amount remaining, but I believe the entity remains and that there is some small positive amount, so that the $26 and a half million was used for the operations, the marketing of C Change, plus the warehousing of those investments for the fund.

Q. And by "warehousing," what was the warehousing? Those three that we discussed?

A. Yes.

Q. The TSI -- so there's not some other sum of money invested in some other investment, correct?

A. To my recollection and memory, no.

Q. Okay. I'd like to go back to your conversations with Mr. Collins.

I believe you said that you had three

Syngas, Inc. or was it NC12 at the time?

A. When I first met with them, my recollection is that it was still called "Texas Syngas", because I actually think that during the second meeting, which was, to my recollection, also in Massachusetts, that was when they proposed the new name of "NC12."

Q. Who proposed the new name?

A. I believe the new name, if my memory serves, came from Mr. Collins, reflecting sort of a new carbon 12 -- new carbon 12 chemistry. It was intended to be a clever acronym for a new chemistry.

Q. Okay. So back to the first meeting, had you already reviewed some of the primary, whether they're promotional materials, background materials, on TSI?

A. I did, indeed.

Q. Had you read biographies for the principals prior to your first meeting?

A. I don't recall if I had read the biographies or had heard them verbally when we first met.

What struck me is that it was a very potentially transformative technology, because it improved the efficiency of creating liquid fuel from

meetings with Mr. Collins in the fall and winter of 2008. Was that correct?

A. To my recollection, that is correct.

Q. I want to start with the very first meeting. When did you first meet Mr. Collins?

A. My memory is that I first met with Michael Collins and Michael Sydow, along with John Preston, in -- if I recall correctly, it was the home of Mr. Sydow in early autumn 2008.

Q. And that's in Houston, correct?

A. No. Actually, Michael Sydow's residence in Massachusetts, near the facilities of Texas Syngas in Fall River, Massachusetts.

Q. And what was the purpose of that meeting?

A. That meeting was an introduction meeting to meet with the principals of Texas Syngas. John Preston had arranged the meeting. John Preston was my partner at C Change Investments. And it was to introduce the principals to what he considered to be a very compelling and interesting investment opportunity in a technology that could transform energy at a very important time for, you know, for new energy initiatives.

Q. At that time had you already reviewed some of the background materials for -- was it Texas

coal and from other carbon sources by a significant percentage. And that's what I was most interested in

So at that time during the first meeting, I wasn't focusing on the credentials of the principals, but was actually -- you know, I certainly had heard very good things about their backgrounds and credibility from my partner, John Preston.

Q. So to you, it was the technology, not so much the people?

MR. HUNTER: Objection to form.

Q. Is that correct?

A. I would say that how I viewed it at the time was that my partner in charge of the technology assessment, John Preston, was very impressed by the technology and by the people involved. He viewed it. I'm certain -- what I picked up was that this was the A team in terms of the principals involved and in terms of the technology. It was, to my mind, an equal and strong story.

Q. Mr. Preston was actually a part of that team at the time, correct, because he was an officer of Texas Syngas?

MR. HUNTER: Objection, form.

forgetting his last name, too.

Q. Is Mr. Sydow a principal at TEM Capital?

A. No. Mr. Sydow has no relationship, to my knowledge, with TEM Capital and did not have any relationship at all with C Change Investments.

Q. Did you travel to Texas at any other time in connection with TSI or NC12 for investment opportunities?

MR. HUNTER: Objection, form.

A. To my recollection, I did not meet in Houston with respect to Texas Syngas or NC12 in Texas, other than that Houstonian meeting.

Q. Did you travel with Mr. Preston to Texas for any other purpose at any time within the last, say, six years?

MR. HUNTER: Objection, form.

A. I did. I remember traveling with John Preston for meetings with Russian technology partners for the formation of a joint venture M.I.T. was entering into with the Russian government.

Q. When was that travel?

A. To my recollection, that travel was either in 2009 or early 2010.

Q. And how many times did you travel to Texas

for that purpose with Mr. Preston?

A. Once.

Q. I'm sorry, one time?

A. One time.

Q. Do you know who the principals of Tripex are?

A. Yes.

Q. Okay. Who are they?

A. The principals of Tripex are Corina Von Schannau, who is the principal owner of Tripex.

Q. Okay.

A. I am not aware of other owners of Tripex.

Q. You mentioned that you've given your deposition before. On how many occasions have you given your deposition?

A. I've given my deposition twice before.

Q. And what were those matters -- were those litigation matters?

A. They were both litigation matters.

Q. And what was the first time you gave your deposition?

A. The first time was as an expert witness. I was retained by Deutsche Bank to serve as an expert witness regarding a fixed income securities

index case dispute that they had with Lehman Brothers.

Q. And when was that? What year was that?

A. That was the year 2005, if I recall correctly.

Q. And what was the second time you gave a deposition?

A. The second time I gave a deposition was with respect to a real estate investment made by CalPERS. That deposition was made early in 2008.

Q. And were you a party to that one or simply a witness?

A. Simply a witness in the second one. I was an expert witness in the first.

Q. Did you actually have a conversation directly with Mr. Collins, where Mr. Collins is the one who actually told you where he received his degrees and whether he was licensed?

A. What I recall is the education discussion. I remember in Massachusetts him confirming that his undergraduate degree was from Carnegie Mellon and that his business degree was from Furman.

What I don't recall, nor would I ask, nor did I ask, about his engineering licensure at that time.

Q. And that conversation, then, was prior to the call report, correct?

A. Correct.

Q. After receiving the second of the two Kroll reports, did C Change make any credit investigation into Mr. Collins' background to determine where he did receive his education?

MR. HUNTER: Objection, form.

A. It was really a dead letter at that point. As much as we were enthusiastic about the technology and its potential in the marketplace, with that second Kroll report, we essentially moved on. We ended our investigation.

Q. Do you have any affiliations with a company called "JK Claims Investment Corporation"?

A. I am not aware of any affiliation I have with JK Claims Investment Corporation.

Q. Are you familiar at all with any attempts by any one of these individuals -- either Mr. Preston, Michael Sydow or Quantum Catalytics -- attempting to purchase out of the bankruptcy estate litigation claims asserted by Jeffrey Kaiser?

MR. HUNTER: Objection, form.

A. I'm not aware of any of those actions or details.

9. Preston expressly incorporates each of the above objections to the extent applicable in each specific response to the interrogatories set forth below, as if fully set forth in the answer to each specific interrogatory.

## SPECIFIC RESPONSES AND OBJECTIONS

### INTERROGATORY NO. 1

State the dates of service for your service on the board of directors of TSI.

**ANSWER:**

Subject to and without waiving Preston's objections, Preston responds as follows:

Preston served on the board of directors of TSI between the end of 2004 and on or about May 4, 2009.

### INTERROGATORY NO. 2

Describe in detail the nature of your service on the board of directors of TSI.

**ANSWER:**

Preston objects to this interrogatory as overly broad and unduly burdensome in requesting that Preston describe "in detail" his service.

Preston also objects to this interrogatory as vague and ambiguous in requesting that Preston describe "the nature of" his service. Preston will interpret this to be a request for Preston to describe his service on the board of directors.

Subject to and without waiving Preston's objections, Preston responds as follows:

The board of directors played a role in the governance of TSI, which included responsibility for the hiring and firing of the CEO. Preston helped provide governance.

### INTERROGATORY NO. 3

Identify each board meeting of TSI in which you participated and state (1) where such meeting was held, 2) when such meeting was held, and 3) whether your participation was in person, by telephone, or by some other electronic means.

6

**ANSWER:**

Preston is not subject to the jurisdiction of this court. Accordingly, Preston objects to this request to the extent it does not seek information that relates to or is reasonably calculated to lead to admissible evidence regarding whether this court has jurisdiction over Preston.

Preston objects to this interrogatory as overly broad and unduly burdensome in requesting that Preston identify "each" board meeting regardless of whether it has any connection to Texas.

Subject to and without waiving Preston's objections, Preston responds as follows:

Preston is not aware which meetings constituted TSI board meetings. He participated in meetings or calls related to TSI, however, that may have constituted TSI board meetings on the following dates and locations, but Preston was never in Texas for any such meetings or calls:

| Date | Location | Means |
|---|---|---|
| March 6, 2006 | Massachusetts | In Person |
| March 20, 2006 | Massachusetts | Telephone |
| April 21, 2006 | Massachusetts | Telephone |
| June 19, 2006 | Massachusetts | In Person |
| January 11-15, 2007 | Lugano, Switzerland | In Person |
| October 22, 2008 | Massachusetts | Telephone |

**INTERROGATORY NO. 4**

Identify all payments you received of any nature from TSI.

**ANSWER:**

Preston is not subject to the jurisdiction of this court. Accordingly, Preston objects to this interrogatory on the grounds that it does not seek information that relates to or is reasonably calculated to lead to admissible evidence regarding whether this court has jurisdiction over Preston.

Preston further objects on the grounds that this information may be obtained directly from other entities that are subject to this court's jurisdiction, which would be the least intrusive and most efficient method for Intervenors' to obtain the information they seek.

Preston also objects to this request to the extent it seeks proprietary information, trade secrets or other confidential information, disclosure of which would harm Preston or is protected from disclosure by confidentiality agreements.

7

325

## INTERROGATORY NO. 5

Identify all documents which you signed as an office or director of TSI.

## ANSWER:

Preston is not subject to the jurisdiction of this court. Accordingly, Preston objects to this interrogatory on the grounds that it does not seek information that relates to or is reasonably calculated to lead to admissible evidence regarding whether this court has jurisdiction over Preston.

Preston also objects to this interrogatory on the grounds that it is overly broad and unduly burdensome is seeking "all documents" Preston signed without any limits, regardless of their connection to Texas.

Preston further objects on the grounds that this information may be obtained directly from other entities that are subject to this court's jurisdiction, which would be the least intrusive and most efficient method for Intervenors' to obtain the information they seek.

Preston also objects to this request to the extent it seeks proprietary information, trade secrets or other confidential information, disclosure of which would harm Preston or Quantum Catalytics or is protected from disclosure by confidentiality agreements.

## INTERROGATORY NO. 6

Identify all investments that you made in TSI, whether such investment was made in money or services. Include in your response, 1) the date of such investment; 2) the amount of such investment; 3) the number of share or other interest received on such investment; and 4) the returns, if any, received on such investment.

## ANSWER:

Preston is not subject to the jurisdiction of this court. Accordingly, Preston objects to this interrogatory on the grounds that it does not seek information that relates to or is reasonably calculated to lead to admissible evidence regarding whether this court has jurisdiction over Preston.

Preston further objects on the grounds that this information may be obtained directly from TSI, which would be the least intrusive and most efficient method for Intervenors' to obtain the information they seek.

Preston also objects to this request to the extent it seeks proprietary information, trade secrets or other confidential information, disclosure of which would harm Preston or is protected from disclosure by confidentiality agreements.

8

326

## INTERROGATORY NO. 7

State the dates of service for your service on the board of directors of NC112.

ANSWER:

Subject to and without waiving Preston's objections, Preston responds as follows:

Preston served on the board of directors of NC12 between May 2009 and September 2009 and again between August 2010 and around March 2012, when the trustee was appointed by the bankruptcy judge for NC12.

## INTERROGATORY NO. 8

Describe in detail the nature of your service on the board of directors of NC12.

ANSWER:

Preston objects to this interrogatory as overly broad and unduly burdensome in requesting that Preston describe "in detail" his service.

Preston also objects to this interrogatory as vague and ambiguous in requesting that Preston describe "the nature of" his service. Preston will interpret this to be a request for Preston to describe his service on the board of directors.

Subject to and without waiving Preston's objections, Preston responds as follows:

The board of directors played a role in the governance of NC12, which included responsibility for the hiring and firing of the CEO. Preston helped provide governance.

## INTERROGATORY NO. 9

Identify each board meeting of NC12 in which you participated and state (1) where such meeting was held, 2) when such meeting was held, and 3) whether your participation was in person, by telephone, or by some other electronic means.

327

**ANSWER:**

Preston is not subject to the jurisdiction of this court. Accordingly, Preston objects to this request to the extent it does not seek information that relates to or is reasonably calculated to lead to admissible evidence regarding whether this court has jurisdiction over Preston.

Preston objects to this interrogatory as overly broad and unduly burdensome in requesting that Preston identify "each" board meeting regardless of whether it has any connection to Texas.

Subject to and without waiving Preston's objections, Preston responds as follows:

Preston is not aware which meetings constituted NC12 board meetings. He participated in meetings or calls related to NC12, however, that may have constituted NC12 board meetings on the following dates and locations, but Preston was never in Texas for any such meetings or calls:

| Date | Location | Means |
|---|---|---|
| May 1, 2009 | Massachusetts | In Person |
| September 14, 2010 | Massachusetts | In Person |
| October 17, 2010 | Munich, Germany | Telephone |
| November 24, 2010 | Massachusetts | In Person |
| November 29, 2010 | Massachusetts | In Person |
| January 4, 2011 | Massachusetts | In Person |
| January 7, 2011 | Massachusetts | In Person |
| February 21, 2011 | Massachusetts | Telephone |
| February 25, 2011 | Frankfurt, Germany | Telephone |

**INTERROGATORY NO. 10**

Identify all payments you received of any nature from NC12.

**ANSWER:**

Preston is not subject to the jurisdiction of this court. Accordingly, Preston objects to this interrogatory on the grounds that it does not seek information that relates to or is reasonably calculated to lead to admissible evidence regarding whether this court has jurisdiction over Preston.

Preston further objects on the grounds that this information may be obtained directly from other entities that are subject to this court's jurisdiction, which would be the least intrusive and most efficient method for Intervenors' to obtain the information they seek.

10

328

Preston also objects to this request to the extent it seeks proprietary information, trade secrets or other confidential information, disclosure of which would harm Preston or Quantum Catalytics or is protected from disclosure by confidentiality agreements.

## INTERROGATORY NO. 11

Identify all documents which you signed as an officer or director of NC12.

## ANSWER:

Preston is not subject to the jurisdiction of this court. Accordingly, Preston objects to this interrogatory on the grounds that it does not seek information that relates to or is reasonably calculated to lead to admissible evidence regarding whether this court has jurisdiction over Preston.

Preston also objects to this interrogatory on the grounds that it is overly broad and unduly burdensome is seeking "all documents" Preston signed without any limits, regardless of their connection to Texas.

Preston further objects on the grounds that this information may be obtained directly from NC12, which would be the least intrusive and most efficient method for Intervenors' to obtain the information they seek.

Preston also objects to this request to the extent it seeks proprietary information, trade secrets or other confidential information, disclosure of which would harm Preston or is protected from disclosure by confidentiality agreements.

## INTERROGATORY NO. 12

Identify all investments that you made in NC12, whether such investment was made in money or services. Include in your response, 1) the date of such investment; 2) the amount of such investment; 3) the number of share or other interest received on such investment; and 4) the returns, if any, received on such investment.

## ANSWER:

Preston is not subject to the jurisdiction of this court. Accordingly, Preston objects to this interrogatory on the grounds that it does not seek information that relates to or is reasonably calculated to lead to admissible evidence regarding whether this court has jurisdiction over Preston.

Preston further objects on the grounds that this information may be obtained directly from TSI, which would be the least intrusive and most efficient method for Intervenors' to obtain the information they seek.

11

329

Preston also objects to this request to the extent it seeks proprietary information, trade secrets or other confidential information, disclosure of which would harm Preston or is protected from disclosure by confidentiality agreements.

## INTERROGATORY NO. 13

Identify all companies, whether public or private, with offices in Texas, for which you have served on the board of directors or as an officer or employee. Include in your response 1) the dates of such service, 2) the location from which you worked/served; 3) the compensation received; and 4) the position in which you served and/or were employed.

## ANSWER:

Preston is not subject to the jurisdiction of this court. Accordingly, Preston objects to this interrogatory to the extent that it does not seek information that relates to or is reasonably calculated to lead to admissible evidence regarding whether this court has jurisdiction over Preston.

Subject to and without waiving Preston's objections, Preston responds as follows:

Texas Syngas LLC is the only company with its principal place of business in Texas or incorporated in Texas for which Preston was a director, officer, or employee. Preston was a director of Texas Syngas LLC between 2004 and 2006.

## INTERROGATORY NO. 14

Describe in detail all of your travel to Texas since 2000. Include in your response, 1) the date of such travel; 2) the purpose of such travel; and the activities you undertook while in Texas.

## ANSWER:

Preston objects to this interrogatory to the extent it is overly broad and unduly burdensome in seeking detailed information about travel that occurred so long ago that it (a) does not relate to specific jurisdiction, and (b) cannot be used as a basis to support general jurisdiction.

Subject to and without waiving Preston's objections, Preston responds as follows:

Preston traveled to Texas on the following occasions as a representative on behalf of TEM Capital between 2006 and the date this suit was filed:

12

330

2009
April 2-3

2009
May 3-4

2010
December 30-31

2011
March 16-17

In addition, Preston traveled to Texas on November 10, 2008 on behalf of his former employer C-Change Investments. Preston met with Michael Collins on this trip. Preston also traveled to Texas in May 2011 to testify as the corporate representative for NC12, Inc. regarding an asset owned by the company in Michael Sydow's divorce proceedings.

## INTERROGATORY NO. 15

State whether any company wholly owned by your [*sic*] or an entity controlled by you owns or controls any real property in Texas or has any business operations in Texas. If so, include in your response, 1) the identity of such company; 2) describe the real property owned or controlled; and 3) describe in detail the nature of such business.

## ANSWER:

Preston is not subject to the jurisdiction of this court. Accordingly, Preston objects to this interrogatory on the grounds that it does not seek information that relates to or is reasonably calculated to lead to admissible evidence regarding whether this court has jurisdiction over Preston.

Subject to and without waiving Preston's objections, Preston responds as follows:

No company or entity wholly owned or controlled by Preston directly owns or controls any real property in Texas or has any business operations in Texas.

## INTERROGATORY NO. 16

State whether any company in which you hold a majority interest owns or controls any real property in Texas or has any business operations in Texas. If so, include in your response: 1) the identity of such company; 2) describe the real property owned or controlled; and 3) describe in detail the nature of such business.

13

331

**ANSWER:**

Preston is not subject to the jurisdiction of this court. Accordingly, Preston objects to this interrogatory on the grounds that it does not seek information that relates to or is reasonably calculated to lead to admissible evidence regarding whether this court has jurisdiction over Preston.

Preston further objects to this interrogatory to the extent it is duplicative of Interrogatory No. 15.

Subject to and without waiving Preston's objections, Preston responds as follows:

> No company or entity in which Preston holds a majority interest directly owns or controls any real property in Texas or has any business operations in Texas.

## INTERROGATORY NO. 17

Identify each investment you have made within the last 10 years in any company incorporated in Texas or having a principal office in Texas. Include in your response the amount of your investment and the nature of such investment.

**ANSWER:**

Preston is not subject to the jurisdiction of this court. Accordingly, Preston objects to this interrogatory on the grounds that it does not seek information that relates to or is reasonably calculated to lead to admissible evidence regarding whether this court has jurisdiction over Preston.

Preston objects to this interrogatory as overly broad and unduly burdensome in seeking detailed information about events that occurred so long ago that: (a) do not relate to specific jurisdiction, and (b) cannot be used as a basis to support general jurisdiction.

## INTERROGATORY NO. 18

Describe in detail all communications which you have had with any person or entities located in Texas within the last five years. Include in your response the dates of such communications, the purpose of such communications, and the means by which such communications were made.

**ANSWER:**

Preston objects to this interrogatory as overly broad and unduly burdensome in seeking detailed information about "all communications" over a five-year period.

14

332

Subject to and without waiving Preston's objections, Preston responds as follows:

Preston communicated by telephone with Michael Sydow on occasion during the last five years in relation to TSI and NC12. As a representative of TEM Capital, Preston communicated regularly with various individuals in Texas on behalf of TEM Capital over the last five years.

333

## VERIFICATION

My name is John Preston, my date of birth is March 18, 1950, and my address is 9 Martins Cove Lane, Hingham, MA 02043. I declare under penalty of perjury that the answers in the foregoing John Preston's First Amended Objections and Answers to Intervenor's First Set of Interrogatories are true and correct to the best of my own personal knowledge and belief.

Executed on the 20 day of March, 2014

John Preston

334

Wed., Apr. 1, 2009

## Flight Check-in Reminder for JOHNT PRESTON

Check in at continental.com and print, fax or e-mail your boarding passes for your trip to Houston, TX (IAH - Intercontinental).

**Important Baggage Information:**
For information regarding baggage fees, allowances, weight/size restrictions and embargos for flights originating on Continental, go to continental.com.
If your flight originates with one of our codeshare partners or another airline you will need to check the operating carrier for baggage policies.

### Continental Confirmation Number: CC554X

| | | | |
|---|---|---|---|
| CO1083 12:45 p.m.<br>Thu., Apr. 2, 2009<br>Boston, MA (BOS) | 4:25 p.m.<br>Thu., Apr. 2, 2009<br>Houston, TX (IAH - Intercontinental) | Boeing 737-300<br><br>Fare Class:<br>REDACTED<br><br>Meals: Snack<br>No Special Meal Offered. | Flight Time:<br>4 hr 40 mn |

**Traveler Information:**
JOHNT PRESTON

> View complete reservation information on continental.com.

**Weather Forecast for Houston, TX**

| Thursday<br>Apr 2 | Friday<br>Apr 3 | Saturday<br>Apr 4 | Sunday<br>Apr 5 | Monday<br>Apr 6 |
|---|---|---|---|---|
| Partly Cloudy/Wind | Sunny | Partly Cloudy | Isolated Thunderstorms | Mostly Sunny |
| High: 76°F (24°C)<br>Low: 48°F (9°C) | High: 76°F (24°C)<br>Low: 55°F (12°C) | High: 81°F (27°C)<br>Low: 66°F (18°C) | High: 84°F (28°C)<br>Low: 47°F (8°C) | High: 72°F (22°C)<br>Low: 48°F (8°C) |

> View the extended forecast at weather.com.

The weather-related content on this e-mail is provided compliments of The Weather Channel Enterprises, Inc. Continental Airlines is not responsible for the accuracy of the information contained herein.

PRESTON000001

**EXHIBIT A-10**

335

## E-mail Information

Please do not reply to this message using the "reply" address.
The information contained in this e-mail is intended for the original recipient only.
If you are experiencing technical issues, please contact the Electronic Support Desk via e-mail or telephone.

**Alert:** Flight Check in Reminder
**E-mail Address:** FRISINA@CCHANGEINVESTMENTS.COM

This one-time e-mail was sent to FRISINA@CCHANGEINVESTMENTS.COM in order to provide information related to your travel.

PRESTON000002

336

From: Continental Airlines, Inc.
To: Katherine Preston
Subject: Check in now for your 6:50 p.m. flight to Boston, MA (BOS). Confirmation CC554X
Date: Thursday, April 02, 2009 7:12:30 PM

Wireless customers may check in at http://pda.continental.com/checkin.aspx?PNR=CC554X.

Thu., Apr. 2, 2009

# Flight Check-in Reminder for JOHNT PRESTON

Check in at continental.com and print, fax or e-mail your boarding passes for your trip to Boston, MA (BOS).

**Important Baggage Information:**
For information regarding baggage fees, allowances, weight/size restrictions and embargos for flights originating on Continental, go to continental.com.
If your flight originates with one of our codeshare partners or another airline you will need to check the operating carrier for baggage policies.

## Continental Confirmation Number: CC554X

CO582 6:50 p.m.
Fri., Apr. 3, 2009
Houston, TX (IAH - Intercontinental)

11:27 p.m.
Fri., Apr. 3, 2009
Boston, MA (BOS)

Boeing 737-800 Flight Time: 3 hr 37 mn

Fare Class: REDACTED

Meals: Snack
No Special Meal Offered.

**Traveler Information:**
JOHNT PRESTON

> View complete reservation information on continental.com.

## Weather Forecast for Boston, MA

| Friday Apr 3 | Saturday Apr 4 | Sunday Apr 5 | Monday Apr 6 | Tuesday Apr 7 |
|---|---|---|---|---|
| Rain | Few Showers | Sunny | Showers | Rain/Snow Showers |
| High: 54°F (12°C) | High: 53°F (11°C) | High: 56°F (13°C) | High: 53°F (11°C) | High: 46°F (7°C) |
| Low: 45°F (7°C) | Low: 39°F (3°C) | Low: 39°F (3°C) | Low: 43°F (6°C) | Low: 34°F (1°C) |

> View the extended forecast at weather.com.

PRESTON000003

337

The weather-related content on this e-mail is provided compliments of The Weather Channel Enterprises, Inc. Continental Airlines is not responsible for the accuracy of the information contained herein.



## E-mail Information

View our Privacy Policy.

Please do not reply to this message using the "reply" address.
The information contained in this e-mail is intended for the original recipient only.
If you are experiencing technical issues, please contact the Electronic Support Desk via e-mail or telephone.

Alert: Flight Check-in Reminder
E-mail Address: PRISTINA@CCHANGEINVESTMENTS.COM

This one-time e-mail was sent to PRISTINA@CCHANGEINVESTMENTS.COM in order to provide information related to your travel.



Copyright © 2009 Continental Airlines, Inc.
All rights reserved.
Continental Airlines, Inc. - Customer Service Center
1600 Smith Plaza HQ, Houston, TX
77002-4321 USA

PRESTON000004

To ensure delivery of email messages, add ContinentalAirlines@continental.com to your address book or approved senders list. See instructions for adding us to your address book.

**Wed., Nov. 5, 2008**

## Continental Itinerary Information

Dear John T. Preston,

Thank you for choosing Continental Airlines. Your receipt will be sent once your eTickets have been processed. Processing may take up to three hours. If you do not receive an eTicket receipt within three hours, please contact us. Once you have received your receipt, you can request additional receipts, export to Outlook, refund or change your flight, view/change seats, check-in, or e-mail or print your itinerary.

### Travel Summary

**Confirmation Number:** DZL0H6

To view complete details of your reservation, visit Manage Reservations.

- CO 133 - New York, NY (LGA – LaGuardia) to Houston, TX (IAH - Intercontinental) on Mon., Nov. 10, 2008

Manage Reservations

Save up to $20 and earn up to 1,500 OnePass Miles with Hertz.

Reserve a Hertz Car Now

Save up to 25% and earn up to 1,500 OnePass Miles with Avis.

Reserve an Avis Car Now

**Yes, Add Trip Protector for $31.98.** See price details.

Purchase Now

### Additional Trip Planning Tools

Baggage Policies
View current baggage acceptance allowances.

**E-mail Information**

View our Privacy Policy.

PRESTON000005

Please do not reply to this message using the "reply" address.
For assistance, please contact the Electronic Support Desk via telephone or e-mail.

Alert: Flight Purchase Confirmation
E-mail Address: finance@cchangeinvestments.com

This one-time e-mail was sent to confirm your ticket purchase on continental.com.

Continental Airlines, Inc. — OnePass Service Center
900 Grand Plaza Dr. Houston, TX
77067-4323 USA

PRESTON000006

340

From: Continental Airlines, Inc.
To: Katherine Frigina
Subject: continental.com Itinerary Information for your trip to Washington, DC (WAS - All Airports)
Date: Monday, November 10, 2008 7:41:16 AM

To ensure delivery of this email, please add ContinentalAirlines@continental.com to your address book or approved sender list. See instructions for adding us to your address book.

**Mon., Nov. 10, 2008**

## Continental Itinerary Information

Dear John T. Preston,

Thank you for choosing Continental Airlines. Your receipt will be sent once your eTickets have been processed. Processing may take up to three hours. If you do not receive an eTicket receipt within three hours, please contact us. Once you have received your receipt, you can request additional receipts, export to Outlook, refund or change your flight, view/change seats, check-in, or e-mail or print your itinerary.

### Travel Summary

**Confirmation Number:** B60972

To view complete details of your reservation, visit Manage Reservations.

- CO 558 – Houston, TX (IAH – Intercontinental) to Washington, DC (DCA – National) on Tue., Nov. 11, 2008

Manage Reservations

Save up to $20 and earn up to 1,500 OnePass Miles with Hertz.

Reserve a Hertz Car Now

Save up to 25% and earn up to 1,500 OnePass Miles with Avis

Reserve an Avis Car Now

Washington from $84

from $84

Yes, Add Trip Protector for **$34.25**. See price details.

Purchase Now

**Additional Trip Planning Tools**

Baggage Policies
View current baggage acceptance allowances.

PRESTON000007

341

Book
Now

## E-mail Information

Please do not reply to this message using the "reply" address.
For assistance, please contact the Electronic Support Desk via telephone or e-mail.

Alert: Flight Purchase Confirmation
E-mail Address: frisina@exchangeinvestments.com

This one-time e-mail was sent to confirm your ticket purchase on continental.com.

Continental Airlines, Inc. - OnePass Service Center
500 Grand River Dr. Houston, TX
77067-4323 USA

View our
Privacy Policy

PRESTON000008

From:      Continental Airlines, Inc.
To:        Katherine Preston
Subject:   continental.com reservation for Houston, TX (IAH - Intercontinental)
Date:      Tuesday, April 28, 2009 3:12:09 PM

Tue., Apr. 28, 2009

# Continental Itinerary Information

Dear Ilia Dubinsky,

We are still processing your reservation, and this e-mail is not yet a confirmation of your reservation.

We will send you an e-ticket receipt confirming your reservation once our processing is complete, which may take up to three hours. If you are traveling within 24 hours, please contact us immediately.

Once your receipt is issued, your reservation is confirmed, and you can use it to view or change seat assignments, check-in (within 24 hours of flight departure), e-mail or print your itinerary, request additional receipts, export it to Outlook, or refund or change your flight.

If you do not receive your receipt within three hours, please contact us.

Thank you for choosing Continental Airlines.

## Travel Summary

**Confirmation Number:** BWXGLE

To view complete details of your reservation, visit Manage Reservations.

- CO 783 - Boston, MA (BOS) to Houston, TX (IAH - Intercontinental) on Sun., May, 3, 2009
- CO 582 - Houston, TX (IAH - Intercontinental) to Boston, MA (BOS) on Mon., May, 4, 2009

Manage Reservations

REDACTED

Special Continental Discount Rates, Plus Dollars Off and up to 1,500 OnePass Miles with Hertz

Reserve a Hertz Car Now

Yes, Add Trip Protector for $57.89. See price details.

Purchase Now

## Additional Trip Planning Tools

Baggage Policies

PRESTON000009



Save up to 25% and earn up to 1,500 OnePass Miles with Avis.

Reserve an Avis Car Now

Houston from $54.

from $54

Join OnePass today and earn 1,000 miles upon completion of this itinerary.

View current baggage acceptance allowances.

## E-mail Information

Please do not reply to this message using the "reply" address.
The information contained in this e-mail is intended for the original recipient only.
If you are experiencing technical issues, please contact the Electronic Support Desk via e-mail or telephone.

View our Privacy Policy

Alert: Flight Purchase Confirmation
E-mail Address: Prairie@exchangeinvestments.com

This one-time e-mail was sent to confirm your ticket purchase on continental.com.

Copyright © 2007 Continental Airlines, Inc.
All rights reserved.
Continental Airlines, Inc. - OnePass Service Center
1600 Smith Street, Houston, TX
77002-1173 USA



PRESTON000010

344

| From: | JUDY DALTON <jdalton@exectravel.com> |
|---|---|
| Sent: | Thursday, March 10, 2011 11:58 AM |
| To: | Katherine Frisina |
| Subject: | Travel Reservation March 16 for JOHN THOMAS PRESTON |

Your Travel Arranger is pleased to deliver your complete travel itinerary through Sabre® Virtually There®.

Click here to access your reservation on the web or a mobile device.

Itinerary

JOHN THOMAS PRESTON

Reservation code: HKZBLO

Travel Arranger Priority Comments:
ETA/HRG OFFERS 24/7 IN-HOUSE EMERGENCY SERVICE

Wed, Mar 16
Flights: JETBLUE AIRWAYS, B6 1265
  From: BOSTON, MA (BOS)                          Departs: 8:40am
  Departure Terminal: TERMINAL C
  To: AUSTIN, TX (AUS)                              Arrives: 12:09pm
  Class: REDACTED
  Seat(s):Check-In Required
  Status: Confirmed                                 Airline Confirmation: OOKMQI
  Meal:                                            Smoking: No
  Aircraft: EMBRAER EMB E90 JET                     Distance (in Miles): 1694
  Duration: 4hour(s) and 29minute(s)
  Frequent Flyer: JETBLUE AIRWAYS 2047935390
  Please verify flight times prior to departure

March 16
Other:
  Status: Confirmed
  Information:SEATS RESTRICTED TO AIRPORT CHECKIN. WE WILL CONTINUE TO MONITOR SEAT MAP

      REDACTED

Thu, Mar 17
Flights: JETBLUE AIRWAYS, B6 1264
  From: AUSTIN, TX (AUS)                            Departs: 4:55pm
  To: BOSTON, MA (BOS)                              Arrives: 9:43pm
  Arrival Terminal: TERMINAL C
  Class: REDACTED
  Seat(s):  PRESTON/JOHN THOMAS - 15D
  Status: Confirmed                                 Airline Confirmation: OOKMQI

1

PRESTON000011

345

```
Meal:                                        Smoking: No
Aircraft: EMBRAER EMB E90 JET                Distance (in Miles): 1694
Duration: 3hour(s) and 48minute(s)
Frequent Flyer: JETBLUE AIRWAYS 2047935390
Please verify flight times prior to departure

May 16
Other:
   Status: Confirmed
   Information:VISIT WWW.EXECTRAVEL.COM

ARRANGER REMARKS:
VISIT US ON THE WEB AT WWW.EXECTRAVEL.COM
*--MY DIRECT PHONE IS 202-496-2791**
*--AFTER HRS EMERGENCY SVC 202-828-0090**
PLS NOTE TICKET IS NONREFUNDABLE. CHANGES MUST BE MADE
ON OR BEFORE THE DEPARTURE OF EACH TICKETED FLIGHT
SEGMENT AND ARE SUBJECT TO A PENALTY PLUS ANY FARE
DIFFERENCE. CHANGES REQUESTED AFTER DEPARTURE DATE OF
ORIGINAL TICKETED FLIGHT ARE NOT PERMITTED AND TICKET
WILL HOLD NO VALUE.

eTicket Receipt(s):

2797962668075 - PREST/J
```

For your convenience, a text version of your itinerary is included in this e-mail and was current as of the time the e-mail was sent. Please click on the link above or contact Your Travel Arranger for the most current information.

Virtually There® allows you to review or print your reservations, as well as:

- Register for trip reminders and cancellation/delay notifications
- View maps & driving directions
- Review city guides & restaurant recommendations
- Get up-to-date weather and much more!

You may also access your reservation on the web or from your mobile device at www.virtuallythere.com. Simply enter your last name and the six-character reservation code provided to you by Your Travel Arranger. As a security measure, you will be prompted to enter your e-mail address or a password that Your Travel Arranger may have provided to you. If you have any question about which e-mail address to use, we recommend that you use the one that received this e-mail.

CLICK HERE to opt out of receiving future e-mails from Virtually There.

If the above link is inactive, please paste this URL into your browser to access your reservations:

https://www.virtuallythere.com/new/reservationsChron.html?host=1W&pnr=21MG2LRH2GOA&name=PRESTON&language=0&email=2

EXECUTIVE TRAVEL ASSOCIATES/HRG
VISIT US ON THE WEB AT WWW.EXECTRAVEL.COM

PRESTON000012

346

Your Travel Arranger is pleased to deliver your complete travel itinerary through Sabre® Virtually There®.

Click here to access your reservation on the web or a mobile device.

Itinerary

JOHN THOMAS PRESTON

Reservation code: KPUDSE

Travel Arranger Priority Comments:
ETA/HRG OFFERS 24/7 IN-HOUSE EMERGENCY SERVICE

```
Thu, Dec 30
Flights: AMERICAN AIRLINES, AA 1365
   From: BOSTON, MA (BOS)                     Departs: 8:40am
   Departure Terminal: TERMINAL B
   To: DAL       WORTH, TX (DFW)              Arrives: 12:15pm
   Class: REDACTED
   Seat(s)        TON/JOHN THOMAS - 18F
   Status: Confirmed                          Airline Confirmation: KPUDSE
   Meal: Food for Purchase                    Smoking: No
   Aircraft: BOEING 757 JET                   Distance (in Miles): 1556
   Duration: 4hour(s) and 35minute(s)
   Frequent Flyer: AMERICAN AIRLINES NRW6022
   Please verify flight times prior to departure

Thu, Dec 30 - Fri, Dec 31
Flights: AMERICAN AIRLINES, AA 2282
   From: DALLAS FT WORTH, TX (DFW)            Departs: 7:45pm - December 30
   To: BOSTON, MA (BOS)                       Arrives: 12:10am - December 31
   Arrival      al: TERMINAL B
   Class: REDACTED
   Seat(s)        TON/JOHN THOMAS - 13A
   Status: Confirmed                          Airline Confirmation: KPUDSE
   Meal: Food for Purchase                    Smoking: No
   Aircraft: BOEING 757 JET                   Distance (in Miles): 1556
   Duration: 3hour(s) and 25minute(s)
   Frequent Flyer: AMERICAN AIRLINES NRW6022
   Please verify flight times prior to departure

March 01
Other:
   Status: Confirmed
   Information:VISIT WWW.EXECTRAVEL.COM

ARRANGER REMARKS:
VISIT US ON THE WEB AT WWW.EXECTRAVEL.COM
*--MY DIRECT PHONE IS 202-496-2791**
*--AFTER HRS EMERGENCY SVC 202-828-0090**
eTicket Receipt(s):

0017943995686 - PREST/J
```

For your convenience, a text version of your itinerary is included in this e-mail and was current as of the time the e-mail was sent. Please click on the link above or contact Your Travel Arranger for the most current information.

PRESTON000023

Virtually There® allows you to review or print your reservations, as well as:

- Register for trip reminders and cancellation/delay notifications
- View maps & driving directions
- Review city guides & restaurant recommendations
- Get up-to-date weather and much more!

You may also access your reservation on the web or from your mobile device at www.virtuallythere.com. Simply enter your last name and the six-character reservation code provided to you by Your Travel Arranger. As a security measure, you will be prompted to enter your e-mail address or a password that Your Travel Arranger may have provided to you. If you have any question about which e-mail address to use, we recommend that you use the one that received this e-mail.

CLICK HERE to opt out of receiving future e-mails from Virtually There.

If the above link is inactive, please paste this URL into your browser to access your reservations:

https://www.virtuallythere.com/new/reservationsChron.html?
host=1W&pnr=21CJ239H9IO2&name=PRESTON&language=0&email=2

EXECUTIVE TRAVEL ASSOCIATES/HRG
VISIT US ON THE WEB AT WWW.EXECTRAVEL.COM

PRESTON000024

348

From: **JUDY DALTON**
To: Katherine Frisina
Subject: Travel Reservation May 02 for JOHN THOMAS PRESTON
Date: Monday, May 02, 2011 9:10:55 AM

Your Travel Arranger is pleased to deliver your complete travel itinerary through Sabre® Virtually There®.

Click here to access your reservation on the web or a mobile device.

Itinerary

```
JOHN THOMAS PRESTON

Reservation code: CHMDGB

Travel Arranger Priority Comments:
ETA/HRG OFFERS 24/7 IN-HOUSE EMERGENCY SERVICE


Mon, May 02
Flights: AMERICAN AIRLINES, AA 1771
  From: BOSTON, MA (BOS)                     Departs: 5:20pm
  Departure Terminal: TERMINAL B
  To: DAL      WORTH, TX (DFW)               Arrives: 8:35pm
  Class: REDACTED
  Seat(s)        TON/JOHN THOMAS - 21F
  Status: Confirmed                          Airline Confirmation: CHMDGB
  Meal: Food for Purchase                    Smoking: No
  Aircraft: BOEING 757 JET                   Distance (in Miles): 1556
  Duration: 4hour(s) and 15minute(s)
  Frequent Flyer: AMERICAN AIRLINES NRW6022
  Please verify flight times prior to departure
```

**REDACTED** y 03

## REDACTED

Wed, May 04
Flights: AMERICAN AIRLINES, AA 1466
  From: DALLAS FT WORTH, TX (DFW)
  To: BOSTON, MA (BOS)
  Arrival     al: TERMINAL B
  Class: REDACTED
  Seat(s)     TON/JOHN THOMAS - 09F
  Status: Confirmed
  Meal: Food for Purchase
  Aircraft: BOEING 737-800 JET
  Duration: 3hour(s) and 25minute(s)
  Frequent Flyer: AMERICAN AIRLINES NRW6022
  Notes:
  ///// SEAT 9F
  Please verify flight times prior to departure

                     Departs: 6:35am
                     Arrives: 11:00am

                     Airline Confirmation: CHMDGB
                     Smoking: No
                     Distance (in Miles): 1556

July 03
Other:
  Status: Confirmed
  Information:VISIT WWW.EXECTRAVEL.COM

ARRANGER REMARKS:
VISIT US ON THE WEB AT WWW.EXECTRAVEL.COM
*--MY DIRECT PHONE IS 202-496-2791**
*--AFTER HRS EMERGENCY SVC 202-828-0090**
eTicket Receipt(s):

0018647721904 - PREST/J

For your convenience, a text version of your itinerary is included in this e-mail and was current as of the time the e-mail was sent. Please click on the link above or contact Your Travel Arranger for the most current information.

Virtually There® allows you to review or print your reservations, as well as:

- Register for trip reminders and cancellation/delay notifications
- View maps & driving directions
- Review city guides & restaurant recommendations
- Get up-to-date weather and much more!

You may also access your reservation on the web or from your mobile device at www.virtuallythere.com. Simply enter your last name and the six-character reservation code provided to you by Your Travel Arranger. As a security measure, you will be prompted to enter your e-mail address or a password that Your Travel Arranger may have provided to you. If you have any question about which e-mail address to use, we recommend that you use the one that received this e-mail.

CLICK HERE to opt out of receiving future e-mails from Virtually There.

If the above link is inactive, please paste this URL into your browser to access your reservations:

https://www.virtuallythere.com/new/reservationsChron.html?
host=1W&pnr=21YB211HKIO0&name=PRESTON&language=0&email=2

PRESTON000026

350

EXECUTIVE TRAVEL ASSOCIATES/HRG
VISIT US ON THE WEB AT WWW.EXECTRAVEL.COM

PRESTON000027

351

REPORTER'S RECORD

VOLUME 1 OF 1 VOLUME

TRIAL COURT CAUSE NO. 2010-02710

IN THE MATTER OF          ) IN THE DISTRICT COURT OF
THE MARRIAGE OF:          )
                          )
MICHAEL D. SYDOW          )
AND                       )
KELLI MCDONALD SYDOW      )
                          ) HARRIS COUNTY, TEXAS
AND IN THE INTEREST OF:   )
                          )
MICHAEL WYATT SYDOW,      )
                          )
A MINOR CHILD             ) 308TH JUDICIAL DISTRICT

COPY

--------------------------------

HEARING

--------------------------------

On the 6th day of October, 2010, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Robert E. Newey, judge presiding, held in Houston, Harris County, Texas;

Proceedings reported by machine shorthand.

Cheryl L. Pierce, CSR

A P P E A R A N C E S

FOR MICHAEL D. SYDOW:
   BOBBY KING NEWMAN
   SBOT NO. 00791347
   Lilly, Newman & Van Ness, L.L.P.
   3355 W. Alabama
   Houston, Texas, 77098

FOR MICHAEL D. SYDOW:
   DAVID J. WUKOSON
   SBOT NO. 22085600
   Attorney at Law
   4801 Woodway, Suite 300E
   Houston, Texas, 77056

FOR MICHAEL D. SYDOW:
   SHANNON L. BOUDREAUX
   SBOT NO. 24040550
   Attorney at Law
   One Riverway, Suite 1700
   Houston, Texas, 77056

FOR KELLI MCDONALD SYDOW:
   DENNIS BRIAN KELLY
   SBOT NO. 11217500
   Attorney At Law
   602 Sawyer, Suite 700
   Houston, Texas, 77007

FOR KELLI MCDONALD SYDOW:
   LEONEL FARIAS, II
   SBOT NO. 24050583
   Attorney At Law
   202 Travis Street, Suite 210
   Houston, Texas, 77002

FOR KELLI MCDONALD SYDOW:
   JEDEDIAH D. MOFFETT
   SBOT NO. 24051069
   Attorney At Law
   1010 Lamar, Suite 860
   Houston, Texas, 77002

FOR NC12, INC.:
     ASHER B. GRIFFIN
     SBOT NO. 24036684
     Scott, Douglass & McConnico, L.L.P.
     One America Center, 15th Floor
     600 Congress Avenue
     Austin, Texas, 78701

WITNESS INDEX

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| John Preston | 63 | 80 | 100 | |

Be seated.

**JOHN PRESTON**

was called as a witness and having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

QUESTIONS BY MR. NEWMAN:

Q.   Will you state your name, please.

A.   John T. Preston.

Q.   And, Mr. Preston, give the court, if you would, a thumbnail sketch of your education.

A.   I went to the University of Wisconsin for physics.  I got a Master's in physics and Northwestern University for an MDA.

Q.   And if you could, were you the director of technology anywhere?

A.   Yes, I was.

Q.   Where were you the director of technology?

A.   I was the director of technology, development of technology licensed at MIT.

Q.   And when was that, sir?

A.   I started at MIT -- I have had many roles at MIT; but I started in 1977, December of 1977; and I still have an appointment at MIT.

Q.   And have you received any appointments to advisory positions?

Cheryl L. Pierce, CSR

THE COURT: Are you calling this man as an expert?

MR. NEWMAN: Well, judge, in part, yes.

THE COURT: Expert on what?

MR. NEWMAN: Well, basically as it relates to their claim with regard to the Fall River Reality entity. I believe, there is an allegation -- if there is not going to be an allegation that that is some asset that Mr. Sydow owns for purposes of this hearing --

THE COURT: I thought that this argument was over whether or not Mr. Sydow was still getting $30,000.00 from NC12.

MR. NEWMAN: That is. I will offer that testimony, too; but I don't want them to say that there is some additional source of money for Mr. Sydow. So I am just going through that. I can speed it up.

THE COURT: Quickly.

MR. NEWMAN: Thank you, judge.

Q. (By Mr. Newman) You have significant experience in entities which own real estate and/or patents and things of that nature?

A. Yes, sir.

Q. And are you on the board of directors of

NC12?

A.  I am.

Q.  And what does NC12 do?

A.  NC12 is a development stage company that is trying to develop a reactor that converts coal into natural gas or synthetic natural gas.

Q.  Does NC12 own significant licenses and licensure for patents?

A.  It took a license for some of the core background patents on high temperature liquid metal chemistry.  So, yes; and it has developed its own patent applications that are inventions that I don't think are filed yet.

Q.  And with regard to the licenses that NC12 has or had a right to, what entity owns the primary core patent licenses?

MR. KELLY:  I am objecting to hearsay, Your Honor.

THE COURT:  Overruled.

If you know.

THE WITNESS:  Yes, sir.

A.  So the patent that were licensed were licensed from a company called Quantum Catalytics which is a company that I helped create.

Q.  (By Mr. Newman) And NC12 has been in

Cheryl L. Pierce, CSR

existence for a little over a year?

A. That is correct.

Q. So it is kind of a start-up company?

A. That is correct.

Q. Now, how much has NC12 earned?

How much in revenue and earnings has NC12 had since its inception?

A. To the best of my knowledge zero.

Q. Not one penny?

A. That is correct.

Q. How is it that NC12 has paid salaries and its officers and/or employees?

A. NC12 raised some venture capital investments from individuals, and it has been using that money to support itself.

Q. Has there been difficulty in obtaining funds from investors to continue the financing for NC12?

MR. KELLY: I will object to hearsay, Your Honor.

THE COURT: Sustained.

MR. NEWMAN: You said sustained it.

THE COURT: I sustained the objection. The only way that he is going to know that is what somebody else told him.

Q. (By Mr. Newman) You certainly are a critical

party in obtaining funds for NC12?

THE WITNESS: I have been the primary fundraiser for the company over the last few years, Your Honor.

Q. (By Mr. Newman) And how much money has been raised for NC12?

MR. KELLY: Object to hearsay, and object to relevance.

THE COURT: Overruled.

A. None. If you go back to NC12's predecessor company which was called Texas Syngas.

MR. KELLY: Objection to nonresponsive.

Q. (By Mr. Newman) I am just talking about NC12 right now.

A. I will have to review the records.

THE COURT: All right. So you don't know.

THE WITNESS: I don't know exactly, no, sir.

Q. (By Mr. Newman) So you don't know exactly.

Do you have a ballpark figure, sir?

MR. KELLY: I object to asked and answered, Your Honor.

THE COURT: Overruled.

Give us your best guesstimate.

A.   Best guesstimate for NC12 is about $5.2 million as convertible debt.

Q.   (By Mr. Newman) And what is convertible debt?

A.   Convertible debt means that it was given to the company as debt which means the company was obligated to repay it.

Q.   As a promissory note?

A.   As a promissory note that would mature as of September 30th of this year, so a week and a half ago.

Q.   And when that matured, was it enough money in NC12 to pay the promissory note back?

A.   No, sir.

Q.   So what was done with regard to those notes?

MR. KELLY:  Your Honor, I am not going to get the sustain probably; but I want to have a running objection on hearsay.  Everything that he is talking about is hearsay.

Q.   (By Mr. Newman)  Do you have personal knowledge of what I am asking you about?

A.   Yes, sir.

MR. MOFFETT:  Your Honor, can we take the witness on voir dire?

THE COURT:  No.

MR. NEWMAN:  And I would like one lawyer, judge.

Cheryl L. Pierce, CSR

THE COURT: That will be Mr. Kelly.

MR. NEWMAN: All right.

Q. (By Mr. Newman) With regard to -- I think my question was: Did NC12 have sufficient funds to meet the obligation to pay the promissory note back?

A. No, sir.

THE COURT: Well, now hold on just a minute.

He may be a fundraiser, but you have not made the tie that he knows enough about the day-to-day management of NC12.

MR. NEWMAN: Yes, sir.

Q. (By Mr. Newman) You are a board member of NC12?

MR. KELLY: Object to leading, Your Honor.

THE COURT: Sustained.

Q. (By Mr. Newman) Are you a board member of NC12?

A. Yes, sir.

Q. As a board member of NC12, are part of your duties and obligations to review the major financing situations of NC12?

A. Yes, sir.

Q. And have you done that?

Cheryl L. Pierce, CSR

A. Yes, sir.

Q. And as part of that obligation and you carrying out your duties, did you come to the determination whether NC12 had the ability to pay back the promissory notes that are due?

MR. KELLY: Objection, Your Honor. The question is based on hearsay. These are documents that I have an issue with because I can't get to them, Your Honor, to say whether they are right or they are wrong.

MR. NEWMAN: I didn't ask him anything about a document, judge.

MR. KELLY: Well, I know but that is what the question is based on.

THE COURT: Are you the chief financial officer for the company?

THE WITNESS: No, sir.

THE COURT: What is your involvement with the company day-to-day?

THE WITNESS: I have been working with the company really almost day-to-day trying to raise money and trying --

THE COURT: But you are not involved in the day-to-day management; in other words, the hiring?

THE WITNESS: No, sir.

THE COURT: I will sustain the hearsay objection.

Q. (By Mr. Newman) Mr. Preston, although you are not involved in the day-to-day involvement with the hiring and the firing of employees, are you involved with virtually the day-to-day involvement with the finances related to the company; in other words, monies available to pay debt and monies available to pay salaries?

MR. KELLY: Objection, asked and answered. It presupposes that his response is going to be based on some document. So my objection is hearsay.

MR. NEWMAN: Your Honor, it is not hearsay. I am not asking about a document. I am asking whether he knows about the financial condition of the entity.

THE COURT: Well, let's just play that out a little bit. He is on the board of directors.

Wouldn't directors' minutes, memoranda, all of those things that pass back and forth between companies and their operating officers and board of directors be relevant to this?

MR. NEWMAN: Absolutely relevant, Your Honor, and absolutely will record what the parties

Cheryl L. Pierce, CSR

did; but Mr. Kelly's proposition is in reverse. They meet, they discuss it, they figure out what the situation is, he has personal knowledge of the situation; and that is documented in some minutes somewhere and in the financial documents somewhere.

I am not asking him about the financial document. I am asking him about his specific knowledge; and, judge, they are sword and shielding it. What they say is, "Either give us the documents which we have not requested." They acknowledge they have not requested appropriately. They have never requested the documents, judge, from NC12 like they were required to do.

And now they are saying, "Well, since they didn't produce document that weren't requested properly, this witness can't testify to what he personally knows because it also happens to be contained in the documents somewhere."

THE COURT: He has already testified that they invested -- that he got about $5.5 million in venture capital, that on September the 30th, 2010, the debt came due; and it wasn't paid.

Q. (By Mr. Newman) Mr. Preston, does Mr. Sydow set his salary or does the board set his salary?

A. The board of directors sets the salary for

the CEO.

Q. Are you on the board of directors?

A. I am.

Q. Is Mr. Sydow on the board of directors?

A. Yes.

Q. Who else is on the board of directors?

A. Christopher Henkle.

THE COURT: Is Mr. Sydow the CEO?

THE WITNESS: He is the CEO, yes.

Q. (By Mr. Newman) Being the CEO, can he unilaterally set what his salary is?

A. No, the board sets his salary.

Q. Is there sufficient funds now in NC12 to continue paying Mr. Sydow the salary?

MR. KELLY: Objection, Your Honor. There is no basis for him knowing that.

THE COURT: I will take his opinion and give it the weight that I think it deserves.

A. The board does review financial --

THE COURT: Is it sufficient money to pay Mr. Sydow's salary?

THE WITNESS: No, sir.

THE COURT: In your opinion?

THE WITNESS: No, sir.

Q. (By Mr. Newman) Are you trying to secure

Cheryl L. Pierce, CSR

salary?

A. Yes.

Q. With regard to there has been an issue of Fall River Reality.

Is there an entity that you are aware --

MR. KELLY: Objection, Your Honor, relevance.

THE COURT: Overruled.

MR. NEWMAN: Well, judge --

THE COURT: I have overruled. You can proceed.

MR. NEWMAN: Judge, I might can cut this short if I can address the present counsel for two seconds.

Are you all going to bring up anything about Fall River Reality?

MR. KELLY: Eventually, sure.

MR. NEWMAN: Well, I am talking about in this hearing.

MR. KELLY: Other than what you all said, you know, that he owns it; and I might bring that up with Mr. Sydow or somebody but not with this guy.

MR. NEWMAN: Okay.

Q. (By Mr. Newman) Mr. Preston, who owns Fall River Realty?

Cheryl L. Pierce, CSR

A. NC12 to the best of my knowledge owns Fall River Realty.

Q. What does Fall River Realty own?

A. Fall River Realty owns a piece of property located at 421 Curren Road in Fall River, Massachusetts.

Q. Where did the money come from to purchase that real property?

A. From NC12.

Q. NC12 cut a check?

A. Yes.

Q. Was Fall River Realty -- why would NC12, for example, pay money for another corporation to own a parcel of property?

MR. KELLY: Your Honor, I object to the relevance. I object to hearsay, too.

THE COURT: Overruled.

Q. (By Mr. Newman) Why might you set up a different company?

A. It is normal to put property in a separate company and the reason for doing that is that it enables you to get a mortgage on the property. It is a normal business operation. If you have a business over in Company A; and you have got the real estate in Company B; and the reason for doing that is you can

Sydow, haven't you, sir?

A. Yes, sir. As I said, I was on the board of Texas Syngas.

Q. And Texas Syngas was an organization that did essentially the same things that NC12 does?

A. Texas Syngas re-organized into NC12.

Q. And do you know that Michael Sydow moved his stock out of Texas Syngas into another corporation named Zygometa?

MR. NEWMAN: Objection. That assumes facts that are not in evidence.

THE COURT: Overruled.

Do you know that?

THE WITNESS: Yes.

Q. (By Mr. Kelly) That he moved his stock out of Zygometa into NC12, do you know that?

A. Zygometa was an entity --

THE COURT: Do you know that, that is a yes or no answer.

THE WITNESS: Yes, sir.

Q. (By Mr. Kelly) Were you on the board of directors of Texas Syngas?

A. Yes.

Q. How many people were with Texas Syngas, sir?

A. How many people?

Cheryl L. Pierce, CSR

108

REPORTER'S CERTIFICATE

THE STATE OF TEXAS    )
COUNTY OF HARRIS      )

I, Cheryl L. Pierce, Deputy Official Court Reporter in and for the 308th District Court of Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $648.00 and was paid by the Respondent.

WITNESS MY OFFICIAL HAND this the 26th day of October, 2010.

_____
CHERYL L. PIERCE, Texas CSR 2711
Expiration Date:  12/31/2010
Deputy Official Court Reporter
308th District Court
Houston, Harris County, Texas

Cheryl L. Pierce, CSR

370

No. 2010-02710

| | | |
|---|---|---|
| In the Matter of the Marriage of | : | IN THE DISTRICT COURT OF |
| Michael D. Sydow | : | |
| and | : | |
| Kelli McDonald Sydow | : | HARRIS COUNTY, TEXAS |
| and in the interest of Michael Wyatt Sydow, | : | |
| a minor child | : | |
| | : | 308TH JUDICIAL DISTRICT |

## DIRECT QUESTIONS TO BE PROPOUNDED TO THE WITNESS

Custodian of Records for: Compass Bank, Brokerage Dept. C/O CT Corporation System
Records Pertaining To: See Exhibit A
Type of Records: Any and all records as described on the attached Exhibit 'A'

1. Please state your full name.

   Answer: Patricia D. Custard

2. Please state by whom you are employed and the business address.

   Answer: BBVA Compass 701 - 32nd Street South Bham, Al. 35253

3. What is the title of your position or job?

   Answer: Item Processor II

4. Are these memoranda, reports, records, or data compilations, outlined in the subpoena duces tecum, pertaining to the above-named person, in your custody or subject to your control, supervision or direction?

   Answer: Yes

5. Are you able to identify these aforementioned records as the originals or true and correct copies of the originals?

   Answer: Yes

6. Please hand to the Officer taking this deposition copies of the memoranda, reports, records, or data compilations, mentioned in Question No. 4. Have you complied? If not, why?

   Answer: Send by mail.

7. Are the copies which you have handed to the Officer taking this deposition true and correct copies of such memoranda, reports, records, or data compilations.

   Answer: Yes

Order No. 03-6270-001

**EXHIBIT A-13**

371

8. Were such memoranda, reports. records, or data compilations kept in the regular course of business of this facility?

Answer: _Yes_

9. Was it in the regular course of business of this facility for a person with knowledge of the acts, events, conditions, opinion. or diagnoses, recorded to make the record or to transmit information thereof to be included in such record?

Answer: _Yes_

10. Were the entries on these records made at or shortly after the time of the transaction recorded?

Answer: _Yes_

11. Was the method of preparation of these records trustworthy?

Answer: _Yes_

_Patricia S. Crostund_
WITNESS (Custodian of Records)

Before me, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument in the capacity therein stated, who being first duly sworn, stated upon his/her oath that the answers to the foregoing questions are true and correct. I further certify that the records attached hereto are exact duplicates of the original records.

SWORN TO AND SUBSCRIBED before me this _26th_ day of _January_, 20_11_.

_Immuethus O. Waller_
NOTARY PUBLIC

**MY COMMISSION EXPIRES ON 2/15/2012**

My Commission Expires: _____

Order No. 03-6270-001

372

# AFFIDAVIT OF SERVICE

## Deposition Subpoena To Testify Or Produce Documents or Things, Attached Notice

Case Number: 2010-02710

Plaintiff:
**In The Matter of the Marriage of Michael D. Sydow and**

vs.

Defendant:
**Kelli McDonald Sydow and In the interes to Michael Wyatt Sydow a minor child**

Received by Smart Choice Process Service, Inc. on the 15th day of December, 2010 at 3:00 pm to be served on **Compass Bank, Brokerage Dept. c/o CT Corporation System It's Registered Agent, 350 North St. Paul Street, Ste.-2900, Dallas, TX 75201.**

I, Michael E. Wigginton, being duly sworn, depose and say that on the 16th day of December, 2010 at 2:51 pm, I:

served a **AUTHORIZED AGENT** by delivering a true copy of the **Deposition Subpoena To Testify Or Produce Documents or Things, Attached Notice** with the date and hour of service endorsed thereon by me, to: Neshka Taylor as **Authorized Person to Accept**, at the address of: **350 North St. Paul Street, Ste.-2900, Dallas, TX 75201** on behalf of **Compass Bank, Brokerage Dept.**, and informed said person of the contents therein.

I am over eighteen (18) years of age and not a party to nor interested in the outcome of the above numbered suit. I am authorized to serve citations and other notices in this cause by The Texas Supreme Court.

Subscribed and Sworn to before me on the 16th day of December, 2010 by the affiant who is personally known to me.

_Melanie A. Locket_
NOTARY PUBLIC

MELANIE A. LOCKET
Notary Public, State of Texas
My Commission Expires
June 30, 2014

Michael E. Wigginton
SCH-3613

Smart Choice Process Service, Inc.
P.O. Box 852188
Mesquite, TX 75185-2188
(214) 742-3100

Our Job Serial Number: LJW-2010001703

Copyright © 1992-2010 Database Services, Inc. - Process Server's Toolbox V6.4g

373

No. 2010-02710

| | | |
|---|---|---|
| In the Matter of the Marriage of | : | IN THE DISTRICT COURT OF |
| Michael D. Sydow | : | |
| and | : | |
| Kelli McDonald Sydow | : | HARRIS COUNTY, TEXAS |
| and in the interest of Michael Wyatt Sydow, | : | |
| a minor child | : | |
| | : | 308TH JUDICIAL DISTRICT |

## NOTICE OF DELIVERY

RE: Compass Bank, Brokerage Dept. C/O CT Corporation System (Any & All Records)

I, __Shelia Edwards_____, Notary Public in and for the State of Texas, hereby certify pursuant to the Rule 206, Texas Rules of Civil Procedure,

1. That this Deposition by Written Questions of **Patricia D. Custard**, the Custodian of Records for the above named is a true and exact duplicate of the records pertaining to See **Exhibit A**, given by the witness named herein, after said witness was duly sworn by__ Anneetress D. Walker _____;

2. That the transcript is a true record of the testimony given by the witness;

3. That **$1,406.15** is the charge for the preparation of the completed Deposition by Written Questions and any copies of exhibits, charged to Attorney for **Respondent, Dennis B. Kelly, TBA # 11217500;**

4. That the deposition transcript was submitted on the **26th** day of **January, 2011**, to the witness for examination, signature and return to the officer by a specified date;

5. That changes, if any made by the witness, in the transcript and otherwise are attached thereto or incorporated therein;

6. That the witness returned the transcript;

7. That the original deposition by Written Questions and a copy thereof, together with copies of all exhibits was delivered to the attorney or party who Noticed the first questions for safekeeping and use at trial;

8. That pursuant to information made a part of the records at the time said testimony was taken, the following includes all parties of record:

**Asher B. Griffin**
**Joseph Indelicato, Jr.**
**David J. Wukoson, Attorney For Petitioner**

and
9. A copy of this Notice of Delivery was served on all parties shown herein.

GIVEN UNDER MY HAND AND SEAL OF OFFICE ON THIS THE __31__ day of ___January___, 20_11_.

**Merrill Corporation**
**315 Capitol Suite 210**
**Houston, TX 77002**
**(713) 868-2929 Fax (713) 315-2158**

Notary Public in and for the State of Texas

Order No. 03-6270-001

SHELIA ANN EDWARDS
MY COMMISSION EXPIRES
December 2, 2011

374

## DEPOSITION SUBPOENA TO TESTIFY OR PRODUCE DOCUMENTS OR THINGS

**THE STATE OF TEXAS**

To any Sheriff or Constable of the State of Texas or other person authorized to serve subpoenas under RULE 176 OF TEXAS RULES OF CIVIL PROCEDURE. - GREETINGS -

You are hereby commanded to subpoena and summon the following witness(es):
Custodian of Records for:

Compass Bank, Brokerage Dept.
C/O CT Corporation System
350 North St. Paul Street
Dallas, TX 75201

to be and appear before a Notary Public of my designation for

Merrill Corporation (713) 868-2929
315 Capitol Suite 210, Houston, TX 77002

or its designated agent, 24 days after the date of service at the office of the custodian and there under oath to make answers of certain written questions to be propounded to the witness and to bring and produce for inspection and photocopying

Any and all records as described on the attached Exhibit 'A'

and any other such record in the possession, custody or control of the said witness, and every such record to which the witness may have access, pertaining to: See Exhibit A

at any and all times whatsoever, then and there to give evidence at the instance of the **Respondent, Kelli McDonald Sydow**, represented by **Dennis B. Kelly**, Attorney of Record, in that Certain Cause No. **2010-02710**, pending on the docket of the **District Court of the 308th Judicial District of Harris County,**, Texas.

This Subpoena is issued under and by virtue of Rule 200 and Notice of Deposition Upon Written Questions on file with the above named court, styled

In the Matter of the Marriage of
Michael D. Sydow
and
Kelli McDonald Sydow
and in the interest of Michael Wyatt Sydow,
a minor child

and there remain from day to day and time to time until discharged according to law.

**WITNESS MY HAND,** this 15th day of December, 2010.

_____
NOTARY PUBLIC

176.8 Enforcement of Subpoena. (a) *Contempt*. Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.

### OFFICER'S RETURN

Came to hand this _____ day of _____, 20____, and executed this the _____ day of _____, 20____, in the following manner: By delivering to the witness _____, a true copy hereof.

Returned this _____ day of _____, 20____.

_____
PROCESS SERVER

Order No. 03-6270-001

## COMPASS BANK - EXHIBIT A

The terms "documents," "writings," and "records" are used in this exhibit in their customary broad sense and include without limitation the following items, regardless of origin or location, whether printed, recorded, filmed, or reproduced by any other mechanical process or written or produced by hand; and whether an original, master, or copy, namely:

1.  All account statements, deposit records, withdrawal records, transfer records, cancelled checks, partnership agreements, funding lines of credit, financing statements, promissory notes and loan documents for the period from April 15, 2010, to the present date, for all checking accounts, savings accounts, certificates of deposit, and all other types of financial accounts, whether personal or for businesses in which the parties, Michael D. Sydow (a/k/a Michael D. Sydow, Sr., Michael David Sydow, Michael David Sydow, Sr., Michael Sydow, or Michael Sydow, Sr.) or Kelli McDonald Sydow (or either of them), have any interest and that are maintained in the name of the parties (or either of them), in the name(s) of their business(es), including but not limited to NC12, Inc., Texas Syngas, Zagometa, Daedelus Air, The Michael and Kelli Sydow Irrevocable Insurance Trust, Chippendale Park, Loki Investments, Loki Services, American International Helicopters, Inc., No Peanuts, or Woden Enterprises, and any other entity on behalf of the parties (or either of them), or on which the parties (or either of them) has or has had the right to draw, including but not limited to each of the following accounts:

    a.  Joint (Kelli Sydow and Michael Sydow) Account #xxx8347
    b.  Amegy Bank Loan Collateral FBO Michael D. Sydow Account #xxx8347-1
    c.  ATM Joint (Kelli Sydow and Michael Sydow) Checking Account #xxx4380
    d.  Money Market Joint (Kelli Sydow and Michael Sydow) Account #xxx1016
    e.  Bill Payer Joint (Kelli Sydow and Michael Sydow) Checking Account #xxx7863
    f.  Kelli Sydow C/F Michael Wyatt Sydow UTMA/TX Account #xxx3919
    g.  VCSP/CollegeAmerica 529 Account for Michael Wyatt Sydow
    h.  Kelli McDonald Sydow Account #xxx6212
    i.  Kelli Sydow and Michael Sydow Tenants in Common Account #xxx8662
    j.  Michael Wyatt Sydow (Kelli McDonald Sydow Custodian) Account #xxx3511
    k.  NC12 Account #xxx8791
    l.  Texas Syngas Account #xxx8791
    m.  Airplane Account.

2.  All cashier's checks purchased by or on behalf of Michael D. Sydow (a/k/a Michael D. Sydow, Sr., Michael David Sydow, Michael David Sydow, Sr., Michael Sydow, or Michael Sydow, Sr.) or any of his businesses, including but not limited to NC12, Inc., Texas Syngas, Zagometa, Daedelus Air, The Michael and Kelli Sydow Irrevocable Insurance Trust, Chippendale Park, Loki Investments, Loki Services, American International Helicopters, Inc., No Peanuts, or Woden Enterprises, from April 15,

2010, to the present date.

3. All financial statements in your possession prepared by or on behalf of Michael D. Sydow (a/k/a Michael D. Sydow, Sr., Michael David Sydow, Michael David Sydow, Sr., Michael Sydow, or Michael Sydow, Sr.) or any of his businesses, including but not limited to NC12, Inc., Texas Syngas, Zagometa, Daedelus Air, The Michael and Kelli Sydow Irrevocable Insurance Trust, Chippendale Park, Loki Investments, Loki Services, American International Helicopters, Inc., No Peanuts, or Woden Enterprises, from April 15, 2010, to the present date.

4. All checks and other financial instruments negotiated for cash paid by your institution to Michael D. Sydow (a/k/a Michael D. Sydow, Sr., Michael David Sydow, Michael David Sydow, Sr., Michael Sydow, or Michael Sydow, Sr.) or any of his businesses, including but not limited to NC12, Inc., Texas Syngas, Zagometa, Daedelus Air, The Michael and Kelli Sydow Irrevocable Insurance Trust, Chippendale Park, Loki Investments, Loki Services, American International Helicopters, Inc., No Peanuts, or Woden Enterprises, from April 15, 2010, to the present date.

5. All wiring/routing instructions, information and transactions for Michael D. Sydow (a/k/a Michael D. Sydow, Sr., Michael David Sydow, Michael David Sydow, Sr., Michael Sydow, or Michael Sydow, Sr.) or any of his businesses, including but not limited to NC12, Inc., Texas Syngas, Zagometa, Daedelus Air, The Michael and Kelli Sydow Irrevocable Insurance Trust, Chippendale Park, Loki Investments, Loki Services, American International Helicopters, Inc., No Peanuts, or Woden Enterprises, from April 15, 2010, to the present date, including but not limited to ABA wiring/routing #113011258.

6. All account statements, deposit records, withdrawal records, transfer records, cancelled checks, partnership agreements, funding lines of credit, financing statements, promissory notes and loan documents for the period from April 15, 2010, to the present date, for the following account:

   a. Account #1013572 with Compass Bank (formerly Southwest Bank of Texas)

No. 2010-02710

| In the Matter of the Marriage of | : | IN THE DISTRICT COURT OF |
| Michael D. Sydow | : | |
| and | : | |
| Kelli McDonald Sydow | : | HARRIS COUNTY, TEXAS |
| and in the interest of Michael Wyatt Sydow, | : | |
| a minor child | : | |
| | : | 308TH JUDICIAL DISTRICT |

## NOTICE OF INTENTION
## TO TAKE DEPOSITION BY WRITTEN QUESTIONS

To Petitioner by and through their attorney(s) of record: **David J. Wukoson**
To other party/parties by and through their attorney(s) of record: **Asher B. Griffin and Joseph Indelicato, Jr.**

You will please take notice that twenty-four (24) days from the service of a copy hereof with attached questions, a deposition by written questions will be taken of Custodian of Records for:

**Compass Bank, Brokerage Dept. C/O CT Corporation System(Any & All Records)**
   **350 North St. Paul Street  Dallas, TX 75201**

before a Notary Public for    Merrill Corporation  (713) 868-2929  Fax (713) 315-2158
   315 Capitol, Suite 210, Houston, TX 77002

or its designated agent, which deposition with attached questions may be used in evidence upon the trial of the above-styled and numbered cause pending in the above named court.  Notice is further given that request is hereby made as authorized under Rule 200, Texas Rules of Civil Procedure, to the officer taking this deposition to issue a subpoena duces tecum and cause it to be served on the witness to produce any and all records as described on the attached questions and/or Exhibit(s) and any other such record in the possession, custody or control of the said witness, and every such record to which the witness may have access, pertaining to:

See Exhibit A

and to turn all such records over to the officer authorized to take this deposition so that photographic reproductions of the same may be made and attached to said deposition.

Dennis B. Kelly
Law Offices of Dennis B. Kelly
602 Sawyer, Suite 700
Houston, TX 77007-7524
(713) 868-2700  Fax (713) 868-6054
Attorney for Respondent
SBA # 11217500

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all Counsel of Record by hand delivery, FAX, and/or certified mail, return receipt requested, on this day.

Dated: December 15, 2010

by _Dennis B. Kelly_

Order No.  03-6270-001

378

# CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Notice and written questions has been hand-delivered and/or mailed receipt requested, to the attorneys of record.

Dated: 12/15/2010

Merrill Corporation
315 Capitol
Suite 210
Houston, TX 77002
(713) 868-2929  Fax (713) 315-2158

379

## Outgoing FED Message

Printed: 5/10/2010 12:03:09PM          Requested By:  gloria

### MESSAGE INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Amount: | $1,100,000.00 | Message ID: | 090115143459MH00 | Source: | |
| Currency: | USD | Latest Version: | 0 | Priority: | |
| Value Date: | 1/15/2009 12:00:00AM | Time: | | URC: | |
| Bank ID: | 001 | Department: | WIR | Status: | COMPLETE |
| Message Type: | 10 | Branch: | 001BR99999 | Template: | |
| Message Subtype: | 00 | Charge: | | | |
| Fee: | 0.00 | Service: | SC | | |
| Ref. No.: | 090115143459MH00 | External Ref.: | | Country Code: | US |

### MESSAGE TEXT

| | | | | | |
|---|---|---|---|---|---|
| Sender ABA: | 062001186 | Sender Name: | COMPASS BANK | Ref. No.: | 090115143459MH00 |
| Receiver ABA: | 011301798 | Receiver Name: | EASTERN BANK LYNN | Prod. Code: | CTR |
| Ref. IMAD: | | As of Reason: | | As of Date: | |
| IMAD: | 20090115F2QCZ60C001731 | Disposition: | | | |
| OMAD: | 20090115A1B7AA1C0002350115156 | | | Ref. for Bnf: | |
| Acc Off: | 001   Account:   210035248900 | Acc. Type:   DDA | Initiator ID: | M CHAMPION |
| Cr Acc Off: | Cr Acc No: | Cr Acc Type: | | |
| Db Advice: | Db Fee:  0.00 | Cr Advice: | Cr Fee: | |

Drawdown Credit Account:

Originator:                                          Beneficiary:

210035248900                                         402447734

BOS, INC.                                            JOHN PRESTON

4900 WOODWAY DR STE 800                              MASSACHUSETTS

HOUSTON, TX 77056-1883


Originator Bank:                                     Beneficiary Bank:



HOUSTON, TX 77056-1883

00448

(c) Fundtech Systems

## Outgoing FED Message

Printed: 5/10/2016 11:35:45AM          Requested By: gloria

### MESSAGE INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Amount: | $5,000.00 | Message ID: | 080804145037TR00 | Source: | |
| Currency: | USD | Latest Version: | 0 | Priority: | M |
| Value Date: | 3/4/2008 12:00:00AM | Time: | | URC: | |
| Bank ID: | 001 | Department: | WIR | Status: | COMPLETE |
| Message Type: | 10 | Branch: | 001BRANCH | Template: | |
| Message Subtype: | 00 | Charge: | | | |
| Fee: | 0.00 | Service: | FW | Country Code: | US |
| Ref. No.: | 080804145037TR00 | External Ref.: | | | |

### MESSAGE TEXT

| | | | | | |
|---|---|---|---|---|---|
| Sender ABA: | 062001186 | Sender Name: | COMPASS BANK | Ref. No.: | 080804145037TR00 |
| Receiver ABA: | 021000021 | Receiver Name: | JPMCHASE | Prod. Code: | CTR |
| Ref. IMAD: | | As of Reason: | | As of Date: | |
| IMAD: | 20080804F2QC280C001320 | Disposition: | | | |
| OMAD: | 20080804D1QGC02R005080080410C | | | Ref. for Ben.: | |
| Acc. O/T: 001 | Account: 210071821243 | | Acc. Type: DDA | Initiator ID: | CBOGINE |
| Cr Acc Off: | Cr Acc No: | | Cr Acc Type: | | |
| Db Advice: | Db Fee: 0.00 | | Cr Advice: | Cr Fee: | |

Drawdown Credit Account:

Originator:
210071821243
TEXAS SYNGAS INC
4600 WOODWAY SUITE 900
HOUSTON TEXAS 77056

Beneficiary:
1449-16
CARIBBEAN MANAGEMENT SERVICES
LIMITED

Originator Bank:

Beneficiary Bank:
NOSCTCGPXXX
SCOTIABANK (TURKS AND CAICOS)
TOWN CENTRE MALL
PROVIDENCIALES TURKS AND CAICOS

HOUSTON TEXAS 77068

Page 1 of 4

00501

Instructing Bank:

Intermediary Bank:
001058853
SCOTIABANK (TURKS & CAICOS) LTD
PROVIDENCIALES TURKS & CAICOS
ISLANDS

Drawdown Debit Account:

Correspondent Bank:

Originator Bank Info:    RE: INCORPORATION OF BOS INC AND FALL RIVER REALTY TRUST LTD

Free Text:

BANK TO BANK INFORMATION

Receiver Bank Info:

Drawdown Debit Account:
Advice Code:
Advice Info:

Intermediary Bank Info:

Page 2 of 4

00502

**Compass Bank**

## NON-PERSONAL DEPOSIT ACCOUNT
## SIGNATURE CARD

| Date | Prepared by | | Bank, Branch No. & Cost Center | |
|---|---|---|---|---|
| 01/02/2009 | Leanne Parker | | TX 712 | 21036 |

[X] New Account      [ ] Change Authorized Signers**      [ ] Name Change**

** New Resolution is required

The undersigned agree(s) to the terms of the Non-Consumer Account Agreement and acknowledge(s) receipt of a copy of the Agreement and a current interest and service charge schedule or disclosure.

### ONLY ONE ACCOUNT PER CARD
### USE BLACK MEDIUM POINT PEN

ACCOUNT NAME

BOE, INC

| TAXPAYER IDENTIFICATION NUMBER | | NO. DO. REQUIRED | BANK NO. | ACCOUNT NO. |
|---|---|---|---|---|
| 20-2845070 | | | 021 | 35748000 |

Present At Opening

Yes  No

[ ] [ ] Name MICHAEL SNOOW     Title Director
Signature _____

[ ] [ ] Name _____     Title _____
Signature _____

[ ] [ ] Name _____     Title _____
Signature _____

[ ] [ ] Name _____     Title _____
Signature _____

TAXPAYER IDENTIFICATION NUMBER CERTIFICATION
For the Account Ownership Is:

[ ] Individual/Sole Proprietor   [X] Corporation
[ ] Partnership   [ ] Other

(Refer to the Non-Consumer Account Agreement for a complete explanation of Backup Withholding Regulations.)

Under penalties of perjury, I certify that:

1. The Internal Revenue Service has not advised me that I am currently subject to backup withholding unless I check this block. [ ]
2. I am a U.S. person (including a U.S. resident alien unless I check this block.   [ ]
3. [X] The number shown above is the correct Taxpayer Identification Number for tax reporting purposes) OR

[ ] A Taxpayer Identification Number has been applied for or number is not provided within 60 days, the account will be closed. If a withdrawal of $500 or more is made prior to the Bank's receipt of this number, the Bank will withhold 20% from interest payments. Is OR

[ ] All owners of this account are nonresident aliens (or this is a foreign entity) who have (has) provided the appropriate completed Form W-8, OR

[ ] Based on Internal Revenue Service regulations, I am a U.S. exempt payee and not subject to Backup Withholding.

Authorized Signature _____

Date Entry (ID's) _____

Rev. 5/00

Ltrform - NONPERS03....AL/AZ/CO/FL/NM/TX

01137

**Compass Bank**

021    BOS, INC.
4900 WOODWAY DR STE 900
HOUSTON TX  77056-1883

Your business is important to us. So let us know if you ever have a question or if we can assist you in any way. We're always happy to hear from you and we're ready to help.

If you have questions about your statement, call Customer Service at 1-800-852-5893.

## Business Checking
## 0035248900

BOS, INC.

**Deposit Account Recap**

| | | |
|---|---|---|
| Beginning Balance as of January 1, 2003 | | 3,500,000.00 |
| 2 Withdrawals | (Minus) | 3,500,000.00 |
| Ending Balance as of January 30, 2003 | | .00 |

**Withdrawals and Other Debits**

| Date | Amount | Description |
|---|---|---|
| Jan 15 | 1,100,000.00 | OUTGOING WIRE RCF# 001731 BNF JOHN PRESTON |
| Jan 21 | 2,400,000.00 | DEBIT MEMO |

**Daily Balance Summary**

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| Dec 31 | 3,500,000.00 | Jan 15 | 2,400,000.00 | Jan 21 | .00 |

01142



01156

385

A-11 TC-04

MRA Investment LLC
75 Cambridge Street Suite 100
Cambridge MA 02142

Date NOVEMBER 10, 2008

94

Pay to the
order of ___ BQS, Inc. ___ $ 2,400,000. —

___ Two Million Four Hundred Thousand and No/100 ___ Dollars

East Cambridge Savings Bank
Cambridge MA 02141

Memo TEXAS SYMONS STOCK    SIGNED _____

⑈211370419⑈    3409788⑈ ⑈0000094⑈

0110070465
Compass Bank
Birmingham, Al
12/22/08

FOR DEPOSIT ONLY

01157



01158

387

# TEXAS SECRETARY of STATE
# NANDITA BERRY

### BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| **Filing Number:** | 801644546 | **Entity Type:** | Domestic For-Profit Corporation |
| **Original Date of Filing:** | August 22, 2012 | **Entity Status:** | Forfeited existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32048819349 | **FEIN:** | |
| **Duration:** | Perpetual | | |

| | |
|---|---|
| **Name:** | JK Claims Investment Corporation |
| **Address:** | 350 N SAINT PAUL ST STE 2900 |
| | DALLAS, TX 75201-4234 USA |

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES |
|---|---|---|---|---|---|

| View Image | Document Number | Filing Type | Filing Date | Effective Date | Eff. Cond | Page Count |
|---|---|---|---|---|---|---|
| ✔ | 438946440002 | Certificate of Formation | August 22, 2012 | August 22, 2012 | No | 3 |
| ✔ | 518871392826 | Change of Name or Address by Registered Agent | December 2, 2013 | December 2, 2013 | No | 1 |
| ✔ | 530640947152 | Tax Forfeiture | February 21, 2014 | February 21, 2014 | No | 1 |

Order     Return to Search

Instructions:
● To place an order for additional information about a filing press the 'Order' button.

## EXHIBIT A-14

388

# TEXAS SECRETARY of STATE
# NANDITA BERRY

### BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| Filing Number: | 801644546 | Entity Type: | Domestic For-Profit Corporation |
| Original Date of Filing: | August 22, 2012 | Entity Status: | Forfeited existence |
| Formation Date: | N/A | | |
| Tax ID: | 32048819349 | FEIN: | |
| Duration: | Perpetual | | |

Name:          JK Claims Investment Corporation
Address:       350 N SAINT PAUL ST STE 2900
                DALLAS, TX 75201-4234 USA

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES |
|---|---|---|---|---|---|

| Last Update | Name | Title | Address |
|---|---|---|---|
| August 23, 2012 | John T Preston | Director | 421 Currant Rd Fall River, MA 02720 USA |

Order       Return to Search

Instructions:

- To place an order for additional information about a filing press the 'Order' button.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT J. HANFLING, CHAPTER 11 )
TRUSTEE FOR ATG, INC. AND )
CATALYTICS LLC )
)
Plaintiff, )
)
v. ) C.A. No. 05-10077-RGS
)
EPSTEIN BECKER & GREEN, P.C. )
JOHN PRESTON, CHRISTOPHER NAGEL, )
EUGENE BERMAN, ETHAN JACKS, )
QUANTUM CATALYTICS LLC, ABC )
CORPS 1 through 5 and JOHN DOES )
1 through 5, )
)
Defendants. )

MODIFIED MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS QUANTUM CATALYTICS, LLC, JOHN
PRESTON, AND CHRISTOPHER NAGEL'S MOTION TO DISMISS

Defendants Quantum Catalytics LLC ("Quantum"), John Preston and Christopher

Nagel (collectively, the "Quantum Defendants"), pursuant to Rules 9(b) and 12(b)(6) of the

Federal Rules of Civil Procedure, respectfully move this Court to dismiss the Complaint in the

above-referenced civil action with prejudice for failure to state a claim upon which relief can

be granted. The Quantum Defendants also respectfully move this Court to dismiss the claims

asserted against them because those claims are barred by the applicable statute of limitations.

PROCEDURAL BACKGROUND

The Quantum Defendants timely filed a Motion To Dismiss Or In The Alternative To

Abstain with the United States Bankruptcy Court for the Northern District of California on

March 22, 2004. Pursuant to the Bankruptcy Court Local Rule 7003-1(b), Plaintiff's

-1-

EXHIBIT A-15

Cause No. 2011-44058

| | | |
|---|---|---|
| MICHAEL COLLINS; ET AL., PLAINTIFFS, | § § § | IN THE DISTRICT COURT |
| vs. | § § § | OF HARRIS COUNTY, TEXAS |
| MICHAEL SYDOW; ET AL., DEFENDANTS. | § § | 215th JUDICIAL DISTRICT |

| | | |
|---|---|---|
| AKILA FINANCE, S.A.; ET AL., INTERVENORS/PLAINTIFFS, | § § § | IN THE DISTRICT COURT |
| vs. | § § § | OF HARRIS COUNTY, TEXAS |
| MICHAEL SYDOW; ET AL., DEFENDANTS. | § § | 215th JUDICIAL DISTRICT |

## AFFIDAVIT OF MICHAEL COLLINS

Before me, the undersigned notary, on this day personally appeared MICHAEL COLLINS, who is personally known to me, and first being duly sworn to law upon his oath deposed and said:

1. My name is Michael Collins. I am over the age of 19 years old and am fully competent to make this affidavit. I am a former member of Texas Syngas, LLC ("Syngas LLC"), former officer and director of Texas Syngas, Inc. ("TSI"), and a former employee of NC12, Inc. ("NC12"). The information contained herein is true and correct and is based on my personal knowledge gained through my association with Syngas LLC, TSI, and NC12, as well as the business relationships I developed with John T. Preston ("Preston") and Michael D Sydow ("Sydow").

2. In July 2004, I formed Syngas LLC for the purpose of exploiting technology that I had developed to create environmentally friendly, low-cost energy through a gasification process. I was the original sole member of Syngas LLC.

3. Shortly after forming Syngas LLC, I was introduced to Preston, who I understood held patents on certain technology called Catalytic Extraction Processing ("CEP"). CEP is a process for breaking down hazardous and radioactive waste and recycling them into marketable products.

4. The CEP technology was formerly owned by a company called Molten Metal Technology Inc. ("MMT"). Before I met Preston, he had been active in attempting to put together a project between MMT and Hoescht Celanese for the development of a facility in Bay City, Texas to process waste water byproducts generated at Hoescht Celanese's Gulf Coast chemical plants.

1

5.  Ultimately MMT went into bankruptcy, and Preston effectively acquired MMT's patents through the bankruptcy proceeding.

6.  My first meeting with Preston occurred in 2004 when Preston flew to Houston to meet with me near my home in The Woodlands. During this meeting, Preston touted the patented technology that he had acquired from MMT and encouraged my participation in the commercial development of that technology.

7.  Preston came to Texas to meet with me again a few months after that first meeting in The Woodlands. This time, we travelled to Bay City, Texas to meet with Hoescht Celanese to continue discussions regarding the development and operation of a CEP facility for Hoescht Celanese. Preston returned to Texas again about two months later, when Preston and I met with Hoescht Celanese, this time in Baytown, Texas.

8.  During these three meetings in Texas, Preston and I discussed the commercial opportunities possible utilizing the MMT technology and the technology I had developed. I believed that a viable business could be developed using my technology, along with the patented technology held by Preston.

9.  Preston and I continued to talk by telephone over the course of the ensuing months. Preston initiated a number of those calls, either to me at my home in The Woodlands, Texas, or to me at an office I used at the law offices of Jeffrey Kaiser ("Kaiser") on TC Jester and later at the offices of Sydow, McDonald, Kaiser & Ahmed, on Bering Street in Houston, Texas and later Bagby Street in Houston. Preston also shipped records regarding MMT and its patented technology to me at the Bagby Street office for my review and use in the business I was undertaking with Preston.

10. Ultimately, Preston decided to join me as a member of Syngas LLC. Preston later requested that his name on the Syngas LLC records be changed to Quantum Catalytics LLC ("Quantum"), a company owned by Preston. Preston led us to believe that he was the sole owner, officer, and employee of Quantum.

11. When we began our discussions and negotiations in 2004, Preston did not represent himself to be negotiating and planning with me on behalf of any corporate entity. Accordingly, I understood at all times that I was doing business with *John Preston*, and not Quantum. In fact, after our introduction, it was Preston that solicited me, inducing me to work with *him* to develop my technology and the technology he had acquired from MMT.

12. At all times during my discussions and business relationship with Preston, I was a resident of The Woodlands, Texas. In my discussions with Preston, I learned that Preston had been to Texas on multiple occasions prior to our introduction. He told me that he had previously travelled to Texas on numerous occasions for meetings with Hoescht Celanese and with Flour Daniel in Clear Lake, Texas. Preston also told me that he had made numerous visits to the Houston Area Research Center, or HARC, on Research Forrest Drive in The Woodlands, Texas to study new technologies in the mid and late 1990s. As a result, Preston was very familiar with The Woodlands. It was my

2

409

understanding that his visits to HARC were for his personal benefit and not done through MIT or any corporation.

13. In November 2008, Preston invited me to dinner at the Houstonian in Houston, Texas. During this dinner, Preston pressed me to consent to a proposal for financing for NC12 that he was attempting to put together through his company C Change Investments ("C Change"). However, it appeared that the proposal was simply Preston's attempt to cut a deal for himself through C Change, and not a genuine effort to raise funding for NC12. As I understood the transaction, the only parties that would benefit would be Preston and companies solely under his control, including C Change, at the expense of NC12 and its existing investors and shareholders.

_____
Michael Collins

STATE OF TEXAS            §
                          §
COUNTY OF HARRIS          §


BEFORE ME, the undersigned authority, on this day personally appeared Michael Collins, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he read the Affidavit of Michael Collins and that the facts stated therein were within his personal knowledge and were true and correct.


GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 2nd day of June 2014.


BARBARA DAVIS
My Commission Expires
November 14, 2015

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS


MY COMMISSION EXPIRES: 11/14/2015

3

410

# TAB 5

Cause No. 2011-44058

| | | |
|---|---|---|
| MICHAEL COLLINS, ET AL., | § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § | |
| | § | |
| VS. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| MICHAEL SYDOW, ET AL., | § | |
| DEFENDANTS. | § | 215th JUDICIAL DISTRICT |

| | | |
|---|---|---|
| AKILA FINANCE, S.A.; BOSQUES DEL MOLINO, | § | IN THE DISTRICT COURT |
| S.A.; CENTRANS ENERGY SERVICES, INC.; | § | |
| CHESTER MESTER HOLDINGS, LTD.; DELTEC | § | |
| BANK & TRUST, LTD.; EMJO INVESTMENTS, | § | |
| LTD.; WILLIAM END; EVANS & PETREE 401K | § | |
| PLAN; FIRST BAY INTERTRADE; GM PARTNERS; | § | |
| MARAIR CORP.; W.L. NICHOL, IV; PANORAMA | § | |
| INVESTMENT, LTD.; PC01 VERMOEGENS VERW.; | § | |
| ALEJANDRO SANTO DOMINGO; SINCHI | § | |
| INVESTMENT; VENTURI GLOBAL | § | |
| INVESTMENTS., LTD., and H.J. von der GOLTZ | § | |
| INTERVENORS/PLAINTIFFS, | § | |
| VS. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| MICHAEL SYDOW; JOHN PRESTON; CHRISTOPH | § | |
| HENKEL; C CHANGE INVESTMENTS, LLC; | § | |
| CHALSYS CAPITAL PARTNERS, LLP; SONIA LO; | § | |
| BRILLIANT NOVELTY, L.L.C.; OSCURA, INC.; | § | |
| MELIORA ENERGY TECHNOLOGIES, S.à.r.l; and | § | |
| FALL RIVER REALTY, LTD., | § | |
| DEFENDANTS. | § | 215th JUDICIAL DISTRICT |

## INTERVENORS' SUPPLEMENTAL RESPONSE
## TO THE SPECIAL APPEARANCE OF JOHN T. PRESTON

### I.    INTRODUCTION

Intervenors file this Supplemental Response to the Special Appearance filed by John T. Preston ("Preston") further addressing Preston's contacts with Texas through JK Claims Investment Corporation ("JK Claims") and allegedly through Transformative Energy & Materials Capital, Inc. ("TEM Capital"). The evidence confirms that:

413

- JK Claims is merely a shell corporation and the alter ego of Preston. Accordingly, JK Claims' contacts with Texas are contacts of Preston for purposes of the personal jurisdictional analysis.

- TEM Capital was not yet incorporated at the time Preston travelled to Texas, allegedly on behalf of TEM Capital. Accordingly, Preston is not entitled to the fiduciary shield as to those visits.

## II.    BACKGROUND

### A.    Preston Established Minimum Contacts with Texas Under the Guise of JK Claim.

The available evidence confirms that Texas corporation JK Claims is merely a front for and the alter ego of Preston and his co-conspirator Michael Sydow ("Sydow"), created for the purpose of purchasing and then dismissing claims pending against them individually in the 152nd Judicial District Court in Harris County, Texas.[1]

### 1.    The Kaiser Litigation.

On June 26, 2007, Jeffery B. Kaiser ("Kaiser") filed a lawsuit against Texas Syngas LLC ("Syngas LLC"), Michael Collins ("Collins"), M. Sameer Ahmed, Sydow, and all other similarly situated officers and directors of "Texas Syngas LLC a/k/a Texas Syngas, Inc." in the 152nd District Court, Harris County, Texas, under cause number 2007-38533 (the "Kaiser Litigation"). On May 5, 2008, Kaiser filed his Second Amended Petition, adding Preston as a named defendant. (Exhibit B at ¶ 10). As reflected in the Second Amended Petition, Kaiser sought to recover against Preston, Sydow, and others for what he alleged to have been fraud in the creation of Texas Syngas, Inc. ("TSI") and the transfer of Syngas LLC's assets to TSI in violation of his rights as a member of Syngas LLC. Kaiser asserted a number of causes of action against all of the defendants including breach of fiduciary duty, fraud, and violations of the Texas Securities Act. (*Id.* at ¶¶ 23 through 68).

---

[1]    Attached hereto and incorporated herein by reference is the Affidavit of Kelley M. Keller.

2

414

## 2. Preston's and Sydow's Response to the Kaiser Litigation.

On August 17, 2007, Preston intervened in the Kaiser Litigation through Quantum Catalytics LLC ("Quantum"). (Exhibit C). Preston is the president of Quantum. (*See* Exhibit D at Ex. D). Quantum asserted that Kaiser did not represent the interests of Quantum and was not entitled to bring any action on its behalf. (Ex. C at ¶ 8). Quantum also sought affirmative relief against Kaiser for alleged breaches of fiduciary duty, negligence, and breach of contract. (*Id.* at ¶¶ 9, 10). Sydow signed Quantum's petition in intervention as counsel for Quantum. (*Id.*).

On June 20, 2008, Sydow filed an amended answer and counterclaim against Kaiser, asserting that Kaiser brought the Kaiser Litigation for purposes of harassment, in bad faith, and without support in fact or in law. (Exhibit E). The same day, Sydow filed an amended motion for summary judgment on the claims asserted by Kaiser, asserting:

> At its core, this lawsuit concerns Kaiser's anger over the fact that Collins has not offered Kaiser any stock in Texas Syngas, Inc. Of course, Collins has no legal obligation to offer his Texas Syngas, Inc. stock to Kaiser or anyone else. Consequently, Kaiser's second amended petition is a lengthy artful dodge asserting causes of action that would purport to create damages where none exist.

(Ex. D at p. 4). Preston submitted an affidavit in support of Sydow's motion, asserting that "[t]he majority of the members of Texas Syngas, L.L.C. have approved the acts taken by Michael C. Collins in the management of the company." (*See* Ex. D at Ex. D).

## 3. The Kaiser Bankruptcy and the Assignment to JK Claims.

On August 8, 2008, Kaiser filed for bankruptcy under Chapter 7 of Title 11 of the United States Code in the Southern District of Texas, Houston Division, under Case Number 08-35261-H1-7. Ronald J. Sommers was appointed Chapter 7 Trustee (the "Kaiser Trustee").

Upon commencement of the Kaiser bankruptcy, the claims owned by Kaiser and asserted in the Kaiser Litigation became the property of Kaiser's bankruptcy estate and the Kaiser Trustee became the real party in interest. *See* 11 U.S.C. § 541(a).

3

415

The Kaiser Trustee attempted to find counsel to pursue Kaiser's claims on behalf of the Kaiser bankruptcy estate or to find a purchaser for the claims. On March 14, 2012, Gretchen McCord ("McCord"), counsel for the Kaiser Trustee, forwarded a draft motion to sell and order to Kelly Stephens ("Stephens"), of Stephens & Domnitz, PLLC, for his review. (Exhibit F[2] at 38:6-39:7 and Ex. 11). Stephens represented the purchaser in connection with the purchase of Kaiser's claims from the Kaiser bankruptcy estate. (Ex. F at 40:3-7, 41:3-42:5 and Exs. 11-13). In an email to McCord on June 15, 2012, Stephens refers to his "*clients*" without identifying the clients. (Ex. F at Ex. 13).

On June 19, 2012, the Kaiser Trustee filed a motion in the bankruptcy court seeking authority to sell Kaiser's claims to JK Claims for $25,000. (Exhibit G). In the motion to sell, the Kaiser Trustee describes the assets to be sold as follows:

> Any and call causes of action owned by the Debtor as of the date of his Bankruptcy filing and now owned by the bankruptcy Estate against Texas Syngas, LLC, Texas Syngas, Inc. and their officers, directors, shareholders, agents, attorneys and/or against any predecessor, successor, or affiliated companies, including but not limited to the following individuals: Michael Sydow, Michael Collins, John T. Preston, Quantum Catalytics, Inc., and M. Sameer Ahmed. These claims would include specifically all those claims that were owned by the Debtor and that were pled, or that could have been pled, in the Lawsuit with Cause Number 2007-38533, and styled *Jeffery B. Kaiser, et. al v. Texas Syngas, LLC a/k/a Texas Syngas, Inc., et al.*, currently pending in the 152[nd] Judicial District Court of Harris County ("Claims").

(Ex. G at ¶ 15).

The Trustee described the value of the Kaiser Litigation as "*tentative at best*" and noted that of "utmost importance in the Trustee's analysis is that he believes that there is *little chance of recovery* if he were to pursue" the litigation. (Ex. G at ¶ 23) (emphasis added).

---

[2]     Collins requested the deposition of the corporate representative of JK Claims in the course of the Kaiser Litigation. JK Claims designated Sydow as the corporate representative. Sydow's deposition in such capacity was taken on February 25, 2014. That deposition is attached hereto and incorporated herein as Exhibit F.

4

416

The Kaiser Trustee described the purchaser as follows:

> The purchaser is JK Claims Investment Corporation, or its assigns, which the Trustee has been informed is being funded by Paul Lohnes ("Purchaser"). The Trustee has been informed that the Purchaser is a business associate of the Defendants.

(*Id.* at ¶ 16). As reflected below, JK Claims had not yet been incorporated at this time. (Ex. F at Ex. 3).

The bankruptcy court granted the Kaiser Trustee's motion to sell on July 13, 2012. (Exhibit H). On July 26, 2012, Stephens & Domnitz, PLLC, wired $24,970 to the Kaiser Trustee as payment for the claims purchased from the Kaiser Trustee (the "Kaiser Claims"). (*See* Exhibit I at 103).

### 4. The Formation of JK Claims.

On June 15, 2012, Sydow filed an Application for Reservation of an Entity Name with the Texas Secretary of State (the "Application"), reserving the name JK Claims Investment Corporation for the exclusive use of Preston. (Ex. F at 27:23-28:24, 29:3-19 and Ex. 6). An applicant for a name reservation may be either an organized entity or an individual. (*See* Ex. F at Ex. 6). The Application reflects that the applicant is *an individual* – Preston. (*Id.*). Sydow also prepared JK Claims' Certificate of Formation and filed same with the Texas Secretary of State on August 22, 2012. (Ex. F at 17:5-9, 21:17-22:13 and Ex. 3).[3]

Sydow signed the Application and paid the $30 fee for the name reservation. (Ex. F at 27:23-28:24, 29:20-24 and Exs. 6, 8). Michael David Sydow, Jr., Sydow's son employed with Sydow at the time, paid the $300 filing fee for incorporating JK Claims. (Ex. F at 20:15-21:4, 23:23-25:25 and Ex. 4).

---

[3] Sydow contends that he is "corporate counsel" for JK Claims and has been since the company's formation. (Ex. F at 6:18-7:8). Sydow could not say how much he charged for his services in forming JK Claims and could not even say if he sent JK Claims an invoice for his services. (*Id.* at 67:21-68:4).

417

Although Sydow contends that Quantum *would have* paid for both the name reservation and the incorporation, he could not identify any records confirming same – the only available documentary evidence is that Sydow and his son paid to incorporate JK Claims. (*See* Ex. F at 20:15-21:4, 26:1-6 and Exs. 4, 6, and 8).[4]

Sydow contends that he also prepared the bylaws for JK Claims (the "Bylaws"). (Ex. F at 10:3-10, 11:1-12). However, JK Claims failed to produce a signed and dated copy of its Bylaws. (Ex. F at Ex. 2). According to Sydow, there is not likely a signed and dated copy. (Ex. F at 12:24-13:4, 13:15-19, 14:10-13, 15:8-12). The Bylaws Sydow did produce appear to have been hastily prepared from bylaws previously prepared for a Nevada corporation, using a search and replace feature to include the corporation's name and to substitute the word "Texas" in place of the word "Nevada." While the Bylaws purport to invoke Texas law, they refer to the "General Corporation Law" throughout – a reference to Nevada law – and refer to specific provisions of the General Corporation Law of Nevada. (*See* Ex. F at Ex. 2 at pp. 2, 5, 7).

The only other corporate records that Sydow produced for JK Claims are similarly lacking in marks of authenticity. Neither the Written Consent in Lieu of Meeting, by which Quantum consented to the appointment of Preston as the sole director on August 22, 2012, nor the Written Consent in Lieu of Meeting, by which Quantum reelected Preston as the sole director on August 22, 2013, are signed. (Ex. F at Ex. 9, pp. 1, 2).[5] However, the Bylaws require that written consents in lieu of shareholder meetings *be signed by the stockholders* holding at least a majority of the voting power of the company. (Ex. F at Ex. 2 at p. 6).

The Bylaws further provide that any action required or permitted to be taken by the JK

---

[4] Sydow testified that he does not advance payment for the formation of entities. (Ex. F at 33:4-7). Accordingly, if the payments were not advances, they were payments made by and on behalf of *Sydow and/or Preston*, for whom the company name was reserved.

[5] Sydow testified that he prepared these documents at Preston's request. (Ex. F at 34:11-36:1).

6

418

Claims board of directors may be taken without a meeting *if*, "before or after the action, a written consent thereto is *signed by all the members of the Board*." (Ex. F at Ex. 2 at p. 9) (emphasis added). However, the document entitled "JK Claims Action by Director" by which some unnamed director purportedly approved the purchase of the Kaiser Claims[6] is neither signed nor dated. (*Id.* at p. 3).

### 5. Officers, Directors, and Ownership of JK Claims.

The JK Claims Certificate of Formation identifies Preston as the sole director and is signed by Sydow as the organizer. (Ex. F at 21:17-22:3 and Ex. 3 at p. 7-9). Preston is and has always been JK Claims' sole officer (president, secretary, and treasurer) and director. (Ex. F at 7:9-25). According to Sydow, Preston was his sole point of contact on the incorporation of JK Claims. (Ex. F at 11:17-24).

Sydow contends that JK Claims is wholly owned by Quantum. (Ex. F at 8:1-6, 56:21-57:3). Sydow initially testified that Quantum held 1,000 shares in JK Claims. (Ex. F at 8:1-6). However, there are no share certificates evidencing ownership by Quantum. (Ex. F at 55:2-6, 57:14-19). Later in the deposition, Sydow testified that JK Claims does not have any shareholders. (Ex. F at 56:21-57:3).

In fact, there do not appear to be any documents evidencing the ownership of JK Claims. According to Sydow, because JK Claims is an "uncertificated" company under applicable Texas law, there are no records that identify JK Claims' shareholder(s). (*See* Ex. F at 57:2-19, 58:3-59:5). However, "uncertificated" corporations are merely relieved of the obligation to issue "certificates" to their shareholders evidencing share ownership. *See* Tex. Bus. Org. Code § 3.201. Ownership of corporations electing "uncertificated" status is still represented by

---

6   The Bylaws state that the business and affairs of the company shall be managed by the board of directors. (Ex. F at Ex. 2 at p. 7).

419

shareholders. In the event the corporation elects to issue "uncertificated" shares, it nonetheless "issues" shares[7] and must deliver to the shareholder a "notice for uncertificated ownership interest" notifying the shareholder of the information required to be stated on the share certificate, unless such information is reflected in the governing documents of the entity and the shareholder has been provided with such governing documents. Tex. Bus. Org. Code § 3.205 ("after *issuing* or transferring an *uncertificated ownership interest*, a domestic entity *shall* notify the owner of the ownership interest in writing of any information required under this subchapter to be stated on a certificate representing the ownership interest") (emphasis added). Accordingly, corporations electing to be "uncertificated" must issue notice to each of their shareholders that includes, among other things, the name of the shareholder and the number and class of ownership interests held by such shareholders, unless reflected in the corporate governing documents. Tex. Bus. Org. Code §§ 3.202(c) and 3.205(a). This information – the identity of the shareholder and number and class of shares held – is not included in JK Claims' governing documents.[8] (*See* Ex. F at Ex. 2). Accordingly, JK Claims was required to provide the prescribed notice to its shareholder(s) and, apparently, has failed to do so.

6.      **Preston and Sydow Purchased the Kaiser Claims, Not JK Claims.**

Although the Kaiser Trustee was led to understand that Paul Lohnes, an alleged business associate of a defendant in the Kaiser Litigation, would be funding the purchase of the Kaiser Claims, according to Sydow, Mr. Lohnes is not connected to JK Claims in any way. (Ex. F at 66:12-18). Sydow contends instead that Quantum funded the purchase. (Ex. F at 61:25-62:23,

---

[7]     The Texas Business Organizations Code defines a "Share" as "a unit into which the ownership interest in a for-profit corporation, . . . is divided, *regardless of whether the share is certificated or uncertificated*." Tex. Bus. Org. Code § 1.002(80) (emphasis added). Accordingly, ownership in uncertificated corporations is still evidenced by shares.

[8]     Intervenors challenge whether the documents produced by Sydow are in fact "governing documents" as they are neither signed nor dated. (*See* Ex. F at Ex. 2).

420

63:11-23). However, Sydow was not able to produce any records confirming that Quantum funded the purchase. (*See* Ex. F at 61:25-62:23, 63:11-23).

Records subpoenaed from JK Claims' former counsel Kelly Stephens reflect that Sydow and Preston split the cost of the claims purchase – with $12,500 coming "from Boston"[9] and $12,500 from Sydow. (*See* Ex. I at 0060). Stephens received the funds for the purchase on June 12, 2012. (*Id.*).

As counsel for JK Claims, Stephens negotiated the purchase of the Kaiser Claims with the Kaiser Trustee's counsel Gretchen McCord. The following communications between Stephens and McCord confirm that Stephens was negotiating on behalf of Preston and Sydow – defendants in the Kaiser Litigation motivated to dismiss the Kaiser Claims – not JK Claims – a corporation not then in existence.

- On September 13, 2011, Stephens emailed the Kaiser Trustee, regarding his prior offer to purchase the Kaiser Claims for $25,000. Stephens indicated that he was making another offer to purchase, this time at $10,000, because he understood that Kaiser was going to attempt to acquire the claims from the bankruptcy estate. (Ex. I at 0001).

  o This email indicates that the purchaser wished to keep Kaiser from pursing the claims.

- Later the same day, Stephens emailed the Trustee, raising the offer to purchase back up to $25,000 and stating that the purchase price was based on a "'cost of defense' evaluation." Moreover, Stephens' email goes on to explain the weaknesses in Kaiser's claims, concluding that they are "worthless." (Ex. I at 0002-3).

  o The valuation method and conclusion that the claims are worthless reflects settlement discussions, not negotiations by a bona fide purchaser for whom "cost of defense" would not have been an issue.

- Stephens confirmed in an email to McCord on September 19, 2011, that the offer was "based on the cost of defense of the claims made in the prior lawsuit" and stated that the buyer had come forward "because Kaiser has filed a couple of motions to retain." Stephens stated that the purchasers had let the first offer lapse when they "thought the suit would die of natural causes." Stephens also confirmed that "we may be interested in

---

[9]     Preston is a resident of Boston.

9

421

maintaining the claims in the original derivative suit *depending on the terms of any settlement*." (Ex. I at 0012) (emphasis added).

- o A bona fide purchaser would not be interested only because Kaiser had filed a motion to retain, as the purchaser could have filed its own motion to retain. Only a defendant would have an interest in obtaining control of the plaintiff's claims if Kaiser filed the motion to retain. Moreover, Stephens' email confirmed that the nature of the purchase is a settlement.

- On December 21, 2011, McCord emailed Stephens asking if he was around "to discuss *the settlement offer*." When Stephens responded that he was, he did not correct McCord's characterization of the offer as a "settlement offer." Later that same day, Stephens emailed McCord, advising her that he clients were "discussing *what vehicle to purchase through*." (Ex. I at 0021-23) (emphasis added).

- On December 27, 2011, Stephens emailed McCord advising her that his client had "decided to make the offer/purchase through one of the individuals involved, Paul Lohnes." (Ex. I at 0024).

- In an email to McCord on January 17, 2012, Stephens indicated that his client is a "he." (Ex. I at 0032).

- o We now know through Sydow's testimony that the "he" *was not* Lohnes. (Ex. F at 66:12-18).

- On February 7, 2012, Stephens emailed McCord and advised her that his client was "forming a company to purchase this asset." (Ex. I at 0040).

- o We know from Sydow that *Sydow* formed JK Claims at Preston's instruction. (Ex. F at 11:17-24, 17:5-9. 21:17-22:13).

- On March 14, 2012, McCord emailed Stephens stating that she had defined the "purchaser" as "Paul Lohnes or his assignee . . . a business associate of the Defendants," and asked for "some explanation as to why [Lohnes] is buying these claims." She stated "I assume he is a business association of Mr. Sydow. But, I need clarification on that issue." (Ex. I at 0042).

- Later that day, Stephens confirmed the purchaser definition, but did not explain why Lohnes would be purchasing the claims. (Ex. I at 0044).

- On March 29, 2012, McCord asked for confirmation that the purchase funds were in Stephens' IOLTA account, and again asked about the purchaser. Stephens responded that he had been "unable to speak with Lohnes or Sydow." (Ex. I at 0047).

- On June 7, 2012, McCord emailed Stephens to "take one more stab at contacting" Stephens. McCord advised Stephens that the Trustee had her engaging special counsel to

10

422

take the litigation on a contingency fee basis "so we can reach some resolution" and asked if Stephens' client was still interested in purchasing the claims. (Ex. I at 0049).

- Later that day, Stephens emailed McCord, advising her that he had been assured that the money would be in his trust account the following week. (Ex. I at 0051).

- On June 12, 2012, Stephens emailed McCord advising her that he had received notice of a wire transfer of $12,500 "from Boston" and had received "a check in the amount of $12,500.00 from Mr. Sydow." (Ex. I at 0060).

- On June 15, 2012, Stephens advised McCord that the name of the purchaser would be JK Claims Investment Corporation. (Ex. I at 0067).

- On June 27, 2012, Stephens forwarded to McCord a copy of the June 2012 order from the 152nd District Court dismissing the Kaiser Litigation. Stephens asked McCord how the order would affect "what we are supposed to be purchasing." (Ex. I at 0069). McCord responded that she did not think it would. (Ex. I at 0070).

- Later that same day, Sydow emailed Stephens the following:

  > If the case has been dismissed and the statute of limitations has run there is nothing left to purchase. A dismissal for want of persecution [sic] used to be subject to reinstatement within a certain time. However, if I recall correctly the reinstatement was discretionary with the Court. If so, either the trustee needs to have it reinstated to sell it or the buyer is purchasing yet another problem. I fail to understand how she thinks the dismissal has no bearing. Perhaps she can explain in just a *bit* more detail.

  (Ex. I at 0071).

- McCord emailed Stephens on June 28, 2012, stating that she would need a written commitment from the purchaser that "if the Trustee reinstates the lawsuit, we still have a deal" or a written statement from the buyer that they were no longer interested in going forward. She further advised that she was meeting with someone to discuss the cost to reinstate the lawsuit. (Ex. I at 0075).

- Stephens confirmed to McCord that the buyer was still interested if the case was reinstated retroactively "so that only limitations defenses available at the time the suit was filed are now available" and the court approved the sale. (Ex. I at 0076).

- On July 3, 2012, McCord emailed Stephens asking that they make the motion to reinstate a joint motion. (Ex. I at 0086). Receiving no response, McCord emailed Stephens on July 10, 2012 asking if she could "at least represent that [the defendants] are unopposed." (Ex. I at 0088).

- On July 11, 2012, Stephens responded to McCord's request for a joint motion to reinstate. According to Stephens, Mike's reply to joining the motion was (paraphrased) *I*

11

423

*am buying this thing to prevent further problems with Kaiser, why would I (the defendant) join in a motion to reinstate."* (Ex. I at 0089) (emphasis added). Sydow also refused to represent that he was unopposed. (Ex. I at 0090).

- On July 12, 2012, McCord wrote to Stephens asking that he confirm that "Mike Sydow is the one who is having the purchaser buy the claims." (Ex. I at 0095). Stephens responded that he could "confirm that Mike Sydow is [his] primary contact" and that Sydow was "consulting with" the purchaser regarding the claims. (*Id.*).

  o As noted above, Sydow testified that Preston was his sole contact on the formation of JK Claims. (Ex. F at 11:17-24).

- According to McCord, the transfer was effective as of July 27, 2012. (Ex. I at 0102).

  o This transfer was negotiated and effected *before* JK Claims was incorporated. (Ex. F. at Ex. 3).

### 7. The Dismissals.

Not surprisingly, JK Claims' first order of business as Kaiser's assignee was to nonsuit with prejudice the claims asserted against Sydow. (*See* Exhibit J). In return, Sydow nonsuited his counterclaim against Kaiser. (*Id.*). On January 14, 2013, Quantum nonsuited its intervention against Kaiser. JK Claims non-suited Preston through the Third Amended Petition which dropped Preston as a defendant. (*Id.*). These actions confirm that the Kaiser Claims were purchased by and solely for the benefit of Sydow and Preston to effectuate a dismissal of the claims asserted against them in the Kaiser Litigation.

### B. Preston's Travels to Texas Prior to April 2011 are Contacts for the Jurisdictional Inquiry.

In his affidavit filed in support of his Special Appearance, Preston identified his "only [ ] activity in Texas" as (1) a "limited number" of visits approximately 20 years ago; (2) a "very limited number" of visits to Texas in the past five years on behalf of TEM Capital; and (3) a visit to Texas in 2010 to testify in the Sydow divorce proceedings. (*See* Preston Aff. at ¶¶ 5-6[10]). In

---

[10] Affidavit of John T. Preston, submitted as Exhibit A to Preston's Amended Special Appearance, filed September 28, 2011.

424

responses to Interrogatories, Preston stated that he traveled to Texas "as a representative on behalf of TEM Capital between 2006 and the date this suit was filed." (*See* Exhibit K at p. 12). Specifically, Preston stated that he traveled to Texas on April 2, 2009, May 3, 2009, December 30, 2010, and March 16, 2011, as a representative of and on behalf of TEM Capital. (*Id.* at pp. 12-13).

However, according to Russell Read ("Read"), Preston's former partner in C Change and TEM Capital, TEM Capital was not formed until 2011. (*See* Exhibit L at 33:2-12; *see also* Exhibit M[11]). Accordingly, Preston's four trips to Texas between April of 2009 and March 2011 could not have been as a representative and on behalf of TEM Capital.

## III.  ARGUMENT AND AUTHORITIES

### A.  JK Claims is Preston's Alter Ego.

JK Claims was the mere tool or conduit used by Preston and Sydow to purchase the Kaiser Claims and is the alter ego of Preston and Sydow. *See Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986) (the corporate veil may be pierced "where a corporation is organized and operated as a mere tool or business conduit of another"). Such "alter ego" status may be shown "from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Id.*; *see also Tryco Enters. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd); *Stauffacher v. Lone Star Mud, Inc.*, 54 S.W.3d 810, 816 (Tex. App.—Texarkana 2001, no pet.).

---

[11]  The Delaware Secretary of State records reflect that Transformative Energy & Materials Capital, Inc. – referred to as TEM Capital – was incorporated on April 12, 2011.

As noted above, JK Claims failed to follow any corporate formalities and was used merely for the personal purpose of Preston and Sydow to purchase the Kaiser Claims pending against them individually to "prevent further problems with Kaiser." (*See* Ex. I at 0089). Sydow further confirmed the following:

- JK Claims does not maintain a stock ledger reflecting issued shares. (Ex. F at 55:2-6).

- JK Claims has no shareholder or director meeting minutes. (Ex. F at 56:7-56:13).

- JK Claims has no documents reflecting the financial condition of the company. (Ex. F at 59:12-22).

- JK Claims has no documents reflecting any outstanding financial obligations. (Ex. F at 60:25-61:5).

- JK Claims does not maintain any type of account with any financial institution. (Ex. F at 61:7-13).

- JK Claims has no employees. (Ex. F at 61:14-18).

- JK Claims has no investments or business interests other than its interest in the Kaiser Claims. (Ex. F at 66:19-67:7).

- JK Claims was formed solely for the purpose of purchasing the Kaiser Claims and has no other business. (Ex. F at 66:19-67:7).

Texas law prohibits a settling tortfeasor from accepting an assignment of a plaintiff's cause of action against other defendants as against public policy. *See Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 21 (Tex. 1987); *BDO Seidman, L.L.P. v. Bracewell & Patterson, L.L.P.*, No. 05-02-006360-CV, 2003 Tex. App. LEXIS 337, *13 (Tex. App.—Dallas 2003, pet. denied). Accordingly, Preston and Sydow were motivated to hide their purchase behind the corporate face – that is to use the corporate form to perpetrate a fraud – to avoid the settling tortfeasor bar to their continued pursuit of the Kaiser Litigation against Collins.

Moreover, the negotiations for and purchase of the Kaiser Claims on behalf of Preston and Sydow – which occurred *in Texas* among Texas residents – occurred before Preston and

14

426

Sydow incorporated JK Claims. Accordingly, regardless of whether JK Claims is the alter ego of Preston, Preston is not afforded the protections of the fiduciary shield doctrine in purchasing the Kaiser Claims. *See Cappuccitti v. Gulf Indus. Prods., Inc.*, 222 S.W.3d 468, 485-86 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("A promoter cannot act as an agent of a corporation that does not yet exist; therefore, the corporation cannot be transacting business through the promoter, and the fiduciary shield doctrine cannot apply to him.").

B.    **Preston's Travel to Texas before April 2011 is Not Protected by the Fiduciary Shield.**

Because TEM Capital was not incorporated during the period of Preston's travel to Texas in 2009 through March 2011, the fiduciary shield doctrine does not apply to Preston's travel to Texas during that period. *See Cappuccitti*, 222 S.W.3d at 485-86.

## IV.    CONCLUSION AND PRAYER

Preston has established sufficient minimum contacts with Texas to support the exercise of jurisdiction over them by this Court. Accordingly, Intervenors Emjo Investments, Ltd. and H.J. von der Goltz respectfully request that this Court deny the Preston's Special Appearance and grant Intervenors such other and further relief to which they may be entitled.

Respectfully submitted,

ELLISON • KELLER, P.C.

Kelley M. Keller
State Bar No. 11198240
Tracey N. Ellison
State Bar No. 150541720
5120 Woodway Drive, Suite 6019
Houston, Texas 77056
Telephone: 713-266-8200
Facsimile: 713-266-2801

*Attorneys for Intervenors/Plaintiffs Emjo Investments, Ltd. and H.J. von der Goltz.*

15

427

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 8th day of August, 2014 a true and correct copy of the above Supplemental Response to the Special Appearance filed by John T. Preston was served on all interested parties, by and through their attorneys of record indicated below via email.

Randall O. Sorrels
Clyde J. "Jay" Jackson. III
Abraham Watkins. Nichols, Sorrels,
    Matthews & Friend
800 Commerce Street
Houston, Texas 77002-1770
Facsimile:  713-225-0827
*Attorneys for Original Plaintiffs*

Asher Griffin
Chris Sileo
Sean Flammer
Scott. Douglass & McConnico, LLP
600 Congress Ave., Ste 1500
Austin, Texas 78701-2589
Facsimile:  512-474-0731
*Attorneys for Defendants*
*Chalsys, MET, and Lo*

F. Eric Fryar
State Bar No. 07495770
eric@fryarlawfirm.com
Matthew Buschi
State Bar No. 24064982
mbusch@fryarlawfirm.com
Christina Richardson
FRYAR LAW FIRM, P.C.
State Bar No. 24070495
912 Prairie. Suite 100
Houston, Texas 77002-3145
Facsimile: 281-605-1888
*Attorneys for all Intervenors/Plaintiffs*

Brent C. Perry
Law Offices of Brent C. Perry
800 Commerce Street
Houston. Texas 77002
Facsimile: 713-237-0415
*Attorney for Original Plaintiffs*

Amir Alavi
Ashley Frankson
Ahmad. Zavitsanos, Anaipakos, Alavi &
Mensing P.C.
3460 One Houston Center
1221 McKinney Street
Houston. Texas 77010
Facsimile: 713-658-0062
*Attorneys for Defendants Sydow, Preston,*
*Henkel, C Change, and Brilliant Novelty*

Kelley M. Keller

16

428

| | | |
|---|---|---|
| MICHAEL COLLINS, ET AL., | § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § | |
| | § | |
| VS. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| MICHAEL SYDOW, ET AL., | § | |
| DEFENDANTS. | § | 215th JUDICIAL DISTRICT |

---

| | | |
|---|---|---|
| AKILA FINANCE, S.A.; BOSQUES DEL MOLINO, | § | IN THE DISTRICT COURT |
| S.A.; CENTRANS ENERGY SERVICES, INC.; | § | |
| CHESTER MESTER HOLDINGS, LTD.; DELTEC | § | |
| BANK & TRUST, LTD.; EMJO INVESTMENTS, | § | |
| LTD.; WILLIAM END; EVANS & PETREE 401K | § | |
| PLAN; FIRST BAY INTERTRADE; GM PARTNERS; | § | |
| MARAIR CORP.; W.L. NICHOL, IV; PANORAMA | § | |
| INVESTMENT, LTD.; PC01 VERMOEGENS VERW.; | § | |
| ALEJANDRO SANTO DOMINGO; SINCHI | § | |
| INVESTMENT; VENTURI GLOBAL | § | |
| INVESTMENTS., LTD., and H.J. von der GOLTZ | § | |
| INTERVENORS/PLAINTIFFS, | § | |
| VS. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| MICHAEL SYDOW; JOHN PRESTON; CHRISTOPH | § | |
| HENKEL; C CHANGE INVESTMENTS, LLC; | § | |
| CHALSYS CAPITAL PARTNERS, LLP; SONIA LO; | § | |
| BRILLIANT NOVELTY, L.L.C.; OSCURA, INC.; | § | |
| MELIORA ENERGY TECHNOLOGIES, S.à.r.l; and | § | |
| FALL RIVER REALTY, LTD., | § | |
| DEFENDANTS. | § | 215th JUDICIAL DISTRICT |

## AFFIDAVIT OF KELLEY M. KELLER

Before me, the undersigned notary, on this day personally appeared KELLEY M. KELLER, who is personally known to me, and first being duly sworn to law upon her oath deposed and said:

1.  My name is Kelley M. Keller. I am over the age of 19 years old and am fully competent to make this affidavit. I am an attorney licensed to practice law in the state of Texas. I am lead counsel for Intervenors H.J. von der Goltz and EMJO Investments, Ltd. (collectively, "Intervenors") in the above referenced action. The information contained herein is true and correct and is based on my personal knowledge as it relates to my representation of Intervenors.

2.  Attached to the Intervenors' Supplemental Response to the Special Appearance of John T. Preston (the "Supplemental Response") as Exhibit B and incorporated therein is a

true and correct copy of the Plaintiffs' Second Amended Petition filed in the Kaiser Litigation (without exhibits).

3. Attached to the Supplemental Response as Exhibit C and incorporated therein is a true and correct copy of a Petition in Intervention of Quantum Catalytics, LLC filed in the Kaiser Litigation.

4. Attached to the Supplemental Response as Exhibit D and incorporated therein is a true and correct copy of the Motion for Summary Judgment, without exhibits, filed by Sydow in the Kaiser Litigation.

5. Attached to the Supplemental Response as Exhibit E and incorporated therein is a true and correct copy of the Amended Answer and Counterclaim filed by Michael D. Sydow ("Sydow") in the Kaiser Litigation.

6. Attached to the Supplemental Response as Exhibit F and incorporated therein is a true and correct copy of the deposition of Michael D. Sydow, as corporate representative of JK Claims Investment Corporation, taken February 25, 2014 in Cause No. 2007-38533, *Jeffery B. Kaiser, et al. v. Texas Syngas, LLC, et al*, in the 152nd Judicial District Court, Harris County, Texas (the "Kaiser Litigation"), with exhibits.

7. Attached to the Supplemental Response as Exhibit G and incorporated therein is a true and correct copy of the Trustee's Motion for Authority to Sell Estate's Interest in Claims, filed by the U.S. Trustee in Case No. 08-35261-H1-7, pending in United States Bankruptcy Court for the Southern District of Texas Houston Division (the "Kaiser Bankruptcy"), which I obtained from the Pacer case search system.

8. Attached to the Supplemental Response as Exhibit H and incorporated therein is a true and correct copy of an Order entered by the court in the Kaiser Bankruptcy on July 13, 2012, which I obtained from the Pacer case search system.

9. Attached to the Supplemental Response as Exhibit I and incorporated therein are true and correct copies of documents produced by Kelly Stephens under subpoena in the Kaiser Litigation.

10. Attached to the Supplemental Response as Exhibit J and incorporated therein are true and correct copies of the Non-Suits filed by JK Claims, Sydow, and Quantum in the Kaiser.

11. Attached to the Supplemental Response as Exhibit K and incorporated therein is a true and correct copy of excerpts from the Interrogatory Responses of John Preston.

12. Attached to the Supplemental Response as Exhibit L and incorporated therein is a true and correct copy of excerpts from the deposition of Russell Read taken April 21, 2014.

13. Attached to the Supplemental Response as Exhibit M and incorporated therein is a true and correct copy of the Entity Details for Transformative Energy & Materials Capital, Inc., which I obtained from the website of the Delaware Secretary of State.

2

430

Dated: August 8, 2014.

_Kelley M. Keller_
Kelley M. Keller

STATE OF TEXAS §
§
COUNTY OF HARRIS §

BEFORE ME, the undersigned authority, on this day personally appeared Kelley M. Keller, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she read the Affidavit of Kelley M. Keller and that the facts stated therein were within her personal knowledge and were true and correct.

GIVEN UNDER MY HAND AND SEAL OF OFFICE on August 8, 2014.

BARBARA DAVIS
My Commission Expires
November 14, 2015

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

MY COMMISSION EXPIRES: _11/14/2015_

3

431

Filed
08 May 5 P4:54
Theresa Chang
District Clerk
Harris District

| | |
|---|---|
| JEFFERY B. KAISER, INDIVIDUALLY, DERIVATELY, AND ON BEHALF OF ALL SIMILARLY SITUATED STOCKHOLDERS AND MEMBERS OF TEXAS SYNGAS, LLC a/k/a TEXAS SYNGAS, INC., Plaintiffs, § § § § § § § § | IN THE DISTRICT COURT OF |
| v. | § § § HARRIS COUNTY, TEXAS |
| TEXAS SYNGAS, LLC a/k/a TEXAS SYNGAS, INC., MICHAEL A. COLLINS, MICHAEL D. SYDOW, M. SAMEER AHMED, AND ALL OTHER SIMILARLY SITUATED OFFICERS AND DIRECTORS OF TEXAS SYNGAS, LLC a/k/a TEXAS SYNGAS, INC., Defendants. § § § § § § § § § § | 152nd JUDICIAL DISTRICT |

## PLAINTIFFS' SECOND AMENDED PETITION

**COMES NOW**, Jeffery B. Kaiser, Individually and Derivatively on Behalf of Texas Syngas, LLC and Texas Syngas, Inc. ("Plaintiffs"), and files this Second Amended Petition, complaining of Michael A. Collins, Michael D. Sydow, M. Sameer Ahmed, and Texas Syngas, LLC and Texas Syngas, Inc. In support of this Second Amended Petition, Plaintiffs show the following:

### DISCOVERY

1. Discovery is intended to be conducted under Level 3 of Rule 194 of the Texas Rules of Civil Procedure.

### PARTIES

1

Unofficial Copy Office of Chris Daniel District Clerk

EXHIBIT B

432

2      Jeffery B. Kaiser, ("Kaiser"), is a member of Texas Syngas, LLC, owning 7.5 percent ownership interest, and resides in Harris County, Texas.

3.     Fred Sembera is an individual member and shareholder in Texas Syngas, LLC & Texas Syngas Inc., and resides in Harris County, Texas.

4.     Texas Syngas, LLC is a Texas Limited Liability Company, whose articles of organization was filed on July 30, 2004, and whose Operating Agreement was signed by its members on October 4, 2004, and has been served with citation and has answered herein.

5.     Texas Syngas, Inc. is a Nevada corporation, incorporated on May 22, 2006, and has been served with citation and has answered herein.

6.     Michael A. Collins ("Collins"), is the Manager of Texas Syngas L.L.C. and Chairman of the Board of Directors and Senior Vice President of Texas Syngas Inc., and owner of seventy-eight (78%) percent of the ownership interests and stock in each of Texas Syngas L.L.C. and Texas Syngas Inc.; and, is an individual resident of Montgomery County, Texas, has been served with citation and has answered herein.

7      Michael D. Sydow ("Sydow") is the Chief Executive Officer of Texas Syngas L.L.C. and Texas Syngas Inc.; an individual resident of Harris County, Texas, has been served with citation and has answered herein.

8.     M. Sameer Ahmed, the Project Development Officer of Texas Syngas L.L.C. and Texas Syngas Inc., an individual resident of Fort Bend County, Texas has been served with citation and has answered herein.

9.     Quantum Catalytics, LLC, is a Delaware limited liability company which has its principal office at 421 Currant Road, Fall River, MA 02720, and has intervened in this lawsuit.

2

433

10. John T. Preston is the manager of Quantum Catalytics L.L.C. and may be served with citation at % Quantum Catalytics L.L.C., 421 Currant Road, Fall River, MA 02720.

## DERIVATIVE ACTION

11. Kaiser brings this suit individually, and derivatively on behalf of Texas Syngas, LLC and Texas Syngas, Inc.

## VENUE

12. Venue is proper in this case pursuant to Texas law. Defendants have their business addresses, personal residences, and principal places of business in Harris County, Texas and the cause of action occurred in Harris County, or all or a substantial part of the events giving rise to this claim occurred in Harris County, Texas.

## JURISDICTION

13. The court has jurisdiction over this lawsuit because the amount in controversy exceeds this court's minimum jurisdiction requirements

## FACTS

14. Beginning in approximately 2004 and continuing through present, Collins, Sydow, and Ahmed, and other officers and directors of Texas Syngas, LLC and Texas Syngas Inc. solicited and, upon information and belief, obtained in excess of one million dollars in investment funds from individual residents of the State of Texas. Texas Syngas, LLC and Texas Syngas Inc., Collins, Sydow, and Ahmed, and other officers and directors, without full disclosure to Plaintiffs, and other members and stockholders, thereafter participated in concealing the planning, organization, registration, creation and expenditure of the approximately one million dollars of the investors' monies by Collins, Sydow, and Ahmed, and others to deceive and hide Texas Syngas, LLC and Texas Syngas, Inc.'s true financial condition from Plaintiffs to further

3

434

the financial interests of Collins, Sydow, Ahmed, and that of the directors and officers at the expense, and in breach of, Defendants' statutory, contractual, fiduciary, and common law obligations and duties owed to Plaintiffs and other member-stockholders, causing damages to Plaintiffs and Texas Syngas, LLC, and Texas Syngas, Inc.

15. On or about August 10, 2004, Kaiser's law firm and Sydow's law firm entered into a retainer agreement with Michael Collins and Texas Syngas LLC, by which they agreed to provide legal services for Collins and Texas Syngas LLC including as to all aspects of Collins/Syngas' efforts to exploit the Collins/Syngas proprietary technology. Kaiser received 7.5 percent of the ownership interests in Texas Syngas LLC for his professional services. Mr. Kaiser continued his representation in all aspects of Collins and Texas Syngas LLC's business efforts to utilize their proprietary technology. Kaiser duly served as General Counsel for Texas Syngas LLC, until the dissolution of Kaiser and Sydow's law firm in February 2006.

16. On or about October 4, 2004 the Operating Agreement of Texas Syngas, L.L.C. was signed by its members, Michael Collins, Quantum Catalytics, LLC by John Preston, Michael Sydow and Jeff Kaiser, a copy of which is attached as Exhibit 1.

17. Collins developed valuable intellectual property to improve and enhance the technology of Molten Metals Technology, Inc., whose assets were purchased by John Preston and others after Molten Metals was placed in chapter 11 bankruptcy proceedings and created Quantum Catalytics LLC to require those assets. Texas Syngas, LLC obtained exclusive licenses from Quantum Catalytics for Texas LLC's use of the intellectual property in conjunction with Collins proprietary enhancements to Quantum Catalytic's technology, and the licenses and Mr. Collier's intellectual property rights and trade secrets were placed in Texas Syngas, LLC.

4

435

18. On May 22, 2006, Defendants caused to be incorporated a Nevada corporation, with the name of "Texas Syngas, Inc." in Texas. Thereafter, without Kaiser's knowledge or consent, Defendants transferred, without consideration, all of the assets, or a substantial part, of Texas Syngas, L.L.C., to the new corporation, Texas Syngas, Inc., thereby illegally and fraudulently denuding and stripping Texas Syngas, L.L.C. of all of its assets in violation of Defendants' statutory, contractual, fiduciary, and common law obligations and duties owed to Plaintiffs and owed to the legal entities of Texas Syngas, L.L.C. and Texas Syngas, Inc., and other member-stockholders, and creditors of these legal entities. In addition to other statutory violations, Defendant Collins and Defendant officers violated section 101.255 of Business Organization Code in that it was a transaction between Texas Syngas, L.L.C. and an entity owned, controlled and operated by Collins and other officers, where that transaction was unfair to Texas Syngas, L.L.C., the transaction was not approved by a disinterested governing body, and there was no disclosure of relevant facts. It was a violation of section 101.356 of that Code in that the transfer of assets in effect shut down the operations of Texas Syngas, L.L.C., yet there was no vote of all the members as required as Kaiser did not receive notice of this transaction and had no opportunity to vote on the transfer that made his ownership interest in Texas Syngas, L.L.C worthless.

19. By letter of December 19, 2006, Kaiser inquired of Collins why Kaiser had never received a membership certificate for his 7.5% ownership interest in Texas Syngas, LLC and the status of the business and future prospects of its business. Collins never responded to the inquiry.

5

436

20.     Further, despite demand, Defendants have failed, and continue to fail and refuse, in violation of the Operating Agreement Section 8.01, to provide Plaintiffs the opportunity to examine the books and records of Texas Syngas, LLC and Texas Syngas, Inc.

21.     Despite demand, Defendants have failed, and continue to fail and refuse, to make an accounting for the investors' funds and interests. A true and correct copy of the December 19, 2006 demand letters are attached as Exhibit "2" and Exhibit "3".

22.     Plaintiff Kaiser is a member of Texas Syngas, LLC and by the Operating Agreement, and by operation of law, he is also a stockholder of Texas Syngas, Inc. The actions of the Defendants constitute breaches of fiduciary duty of a majority stockholder by Michael Collins, common law fraud, breach of contract, and securities fraud, aiding and abetting, conspiracy and joint enterprise liability under the laws of the State of Texas, resulting in damages to the Plaintiffs exceeding the jurisdictional limits of this Court.

### COUNT ONE

### BREACH OF FIDUCIARY DUTY AND FRAUD BY FIDUCIARY

23.     Plaintiffs hereby reallege and incorporate herein by reference Paragraphs 1 through 22 of this Petition.

24.     Collins as majority shareholder in Texas Syngas LLC, and as the sole Manager in Texas Syngas LLC, and as partner and joint venturer with Kaiser, Sydow and Quantum Catalytics, owed a fiduciary duty to the minority shareholders in the circumstances of this case, to the other members, to the other partners and joint venturers, including Kaiser, including (i) a duty of loyalty to the joint concern, (ii) a duty of utmost good faith, fairness and honesty, (iii) a duty of full disclosure of all matters affecting the common enterprise, (iv) a duty to account for

6

437

all property of the common enterprise, and (v) a duty to refrain from competition with the common enterprise.

25. Collins breached his fiduciary duties owed to Kaiser as to minority shareholders, member, partner and joint venturer, through oppressive conduct and through dominated control over the business, by dissipation of all the assets of the common enterprise and by conversion of the assets to his own use and benefit, thus destroying the object for which the joint enterprise was created and rendering it impossible for the joint enterprise to conduct its business. Collins' conduct destroyed Kaiser's reasonable expectations that were central to his decision to join and participate in the venture. Collins conduct rendered the joint enterprise incapable of the continued business for which it was established. Collins breached his duty of loyalty to the joint concern, his duty of utmost good faith, fairness and honesty, his duty of full disclosure of all matters affecting the common enterprise, his duty to account for all property of the common enterprise, and his duty to refrain from competition with the common enterprise.

26. Defendants knew that Collins' conduct constituted a wrongful act against Plaintiffs and with intent to assist Collins in the wrongful acts, defendants substantially assisted and encouraged Collins by their acts of assistance and encouragement as alleged herein. Defendants' assistance and encouragement was a substantial factor in causing the wrongful conduct. Alternatively, defendants were engaged in a joint enterprise. Plaintiffs and Defendants had an agreement, a common purpose, a community of pecuniary interest in that common purpose, and an equal right to direct and control the enterprise. At the time of defendants' acts as alleged herein they were acting within the scope of the enterprise. Alternatively, defendants were engaged in a conspiracy, in that there was a combination among the co-conspirators for an unlawful purpose as alleged herein or lawful purpose by unlawful means. Defendants knew that

7

438

the agreed acts would result in harm to Plaintiffs. To accomplish the object of their agreement Defendants engaged in the overt acts described herein. The agreement to engage in the above described acts proximately caused injury to Plaintiffs.

27.     Defendants' breach of fiduciary duty injured Plaintiffs by depriving Plaintiffs of the value of their property, the loss of their reasonable expectations for the business enterprise and their investment and loss of business opportunities, in damages including the full market value of their ownership interest in the common enterprise.

28.     Defendants' breach of fiduciary duty benefited defendants in that the conversion of the assets of Texas Syngas, LLC for use in Texas Syngas, Inc substantially benefited and enriched Defendants to the detriment of the Plaintiffs

29.     Plaintiffs injury resulted from defendants' gross negligence, malice, or actual fraud, which entitles Plaintiffs to exemplary damages under the Texas Civil Practice & Remedies Code section 41.003(a).

## COUNT TWO
### BREACH OF CONTRACT

30.     Plaintiffs hereby reallege and incorporate herein by reference Paragraphs 1 through 22 of this Petition.

31.     On November 10, 2004, Plaintiffs and Defendants executed a valid and enforceable written Operating Agreement of Texas Syngas, LLC, attached as Exhibit "1" and incorporated by reference herein

32.     The Operating Agreement provides in Section 5.07 that "no member or Manager shall engage in or possess any interest, legal, equitable, or otherwise, in any business venture that competes in any way with the Company unless such participation shall be approved by a vote of

8

439

JEFFERY B. KAISER, INDIVIDUALLY § IN THE DISTRICT COURT OF
DERIVATIVELY, AND ON BEHALF OF §
ALL SIMILARLY SITUATED §
STOCKHOLDERS AND MEMBERS OF §
TEXAS SYNGAS, LLC A/K/A TEXAS §
SYNGAS, INC., §
      Plaintiff, §
§
v. §
§ HARRIS COUNTY, TEXAS
§
TEXAS SYNGAS, LLC A/K/A TEXAS §
SYNGAS, INC., MICHAEL A. COLLINS, §
MICHAEL D. SYDOW, M. SAMEER AHMED, §
AND ALL OTHER SIMILARLY SITUATED §
OFFICERS AND DIRECTORS OF §
TEXAS SYNGAS, LLC A/K/A TEXAS §
SYNGAS, INC., §
      Defendants. § 190th JUDICIAL DISTRICT

## INTERVENTION OF QUANTUM CATALYTICS, L.L.C.

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Quantum Catalytics, L.L.C., and in support of its Intervention under Rule 60 of the Texas Rules of Civil Procedure would respectfully show the following:

## FACTS

1.    Quantum Catalytics, L.L.C. (hereinafter "Quantum Catalytics"), is one of four members of Texas Syngas, L.L.C. The four members are Michael C. Collins, Quantum Catalytics, Michael D. Sydow, and Jeffery Kaiser.

2.    All other members of Texas Syngas, L.L.C. are parties to this suit. Jeffery Kaiser (hereinafter "Kaiser") is a Plaintiff, and he has sued Michael C. Collins and Michael D. Sydow.

3.    The operating agreement, signed by all four members, provides that the company is to be managed by a majority of its members. All of the corporation's members other than Kaiser, who owns a minority interest, agree that it is being managed in the best interests of the

1

EXHIBIT C

CAUSE NO. 2007-38533

| | | |
|---|---|---|
| JEFFERY B. KAISER, INDIVIDUALLY, | § | IN THE DISTRICT COURT OF |
| DERIVATELY, AND ON BEHALF OF | § | |
| ALL SIMILARLY SITUATED | § | |
| STOCKHOLDERS AND MEMBERS OF | § | |
| TEXAS SYNGAS, LLC A/K/A TEXAS | § | |
| SYNGAS, INC., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| TEXAS SYNGAS, LLC A/K/A TEXAS | § | |
| SYNGAS, INC., MICHAEL A. COLLINS, | § | |
| MICHAEL D. SYDOW, M. SAMEER | § | |
| AHMED, AND ALL OTHER SIMILARLY | § | |
| SITUATED OFFICERS AND | § | |
| DIRECTORS OF TEXAS SYNGAS, LLC | § | |
| A/K/A TEXAS SYNGAS, INC., | § | |
|     Defendants. | § | 152ⁿᵈ JUDICIAL DISTRICT |

## DEFENDANT MICHAEL SYDOW'S
## AMENDED MOTION FOR SUMMARY JUDGMENT

Defendant Michael D. Sydow hereby files his Amended Motion for Summary Judgment, in support of which he would respectfully show the Court as follows:

### I.  INTRODUCTION

We have been down this road once before. In April 2008, Defendant Michael Sydow ("Sydow") moved for summary judgment on all claims asserted against him by Jeffery Kaiser ("Kaiser"). Sydow's motion was based on purely legal issues and undisputed facts (*e.g.*, Kaiser's admission that Sydow did not induce him to acquire an interest in Texas Syngas LLC). Rather than respond to Sydow's motion, Kaiser claimed that he needed a 45-day continuance in order to review additional documents. The Court gave Kaiser one week (until May 9) to file a response.

But Kaiser's gamesmanship continued. On May 5, Kaiser attempted to side-step summary judgment by filing a second amended petition. Although the new petition asserts

CAUSE NO. 2007-38533

| | | |
|---|---|---|
| JEFFERY B. KAISER, INDIVIDUALLY DERIVATIVELY, AND ON BEHALF OF ALL SIMILARLY SITUATED STOCKHOLDERS AND MEMBERS OF TEXAS SYNGAS, LLC A/K/A TEXAS SYNGAS, INC., Plaintiff, | § § § § § § § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| TEXAS SYNGAS, LLC A/K/A TEXAS SYNGAS, INC., MICHAEL A. COLLINS, MICHAEL D. SYDOW, M. SAMEER AHMED, AND ALL OTHER SIMILARLY SITUATED OFFICERS AND DIRECTORS OF TEXAS SYNGAS, LLC A/K/A TEXAS SYNGAS, INC., Defendants. | § § § § § § § § § | 190th JUDICIAL DISTRICT |

## AFFIDAVIT OF JOHN PRESTON

COMMONWEALTH OF MASSACHUSETS

BEFORE ME, the undersigned authority, on this day personally appeared John Preston, who being by me first duly sworn upon oath did depose and say:

"My name is John Preston. I am over the age of 21 years, am under no legal disability, and am fully competent to make this affidavit. The statements in this affidavit are true and made on personal knowledge.

I am the President of Quantum Catalytics, L.L.C.. Quantum Catalytics is a member of Texas Syngas, L.L.C. The other members of Texas Syngas L.L.C. are Michael C. Collins, Michael D. Sydow, and Jeffery Kaiser. There are no other members of Texas Syngas, L.L.C. and never have been.

Michael C. Collins is now and always has been the Managing Member of Texas Syngas, L.L.C. There has never been any other Manager. Michael C. Collins has always had the sole authority to manage the company, subject to any restrictions that might be placed on his authority by a majority of the members of Texas Syngas, L.L.C. The majority of the members of Texas Syngas, L.L.C. have never placed any restriction on his authority to manage the company. The majority of the members of Texas Syngas, L.L.C. have approved the acts taken by Michael C. Collins in the management of the company.

1

Defendant's Exhibit D No. 2007-38533

Michael D. Sydow has acted as the Chief Executive Officer of the company under the direction and control of Michael C. Collins. Michael D. Sydow has never had any authority over the expenditure or disbursement of any funds from Texas Syngas, L.L.C. Michael D. Sydow has never signed, or been authorized to sign, on any bank or other accounts of Texas Syngas, L.L.C."

FURTHER AFFIANT SAYETH NOT

_John Preston_
John Preston

SIGNED AND SWORN TO BEFORE ME, the undersigned authority, on this 29th day of August, 2007.

_Eileen A. McCracken_
Notary Public

OFFICIAL SEAL
EILEEN A. McCRACKEN
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
My Comm. Expires May 19, 2011

2

476

CAUSE NO. 2007-38533

| | | |
|---|---|---|
| JEFFERY B. KAISER, INDIVIDUALLY, | § | IN THE DISTRICT COURT OF |
| DERIVATELY, AND ON BEHALF OF | § | |
| ALL SIMILARLY SITUATED | § | |
| STOCKHOLDERS AND MEMBERS OF | § | |
| TEXAS SYNGAS, LLC A/K/A TEXAS | § | |
| SYNGAS, INC., | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| TEXAS SYNGAS, LLC A/K/A TEXAS | § | |
| SYNGAS, INC., MICHAEL A. COLLINS, | § | |
| MICHAEL D. SYDOW, M. SAMEER | § | |
| AHMED, AND ALL OTHER SIMILARLY | § | |
| SITUATED OFFICERS AND | § | |
| DIRECTORS OF TEXAS SYNGAS, LLC | § | |
| A/K/A TEXAS SYNGAS, INC., | § | |
| Defendants. | § | 152nd JUDICIAL DISTRICT |

### DEFENDANT MICHAEL SYDOW'S
### FIRST AMENDED ANSWER AND COUNTERCLAIM

Michael D. Sydow ("Sydow"), files his First Amended Answer and Counterclaim.

### I.

### ANSWER

1. Sydow denies generally the allegations of the Petition pursuant to Rule 92 of the Texas Rules of Civil Procedure.

### II.

### AFFIRMATIVE DEFENSES

2. Plaintiff has no standing to bring the action pursuant to the laws of the State of Texas.

3. Plaintiff has no right to maintain the action because he has failed to comply with statutory conditions precedent to the filing of the action.

4. Alternatively, Sydow invokes his rights under §§101.454(a)(3), 101.454(b), and

Unofficial Copy Office of Chris Daniel District Clerk

EXHIBIT E

477

Page 1

CAUSE NO. 2007-38533

| | | |
|---|---|---|
| JEFFERY B. KAISER, | : | IN THE DISTRICT COURT OF |
| INDIVIDUALLY, DERIVATELY, | : | |
| AND ON BEHALF OF ALL | : | |
| SIMILARLY SITUATED | : | |
| STOCKHOLDERS AND MEMBERS OF: | | |
| TEXAS SYNGAS, LLC a/k/a | : | |
| TEXAS SYNGAS, INC., | : | |
|     Plaintiff, | : | |
| | : | |
| | : | |
| VS. | : | HARRIS  COUNTY,  TEXAS |
| | : | |
| | : | |
| TEXAS SYNGAS, LLC A/K/A | : | |
| TEXAS SYNGAS, INC., | : | |
| MICHAEL A. COLLINS, | : | |
| MICHAEL D. SYDOW, M. SAMEER: | | |
| AHMED, AND ALL OTHER | : | |
| SIMILARLY SITUATED OFFICERS: | | |
| AND DIRECTORS OF TEXAS | : | |
| SYNGAS, LLC A/K/A TEXAS | : | |
| SYNGAS, INC. | : | |
|     Defendants. | : | 152ND  JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
MICHAEL D. SYDOW, SR.
FEBRUARY 25, 2014

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

EXHIBIT F         481

## Page 2

ORAL DEPOSITION OF MICHAEL D. SYDOW, SR., produced as a witness at the instance of the Defendant Michael Collins and duly sworn, was taken in the above-styled and numbered cause on the 25th day of February, 2014, from 10:26 a.m. to 11:46 a.m., before Donna Worley, CSR in and for the State of Texas, reported by stenographic method, at the offices of Reich & Binstock, 4265 San Felipe, Suite 1000, Houston, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 4

EXHIBITS (CONTINUED)

NO. DESCRIPTION                                         PAGE

7 Letter from CT Corporation System to Mr. Sydow, 10-15-12.............30

8 Texas Secretary of State Payment Form, 6-15-12....31

9 JK Claims Written Consent in Lieu of Meeting, 8-22-12 and 8-22-13, Resolution of Action By Sole Director...........34

10 E-mail from Beau Beduze to Amber Polach, regarding 8-22-12 Registered Agent for JK Claims Investment, dated 8-22-12...........36

11 E-mail from Gretchen McCord to Kelly Stephens, regarding Kaiser, 3-14-12...........37

12 E-mail from Gretchen McCord to Kelly Stephens, regarding Kaiser - Sale Order, 6-15-12...........41

13 E-mail from Kelly Stephens to Gretchen McCord, regarding Kaiser - Sale Order, 6-15-12...........41

## Page 3

INDEX

                                                        PAGE

Appearances...........5

MICHAEL D. SYDOW, SR.,
  Examination by Ms. Kelley M. Keller.............6

Changes and Signature Page...........74

Reporter's Certificate...........76


EXHIBITS

NO. DESCRIPTION                                         PAGE

1 Defendant Michael Collins' Amended Notice of Intent to Take The Deposition of JK Claims Investment Corporation...........6

2 Bylaws of JK Claims Investment Corporation.......10

3 Texas Secretary of State Business Organizations Inquiry, JK Claims Investment Corporation and other documents...........15

4 Texas Secretary of State Payment Form, 8-22-12....22

5 Telecopy cover sheet from Michael Sydow to the Texas Secretary of State, 8-22-12, regarding Certificate of Formation For-Profit Corporation for JK Claims Investment Corporation.............26

6 Office of Secretary of State Packing Slip, 6-20-12, regarding Application for Name Reservation...........27

## Page 5

APPEARANCES

FOR THE PLAINTIFF JK CLAIMS INVESTMENT CORPORATION:
  Mr. Charles Clinton Hunter
  REICH & BINSTOCK, L.L.P.
  4265 San Felipe, Suite 1000
  Houston, Texas  77027
  Phone: (713) 622-7271
  Fax: (713) 623-8724

FOR THE DEFENDANT MICHAEL COLLINS:
  Ms. Kelley M. Keller
  ELLISON & KELLER, P.C.
  5120 Woodway Drive, Suite 6019
  Houston, Texas  77056
  Phone: (713) 266-8218
  Fax: (713) 266-8201

## Page 54

to Request No. 3.

Q. So is it correct, then, that there are no Articles of Incorporation for JK Claims?

A. Of course, there are. They've been produced.

Q. They're not here in what I have seen. Is that the Certificate of Formation?

A. Yes.

Q. Okay. We've seen a Certificate of Formation. Are there Articles of Incorporation?

A. All the documents --

Q. I just want to know --

A. -- that exist are here.

Q. -- are there Articles of Incorporation? You said there's Articles of Incorporation. I want you to find those in the materials we reviewed today.

A. Bates Nos. 36 through 38.

Q. Okay. And what is the title of that document you're referring to?

A. Certificate of Formation For-Profit Corporation.

Q. Okay. So there's a Certificate of Formation. Have you found anything identified as Articles of Incorporation for JK Claims?

A. That's what this is.

Q. Okay.

## Page 55

A. It's the same thing.

Q. Okay. Stock ledgers, are there any stock ledgers for JK Claims?

A. It's an -- ownership is uncertificated under the Business Organizations Code, so there is no stock. Hence, there would be no stock ledgers.

Q. Director and shareholder meeting minutes?

A. Produced.

Q. I haven't seen minutes. I've seen consents that were unsigned. Were there any director and shareholder --

A. You just need to read --

Q. -- meeting minutes?

A. You just need to read the Business Organizations Code.

Q. I understand that.

A. I'm not here to give you a --

Q. And I understand --

A. -- seminar on forming corporations.

Q. Mr. Sydow, I understand the difference between needing --

A. And if you don't quiet down and get out of my face, I'm walking out.

Q. Yeah. I'm not in your face.

A. You are. You're leaning across the table and

## Page 56

yelling at me, and I'm tired of that.

Q. Yeah.

A. Every time I see you, you get this way. You're not the party. Just calm down and ask straightforward questions and get straightforward answers.

Q. I asked the question, are there any shareholder meeting minutes?

A. There are written consents in lieu of meetings.

Q. Thank you. So there are no actual meeting minutes, correct?

A. Correct.

Q. Thank you.

Corporate resolutions, have you produced all of the corporate resolutions of JK Claims?

A. Yes.

Q. Okay. And again, the ones we've seen are unsigned, correct?

A. They don't have to be signed.

Q. Okay. Shareholder consents, have you produced all of the shareholder consents of JK Claims?

A. There aren't any shareholders.

Q. Okay. So there's no shareholders. Who are the owners --

## Page 57

A. It's uncertificated.

Q. Who are the owners of JK Claims?

A. Quantum Catalytics.

Q. And how is their ownership acknowledged?

A. It's uncertificated under the BOC.

Q. If someone wanted to find out who the owner of JK Claims is from some type of record, what record would they look to --

A. The --

Q. -- find the owner of JK Claims?

A. It's uncertificated, so there aren't records.

Q. So anybody could be owner of JK Claims, correct?

A. Ownership interests are uncertificated under the BOC.

Q. And what I'm asking, is there any other type of record that someone would look to to find out who the owner of JK Claims is?

A. Not that I'm aware of.

Q. Okay. So you could actually say anyone is the owner of JK Claims and there's no way to verify that; is that correct?

MR. HUNTER: Objection; form.

A. JK Claims is incorporated as an uncertificated company --

## Page 58

Q. (BY MS. KELLER) I've heard that.

A. — through the BOC.

Q. What I'm asking is, is there any other way other than your testimony today to verify the ownership of JK Claims?

A. I'm not aware of any documentation -- well, actually there might be some documentation that may exist.

Q. Okay. What would that documentation be?

A. I believe the consent in lieu of meetings clearly shows who the owner is.

MR. HUNTER: I think there's a Bates No. 50.

A. Quantum Catalytics, L.L.C., being the holder of the majority of the shares of JK Claims does hereby consent to the appointment of John Preston as sole director of the company.

Q. (BY MS. KELLER) Okay.

A. Exhibit 9.

Q. Okay. Anything else?

A. Bates No. 050, Quantum Catalytics, L.L.C., being the holder of the majority of the shares of JK Claims does hereby reelect John Preston as the sole director of the company. Exhibit 9, Bates No. 51.

Q. Okay.

## Page 59

A. So, yes, there are documents that reflect the ownership.

Q. Okay. Would there be any other documents other than Exhibit No. 9?

A. Not that I'm aware of.

Q. Okay. Request No. 4 asks for all employment-related agreements executed by JK Claims from January 2012 to the present, including but not limited to, consulting agreements and employment agreements. Are there any documents?

A. No.

Q. Request No. 9 asks for all documents reflecting the financial condition of JK Claims from January 1, 2012, to the present, including but not limited to, profit and loss statements, balance sheets, and income statements. Do you have any documents responsive to this request?

A. There would only be a franchise tax report when it's finalized and filed.

Q. Has JK Claims filed any franchise tax reports before?

A. Evidently not.

Q. Well, earlier you referred to a certificate that was filed with something that was not checked. So is there actually a franchise —

## Page 60

A. It's not filed if it's rejected.

Q. Okay. But it was filed and then rejected, correct? Just filed, but not accepted?

A. It was submitted, but not filed because it wasn't properly filled out.

Q. Do you have a copy of that?

A. No.

Q. Who prepared that?

A. Some accountant in Massachusetts.

Q. So does JK Claims have any profit and loss statements?

A. No.

Q. Does JK Claims have a balance sheet?

A. No.

Q. Does JK Claims have any income statements?

A. No.

Q. Does JK Claims have any other type of document that might reflect the current financial condition of JK Claims?

A. No.

Q. Request No. 6 asks for any and all loan applications prepared by or on behalf of JK Claims. Has JK Claims prepared any loan applications?

A. No.

Q. All documents reflecting any outstanding

## Page 61

financial obligation held by JK Claims, including but not limited to, loan statements, credit card account statements, promissory notes, and security instruments. Have you seen any such documents?

A. There aren't any.

Q. There are none?

Request No. 8, all records reflecting the existence of all accounts held by JK Claims at any type of financial institution, including but not limited to, account opening documents, signature authorizations, and the last six months of statements. Does JK Claims hold any type of banking or savings financial account?

A. No.

Q. All payroll records for JK Claims. Does JK Claims maintain any payroll records?

A. No.

Q. Does JK Claims have any employees?

A. No.

Q. Request No. 10, all contracts, agreements, or understanding between or among Lohnes, Preston, and/or Sydow regarding the creation or incorporation or business of JK Claims. Are there any documents responsive to that request?

A. No.

Q. Request No. 11, all documents reflecting or

Page 62

related to the sources of the $25,000 used by JK Claims to purchase the claims owned by the bankruptcy of Jeffery Kaiser. What documents have you brought responsive to Request No. 11?

A. None.

Q. I'm sorry?

A. None.

Q. Okay. I assume that there would be documents reflecting the source of that funding. Have you made any effort to locate documents responsive to Exhibit No. 11 --

A. Yes.

Q. -- excuse me -- Request No. 11?

A. Yes.

Q. What efforts have you made?

A. I have done an investigation.

Q. What was that investigation? Who did you request records from?

A. John Preston.

Q. When did you make that request?

A. I don't recall.

Q. And what was the response from Mr. Preston?

A. JK Claims doesn't have any such records.

Q. Regarding the source of the funds of the 25,000 purchase money for the claims?

Page 63

A. Right.

Q. Do you know what source of funding for the purchase -- what was the funding source for the purchase of JK Claims -- excuse me -- Kaiser claims?

MR. HUNTER: Objection; form.

A. I understand it was from Quantum Catalytics.

Q. (BY MS. KELLER) And how did you make that understanding?

A. Through an internal investigation that I conducted to prepare for the deposition.

Q. And what did you learn in that internal investigation regarding the payment for Mr. Kaiser's claim?

A. Quantum Catalytics transmitted the money to pay for the claims.

Q. In what form? Was it a check or wire transfer record?

A. I don't know.

Q. I'm sorry?

A. I don't know.

Q. And who told you that Quantum Catalytics transmitted the money?

A. John Preston.

Q. What else did he say about the funding of the purchase of Kaiser claims?

Page 64

A. Nothing.

Q. Just that Quantum Catalytics paid?

A. Yes.

Q. That's it?

A. Yes.

Q. Request No. 12, all documents reflecting or related to communications between JK Claims or its representatives and the trustee of the estate regarding the purchase. That's essentially these three records you produced as Exhibit No. 11 through 13?

A. Those are the documents that exist.

Q. Is there anything else, any other communications related to the discussions between the trustee of the Kaiser estate and any person on behalf of JK Claims?

A. No. No, not that I've been able to determine.

Q. Were you a party to any of those communications?

A. No.

Q. Request No. 13, all e-mails, notes, correspondence, and other documents reflecting communications by and between or among Lohnes, Preston, and/or Sydow regarding the claims and the purchase of the same from the estate. Are there any documents responsive to No. 13?

Page 65

A. No.

Q. Okay. I'd like to focus now on conversations between you and Mr. Preston regarding the purchase of Mr. Kaiser's claims out of the Kaiser bankruptcy estate.

When do you recall you first spoke with Mr. Preston regarding some entity purchasing those claims?

A. I don't recall.

Q. How many times would you say you spoke with Mr. Preston regarding that matter?

A. I don't recall.

Q. Whose proposal was it that some entity purchase Mr. Kaiser's claims from the bankruptcy estate?

A. I don't recall.

Q. Was it your suggestion that somebody purchase those claims?

MR. HUNTER: Objection; form.

A. No.

Q. (BY MS. KELLER) Was it Mr. Preston's suggestion?

A. I don't recall.

Q. Could it have been your suggestion that the claims be purchased by some entity?

A. No.

Q. Was it Mr. Lohnes' suggestion?

A. No.

Q. Do you know if Mr. Lohnes provided the money that was used to purchase the claims from the Kaiser estate?

A. No.

Q. Do you know why the bankruptcy trustee would have stated that the money was coming from Mr. Lohnes?

A. I don't know that the bankruptcy trustee so stated.

Q. Okay. If the bankruptcy trustee stated that Mr. Lohnes was affiliated with or funding a purchase of Mr. Kaiser's claims, would that be incorrect?

A. Yes.

Q. Okay. Is Mr. Lohnes affiliated in any way with JK Claims Investment Corporation?

A. No.

Q. Okay. Do you know what -- does JK Claims have any other business other than holding the claims purchased from the Kaiser bankruptcy estate?

A. No.

Q. That's the only business that JK Claims has ever done was to purchase those claims and pursue those in court, correct?

A. That's correct.

Q. Okay. Is that the purpose of the formation of JK Claims?

A. Yes.

Q. Okay. What other -- so is it true, then, that JK Claims has no other investments?

A. No, it does not.

Q. Okay. Does JK Claims have any investors other than its sole shareholder Quantum Catalytics?

A. No.

Q. Okay. Did Quantum Catalytics provide any money for the capitalization of JK Claims on its formation?

A. Of course.

Q. How much did Quantum Catalytics provide for the capitalization of the company?

A. Enough to buy the claims and organize the company.

Q. How much was that?

A. Somewhere between 25- and $26,000.

Q. And how much did you charge JK Claims as corporate counsel for JK Claims for the formation of the company?

A. I don't know.

Q. Did you send them a bill for your services?

A. I don't know.

Q. Would you have a copy of the bill for services if you did?

A. Yes.

Q. Okay.

MS. KELLER: I'll make a request for that.

Q. (BY MS. KELLER) Do you know the sources of funds for the capitalization other than your testimony that it came from Quantum Catalytics?

A. That is the source.

Q. Okay. Does JK Claims derive any income from any source?

A. I assume it hopes to.

Q. And what source would that be?

A. Recovery on the claims that it purchased.

Q. Okay. Any other potential sources of income for JK Claims?

A. No.

Q. Does JK Claims have any assets other than the claims it purchased from the Kaiser bankruptcy?

A. No.

Q. Does JK Claims have any liabilities?

A. No.

Q. As corporate counsel for JK Claims, were you

responsible for obtaining litigation counsel to pursue the claims that were purchased from the Kaiser estate?

MR. HUNTER: Objection; privileged.

Q. (BY MS. KELLER) I'm going to ask you again; and if you refuse to answer it on the basis of advice of counsel, let me know.

As corporate counsel for JK Claims, were you responsible for retaining counsel to pursue the claims for bankruptcy?

A. I refuse to answer on the advice of counsel.

Q. Okay. Going back to Request for Production, the ones related to the funding of the purchase, the request specifically asks for checks, wire transfer records, drafts, or any loan documentation, anything related to the purchase for the claims. Were you able to obtain any of that from Mr. Preston?

A. No.

Q. Did you ask for that from Mr. Preston?

A. Yes.

Q. And what was his response?

A. JK Claims doesn't have any such documents.

Q. Okay. Do you know why that would be -- if JK Claims made the purchase, why would they not have those records?

A. It's my understanding that the money for the

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



Hope Andrade
Secretary of State

## Office of the Secretary of State
### Packing Slip

RECEIVED
JUN 2 6 2012

June 20, 2012
Page 1 of 1

Attn: Michael D. Sydow
The Sydow Firm, LLP
1980 Post Oak Blvd. Suite 2100
Houston, TX 77056

Batch Number: 42636919

Client ID: 387134096

Batch Date: 06-15-2012

Return Method: Mail

| Document Number | Document Detail | Number / Name | Page Count | Fee |
|---|---|---|---|---|
| 426369190002 | Application for Name Reservation | JK Claims Investment Corporation | 0 | $40.00 |
| | | | Total Fees: | $40.00 |

| Payment Type | Payment Status | Payment Reference | Amount |
|---|---|---|---|
| Credit Card | Received | ************7812 | $40.00 |
| | | Total: | $40.00 |

Total Amount Charged to Client Account: $0.00
(Applies to documents or orders where Client Account is the payment method)

*Note to Customers Paying by Client Account:* This is not a bill. Payments to your client account should be based on the monthly statement and not this packing slip. Amounts credited to your client account may be refunded upon request. Refunds (if applicable) will be processed within 10 business days.

There is a 2.7% convenience fee on credit card payments. This additional amount will be computed and shown on your credit card statement when the credit card transaction is settled.

User ID: RARRELLANO

EXHIBIT
6
Sydow



## Office of the Secretary of State

June 20, 2012

Attn: Michael D. Sydow

The Sydow Firm, LLP
1980 Post Oak Blvd. Suite 2100
Houston, TX 77056 USA

RE: JK Claims Investment Corporation
File Number: 801614039

Enclosed is the certificate of reservation for the referenced entity name. The name is reserved for a period of 120 days from the date shown on the certificate. This name reservation can be used to organize a domestic filing entity, to change the name of a filing entity, or to make an application for registration of a foreign filing entity to transact business in Texas. The right to use this reservation may be transferred to another person by filing with this office a notice of transfer. During the period of reservation, a registrant may terminate the reservation by filing a withdrawal of the reservation.

This reservation may be renewed by filing an application for name reservation in the manner prescribed for the filing of an original application. The renewal application may be filed during the thirty (30) days preceding the expiration date of the reservation period. If no action has been taken to renew the reservation or to file an instrument using the above name during the 120-day period, the reservation will expire and other requests, if any, for the name will be honored.

When submitting a filing instrument utilizing this reservation, please submit a copy of this reservation. If we can be of further service at any time, please let us know.

Sincerely,

Corporations Section
Business & Public Filings Division
(512) 463-5555
Enclosure

Come visit us on the Internet at http://www.sos.state.tx.us/
Phone: (512) 463-5555
Prepared by: Rosa Arrellano
Phone: (512) 463-5709
TID: 10290
Dial: 7-1-1 for Relay Services
Document: 426369190002

525



# Office of the Secretary of State

## CERTIFICATE OF RESERVATION OF
## ENTITY NAME
## OF

### JK Claims Investment Corporation

The undersigned, as Secretary of State of Texas, hereby certifies that the above entity name has been reserved in this office pursuant to the provisions of Section 5.101 of the Texas Business Organizations Code for the exclusive use of

John T Preston
421 Currant Road, Fall River , MA 02720

for a period of one hundred twenty days after the date hereof.

This name reservation does not authorize the use of a name in this state in violation of the rights of another under the federal Trademark Act of 1946, the Texas trademark law, the Assumed Business or Professional Name Act, or the common law.

Dated: 06/20/2012



Hope Andrade
Secretary of State

Come visit us on the internet at http://www.sos.state.tx.us/

Phone: (512) 463-5555
Prepared by: Rosa Arrellano

Fax: (512) 463-5709
TID: 10317

Dial: 7-1-1 for Relay Services
Document: 426369190002

526

**Form 501**
(Revised 05/11)
Return in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX 512 463-5709
Filing Fee: $40



**Application for Reservation
or Renewal of Reservation
of an Entity Name**

This space reserved for office use.

F I L E D
In the Office of the
Secretary of State of Texas

JUN 2 0 2012

**Corporations Section**

☑ New application      ☐ Renewal

If renewal, date and file number for reservation being renewed. Date: _____ File No. _____
                dd/mm/yyyy

The undersigned applicant requests that the following entity name be reserved or renewed for a period
of one hundred twenty (120) days:

JK Claims Investment Corporation

The reservation of an entity name is to be used for the following type of entity (choose only one)

☑ Domestic For-profit Corporation    ☐ Domestic Professional Corporation    ☐ Foreign Limited Liability Co.
☐ Foreign For-profit Corporation      ☐ Foreign Professional Corporation     ☐ Domestic Limited Partnership
☐ Domestic Nonprofit Corporation     ☐ Professional Association             ☐ Foreign Limited Partnership
☐ Foreign Nonprofit Corporation      ☐ Domestic Limited Liability Co.       ☐ Other

☐ A. The applicant is an organized entity by the name of:

OR

☑ B. The applicant is an individual by the name of:

| John | T. | Preston | |
|------|-----|---------|---|
| First Name | M.I. | Last Name | Suffix |

### Applicant Address

| 421 Currant Road | Fall River | MA | USA | 02720 |
|------------------|-----------|-----|------|-------|
| Street or Mailing Address | City | State | Country | Zip Code |

Form 501                       4

JK Claims 000027

527

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date:    06/15/2012

Signature of applicant, applicant's attorney or agent

JK Claims 000028

528

# JK CLAIMS

## WRITTEN CONSENT IN LIEU OF MEETING

Quantum Catalytics, LLC being the holder of a majority of the shares of JK Claims, does hereby consent to the appointment of John Preston as the sole director of the company.

---

John Preston, Managing Member

August 22, 2012



EXHIBIT
9
Sydow
depobook.com

JK Claims 000050

529

# JK CLAIMS WRITTEN CONSENT IN LIEU OF MEETING

Quantum Catalytics LLC being the holder of a majority of the shares of JK Claims, does hereby re-elect John Preston as the sole director of the company.

_____

John T. Preston, Managing Member

August 22, 2013

JK Claims 000051

530

# JK CLAIMS ACTION BY DIRECTOR

The undersigned director does hereby approve the purchase of all claims of Jeffery Kaiser from the trustee of his Chapter 7 bankruptcy.

531

From: gmccord@nathansommers.com
To: kelly.stephens@hotmail.com
Subject: Kaiser
Date: Wed, 14 Mar 2012 14:13:25 +0000

I am sending you a motion to sell today with a an order for your review. Do you have the money in your account? And, do you have the name of the entity set up to purchase the claims?

Gretchen Gauer McCord
Nathan Sommers Jacobs
A Professional Corporation
2800 Post Oak Boulevard
61st Floor
Houston, Texas 77056
Voice: (713) 892-4816
Fax:    (713) 892-4800
gmccord@nathansommers.com
www.nathansommers.com

THIS E-MAIL MESSAGE AND THE ATTACHMENTS HERETO, IF ANY, ARE INTENDED ONLY FOR USE BY THE SENDER'S INTENDED RECIPIENT(S). IF YOU ARE NOT THE SENDER'S INTENDED RECIPIENT OF THIS E-MAIL MESSAGE OR YOU RECEIVED THIS E-MAIL MESSAGE OR THE ATTACHMENTS TO IT IN ERROR, OR THIS E-MAIL MESSAGE OR SAID ATTACHMENTS CONTAIN LEGALLY PRIVILEGED OR CONFIDENTIAL INFORMATION AND YOU ARE NOT THE SENDER'S INTENDED RECIPIENT OF SUCH LEGALLY PRIVILEGED OR CONFIDENTIAL INFORMATION, THE DISSEMINATION, DISTRIBUTION, PUBLICATION, DISCLOSURE OR USE OF SAID E-MAIL MESSAGE, ATTACHMENTS AND INFORMATION AND STRICTLY PROHIBITED AND YOU ARE INSTRUCTED TO IMMEDIATELY (A) NOTIFY THE SENDER BY TELEPHONE AT 713.960.0303 OF YOUR RECEIPT OF THIS E-MAIL MESSAGE AND SAID ATTACHMENTS, AND (B) DELETE THIS E-MAIL MESSAGE AND THE ATTACHMENTS TO IT, AND DESTROY ALL COPIES AND PRINTOUTS THEREOF.

JK Claims 000013


EXHIBIT
11
Sydow

INFORMATION AND STRICTLY PROHIBITED AND YOU ARE INSTRUCTED TO IMMEDIATELY (A) NOTIFY THE SENDER BY TELEPHONE AT 713.960.0303 OF YOUR RECEIPT OF THIS E-MAIL MESSAGE AND SAID ATTACHMENTS, AND (B) DELETE THIS E-MAIL MESSAGE AND THE ATTACHMENTS TO IT, AND DESTROY ALL COPIES AND PRINTOUTS THEREOF.

From: Kelly Stephens [mailto:kelly.stephens@hotmail.com]
Sent: Friday, June 15, 2012 10:24 AM
To: Gretchen McCord
Subject: RE: Kaiser- Sale Order

Gretchen,

my clients inform me that they would like to make some changes in the valuation language of the order.

they are supposed to get me their suggestions today. I will forward upon receipt.

Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX  77279-9734
281-394-3287
832-476-5460 Fax

From: gmccord@nathansommers.com
To: kelly.stephens@hotmail.com
Subject: Kaiser- Sale Order
Date: Wed, 13 Jun 2012 20:25:05 +0000

Attached is a form of order that will be filed with the motion. The trustee had a few revisions. I have put a signature blank to sign as an agreed order, but did not know if you or someone else would be signing. Please let me know asap. Thanks.

Gretchen Gauer McCord

Nathan Sommers Jacobs

A Professional Corporation

2800 Post Oak Boulevard

61st Floor

Houston, Texas 77056

Voice: (713) 892-4816

Fax:    (713) 892-4800

gmccord@nathansommers.com

www.nathansommers.com

JK Claims 000053

EXHIBIT
13
Sydow

533

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JEFFERY B. KAISER | § | CASE NO. 08-35261-H1-7 |
| 2421 Wordsworth | § | |
| Houston, TX 77030 | § | (CHAPTER 7) |
| SS#: xxx-xx-7148 | § | |
| | § | |
| | § | |
| DEBTOR(S) | § | |

**TRUSTEE'S MOTION FOR AUTHORITY TO SELL
ESTATE'S INTEREST IN CLAIMS**

Pursuant to Local Rule 9013:

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

COMES NOW, Ronald J. Sommers in his capacity as the Chapter 7 Trustee ("Trustee") for

the above-captioned bankruptcy estate ("Estate") and files this his Motion for Authority to Sell

Estate's Interest in Claims ("Motion") and would show as follows:

G:\Kaiser\Mtn Sell.wpd

1

EXHIBIT G

534



ENTERED
07/13/2012

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE: §
§
JEFFERY B. KAISER § CASE NO. 08-35261-H1-7
2421 Wordsworth §
Houston, TX 77030 § (CHAPTER 7)
SS#: xxx-xx-7148 §
§
§
DEBTOR(S) §

## ORDER GRANTING
## TRUSTEE'S MOTION FOR AUTHORITY TO SELL
## ESTATE'S INTEREST IN CLAIMS

ON THIS DAY came on for consideration the Trustee's Motion for Authority to Sell Estate's Interest in Claims (the "Motion") filed by Ronald J. Sommers, the chapter 7 trustee in the above-captioned bankruptcy estate (the "Trustee"), pursuant to 11 U.S.C. § 363. The Court, after considering the Motion, the argument of counsel and any evidence presented, finds that

1. This is an action filed under Federal Rule of Bankruptcy Procedure 6004 and the corresponding local rules for the Southern District of Texas and under 11 U.S.C. §§ 363 to sell the estate's interest in property.

2. This Court has jurisdiction over this matter.

3. The sale approved herein is in the best interests of the creditors and the above-captioned bankruptcy estate ("Estate").

4. The Trustee is exercising reasonable business judgment.

5. The sale approved herein is free and clear of liens.

6. The Trustee and the buyer negotiated the sale at arms length and in good faith.

1

EXHIBIT H

7.    Adequate notice of the Motion and any hearing on the Motion has been given to all

creditors and parties-in-interest.

8.    The sale of the Claims is a sale of the Estate's interest in such Claims.

9.    The Trustee has not made any representations or warranties with respect to the sale

or ownership of the Claims.

10.    Any and all objections have been withdrawn or are overruled.

Accordingly, it is

ORDERED that the Trustee is authorized to sell the Estate's interest, if any, in the following claims

to JK Claims Investment Corporation , or its assigns ("Buyer"), for twenty-five thousand and no/100

dollars ($25,000.00) ("Sale Price") in accordance with the terms of this order:

> Any and all causes of action owned by the Debtor as of the date of his Bankruptcy filing and now owned by the bankruptcy Estate against Texas Syngas, LLC, Texas Syngas, Inc. and their officers, directors, shareholders, agents, attorneys and/or against any predecessor, successor, or affiliated companies, including but not limited to the following individuals: Michael Sydow, Michael Collins, John T. Preston, Quantum Catalytics, Inc., and M. Sameer Ahmed. These claims would include specifically all those claims that were owned by the Debtor and that were pled, or that could have been pled, in the Lawsuit with Cause Number 2007-38533, and styled *Jeffery B. Kaiser, et al v. Texas Syngas, LLC a/k/a Texas Syngas, Inc. et al.*, currently pending in the 152nd Judicial District Court of Harris County ("Claims").

Further, it is

ORDERED that within three days of the entry of this order, Buyer must deliver the entirety

of the Sale Price to the Trustee in good funds.  Further, it is

ORDERED that, upon receive of the Sale Proceeds in good funds, the Trustee will provide

to Buyer a receipt of such funds in writing.  Further, it is

2

546

ORDERED that the sale of the Claims shall be effective immediately upon the conditions in this Order being met without further order of this Court or further documentation and this Order shall be sufficient evidence of the assignment and sale of the Claims. Further, it is

ORDERED that the sale of the Claims is free and clear of any liens, claims or interests. It is further

ORDERED that the Trustee is authorized to execute all documents and take all other actions necessary to complete the compromise and the sale of the Claims. It is further

ORDERED that the Trustee has made no warranties or representations as to the sale or ownership of the Claims. It is further

ORDERED that the sale of the Claims is a sale of the Estate's interest therein, and that the Court makes no finding that the Estate has any actual interest in the Claims, ownership of which

is disputed.

Signed: July 13, 2012

Marvin Isgur
United States Bankruptcy Judge

547

# In re: Kaiser and In re: Jorden

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Tue 9/13/11 2:23 PM
To: rsommers@nathansommers.com

Ron,

I need to discuss two issues with you.

1) Cause No. 08-35261, In Re: Jeffery B. Kaiser.

On this case, you may remember that I made a written offer to purchase the Estate's interest in all cases and/or causes of action which Jeff Kaiser/The Estate had a claim against Texas Syngas, LLC, Texas Syngas, Inc., Michael Sydow etc.
We offered you $25,000.00 cash for those claims. You never responded. Kaiser has recently (this year) filed two motions to retain in the existing lawsuit, claiming to have acquired or that he is about to acquire from you the right to go forward in this case.

I can still offer you $10,000.00 for those claims assuming they have not been abandoned. Please let me know your position on this matter.

2) unsure about the cause but I believe that the case is In Re: Robert Jordan.

I received a call from Artice Allen yesterday requesting that I represent him in this matter and his deposition. Based on our conversation, this has been noticed for Thursday of this week.
I am requesting a postponement of that deposition to give me a chance to meet with him, get the documents concerning the property in hand and to get a grasp on your claims.

please call me asap to discuss.

Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

KDS 0001

EXHIBIT I        548

Print                                                                              Close

# Cause No. 08-35261, In Re: Jeffery B. Kaiser

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Tue 9/13/11 6:20 PM
To:     Ronald Sommers (rsommers@nathansommers.com)
Bcc:   michael.sydow@thesydowfirm.com; Amber Polach (amber.polach@thesydowfirm.com)

Ron,

I am contacting you in reference to my offer to purchase rights/causes of action of the estate of Jeffery Kaiser. In my earlier email, I offered $10,000.00 for those rights.

As we discussed this afternoon, I am renewing that offer at $25,000.00. My client would like to purchase any and all causes of action held by the estate against Texas Syngas, LLC, Texas Syngas, Inc., Michael Sydow, Michael Collins, John T. Preston, Quantum Catalytics, Inc., and M. Sameer Ahmed.

These would include specifically all those claims made in Cause 2007-38533, *Jeffery B. Kaiser, et al v. Texas Syngas, LLC a/k/a Texas Syngas, Inc. et al.*, currently pending in the 190th Judicial District Court of Harris County.

In that case, Mr. Kaiser has filed a derivative action as a shareholder and is alleging loss of his "investment" and/or ownership interest in Texas Syngas, LLC. Mr. Kaiser did not contribute any real money for his ownership interest, rather it was predicated on his contribution as an officer and promoter of the company.

A partial summary judgment was issued which declared that Texas Syngas, Inc., was not a continuation of, subsidiary of or a substitution corporation for Texas Syngas, LLC. Mr. Kaiser had no affiliation with or ownership in Texas Syngas, Inc. Therefore he has no claims or standing to make derivative claims regarding this entity.

My client is making this offer based on a "cost of defense" evaluation. I might point out that Mr. Kaiser filed this bankruptcy on the eve of summary judgment hearings being held on behalf of all defendants in that suit. It is my belief that those motions would have/will be granted. Mr. Kaiser's claims are refuted by over 75% of the shareholders of the company. Additionally, in deposition, Mr. Kaiser was unable to detail even a single instance of misrepresentation or omission on behalf of the officers and directors of the company. We believe that Mr. Kaiser's bankruptcy was directly and predominately predicated on his inability to substantially respond to those motions or to provide any evidence to support the elements of his claims.

As you may be aware, both Texas Syngas, LLC and Texas Syngas, Inc., are now defunct non-operating companies with no assets. the failure of Texas Syngas, LLC was predicated on a severe lack of funding. The failure of the new company (with substantial new investors and management) Texas Syngas, Inc., was brought about by the inability of the company to make the synthesis process commercially viable.

KDS 0002

549

It is my belief that the claims of Mr. Kaiser are worthless. It would be in the best interest of the estate to take this cash offer.

Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

KDS 0003

# RE: Kaiser Bankruptcy

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Mon 9/19/11 12:06 AM
To: gmccord@nathansommers.com

Grethen,

our offer is the same we made a couple of years ago. it is based on the cost of defense of the claims made in the prior lawsuit.
we came forward because Kaiser has filed a couple of motions to retain. the one early in this year was made without notice to myself or my client. the last one was noticed and promted the re up of the offer. the first offer was not responded to, so we thought the suit would die of natural causes.

at any rate, we may be interested in maintaining the claims in the original derative suit depending on the terms of any settlement.

you should know that according to Sydow, he has not been served with the suit you forwarded.

Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

Subject: Kaiser Bankruptcy
Date: Fri, 16 Sep 2011 14:05:45 -0500
From: gmccord@nathansommers.com
To: kelly.stephens@hotmail.com

Kelly:

KDS 0012

551

# RE: Cause No. 08-35261, In Re: Jeffery B. Kaiser

From: **Gretchen McCord** (gmccord@nathansommers.com)

Sent: Wed 12/21/11 7:47 AM

To:    'Kelly Stephens' (kelly.stephens@hotmail.com)

Kelly:

Are you around this week to discuss the settlement offer?

Gretchen Gauer McCord

Nathan Sommers Jacobs

A Professional Corporation

2800 Post Oak Boulevard

61st Floor

Houston, Texas 77056

Voice: (713) 892-4816

Fax      (713) 892-4800

gmccord@nathansommers.com

www.nathansommers.com

THIS E-MAIL MESSAGE AND THE ATTACHMENTS HERETO, IF ANY, ARE INTENDED ONLY FOR USE BY THE SENDER'S INTENDED RECIPIENT(S). IF YOU ARE NOT THE SENDER'S INTENDED RECIPIENT OF THIS E-MAIL MESSAGE OR YOU RECEIVED THIS E-MAIL MESSAGE OR THE ATTACHMENTS TO IT IN ERROR, OR THIS E-MAIL MESSAGE OR SAID ATTACHMENTS CONTAIN LEGALLY PRIVILEGED OR CONFIDENTIAL INFORMATION AND YOU ARE NOT THE SENDER'S INTENDED RECIPIENT OF SUCH LEGALLY PRIVILEGED OR CONFIDENTIAL INFORMATION, THE DISSEMINATION, DISTRIBUTION, PUBLICATION, DISCLOSURE OR USE OF SAID

KDS 0021

552

# RE: Cause No. 08-35261, In Re: Jeffery B. Kaiser

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Wed 12/21/11 10:54 AM
To:      gmccord@nathansommers.com

I am


Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax


---

From: gmccord@nathansommers.com
To: kelly.stephens@hotmail.com
Subject: RE: Cause No. 08-35261, In Re: Jeffery B. Kaiser
Date: Wed, 21 Dec 2011 12:47:47 +0000


Kelly:


Are you around this week to discuss the settlement offer?


Gretchen Gauer McCord

Nathan Sommers Jacobs

A Professional Corporation

2800 Post Oak Boulevard

KDS 0022                    553

Print                                                                 Close

# RE: Cause No. 08-35261, In Re: Jeffery B. Kaiser

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Wed 12/21/11 12:57 PM
To:     gmccord@nathansommers.com

       1 attachment
       Order Retaining 09232011.PDF (135.3 KB)

Gretchen,

attached are the orders regarding retention of the case by Judge Schaffer. I talked with the coordinator a minute or so ago. no action has been taken or will be taken for a week or so at least.
my clients are interested in going forward with the asset purchase as discussed and will be available for testimony if needed.
I will forward more precise language on the offer shortly, my clients are discussing what vehicle to purchase through etc.


Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax




From: gmccord@nathansommers.com
To: kelly.stephens@hotmail.com
Subject: RE: Cause No. 08-35261, In Re: Jeffery B. Kaiser
Date: Wed, 21 Dec 2011 12:47:47 +0000


Kelly:



Are you around this week to discuss the settlement offer?

KDS 0023

554

# Kaiser estate

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Tue 12/27/11 10:39 AM
To: gmccord@nathansommers.com

Gretchen,

sorry for the delay. I know we need to get this in. my client has decided to make the offer/purchase through one the individuals involved, Paul Lohnes.

I am renewing the offer of $25,000.00. My client would like to purchase any and all causes of action or potential causes of action held by the estate against Texas Syngas, LLC, Texas Syngas, Inc., their officers, directors, shareholders, agents, attorneys, etc. (or any predecessor, successor, or related companies), including but not limited to the following individuals: Michael Sydow, Michael Collins, John T. Preston, Quantum Catalytics, Inc., and M. Sameer Ahmed. These would include specifically all those claims made or that could have been made in Cause 2007-38533, Jeffery B. Kaiser, et al v. Texas Syngas, LLC a/k/a Texas Syngas, Inc. et al., currently pending in the 152nd Judicial District Court of Harris County. this would include any other claims that estate may have against any of these entities their predecessors, successors, related companies, agents etc. In addition, we would like to purchase as a part of this transaction any equity interest or claim of interest the Estate has in any of the above entities.

Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

KDS 0024

Print                                                              Close

# RE: Kaiser

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Tue 1/17/12 10:27 AM
To:   gmccord@nathansommers.com

no word, Mike was in deposition all day and did not return my call.

Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

From: gmccord@nathansommers.com
To: kelly.stephens@hotmail.com
Subject: Kaiser
Date: Tue, 17 Jan 2012 15:09:55 +0000

Kelly:

Any word?

Gretchen Gauer McCord

Nathan Sommers Jacobs

A Professional Corporation

2800 Post Oak Boulevard

61st Floor

KDS 0029

556

Print                                                                     Close

# RE: Kaiser

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Tue 1/17/12 4:47 PM
To: gmccord@nathansommers.com

Gretchen,

left you a voice mail, but just in case.

Have communication from my client. he is willing to put the money in my IOLTA account pending approval. He wants me to hold. assuming that is sufficient I would give you notice of the deposit and hold pending approval.

let me know.

Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

From: gmccord@nathansommers.com
To: kelly.stephens@hotmail.com
Subject: Kaiser
Date: Tue, 17 Jan 2012 15:09:55 +0000

Kelly:

Any word?

KDS 0032

557

# RE: Kaiser

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Tue 2/07/12 12:01 PM
To: gmccord@nathansommers.com

Gretchen,

a couple of things.

1. My client is forming a company to purchase this asset. should have that info mid day tomorrow.
2. Should have the money by Thursday.

3. His lawyer in Boston is asking to review the transfer documents. do you use a standard for for asset purchase? if so, can I get a copy to give them so that we speed up the process.


Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

---

From: gmccord@nathansommers.com
To: kelly.stephens@hotmail.com
CC: rsommers@nathansommers.com
Subject: Kaiser
Date: Thu, 2 Feb 2012 17:01:45 +0000


Kelly:


I wanted to file the motion to sell this week. Do you have the funds in your Iolta account? Also, did you send the email I requested that I can attach to the motion to sell as the offer?

KDS 0040

558

# Kaiser

From: **Gretchen McCord** (gmccord@nathansommers.com)

Sent: Wed 3/14/12 12:08 PM

To: Kelly Stephens (kelly.stephens@hotmail.com) (kelly.stephens@hotmail.com)

Since I never heard who the purchaser was, I defined it as follows:

The purchaser is Paul Lohnes or his assignee ("Purchaser"). The Purchaser is a business associate of the Defendants.

There needs to be some explanation as to why he is buying these claims. I assume he is a business associate of Mr. Sydow. But, I need clarification on that issue.

Gretchen Gauer McCord

Nathan Sommers Jacobs

A Professional Corporation

2800 Post Oak Boulevard

61st Floor

Houston, Texas 77056

Voice: (713) 892-4816

Fax     (713) 892-4800

gmccord@nathansommers.com

www.nathansommers.com

THIS E-MAIL MESSAGE AND THE ATTACHMENTS HERETO, IF ANY, ARE INTENDED ONLY FOR USE BY THE SENDER'S INTENDED

KDS 0042

Print                                                           Close

# Re: Kaiser

From: **Kelly D Stephens** (kelly.stephens@hotmail.com)
Sent: Wed 3/14/12 1:04 PM
To: Gretchen McCord (gmccord@nathansommers.com)

I am out of the office until Monday. The definition is actually good as he has not yet informed me either.

T-Mobile, America's First Nationwide 4G Network
Sent by Samsung Mobile

Gretchen McCord <gmccord@nathansommers.com> wrote:

>Since I never heard who the purchaser was, I defined it as follows:
>
>The purchaser is Paul Lohnes or his assignee ("Purchaser"). The Purchaser is a business associate of the Defendants.
>
>There needs to be some explanation as to why he is buying these claims. I assume he is a business associate of Mr. Sydow. But, I need clarification on that issue.
>
>
>Gretchen Gauer McCord
>Nathan Sommers Jacobs
>A Professional Corporation
>2800 Post Oak Boulevard
>61st Floor
>Houston, Texas 77056
>Voice: (713) 892-4816
>Fax: (713) 892-4800
>gmccord@nathansommers.com<mailto:gmccord@nathansommers.com>
>www.nathansommers.com<http://www.nathansommers.com/>
>
>
>THIS E-MAIL MESSAGE AND THE ATTACHMENTS HERETO, IF ANY, ARE INTENDED ONLY FOR USE BY THE SENDER'S INTENDED RECIPIENT(S). IF YOU ARE NOT THE SENDER'S INTENDED RECIPIENT OF THIS E-MAIL MESSAGE OR YOU RECEIVED THIS E-MAIL MESSAGE OR THE ATTACHMENTS TO IT IN ERROR, OR THIS E-MAIL MESSAGE OR SAID ATTACHMENTS CONTAIN LEGALLY PRIVILEGED OR CONFIDENTIAL INFORMATION AND YOU ARE NOT THE SENDER'S INTENDED RECIPIENT OF SUCH LEGALLY PRIVILEGED OR CONFIDENTIAL INFORMATION, THE DISSEMINATION, DISTRIBUTION, PUBLICATION, DISCLOSURE OR USE OF SAID E-MAIL MESSAGE, ATTACHMENTS AND INFORMATION AND STRICTLY PROHIBITED AND YOU ARE INSTRUCTED TO IMMEDIATELY (A) NOTIFY THE SENDER BY TELEPHONE AT 713.960.0303 OF YOUR RECEIPT OF THIS E-MAIL MESSAGE AND SAID ATTACHMENTS, AND (B) DELETE THIS E-MAIL MESSAGE AND THE ATTACHMENTS TO IT, AND DESTROY ALL COPIES AND PRINTOUTS THEREOF.
>

KDS 0044

560

Print                                                              Close

# RE: Kaiser

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Tue 4/03/12 10:08 AM
To:   gmccord@nathansommers.com

Gretchen,

just wanted to let you know, I am not ignoring your request. I have been unable to speak with Lohnes or Sydow.
I do not have the money as of yet.

Kelly D. Stephens
Stephens & Dormnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

> From: gmccord@nathansommers.com
> To: kelly.stephens@hotmail.com
> Subject: RE: Kaiser
> Date: Thu, 29 Mar 2012 16:01:12 +0000
>
> Kelly:
>
> Can you confirm that you have the money in your IOLTA account? That the buyer still wants to move forward?
>
> Also, per my request can you give me a short explanation of the identity of the buyer? (per my question below) If there has not yet been an entity set up, then I will use the definition below.
>
> Gretchen Gauer McCord
> Nathan Sommers Jacobs
> A Professional Corporation
> 2800 Post Oak Boulevard

KDS 0047

561

Print            Close

# Kaiser

From: **Gretchen McCord** (gmccord@nathansommers.com)

Sent: Thu 6/07/12 2:56 PM

To: Kelly Stephens (kelly.stephens@hotmail.com) (kelly.stephens@hotmail.com)

Kelly:

I thought I would take one more stab at contacting you. Ron has me engaging special counsel to take this on an contingency fee basis so we can reach some resolution. Is your client still interested in purchasing the claims? We had reached an understanding, but your client was required to pay the money into your trust account. Last we spoke, they had still not done this.

If I do not hear back from you by tomorrow morning, I will assume that your client is no longer interested in purchasing the claims.

Gretchen Gauer McCord

Nathan Sommers Jacobs

A Professional Corporation

2800 Post Oak Boulevard

61st Floor

Houston, Texas 77056

Voice: (713) 892-4816

Fax     (713) 892-4800

gmccord@nathansommers.com

www.nathansommers.com

KDS 0049

562

Print                                                           Close

# RE: Kaiser

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Thu 6/07/12 3:23 PM
To:    gmccord@nathansommers.com

Gretchen,

I am again assured that the money will be in my trust account mid next week.

Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX  77279-9734
281-394-3287
832-476-5460 Fax

---

From: gmccord@nathansommers.com
To: kelly.stephens@hotmail.com
Subject: Kaiser
Date: Thu, 7 Jun 2012 18:56:48 +0000

Kelly:

I thought I would take one more stab at contacting you. Ron has me engaging special counsel to take this on an contingency fee basis so we can reach some resolution. Is your client still interested in purchasing the claims? We had reached an understanding, but your client was required to pay the money into your trust account. Last we spoke, they had still not done this.

If I do not hear back from you by tomorrow morning, I will assume that your client is no longer interested in purchasing the claims.

KDS 0051

563

# Kaiser Estate

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Tue 6/12/12 5:53 PM
To: gmccord@nathansommers.com

Gretchen,

this morning, I received notice of a wire transfer of $12,500.00 from Boston.
this afternoon, I received a check in the amount of $12,500.00 from Mr. Sydow. I deposited same around 4:15 p.m. this afternoon.

I guess I can say that I have the money in my trust account.

Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

KDS 0060

564

Print           Close

# RE: Kaiser- Sale Order

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Fri 6/15/12 11:23 AM
To: gmccord@nathansommers.com

Gretchen,

my clients inform me that they would like to make some changes in the valuation language of the order. they are supposed to get me their suggestions today. I will forward upon receipt.

Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

From: gmccord@nathansommers.com
To: kelly.stephens@hotmail.com
Subject: Kaiser- Sale Order
Date: Wed, 13 Jun 2012 20:25:05 +0000

Attached is a form of order that will be filed with the motion. The trustee had a few revisions. I have put a signature blank to sign as an agreed order, but did not know if you or someone else would be signing. Please let me know asap. Thanks.

Gretchen Gauer McCord

Nathan Sommers Jacobs

A Professional Corporation

KDS 0063

565

Print        Close

# RE: Kaiser- Sale Order

From: **Gretchen McCord** (gmccord@nathansommers.com)
Sent: Fri 6/15/12 11:32 AM
To: Kelly Stephens (kelly.stephens@hotmail.com)

I am pretty much married to that language. I will look at what they send, but the language is already broader than I think it should be.

Gretchen Gauer McCord

Nathan Sommers Jacobs

A Professional Corporation

2800 Post Oak Boulevard

61st Floor

Houston, Texas 77056

Voice: (713) 892-4816

Fax (713) 892-4800

gmccord@nathansommers.com

www.nathansommers.com

THIS E-MAIL MESSAGE AND THE ATTACHMENTS HERETO, IF ANY, ARE INTENDED ONLY FOR USE BY THE SENDER'S INTENDED RECIPIENT(S). IF YOU ARE NOT THE SENDER'S INTENDED RECIPIENT OF THIS E-MAIL MESSAGE OR YOU RECEIVED THIS E-MAIL MESSAGE OR THE ATTACHMENTS TO IT IN ERROR, OR THIS E-MAIL MESSAGE OR SAID ATTACHMENTS CONTAIN LEGALLY PRIVILEGED OR CONFIDENTIAL INFORMATION AND YOU ARE NOT THE SENDER'S INTENDED RECIPIENT OF SUCH LEGALLY PRIVILEGED OR CONFIDENTIAL INFORMATION, THE DISSEMINATION, DISTRIBUTION, PUBLICATION, DISCLOSURE OR USE OF SAID E-MAIL MESSAGE, ATTACHMENTS AND INFORMATION AND STRICTLY PROHIBITED AND YOU ARE INSTRUCTED TO IMMEDIATELY (A) NOTIFY THE SENDER BY TELEPHONE AT 713.960.0303 OF YOUR RECEIPT OF THIS E-MAIL MESSAGE AND SAID ATTACHMENTS, AND (B) DELETE THIS E-MAIL MESSAGE AND THE ATTACHMENTS TO IT, AND DESTROY ALL COPIES AND PRINTOUTS THEREOF.

KDS 0065

566

# FW: Kaiser- Sale Order

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Fri 6/15/12 3:45 PM
To:   gmccord@nathansommers.com


Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX  77279-9734
281-394-3287
832-476-5460 Fax


Date: Fri, 15 Jun 2012 12:45:07 -0700
From: michael.sydow@thesydowfirm.com
Subject: Re: Kaiser- Sale Order
To: kelly.stephens@hotmail.com

After consulting his Boston lawyers, they can live with the language.

From: Kelly Stephens <kelly.stephens@hotmail.com>
To: Michael Sydow <michael.sydow@thesydowfirm.com>
Sent: Wednesday, June 13, 2012 3:57 PM
Subject: FW: Kaiser- Sale Order

Mike,

see the attached. we have a window to make suggestions.


Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734

KDS 0066

567

# FW: Kaiser- Sale Order

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Fri 6/15/12 4:09 PM
To:    gmccord@nathansommers.com

Here is the illusive name.

Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

Date: Fri, 15 Jun 2012 12:54:56 -0700
From: michael.sydow@thesydowfirm.com
Subject: Re: Kaiser- Sale Order
To: kelly.stephens@hotmail.com

The name of the purchaser will be JK Claims Investment Corporation.

From: Kelly Stephens <kelly.stephens@hotmail.com>
To: "mdsydow@yahoo.com" <mdsydow@yahoo.com>; Michael Sydow <michael.sydow@thesydowfirm.com>
Sent: Friday, June 15, 2012 11:33 AM
Subject: FW: Kaiser- Sale Order

Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287

KDS 0067

568

# Dismissal of State Court Action

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Wed 6/27/12 10:08 AM
To: gmccord@nathansommers.com
Bcc: Michael Sydow (michael.sydow@thesydowfirm.com); Amber Polach
(amber.polach@thesydowfirm.com)

     1 attachment
     Order Dismissing case 06-12-2012.pdf (18.5 KB)

Gretchen,

have you seen this order, how does this affect what we are supposed to be purchasing.

Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

KDS 0069

569

# Re: Dismissal of State Court Action

From: **Gretchen McCord** (gmccord@nathansommers.com)
Sent: Wed 6/27/12 10:12 AM
To: kelly.stephens@hotmail.com (kelly.stephens@hotmail.com)

I don't think it does.

Sent from my HTC on the Now Network from Sprint!

----- Reply message -----
From: "Kelly Stephens" <kelly.stephens@hotmail.com>
Date: Wed, Jun 27, 2012 9:08 am
Subject: Dismissal of State Court Action
To: "Gretchen McCord" <gmccord@nathansommers.com>

Gretchen,

have you seen this order, how does this affect what we are supposed to be purchasing.


Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

KDS 0070

# FW: Dismissal of State Court Action

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Thu 6/28/12 11:16 AM
To: gmccord@nathansommers.com

Gretchen,

see the question below.


Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

---

Date: Wed, 27 Jun 2012 13:54:42 -0700
From: michael.sydow@thesydowfirm.com
Subject: Re: Dismissal of State Court Action
To: kelly.stephens@hotmail.com

If the case has been dismissed and the statute of limitations has run there is nothing left to purchase. A dismissal for want of persecution used to be subject to reinstatement within a certain time. However, if I recall correctly the reinstatement was discretionary with the Court. If so, either the trustee needs to have it reinstated to sell it or the buyer is purchasing yet another problem. I fail to understand how she thinks the dismissal has no bearing. Perhaps she can explain in just a *bit* more detail.

---

KDS 0071

# Kaiser

From: **Gretchen McCord** (gmccord@nathansommers.com)

Sent: Thu 6/28/12 11:56 AM

To:    Kelly Stephens (kelly.stephens@hotmail.com) (kelly.stephens@hotmail.com)

Cc:    Ron Sommers (rsommers@nathansommers.com)


I need a written commitment from the purchaser that if the Trustee reinstates the lawsuit, we still have a deal and the purchase money needs to be paid to the trustee to hold in trust pending approval of the motion.


Or, I need a written statement from the buyer that they are no longer interested in going forward because the case has now been dismissed.


Please let me know today. I am meeting with someone to discuss the cost to reinstate the lawsuit.


Gretchen Gauer McCord

Nathan Sommers Jacobs

A Professional Corporation

2800 Post Oak Boulevard

61st Floor

Houston, Texas 77056

Voice: (713) 892-4816

Fax     (713) 892-4800

gmccord@nathansommers.com

www.nathansommers.com


THIS E-MAIL MESSAGE AND THE ATTACHMENTS HERETO, IF ANY, ARE INTENDED ONLY FOR USE BY THE SENDER'S INTENDED

KDS 0075

572

Print　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Close

# FW: Kaiser

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Thu 6/28/12 2:52 PM
To:　gmccord@nathansommers.com

here is the response.


Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax


Date: Thu, 28 Jun 2012 10:45:23 -0700
From: michael.sydow@thesydowfirm.com
Subject: Re: Kaiser
To: kelly.stephens@hotmail.com

I have spoken to the purchaser. He is OK with the trustee holding the money IN TRUST, and will go through with the purchase if:

　1. The case is reinstated retroactively so that only limitations defenses available at the time the suit was filed are now available; and
　2. The Court approves the sale of the cause of action in substantially the form agreed.

KDS 0076

573

# Kaiser

From: **Gretchen McCord** (gmccord@nathansommers.com)
Sent: Tue 7/03/12 12:28 PM
To: Kelly Stephens (kelly.stephens@hotmail.com) (kelly.stephens@hotmail.com)
Cc: Rick Kincheloe (rkincheloe@nathansommers.com)
   2 attachments
   mtn reinstate.v2.pdf (68.4 KB) , mtn reinstate.v2.wpd (21.5 KB)

Kelly:

I asked about Michael Sydow because I think that we should perhaps make this a joint motion. See the draft attached hereto (we will have to change, as I thought Michael was counsel to some defendants, including himself).

But see what I want to do and get back with me.

The reason I would like to make it joint, is that I don't want to run into a problem with the court saying the trustee never intervened. There are two schools of thought- one that the trustee just steps in without the necessity that a motion for intervention is necessary and two that the trustee has to formally intervene. I just don't want it to be an issue and then have the court say the trustee had no standing to file the motion to reinstate.

Gretchen Gauer McCord

Nathan Sommers Jacobs

A Professional Corporation

2800 Post Oak Boulevard

61st Floor

Houston, Texas 77056

KDS 0086

574

# Kaiser

From: **Gretchen McCord** (gmccord@nathansommers.com)

Sent: Tue 7/10/12 6:14 PM

To: Kelly Stephens (kelly.stephens@hotmail.com) (kelly.stephens@hotmail.com)

Cc: Rick Kincheloe (rkincheloe@nathansommers.com)

Kelly:

If they are not going to join in the motion, can I at least represent that they are unopposed. I need an answer asap.

Gretchen Gauer McCord

Nathan Sommers Jacobs

A Professional Corporation

2800 Post Oak Boulevard

61st Floor

Houston, Texas 77056

Voice: (713) 892-4816

Fax    (713) 892-4800

gmccord@nathansommers.com

www.nathansommers.com

THIS E-MAIL MESSAGE AND THE ATTACHMENTS HERETO, IF ANY, ARE INTENDED ONLY FOR USE BY THE SENDER'S INTENDED RECIPIENT(S). IF YOU ARE NOT THE SENDER'S INTENDED RECIPIENT OF THIS E-MAIL MESSAGE OR YOU RECEIVED THIS E-MAIL MESSAGE OR THE ATTACHMENTS TO IT IN ERROR, OR THIS E-MAIL MESSAGE OR SAID ATTACHMENTS CONTAIN LEGALLY PRIVILEGED OR CONFIDENTIAL INFORMATION AND YOU ARE NOT THE SENDER'S INTENDED RECIPIENT OF SUCH LEGALLY PRIVILEGED OR CONFIDENTIAL INFORMATION, THE DISSEMINATION, DISTRIBUTION, PUBLICATION, DISCLOSURE OR USE OF SAID E-MAIL MESSAGE, ATTACHMENTS AND INFORMATION AND STRICTLY PROHIBITED AND YOU ARE INSTRUCTED TO IMMEDIATELY (A) NOTIFY THE SENDER BY TELEPHONE AT 713.960.0303 OF YOUR RECEIPT OF THIS E-MAIL MESSAGE AND SAID ATTACHMENTS.

KDS 0088

575

# RE: Kaiser

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Wed 7/11/12 10:37 AM
To: gmccord@nathansommers.com

Gretchen,

we're back to please don't shoot the messenger. Mike's reply to joining the motion was (paraphrased):

I am buying this thing to prevent further problems with Kaiser, why would I (the defendant) join in a motion to reinstate.

I have forwarded your request below to him, but have not heard back yet. I am about to get on the road for Duval County for a hearing this afternoon.
my cell is 713-252-4945. please call me around noon. my hearing is at 1:30. I'll try to reach Mike while I am on the road.


Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

---

From: gmccord@nathansommers.com
To: kelly.stephens@hotmail.com
CC: rkincheloe@nathansommers.com
Subject: Kaiser
Date: Tue, 10 Jul 2012 22:14:53 +0000


Kelly:

KDS 0089

576

# RE: Kaiser

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Wed 7/11/12 11:01 AM
To:    gmccord@nathansommers.com

Gretchen,

first, my hearing in Duval got cancelled late yesterday and I just found out.

second: I looked at the court records regarding the parties in this litigation:

Jeff Kaiser represented himself, now your position.

I represented John Preston, Texas Syngas, Inc. and Quantum Catalytics, LLC

Steve Davis (Davis & Davis) represented Sameer Ahmed.

Teresa Schnieer (Winstead) represented Michael Collins, Micheal Sydow and Texas Syngas, LLC
She withdrew leaving each of these pro se.

On behalf of John Preston, Texas Syngas, Inc. and Quantum Catalytics, LLC, I have requested authority but have not received it to represent that they are unopposed.

Mike Sydow's position is that he cannot make that representation for any of the other defendants, and will not on his own behalf.

I have not been able to reach Steve Davis, but I represent Sameer Ahmed in other matters (and have made him aware of this) and he wants this thing dead so I doubt if he would agree.

I have no contact with Michael Collins.

I realize this complicates things, but its the best I can do at this point.

Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

KDS 0090

# RE: Kaiser

From: **Kelly Stephens** (kelly.stephens@hotmail.com)
Sent: Thu 7/12/12 5:29 PM
To: gmccord@nathansommers.com

Gretchen,

I can confirm that Mike Sydow is my primary contact. My understanding is that the purchaser is consulting with Mike regarding the claims (their merits etc under Texas Law), but not that he is "having" someone purchase the claim.


Kelly D. Stephens
Stephens & Domnitz, PLLC
P.O. Box 79734
Houston, TX 77279-9734
281-394-3287
832-476-5460 Fax

---

From: gmccord@nathansommers.com
To: kelly.stephens@hotmail.com
Subject: RE: Kaiser
Date: Thu, 12 Jul 2012 21:07:34 +0000


Please confirm for me that Mike Sydow is the one who is having the purchaser buy the claims.


Gretchen Gauer McCord

Nathan Sommers Jacobs

A Professional Corporation

2800 Post Oak Boulevard

KDS 0095

578

Print Close

# Kaiser

From: **Gretchen McCord** (gmccord@nathansommers.com)
Sent: Thu 11/01/12 5:09 PM
To: Kelly Stephens (kelly.stephens@hotmail.com) (kelly.stephens@hotmail.com)
    1 attachment
    Assignment (081712)V.2..docx (19.3 KB)

I have not run this by the Trustee. Accordingly, it is subject to his approval. I still assert this is unnecessary and the transfer of the claims was effective as of July 27, 2012, when the order reinstating the state court lawsuit was entered and it would appear that filing that order would be sufficient. Having said that, if a separate assignment is going to be entered into it needs to incorporate the sale order, the sale order needs to control any conflict, and the Trustee cannot assign things other than what is owned by the estate. I think the language needs to be identical to that of the sale order. I also do not know the reason that the Assignee would ever give a release for the Trustee. And, the Trustee does not own the claims any longer so is not going to settle the pending lawsuit.

Having said all of this, I made some possible changes. See if you are ok with them.

Gretchen Gauer McCord

Nathan Sommers Jacobs

A Professional Corporation

2800 Post Oak Boulevard

61st Floor

Houston, Texas 77056

Voice: (713) 892-4816

Fax    (713) 892-4800

gmccord@nathansommers.com

www.nathansommers.com

KDS 0102

579

# Wire Transfer Services
# Outgoing Wire Transfer Request



A customer or team member, with the customer present, completes this form when requesting to send a wire. Outgoing wires can only be sent for Wells Fargo customers. Retain the original copy and provide a copy to the customer ensuring you give the customer the Agreement for Outgoing Wire Transfer Request (page 2 when form is accessed on-line & preprinted on the back of printed forms). Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See back (page 2) for explanations of the Mexican CLABE account, the SWIFT BIC, the International Routing Code (IRC) and the International Bank Account Number (IBAN). *Required information is noted with an asterisk.

**\*Today's Date**  07/21/2012

**\*Send Date** (if next day submit wire after 4:30 CT. Store must hold if other than today or next day date.)  7·26·2012

### 1. Originator's Information

**\*Customer's Name**  STEPHENS 2 DONNITE IOLTA / KELLY STEPHENS

**\*Phone Number**  713 252 1945

**\*Customer's Physical Address, City, State, Zip Code**  12611 TRAIL HOLLOW  HOUSTON TX 77024

**\*Transfer from Wells Fargo Account No.** (Must be checking, savings, market rate, wholesale checking account or 10-digit command account)

**\*U.S. Dollar Wire Amount**  25,000  24,970

International Wire only: When sending in foreign currency, please ensure the beneficiary's account accepts the designated currency.

**Funds to be sent in foreign currency** ☐ Yes ☒ No   **Foreign Currency Type/Name** (SVT/SVP will default to FX rates specified otherwise)   **\*Currency Code** (if known)   **\*Foreign Currency Amount**

### 2. Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds.)

**\*Beneficiary/Recipient Name**  RONALD J. SOMMERS TRUSTEE FOR EST OF JEFFREY KAISER

**\*Beneficiary Account Number, Mexican CLABE # or the International Bank Account Number (IBAN) where applicable:**

**Beneficiary's Physical Address, City, State, Zip Code (A physical address is required for foreign wires.)**

**Information for the Beneficiary** (Invoice number, purchase order number, etc.)    **Beneficiary Phone Number**

### 3. Beneficiary Bank Information (This is the financial institution where the beneficiary maintains their account.)

**\*Beneficiary Bank RTN or SWIFT Bank Identifier Code (SWIFT BIC)**    **\*International Routing Code (IRC)**

**\*Beneficiary Bank Name**  GREEN BANK

**Beneficiary Bank Address, City, State, Zip Code & Country (optional information)**

**Information for Beneficiary Bank** (wires to Mexican banks require the CLABE account number in the Beneficiary instructions to ensure correct payment.)

### 4. Intermediary Bank Information (This is a financial institution that the wire must pass through before reaching the final beneficiary bank.) This section is optional and not required for all wires. Please note that routing may be altered depending on Wells Fargo Bank's correspondent relationships.

**Optional: \*Intermediary Beneficiary Bank RTN or SWIFT BIC**    **International Routing Code (IRC)**

**\*Intermediary Bank Name**    **\*Intermediary Bank Account No.**

**Intermediary Bank Address, City, State, Zip, Country (optional information)**

**Information for Intermediary Bank**

### 5. Wire Fee & Customer Signature (Additional fees from intermediary and beneficiary banks may be charged to international transactions - see Fees Section on page 2 of this form.)

Wire Fee Amount (the Transfer From Account will be charged the fee.) The region that houses the account being debited determines the fee amount. Use the fee information available through Teamworks and/or the Banker's Guide. Do not use SVT/SVP for fee when the account is not in your region. Additional fees may apply (see page 2 of this form). Contact WBR Store Support for questions regarding Command Fees.

**\*All where the Originator's account is located**  7 3742

**\*Fee Amount**  $ 30

My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions on the second page of this request. Wells Fargo is authorized to rely solely on the information on this Request in making the requested funds transfer.

**X** Kelly Stephens    **\*Date** 07/26/12

### 6. Wells Fargo Use Only – Wells Fargo Approval – Following MUST be completed for ALL outgoing wires.

International Wire Foreign Currency Information
**Rate**    **Contract No.** (required when $100,000 or more U.S.$)    **FX Trader Contact**

**\*Wire Transaction/FAS Number**  FW-0063429·208·518443    **\*Name on ID used by customer**  KELLY DWAYNE STEPHENS    **Method used to verify business acct. transaction authority**  SVP

**\*1st ID type, number, issued by State/Country & Expiration Date**  TXDL  3/15/2017    **\*2nd ID type, number, issued by State/Country & Expiration Date**  PIN

**\*Initiated by and AU#**  X _____ 63429    **\*First Approval**  X    **Second Approval, if applicable**  X

### 7. Wires in Process (WIP)

**\*When Customer's account is not debited, the WIP Account is funded by:**

☐ Paid by Check  ☐ Paid Cash  ☐ Paid through account other than checking, savings, MRA, TRS or Hogan. Reference Acct #: _____

Tax ID Type–Type & No. are required when customer's account is not debited.    Tax ID No. (if non-citizen provide Alien ID #, Passport # & Country)

☐ Social Security  ☐ TIN  ☐ Non-U.S. Citizen without TIN  ☐ Employer ID

Filed 12 October 1 A11:33
Chris Daniel - District Clerk
Harris County
ED101J017105803
By: daunshae n. willrich

CAUSE NO. 2007-38533

| | | |
|---|---|---|
| JEFFERY B. KAISER, INDIVIDUALLY DERIVATIVELY, AND ON BEHALF OF ALL SIMILARLY SITUATED STOCKHOLDERS AND MEMBERS OF TEXAS SYNGAS, LLC A/K/A TEXAS SYNGAS, INC., *Plaintiff,* | § § § § § § § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| TEXAS SYNGAS, LLC A/K/A TEXAS SYNGAS, INC., MICHAEL A. COLLINS, MICHAEL D. SYDOW, M. SAMEER AHMED, AND ALL OTHER SIMILARLY SITUATED OFFICERS AND DIRECTORS OF TEXAS SYNGAS, LLC A/K/A TEXAS SYNGAS, INC., *Defendants.* | § § § § § § § § § | 152nd JUDICIAL DISTRICT |

## PLAINTIFF'S NONSUIT WITH PREJUDICE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, JK Claims Investment Corporation (successor in interest to Jeffery B. Kaiser), Plaintiff in the above-numbered and entitled cause, and respectfully files this Nonsuit With Prejudice. In support of this motion Plaintiff shows as follows:

### I.

Plaintiff has sued Defendant, Michael D. Sydow, for alleged mismanagement, breach of fiduciary duty, violation of state or federal securities laws, fraud, misrepresentation, and misappropriation. Plaintiff no longer wishes to pursue the claims against Defendant, Michael D. Sydow.

### II.

Plaintiff asks the Court to sign an order of nonsuit with prejudice on all of Plaintiff's claims against Defendant, Michael D. Sydow.

Pltf Nonsuit w/Prejudice                    1

EXHIBIT J                         581

Plaintiff asks that all claims against Defendant, Michael D. Sydow, be dismissed with prejudice. Plaintiff asks that all costs of court be assessed against the party incurring same.

## III.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that this motion for Nonsuit With Prejudice be granted; that the Court dismiss without prejudice all claims against Defendant, Michael D. Sydow; that all costs of court be assessed against the party incurring same; and for such other relief, at law or in equity, to which Plaintiff is entitled.

Respectfully submitted,
**STEPHENS & DOMNITZ, PLLC**

By: _____

Kelly D. Stephens
Texas SBN: 19158300
P. O. Box 79734
Houston, Texas 77279-9734
Tel: 281-394-3287
Fax: 832-476-5460
kelly.stephens@hotmail.com

*Attorneys for Plaintiff, JK Claims Investment Corporation, Defendants, Texas Syngas, LLC and Texas Syngas, Inc. and Intervenor, Quantum Catalytics, LLC.*

### Certificate of Service

I hereby certify that a true and correct copy of the foregoing document has been served on this 1st day of October, 2012, on the following:

*Via Telecopier No. (713) 781-2235*
Mr. Steven Ray Davis
Davis & Davis
440 Louisiana, Suite 1850
Houston, Texas 77002
Attorneys for Sameer Ahmed

582

*Via Telecopier No. (713) 552-1949*
Mr. Michael D. Sydow
1980 Post Oak Boulevard, Suite 2100
Houston, Texas 77056

Defendant Pro Se

*Via Certified Mail, Return Receipt Requested #7011 1570 0000 9065 3472*
Mr. Michael A. Collins
63 Sky Terrace Place
The Woodlands, Texas 77381

Defendant Pro Se

Kelly D. Stephens

**CAUSE NO. 2007-38533**

Pltf Nonsuit w/Prejudice      3

583

Cause No. 2007-38533

| | | |
|---|---|---|
| JEFFERY B. KAISER, INDIVIDUALLY, | § | IN THE DISTRICT COURT OF |
| DERIVATELY, AND ON BEHALF OF | § | |
| STOCKHOLDERS AND MEMBERS OF | § | |
| TEXAS SYNGAS, LLC a/k/a TEXAS | § | |
| SYNGAS, INC., | § | |
|     Plaintiffs, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| TEXAS SYNGAS, LLC a/k/a TEXAS | § | |
| SYNGAS, INC., MICHAEL A. COLLINS, | § | |
| MICHAEL D. SYDOW, M. SAMBER | § | |
| AHMED, AND ALL OTHER SIMILARLY | § | |
| SITUATED OFFICERS AND DIRECTORS | § | |
| OF TEXAS SYNGAS, LLC a/k/a TEXAS | § | |
| SYNGAS, INC., | § | |
|     Defendants. | § | |
| | § | 152nd JUDICIAL DISTRICT |

**DEFENDANT MICHAEL D. SYDOW'S**
**MOTION TO NONSUIT CAUSE OF ACTION**

**TO THE HONORABLE JUDGE OF SAID COURT**:

**NOW COMES** Defendant, Michael D. Sydow, and requests this Honorable Court to nonsuit the counterclaim he filed against Plaintiff Kaiser in Cause Number 2007-38533 for the ground set forth herein.

I.

A.    Defendant requests nonsuit of his counterclaim in Cause Number 2007-38533 for the following reason:

1.    Kaiser has dismissed his claims against Mr. Sydow in exchange for the nonsuit of Mr. Sydow's bad faith claim against Kaiser.

**WHEREFORE**, Defendant requests this Honorable Court to nonsuit his counterclaim against Kaiser in Cause Number 2007-38533 and for such other and further relief that may be

1

584

awarded at law or in equity.

Respectfully submitted,

/s/ Michael D. Sydow
Michael D. Sydow
Texas Bar No. 19592000
1980 Post Oak Boulevard, Suite 2100
Houston, Texas 77056
(713) 622-9700 [Telephone]
(713) 552-1949 [Telecopier]
Attorney for Defendant,
Michael D. Sydow

## CERTIFICATE OF SERVICE

I certify that on January 11, 2013 at Houston, Texas a true and correct copy of Defendant's Motion to Nonsuit was served on Kelley M. Keller electronically at kkeller@ellison.keller.com, and the electronic transmission was reported as complete.

/s/ Michael D. Sydow
Michael D. Sydow
E-mail: michael.sydow@thesydowfirm.com

2

Unofficial Copy Office of Chris Daniel District Clerk

585

Filed 13 January 14 P2:33
Chris Daniel - District Clerk
Harris County
FAX15387276

Cause No. 2007-38533

| | | |
|---|---|---|
| JEFFERY B. KAISER, INDIVIDUALLY, DERIVATELY, AND ON BEHALF OF STOCKHOLDERS AND MEMBERS OF TEXAS SYNGAS, LLC a/k/a TEXAS SYNGAS, INC., <br> Plaintiffs, <br><br> v. <br><br> TEXAS SYNGAS, LLC a/k/a TEXAS SYNGAS, INC., MICHAEL A. COLLINS, MICHAEL D. SYDOW, M. SAMBER AHMED, AND ALL OTHER SIMILARLY SITUATED OFFICERS AND DIRECTORS OF TEXAS SYNGAS, LLC a/k/a TEXAS SYNGAS, INC., <br> Defendants. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | IN THE DISTRICT COURT OF <br><br><br><br><br><br><br> HARRIS COUNTY, TEXAS <br><br><br><br><br><br><br> 152nd JUDICIAL DISTRICT |

## INTERVENOR QUANTUM CATALYTIC, LLC'S MOTION FOR NONSUIT

### TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Intervenor, Quantum Catalytic, LLC, and requests this Honorable Court to nonsuit the counterclaim he filed against Plaintiff Kaiser in Cause Number 2007-38533 for the ground set forth herein.

I.

A. Intervenor requests nonsuit of its claim in Cause Number 2007-38533 for the following reason:

1. JK Claims Investment Corporation has acquired the cause of action of Kaiser, and Intervenor is not adverse to JK Claims Investment Corporation. Intervenor will align its interests with those JK Claim Investment Corporation in an amended petition.

586

**WHEREFORE**, Intervenor requests this Honorable Court to nonsuit his claim against Kaiser in Cause Number 2007-38533 and for such other and further relief that may be awarded at law or in equity.

Respectfully submitted,

By: _____

John T. Preston, CEO
Quantum Catalytics, LLC
421 Currant Rd.
Fall River, Massachusetts 02720
617-575-7890

587

## CERTIFICATE OF SERVICE

I certify that on January 11, 2013 at Houston, Texas a true and correct copy of Defendant's Motion to Dismiss was served on Kelley M. Keller electronically at kkeller@ellison.keller.com, and the electronic transmission was reported as complete.

John T. Preston

Unofficial Copy Office of Chris Daniel District Clerk

588



CONFIDENTIAL COMMUNICATIONS INTERNATIONAL, LTD.

# Transcript of the Testimony
## of
# **Russell Read, CFA, Ph.D.**

**Volume:** I

**Date of Deposition:**
April 21, 2014

**Case:** Jeffrey B. Kaiser v. Texas Syngas, LCC

Confidential Communications Int. Ltd.
Phone: 713.365.0777
Fax: 713.365.0808
Email: scheduling@recordsdiscovery.com
Internet: www.recordsdiscovery.com
4777

EXHIBIT L

## Department of State: Division of Corporations

| | |
|---|---|
| HOME<br>About Agency<br>Secretary's Letter<br>Newsroom<br>Frequent Questions<br>Related Links<br>Contact Us<br>Office Location<br><br>**SERVICES**<br>Pay Taxes<br>File UCC's<br>Delaware Laws Online<br>Name Reservation<br>Entity Search<br>Status<br>Validate Certificate<br>Customer Service<br>Survey<br><br>**INFORMATION**<br>Corporate Forms<br>Corporate Fees<br>UCC Forms and Fees<br>Taxes<br>Expedited Services<br>Service of Process<br>Registered Agents<br>Get Corporate Status<br>Submitting a Request<br>How to Form a New<br>Business Entity<br>Certifications, Apostilles<br>& Authentication of<br>Documents | Privacy Policy  Frequently Asked Questions  View Search Results |

### Entity Details

THIS IS NOT A STATEMENT OF GOOD STANDING

|  |  |  |  |
|---|---|---|---|
| File Number: | 4967757 | Incorporation Date<br>Formation Date: | **04/12/2011**<br>(mm/dd/yyyy) |
| Entity Name: | **TRANSFORMATIVE ENERGY & MATERIALS CAPITAL, INC.** | | |
| Entity Kind: | **CORPORATION** | Entity Type: | **GENERAL** |
| Residency: | **DOMESTIC** | State: | **DE** |

### REGISTERED AGENT INFORMATION

| | | | |
|---|---|---|---|
| Name: | **CORPORATION SERVICE COMPANY** | | |
| Address: | **2711 CENTERVILLE RD SUITE 400** | | |
| City: | **WILMINGTON** | County: | **NEW CASTLE** |
| State: | **DE** | Postal Code: | **19808** |
| Phone: | **(302)636-5401** | | |

Would you like    Status    Status, Tax & History Information  Submit

Back to Entity Search

click here

site map  |  about this site  |  contact us  |  translate  |  delaware.gov

# TAB 6

CAUSE NO. 2011-44058

| MICHAEL COLLINS, ET AL., | § | IN THE DISTRICT COURT |
| Plaintiffs | § | |
| | § | |
| | § | |
| vs. | § | OF HARRIS COUNY |
| | § | |
| | § | |
| MICHAEL SYDOW, ET AL. | § | |
| Defendants | § | 215TH JUDICIAL DISTRICT |

| AKILA FINANCE, S.A., ET AL., | § | IN THE DISTRICT COURT |
| Intervenors/Plaintiffs | § | |
| | § | |
| vs. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| MICHAEL SYDOW; ET AL. | § | |
| Defendants. | § | 215TH JUDICIAL DISTRICT |

## DEFENDANTS JOHN T. PRESTON, BRILLIANT NOVELTY, L.L.C., AND C CHANGE INVESTMENTS, LLC'S REPLY IN SUPPORT OF THEIR SPECIAL APPEARANCES AND MOTION TO STRIKE HEARSAY STATEMENTS

Pursuant to Texas Rule of Civil Procedure 120a, Defendants John T. Preston, Brilliant Novelty, L.L.C. ("Brilliant Novelty"), and C Change Investments, LLC ("C Change") (together "Massachusetts Defendants") file this Reply in Support of Their Special Appearances and Motion to Strike Hearsay Statements, and in support state as follows:

### PRELIMINARY STATEMENT

At issue here is whether claims filed by foreign corporations and individuals—none of whom are Texas residents—against a Masachusetts resident and two Massachusetts companies should be allowed to go forward even though after three years of litigation there still is no evidence for asserting jurisdiction over any of the Massachusetts Defendants in a Texas court.

617

The Massachusetts Defendants established in their Special Appearances that personal jurisdiction cannot be asserted over them. Neither the lengthy response or supplemental response submitted by the Intervenors should be considered in this case because both are untimely. [1] In any event, nothing in either brief changes the fact that there is no specific or general jurisdiction over any of the Massachusetts Defendants. First, there is no specific jurisdiction because the Intervenors do not even allege that the Massachusetts Defendants committed any act in Texas that gives rise to the claims in this lawsuit. The Texas Supreme Court has explicitly rejected the theory on which the Intervenors rely for specific jurisdiction. It is not enough to allege that a tort was "directed" at Texas. Second, there is no general jurisdiction over any of these defendants. Preston has not lived in Texas since he was an infant over sixty years ago and the handful of visits he has made to Texas since then are not jurisdictional contacts because they were made in a representative capacity. The handful of contacts by C Change with Texas through Preston were not so "continuous and systematic" to render C Change "essentially at home" in Texas as the U.S. Supreme Court requires. Finally, Intervenors have not cited any specific contacts by Brilliant Novelty with Texas.

## I. THE MASSACHUSETTS DEFENDANTS COMPLIED WITH RULE 120A.

The Intervenors claim that the Massachusetts Defendants' special appearances do not comply with Rule 120a on the grounds that the special appearances themselves are not verified. But as the Intervenors acknowledge, affidavits were attached to each of the special appearances. Resp. at 8-9. These affidavits swear to the truth of every statement of fact in the motions. It

---

[1] Despite the fact that Defendants agreed to several extensions of the deadline for Intervenors' response brief, Intervenors failed to meet the agreed July 2, 2014 deadline for filing their Response Brief. Ex. A, Rule 11 Agreement (June 29, 2014); Intervenors' Resp. at 1 (July 3, 2014). More significantly, Intervenors subsequently filed an additional supplemental response brief on August 8, 2014, despite being bound by the Rule 11 Agreement requiring that any response by the Intervenors must be filed by July 2, 2014. Intervenors' Supp. Resp. (Aug. 8, 2014).

2

618

makes no sense to argue they are not sworn motions as Rule 120a requires. In any event, even if there were a technical defect—which there is not—the Texas Supreme Court has made clear that a special appearance can be verified *after* the hearing.[2]

## II. INTERVENORS DID NOT MEET THEIR BURDEN OF PLEADING SUFFICIENT JURISDICTIONAL ALLEGATIONS OVER NON-RESIDENTS.

There is no allegation that any acts by the Massachusetts Defendants giving rise to the Intervenors claims took place in Texas. That means it is enough to establish that the Massachusetts Defendants are not residents and the Court does not need to go any further. "The plaintiff has the initial burden of pleading sufficient allegations to bring the nonresident defendant within the provisions of the Texas long-arm statute. . . . If the plaintiff does not plead jurisdictional allegations, i.e., that the defendant has committed any act in Texas, the defendant can satisfy its burden by presenting evidence that it is a nonresident."[3]

## III. THERE IS NO SPECIFIC JURISDICTION OVER ANY OF THE MASSACHUSETTS DEFENDANTS.

Here, none of the legal requirements for asserting specific jurisdiction are met for any of the Massachusetts Defendants. To assert specific jurisdiction over a defendant that defendant "must have made minimum contacts with Texas by purposefully availing itself of the privilege of conducting activities here" *and* "liability must have arisen from or related to those contacts."[4] Moreover, there has to be "a substantial connection between [the defendant's forum] contacts and the operative facts of the litigation."[5]

---

[2] *Dawson-Austin v. Austin*, 968 S.W.2d 319, 322 (Tex. 1998).

[3] *C-Loc Retention Sys., Inc. v. Hendrix*, 993 S.W.2d 473, 476 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *see also Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 634 (Tex.App.-Dallas 1993, writ denied) (granting special appearance proper where the defendant established it was a non-resident and the plaintiff's "pleadings contained no allegations that [the defendant] committed any acts in Texas").

[4] *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 576 (Tex. 2007).

[5] *Id.* at 585.

3

**A. No Allegations in the Intervenors' Petition Support Specific Jurisdiction.**

The Intervenors do not make a single factual allegation in their petition that *any* conduct by the Massachusetts Defendants actually took place in Texas. Without specific allegations regarding acts by the Massachusetts Defendants in Texas, there can be no specific jurisdiction.[6]

**B. None of the Contacts Alleged by the Intervenors in Their Briefing Support the Exercise of Specific Jurisdiction.**

The Intervenors argue that specific jurisdiction may be asserted over the Massachusetts Defendants based on "Preston's activities as a director of and fund raiser for TSI and NC12 – both Texas companies" and on the grounds that they "could reasonably foresee that NC12 and its shareholders and investors would suffer direct economic injury."[7] This argument echoes Intervenors' general claim in their petition that jurisdiction is proper simply because tortious conduct "was directed at the State of Texas."[8] But the Texas Supreme Court unequivocally rejected the argument that jurisdiction can arise just because actions caused harm to a Texas resident.[9] "Several problems arise if jurisdiction turns not on a defendant's contacts, but on where it 'directed a tort.'"[10] Here, the Intervenors' allegations are even further removed given that *none* of the Intervenors are Texas residents and TSI and NC12 are Nevada corporations, *not* Texas corporations.

---

[6] *Vosko v. Chase Manhattan Bank, N.A.*, 909 S.W.2d 95, 99 (Tex.App.-Houston [14th Dist.] 1995, writ denied) ("if the plaintiff does not allege that the defendant performed a specific act in Texas, the defendant's evidence that he is a nonresident is enough to carry his burden of proof"); *Olympia Capital Assocs., L.P. v. Jackson*, 247 S.W.3d 399, 407 (Tex.App.-Dallas 2008, no pet.) ("absent allegations of any specific, purposeful act through which the defendant can be said to have sought a benefit by 'availing itself of the jurisdiction,' . . . evidence that a defendant is a nonresident is sufficient to meets its burden").

[7] Intervenors' Resp. at 13.

[8] Ex. B, Orig. Pet. in Intervention at ¶ 44 (Nov. 11, 2011).

[9] *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777 (Tex. 2005).

[10] *Id.* at 790.

620

Because the general allegations by the Intervenors do not point to *any* activities in Texas, they also fail to show that Preston "purposely avail[ed] [him]self of the privilege of conducting activities" in Texas.[11] Nor do the actual facts related to Preston's involvement with NC12 show a connection to Texas. Preston is a shareholder and director of NC12, but the only board meeting he attended physically took place in Massachusetts, not Texas, and the only time he ever traveled to Texas in relation to NC12 was to serve as a witness in a representative capacity for the company for the limited purpose of testifying about an asset in a divorce proceeding.[12]

The Intervenors argue that Preston is not protected by fiduciary shield doctrine for purposes of specific jurisdiction.[13] But this does not change the fact that there are no allegations here of contacts with Texas that give rise to specific jurisdiction. Intervenors simply have not pointed to any specific conduct that took place in Texas that gives rise to the claims asserted in this case.

## IV. THERE IS NO GENERAL JURISDICTION OVER THE MASSACHUSETTS DEFENDANTS.

There can be no question that none of the Massachusetts Defendants have the substantial continuous and systematic contacts with Texas that are necessary to support general jurisdiction. This should be clear based on the fact that for the last 60 years Preston has not lived in Texas and has not had any contact with the state in his personal capacity, Brilliant Novelty has had no contacts with Texas, and contacts by C Change have been extremely limited. General jurisdiction can only be asserted over nonresident defendants that have contacts with the forum that are "so 'continuous and systematic' as to render them essentially at home in the forum

---

[11] *Moki Mac River Expeditions*, 221 S.W.3d at 576.

[12] Ex. C, Preston Dec. ¶¶ 6, 7 (Sept. 26, 2011), Ex. D, Preston Supp. Dec. ¶¶ 3-8 (Oct. 23, 2014).

[13] Ex. B, Resp. at 14.

5

State."[14] General jurisdiction, therefore, is "dispute-blind," inquiring only whether a nonresident defendant's contacts with the forum are substantial enough that they would support jurisdiction over a hypothetical dispute that has no connection whatsoever to Texas.[15] "Usually, 'the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there" and "activities that are less extensive than that will not qualify for general in personam jurisdiction."[16] The Massachusetts Defendants' almost complete lack of contact with Texas does not meet this standard.

### 1. Preston is not a Texas resident and does not do business in Texas in his individual capacity.

Preston is not subject to general jurisdiction because he is not a resident and is not "engaged in longstanding business" as is required to support general jurisdiction.[17] He has not been a resident of Texas for the last 60 years, but rather is a resident of Massachusetts.[18] His few visits to Texas have all been in a representative capacity.[19] Preston is employed outside of Texas and has never been employed in Texas or maintained an office in Texas.[20] Preston does not employ anybody who resides in Texas, or who regularly travels to Texas in connection with his or her business.[21] Because Preston does not reside in or conduct business in Texas, he has never

---

[14] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011).

[15] *PHC-Minden*, 235 S.W.3d at 169.

[16] *Id.* at 168 (quoting 4 Wright & Miller, Federal Practice and Procedure § 1067.5).

[17] *Id.*

[18] Ex. C, Preston Dec. ¶ 4.

[19] *Id.* ¶¶ 4-6; Ex. D, Preston Supp. Dec. ¶¶ 3-8.

[20] Ex. C, Preston Dec. ¶ 8.

[21] *Id.* ¶ 11.

6

incurred or paid any taxes in Texas.[22]  Preston is not required to and does not maintain any agent in Texas who is authorized to receive service of process.[23]

### 2. Preston does not maintain any presence in Texas.

Preston cannot be considered "essentially at home" in Texas because he does not maintain any presence in Texas.[24]  Preston is not engaged in any business in his individual capacity in Texas and has never maintained an office or any other facility, telephone listing, post office box, or mailing address in Texas.[25]  Nor has he ever rented, owned, or possessed any real or personal property in Texas.[26]  Preston is a Director of NC12, Inc., but that company was not incorporated in Texas and the only board meeting Preston ever physically attended did not take place in Texas, but in Massachusetts.[27]

Further, the Intervenors' suggestion that tangential contact with Texas by Preston based on his role as a director or investor in companies that operate in Texas fails as a matter of law to demonstrate any genuine contact with Texas for jurisdictional purposes.  Mere "investor status" is not sufficient to impute contacts by NC12 with Texas to Preston for purposes of jurisdiction.[28]  In any event, the Intervenors admit that it was Quantum Catalytics that invested in TSI, not

---

[22] *Id.* ¶ 12.

[23] *Id.* ¶ 8.

[24] *Goodyear Dunlop Tires Operations, S.A.*, 131 S. Ct. at 2851 (requiring that a nonresident defendant must have "continuous and systematic" contacts with the forum that are "so 'continuous and systematic' as to render them essentially at home in the forum State" to exercise general jurisdiction).

[25] Ex. C, Preston Dec. ¶¶ 5-10.

[26] *Id.* ¶ 9.

[27] *Id.* ¶¶ 2, 6-7.

[28] *See, e.g., PHC–Minden v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 176 (Tex. 2007); *Mikuni Corp. v. Foster*, No. 01-11-00383-CV, 2012 WL 170603, *5 (Tex. App.-Houston [1st Dist.] Jan. 19, 2012, no pet.).

7

Preston.[29] Also, notwithstanding the Intervenors' claims, Preston was not involved with Metal Catalyst Venture, Inc.[30]

Intervenors also claim that certain visits to Texas by Preston that he initially stated were on behalf of TEM Capital must have been made in a personal capacity because the visits preceded the formation of TEM Capital.[31] As Preston explained in his supplemental declaration, however, these contacts were made on behalf of C Change, an entity affiliated with TEM Capital.[32]

Even if the handful of visits Preston made to Texas in his representative capacity were jurisdictional contacts—which they are not—"[o]ccasional travel to Texas is insufficient by itself to establish continuous and systematic contact."[33] Here, like the defendant in *Garner v. Furmanite Australia Pty., Ltd.*, Preston's handful of visits to Texas in a representational capacity cannot give rise to general jurisdiction.[34]

### 3. Intervenors Have Not Shown that Preston is the Alter Ego for JK Claims.

Knowing the weakness of their argument for general jurisdiction over Preston, Intervenors filed an untimely supplemental response in a last ditch effort to create nonexistent connections between Preston and Texas. In this desperate supplemental brief, Intervenors argue that contacts by JK Claims Investment Corporation ("JK Claims") with Texas should be imputed to Preston.

---

[29] Intervenors' Resp. at 6.

[30] Ex. D, Preston Supp. Dec. ¶ 9.

[31] Intervenors' Resp. at 6.

[32] Ex. D, Preston Supp. Dec. ¶¶ 5-6.

[33] *Preussag Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 124 (Tex. App.-Houston [1st Dist.] 2000, pet. denied).

[34] 966 S.W.2d 798, 803 (Tex. App.-Houston [1st Dist.] 1998, pet. denied) (holding no general jurisdiction over individual who made eight to 10 visits to Texas on behalf of company).

8

624

Absent a showing that a company is the alter ego of an individual defendant, an individual defendant's contacts with Texas on behalf of a corporation or company cannot be the basis for general jurisdiction over a person.[35]

Because Intervenors' attempt to assert that contacts by JK Claims should be considered contacts of Preston for purposes of general jurisdiction,[36] Intervenors must prove—not simply allege—that Preston is the alter ego of JK Claims for the Court to consider these contacts in its jurisdictional analysis. The convoluted string of hearsay statements presented in the Intervenors' untimely Supplemental Response falls far short of the stringent requirements for showing that JK Claims is the alter ego of Preston. Moreover, Quantum Catalytics—not Preston—is the sole shareholder of JK Claims and Preston is only one of the 21 shareholders in Quantum Catalytics.[37] Thus, there is no basis for concluding that Preston is the alter ego of JK Claims and that its contacts should be imputed to Preston.

And even if these contacts were imputed to Preston—though there is no reason for them to be—Preston's contacts with Texas still would fall far short of the contacts required to demonstrate that he is "essentially at home" in Texas as the U.S. Supreme Court made clear is required in *Goodyear*.

---

[35] *SITQ E.U., Inc. v. Reata Rests., Inc.*, 111 S.W.3d 638, 651 (Tex. App.-Fort Worth 2003, pet. denied); *Brown v. Gen. Brick Sales Co.*, 39 S.W.3d 291, 300 (Tex. App.-Fort Worth 2001, no pet.); *cf. Garner v. Furmanite Australia Pty., Ltd.*, 966 S.W.2d 798, 803 (Tex. App.-Houston [1st Dist.] 1998, pet. denied) (holding that fiduciary shield doctrine protected Australian resident from trial court's exercise of general jurisdiction because his only contacts with Texas were on his employer's business).

[36] There is no question that Intervenors' allegations related to JK Claims cannot form the basis for asserting specific jurisdiction because the claims in this case are not related in any way to these allegations.

[37] Ex. D, Preston Supp. Dec. ¶ 10.

625

## V. THE COURT SHOULD STRIKE HEARSAY STATEMENTS IN THE COLLINS AFFIDAVIT.

The Massachusetts Defendants object to and move to strike the following statements in the Collins affidavit that was attached as Exhibit B to the Intervenors' Response for the following reasons:

| Paragraph | Statement | Objections |
|---|---|---|
| 4 | Before I met Preston, he had been active in attempting to put together a project between MMT and Hoescht Celanese for the development of a facility in Bay City, Texas to process waste water byproducts generated at Hoescht Celanese's Gulf Coast chemical plants. | There is no evidence that the declarant has personal knowledge. TEX. R. EVID. 602. This statement constitutes inadmissible hearsay under TEX. R. EVID. 802 because this information is clearly based on statements alleged to have been made by another person. |
| 6 | During this meeting, Preston touted the patented technology that he had acquired from MMT and encouraged my participation in the commercial development of that technology. | This statement constitutes inadmissible hearsay under TEX. R. EVID. 802 because this information is clearly based on statements alleged to have been made by another person. |
| 10 | Preston later requested that his name on the Syngas LLC records be changed to Quantum Catalytics LLC ("Quantum"), a company owned by Preston. Preston led us to believe that he was the sole owner, officer, and employee of Quantum. | This statement constitutes inadmissible hearsay under TEX. R. EVID. 802 because this information is clearly based on statements alleged to have been made by another person. |
| 11 | When we began our discussions and negotiations in 2004, Preston did not represent himself to be negotiating and planning with me on behalf of any corporate entity. | This statement constitutes inadmissible hearsay under TEX. R. EVID. 802 because this information is clearly based on statements alleged to have been made by another person. |

10

626

| Paragraph | Statement | Objections |
|---|---|---|
| 12 | In my discussions with Preston, I learned that Preston had been to Texas on multiple occasions prior to our introduction. He told me that he had previously travelled to Texas on numerous occasions for meeting with Hoescht Celanese and with Flour Daniel in Clear Lake, Texas. Preston also told me that he had made numerous visits to the Houston Area Research Center, or HARC, on Research Forrest Drive in The Woodlands, Texas to study new technologies in the mid and late 1990s. As a result, Preston was very familiar with The Woodlands. It was my understanding that his visits to HARC were for his personal benefit and not done through MIT or any corporation. | This statement constitutes inadmissible hearsay under TEX. R. EVID. 802 because this information is clearly based on statements alleged to have been made by another person. |
| 13 | During this dinner, Preston pressed me to consent to a proposal for financing for NC12 that he was attempting to put together through his company C Change Investments ("C Change"). However, it appeared that the proposal was simply Preston's attempt to cut a deal for himself through C Change, and not a genuine effort to raise funding for NC12. As I understood the transaction, the only parties that would benefit would be Preston and companies solely under his control, including C Change, at the expense of NC12 and its existing investors and shareholders. | This statement constitutes inadmissible hearsay under TEX. R. EVID. 802 because this information is clearly based on statements alleged to have been made by another person.<br><br>There is no evidence that the declarant has personal knowledge of the statements in the second two sentences. TEX. R. EVID. 602. |

## CONCLUSION

This Court should reject the attempt by the Intervenors—none of whom are Texas residents—to have this Court assert personal jurisdiction over nonresidents with practically no contact with Texas in a case in which they assert claims related to activities involving Nevada corporations. There is no specific jurisdiction over any of the Massachusetts Defendants because this dispute does not arise from or relate to any act they performed in Texas. There is no general jurisdiction over the Massachusetts Defendants because none of them have continuous and

11

627

systematic contacts with Texas. Preston is not a Texas resident, does not conduct business in Texas in his personal capacity, and has no presence in Texas. Brilliant Novelty has no connection to Texas whatsoever and C Change only a handful of contacts with Texas that fall far short of the contact that are necessary to support general jurisdiction.

Respectfully submitted,

AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI
& MENSING P.C.

By:   _/s/ Jamie A. Aycock_
Sean Gorman
Texas Bar No. 08218100
Jamie A. Aycock
Texas Bar No. 24050241
1221 McKinney St., Suite 3460
Houston, Texas 77010
Telephone: (713) 655-1101
Telecopier: (713) 655-0062

ATTORNEYS FOR DEFENDANTS MICHAEL
SYDOW, JOHN T. PRESTON, CHRISTOPH
HENKEL, C CHANGE INVESTMENTS, LLC,
AND BRILLIANT NOVELTY, L.L.C.

12

628

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of October 2014, a true and correct copy of the above and foregoing document was served by E-File.TxCourts.Gov. or facsimile on the following counsel of record in accordance with the Texas Rules of Civil Procedure:

Kelley M. Keller
State Bar No. 11198240
Tracey N. Ellison
State Bar No. 15054720
5120 Woodway Dr., Suite 6019
Houston, Texas 77056
Telephone: 713-266-8200
Fax: 713-266-8201
kkeller@ellison-keller.com
***Attorneys for Intervenors/Plaintiffs Emjo Investments, Ltd. and H.J. von der Goltz***

Asher Griffin
Chris Sileo
Sean Flammer
SCOTT, DOUGLASS & MCCONNICO, LLP
600 Congress Ave., Ste 1500
Austin, Texas 78701-2589
Fax: 512-474-0731
***Attorneys fort Defendants Chalysys, MET, and Lo***

F. Eric Fryar
State Bar No. 07495770
eric@fryarlawfirm.com
Matthew Buschi
State Bar No. 24064982
mbuschi@fryarlawfirm.com
Christina Richardson
FRYAR LAW FIRM, P.C.
State Bar No. 24070495
912 Prairie, Suite 100
Houston, Texas 77002-3145
Fax: 281-605-1888
***Attorneys for all Intervenors/Plaintiffs***


/s/ Jamie A. Aycock
Jamie A. Aycock

629



CAUSE NO. 2011-44058

| | | |
|---|---|---|
| MICHAEL COLLINS, ET AL., Plaintiffs | § § § § | IN THE DISTRICT COURT |
| vs. | § § § | OF HARRIS COUNY |
| MICHAEL SYDOW, ET AL. Defendants | § § § | 215TH JUDICIAL DISTRICT |

| | | |
|---|---|---|
| AKILA FINANCE, S.A., ET AL., Intervenors/Plaintiffs | § § § | IN THE DISTRICT COURT |
| vs. | § § § | OF HARRIS COUNTY, TEXAS |
| MICHAEL SYDOW, ET AL. Defendants. | § § § | 215TH JUDICIAL DISTRICT |

## JOHN T. PRESTON'S SUPPLEMENTAL DECLARATION IN SUPPORT OF HIS SPECIAL APPEARANCE

1. My name is John T. Preston. My date of birth is March 18, 1950, and my address is 9 Martins Cove Lane, Hingham, MA 02043. I declare under penalty of perjury that the statements in this declaration are true and correct.

2. I am over the age of 21. I have never been convicted of a felony or crime involving moral turpitude. I am of sound mind and am fully competent to make this declaration.

3. As I previously disclosed in this case, I traveled to Texas in the 1990s on a handful of occasions. None of those trips were in my personal capacity.

4. I keep detailed records of my travel. After reviewing my travel records, I identified all of my trips to Texas in the five years before this lawsuit was filed for which I could locate travel information or that I could remember.

5. I previously identified trips that I took to Texas that I stated were on behalf of TEM Capital, an affiliated entity that was created by C Change Investments. At the time of my statement, I believed these trips were made on behalf of TEM Capital. The three trips I took to Texas before TEM Capital was formed in April 2011, however, were made not on behalf of TEM Capital but on behalf of C Change Investments, which was formed on or about May 2008.

672

6. I previously identified another trip to Texas in 2008 on behalf of C Change Investments. Russell Read traveled with me on that trip. I do not recall any other trips to Texas with Mr. Read.

7. I previously identified a trip to Texas in May 2011. My records did not indicate the purpose of this trip. I mistakenly assumed that this trip was for testimony in Michael Sydow's divorce proceedings. I appeared at a foreclosure sale in Texas on behalf of TEM Capital. I also inspected a cement plant in Jewett, Texas in relation to this foreclosure sale.

8. In addition to the specific trips I previously identified that I made to Texas in the five years before this lawsuit was filed, I also traveled to Texas in 2004 in a representative capacity on behalf of Quantum Catalytics, LLC. All of my meetings and discussions with Michael Collins during this time were in my representative capacity.

9. I understand that representations have been made about my involvement with Metal Catalyst Venture, Inc. I did not agree to nor am I aware of ever serving as a director for this entity. I did not submit a Texas address as being my address for this entity or for other purposes.

10. JK Claims Investment Corporation is a Texas general corporation. Quantum Catalytics is the sole shareholder of JK Claims. I am one of 21 shareholders of Quantum Catalytics.

Executed in Cambridge, Massachusetts on the 23 day of October, 2014.

John T. Preston

Katherine B. Frisina
Commission Expires: May 6 2016

4847-0281-8592, v. 1



KATHERINE B. FRISINA
Notary Public
Massachusetts
Commission Expires May 6, 2016

# TAB 7

P-3
COPY

**Cause No. 2011-44058**

| | | |
|---|---|---|
| MICHAEL COLLINS, ET AL., | § | IN THE DISTRICT COURT |
| PLAINTIFFS, | § | |
| | § | |
| VS. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| MICHAEL SYDOW, ET AL., | § | |
| DEFENDANTS. | § | 215th JUDICIAL DISTRICT |

| | | |
|---|---|---|
| AKILA FINANCE, S.A.; BOSQUES DEL MOLINO, | § | IN THE DISTRICT COURT |
| S.A.; CENTRANS ENERGY SERVICES, INC.; | § | |
| CHESTER MESTER HOLDINGS, LTD.; DELTEC | § | |
| BANK & TRUST, LTD.; EMJO INVESTMENTS, | § | |
| LTD.; WILLIAM END; EVANS & PETREE 401K | § | |
| PLAN; FIRST BAY INTERTRADE; GM PARTNERS; | § | |
| MARAIR CORP.; W.L. NICHOL, IV; PANORAMA | § | |
| INVESTMENT, LTD.; PC01 VERMOEGENS VERW.; | § | |
| ALEJANDRO SANTO DOMINGO; SINCHI | § | |
| INVESTMENT; VENTURI GLOBAL | § | |
| INVESTMENTS., LTD., and H.J. von der GOLTZ | § | |
| INTERVENORS/PLAINTIFFS, | § | |
| | § | |
| VS. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| MICHAEL SYDOW; JOHN PRESTON; CHRISTOPH | § | |
| HENKEL; C CHANGE INVESTMENTS, LLC; | § | |
| CHALSYS CAPITAL PARTNERS, LLP; SONIA LO; | § | |
| BRILLIANT NOVELTY, L.L.C.; OSCURA, INC.; | § | |
| MELIORA ENERGY TECHNOLOGIES, S.à.r.l; and | § | |
| FALL RIVER REALTY, LTD., | § | |
| DEFENDANTS. | § | 215th JUDICIAL DISTRICT |

### ORDER DENYING SPECIAL APPEARANCES OF JOHN T. PRESTON, ~~BRILLIANT NOVELTY, L.L.C.~~ AND C CHANGE INVESTMENTS, LLC

On this day came on for consideration the Special Appearances of John T. Preston, ~~Brilliant Novelty, L.L.C.~~ and C Change Investments, LLC. The Court, having considered same, the Petition in Intervention, the Intervenors' Response to the Special Appearances, and any further replies and responses, and the argument of counsel, the Court

OVERRULES the special appearances of John T. Preston, ~~Brilliant Novelty, L.L.C.~~ and

C Change Investments, LLC and retains this suit on the Court's docket.

**RECORDER'S MEMORANDUM**
This instrument is of poor quality
at the time of imaging

674

Signed this _17th_ day of _November_ , 2014.

_____
THE HONORABLE ELAINE H. PALMER

2

675

# TAB 8

301 S.W.3d 653
Supreme Court of Texas.

Dan KELLY and Laura Hofstatter, Petitioners,

v.

GENERAL INTERIOR CONSTRUCTION, INC., Respondent.

No. 08–0669.    |    Argued Nov. 18, 2009.    |    Delivered Jan. 15, 2010.

**Synopsis**

**Background:** Hotel corporation sued Arizona general contractor for claims arising from renovation of hotel in Texas. Subcontractor filed cross-claims against general contractor for breach of contract, violation of Texas Trust Fund Act, and fraud. The 125th District Court, Harris County, John A. Coselli, Judge, denied general contractor's motion for special appearance. General contractor appealed, and the Court of Appeals, 262 S.W.3d 79, affirmed denial.

**[Holding:]** On general contractor's petition for review, the Supreme Court, Guzman, J., held that trial court lacked personal jurisdiction over Arizona general contractors.

Judgment of cap reversed in part; judgment rendered dismissing cross-claims.

**Attorneys and Law Firms**

 **\*655** David C. Holmes and Leymon L. Solomon, The Solomon Law Firm, Houston, TX, for Petitioners.

Ross A. Sears II, Sears Crawford, L.L.P., Houston, TX, for Respondent.

**Opinion**

Justice GUZMAN delivered the opinion of the Court.

 **[1]**   To establish personal jurisdiction in Texas courts over nonresident defendants, plaintiffs must plead a connection between the defendants' alleged wrongdoing and the forum state. Asserting statutory and common law claims, General Interior Construction, Inc. (GIC), a Texas corporation, sued Daniel Kelly and Laura Hofstatter (collectively, the Officers), both Arizona residents. Absent from GIC's pleadings, however, is any allegation that Kelly and Hofstatter committed any acts giving rise to these claims in Texas. Because the Officers filed a special appearance proving that

they do not live in Texas, they successfully negated all alleged bases for personal jurisdiction in Texas courts. We accordingly reverse in part the court of appeals and render judgment dismissing GIC's claims against the Officers for lack of personal jurisdiction.

## I. Background

Kelly and Hofstatter are the sole shareholders and officers of Diva Consulting, Inc., an Arizona-based general contractor that Meristar Hospitality Corporation, a non-Texas entity, hired to renovate a Houston hotel. Diva then entered into subcontracting agreements with various companies, including Texas-based GIC, to perform the work. During construction Kelly made several trips to Houston to oversee the project. Diva also sent change orders and payments to and received invoices from these Texas companies, while receiving funds from Meristar to pay for the work.

Disputes arose between Diva and GIC, with the former claiming that GIC did substandard work requiring substantial expenditures **\*656** to remedy, and the latter claiming that Diva did not pay the entire contract amount. Meristar ultimately filed a lawsuit against Diva and various subcontractors, including GIC. GIC filed cross-claims against Diva and third-party claims against the Officers, asserting claims for breach of contract, violations of Chapter 162 of the Texas Property Code (Texas Trust Fund Act), [1] and fraud.

[1]   Texas law provides that payments made to a contractor or its officers, agents, or directors are trust funds if made under a contract for the improvement of real property in this state. *See* TEX. PROP.CODE § 162.001(a). The contractor or its officers, agents, or directors who receive or control the funds are trustees thereof. *Id.* § 162.002. The beneficiaries of the trust funds are persons who provide labor or materials for the project. *See id.* § 162.003. A trustee who acts, *inter alia,* with intent to defraud by using, disbursing, or otherwise diverting "trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries" misapplies the trust funds. *Id.* § 162.031. "Intent to defraud" means, as relevant here, that the trustee so used trust funds obtained by means of an affidavit under Texas Property Code § 53.085 containing false information relating to the trustee's payment of the obligations. *Id.* § 162.005(1)(C); *see also id.* § 53.085 (requiring the affiant, upon request of the payor, to aver that subcontractors, laborers, and materialmen have been paid in full).

Regarding the trust-fund claims, GIC alleged that the Officers "were the trustee[s] of all payments made to [Diva] by [Meristar]"; that GIC was "a beneficiary of the trust money paid to the trustees"; and that the Officers "provided affidavits to [Meristar] stating that all subcontractors (including [GIC] ) were paid or would be paid" when in fact those statements were "untrue." In its fraud claim, GIC referred to its trust-fund allegations and alleged that "the material representations made by [Diva] were false and were made with the intention that GIC would rely thereon." The only mention of Texas in GIC's pleading is the incorporation by reference of Diva's contract with GIC, which identifies the Houston hotel as the job site. GIC did not allege that the Officers lived in Texas, that they conducted business in Texas, or that any of the operative facts of the trust-fund and fraud claims occurred in Texas.

The Officers filed a special appearance, stating they were residents of Arizona, did not own property in Texas, did not employ anyone in Texas, and did not conduct business in Texas in their personal capacities. The trial court denied the special appearance, and a divided court of appeals affirmed in part, reversing only as to the breach-of-contract claim. [2]

2     GIC has not sought review of the court of appeals' judgment regarding the breach-of-contract issue.

The majority reasoned that the Texas Trust Fund Act reaches past the corporation to hold its officers personally liable for violations of the Act: "[W]e must focus only on whether [GIC] has pleaded that the Officers, regardless on behalf of [Diva] or in their individual capacities, controlled and directed funds received for the [hotel] project." 262 S.W.3d 79, 86. Finding that GIC had so pleaded, the court upheld the trial court's order. The court used similar reasoning regarding the fraud claim, concluding that "[t]he Officers' alleged fraud sufficiently 'relates to' conduct purposefully directed toward Texas." *Id.* at 86–87. In response to the dissent's claim that the Officers had no connection with Texas, the majority pointed to the following facts: "The record reveals that performance under the construction contract was to be performed exclusively in Texas. The Officers sent and directed payments to [GIC] in Texas. Kelly made site visits to the Texas work site. The Officers received **\*657** numerous invoices from Texas regarding the [hotel] project." *Id.* at 86 n. 5.

The dissent found no connection between the Officers and Texas for either claim:

> In its third-party petition, [GIC] alleges that the Officers acted with intent to defraud by providing false affidavits to Meristar and that the Officers violated section 162.005(1)(C) of the Texas Property Code. [GIC] also asserts that the Officers fraudulently represented that [GIC] would be paid in full under its contract with Diva. Notably, [GIC] does not allege that any of these acts occurred in Texas. Moreover, in its third-party petition, [GIC] does not allege that the Officers committed any act whatsoever in Texas or that they conducted any business whatsoever in Texas. Therefore, [GIC's] third-party petition lacks sufficient allegations to invoke the trial court's personal jurisdiction over the Officers, and the Officers, thus, could satisfy their burden of negating all bases of personal jurisdiction merely by presenting evidence that they are not residents of Texas.

*Id.* at 93 (Frost, J., dissenting). Because the Officers established that they do not live in Texas, the dissent would have reversed the trial court's denial of the Officers' special appearance.

The Officers petitioned this Court for review, which we granted. 52 Tex. Sup.Ct. J. 792 (June 5, 2009). We have jurisdiction because there is a dissent in the court of appeals. *See* TEX. GOV'T CODE § 22.225(c); *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 793 (Tex.2002).

## II. Standard of Review

 **[2]**    **[3]**    Whether a court can exercise personal jurisdiction over nonresident defendants is a question of law, and thus we review de novo the trial court's determination of a special appearance. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007); *BMC Software,* 83 S.W.3d at 794. "When [as here] a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software,* 83 S.W.3d at 795 (citing *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990); *Zac Smith & Co. v. Otis Elevator Co.,* 734 S.W.2d 662, 666 (Tex.1987); *In re W.E.R.,* 669 S.W.2d 716, 717 (Tex.1984)).

## III. Discussion

## A. In Personam Jurisdiction

 **[4]**    **[5]**    **[6]**    **[7]**    A nonresident defendant is subject to the personal jurisdiction of Texas courts if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction does not violate federal and state constitutional due process guarantees. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990). The broad "doing business" language in Texas's long-arm statute allows the trial court's jurisdiction to "reach as far as the federal constitutional requirements of due process will allow." *Moki Mac,* 221 S.W.3d at 575 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991)). Personal jurisdiction is consistent with due process "when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice." *Id.* (internal quotation marks omitted) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). "A defendant establishes minimum contacts with a state when it purposefully avails itself of the privilege of conducting activities within the forum **\*658** state, thus invoking the benefits and protections of its laws." *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 338 (Tex.2009) (internal quotation marks omitted) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

**[8]** **[9]** GIC argues that the trial court had only specific jurisdiction over its claims against the Officers. "Specific jurisdiction ... arises when (1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities. In a specific jurisdiction analysis, we focus ... on the relationship among the defendant, the forum[,] and the litigation." *Id.* (alteration in original) (citations and internal quotation marks omitted).

### B. Special Appearance

**[10]** Our special-appearance jurisprudence dictates that the plaintiff and the defendant bear shifting burdens of proof in a challenge to personal jurisdiction. We have consistently held that the plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute. *See id.* at 337; *Moki Mac,* 221 S.W.3d at 574; *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 807 (Tex.2002); *BMC Software,* 83 S.W.3d at 793; *McKanna v. Edgar,* 388 S.W.2d 927, 930 (Tex.1965). Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special appearance bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff. *E.g., Retamco Operating,* 278 S.W.3d at 337.[3] Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading.[4]

[3] The adoption of the special appearance was a significant development in Texas law. For most of its history prior to 1962, Texas law did not recognize a special appearance, and a nonresident defendant who appeared in a Texas court waived any objection to personal jurisdiction. *See Atchison, Topeka & Santa Fe Ry. Co. v. Stevens,* 109 Tex. 262, 206 S.W. 921, 921 (1918) ("A special appearance is unknown to our practice. The filing by a defendant of any defensive pleading, though it be only for the purpose of challenging the jurisdiction of the court, constitutes an appearance and a submission to the jurisdiction of the forum."); *see also York v. Texas,* 137 U.S. 15, 21, 11 S.Ct. 9, 34 L.Ed. 604 (1890) (holding that Texas's rule disallowing special appearances did not violate due process); E. Wayne Thode, *In Personam Jurisdiction; Article 2031B, the Texas "Long Arm" Jurisdiction Statute; and the Appearance to Challenge Jurisdiction in Texas and Elsewhere,* 42 TEX. L.REV. 279, 292–97 (1964) (recounting early special-appearance jurisprudence). Thus, a nonresident defendant wishing to challenge personal jurisdiction in Texas had but one choice —default and challenge jurisdiction collaterally when the plaintiff came to enforce the judgment in the defendant's home state. Faced with a waiver of any objection to jurisdiction or a default on the merits, the nonresident defendant had to choose between two unpleasant alternatives. Seeking to remedy this dilemma, this Court promulgated Texas Rule of Civil Procedure 120a, which allows nonresident defendants to specially appear for the sole purpose of challenging the trial court's jurisdiction over them or their property. *See* TEX.R. CIV. P. 120a.

[4] While the pleadings are essential to frame the jurisdictional dispute, they are not dispositive. Rule 120a requires a special appearance to be made by sworn motion, TEX.R. CIV. P. 120a(1), and also requires the trial court to "determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony," TEX.R. CIV. P. 120a(3). Even so, this additional evidence merely supports or undermines the allegations in the pleadings.

**[11]** **[12]** If the plaintiff fails to plead facts bringing the defendant within reach **\*659** of the long-arm statute (i.e., for a tort claim, that the defendant committed tortious acts in Texas), the

defendant need only prove that it does not live in Texas to negate jurisdiction. *See Siskind v. Villa Found. for Educ., Inc.* 642 S.W.2d 434, 438 (Tex.1982) ("[T]he only evidence offered to negate jurisdiction was [a defendant's] testimony that she and the other individuals were residents of Arizona.... In view of [the plaintiff's] failure to allege any act by these individuals in Texas, we believe that the [defendants] have sustained their burden.").[5] When the pleading is wholly devoid of jurisdictional facts, the plaintiff should amend the pleading to include the necessary factual allegations, *see* TEX.R. CIV. P. 63, thereby allowing jurisdiction to be decided based on evidence rather than allegations, as it should be.

[5]    *See also Perna v. Hogan,* 162 S.W.3d 648, 653 (Tex.App.-Houston [14th Dist.] 2005, no pet.) ("If the plaintiff does not plead jurisdictional allegations, *i.e.,* that the defendant has committed any act in Texas, the defendant can satisfy its burden of negating all bases of personal jurisdiction by presenting evidence that it is a nonresident at the special appearance hearing."); *Frank A. Smith Sales, Inc. v. Atl. Aero, Inc.,* 31 S.W.3d 742, 747 (Tex.App.-Corpus Christi 2000, no pet.) ("[The plaintiff's] third-party petition stated only that [the defendant] had committed acts of negligence, without specifying what those negligent acts were, or where they occurred. Therefore, [the] petition fell well short of pleading sufficient allegations to show jurisdiction in Texas.").

 **[13]    [14]    [15]    [16]    [17]**    The defendant can negate jurisdiction on either a factual or legal basis. Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. The plaintiff can then respond with its own evidence that affirms its allegations,[6] and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction.[7] Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.[8]

[6]    If the plaintiff's evidence does not fall within the scope of the factual allegations in the pleading, then the plaintiff should amend the pleading for consistency.

[7]    The losing party in the trial court can challenge the factual sufficiency of the evidence in the court of appeals. *E.g., BMC Software,* 83 S.W.3d at 794.

[8]    The losing party in the trial court can challenge the legal sufficiency of the evidence in the court of appeals and in this Court. *E.g., id.* The trial court's legal conclusions are, as noted, reviewed de novo. *See id.*

## C. Analysis

 **[18]**    Turning to the case at hand, the only relevant prong of the Texas long-arm statute extends jurisdiction over a nonresident who "commits a tort in whole or in part in this state." TEX. CIV. PRAC. & REM.CODE § 17.042(2).[9]

[9]    We recognize that § 17.042 is non-exclusive, *see BMC Software,* 83 S.W.3d at 795, but GIC does not separately allege that the Officers conducted business in Texas, and the only remaining claims against them are for tortious activity, making this subsection

directly applicable. Section 17.042(1), regarding performance of a contract in Texas, does not apply as the Officers were not parties to Diva's contract with GIC, nor did they guarantee it.

GIC failed to plead facts within the reach of the long-arm statute because it did not allege that the Officers committed any tortious acts in Texas. As noted, GIC's live pleading contains no allegations **\*660** that the Officers' wrongdoing occurred in Texas. Regarding the fraud claim, GIC did allege several fraudulent acts (e.g., providing false affidavits to Meristar and misrepresenting to GIC that it would be paid in full), but it did not allege that any fraudulent acts occurred in Texas. Regarding the trust-fund claims, GIC did not allege that the Officers used or retained the trust funds in Texas, nor that they submitted false affidavits to Meristar in Texas. Thus, although GIC has alleged two claims of wrongdoing, it has not alleged that any acts giving rise to these two claims occurred in Texas.

Because GIC failed to plead jurisdictional facts, the Officers could, and did, meet their burden to negate all bases of jurisdiction by proving that they do not live in Texas. *See Siskind,* 642 S.W.2d at 438. GIC did not challenge that fact, nor did it present any responsive evidence establishing the requisite link with Texas. The most relevant piece of evidence is an affidavit of GIC's president stating that Laura Hofstatter promised him payment. But even this affidavit does not state where this conversation occurred or make any connection with Texas. In short, GIC's rebuttal evidence is as silent as its pleadings regarding the Officers' Texas contacts related to its claims. Having met their burden of proof, the Officers' special appearance should have been granted.

Although the trier-of-fact may ultimately conclude that Kelly and Hofstatter violated the Texas Trust Fund Act and committed fraud, the mere commission of an act does not grant Texas courts jurisdiction over the actor. Rather, as we have frequently emphasized, the requirements of due process must be upheld, particularly the connection between the defendant, the forum, and the litigation in the specific jurisdiction context. *See, e.g., Retamco Operating,* 278 S.W.3d at 338.

 **[19]**   **[20]**   **[21]**   The majority in the court of appeals focused on a corporate officer's potential for individual liability under the Texas Trust Fund Act, finding sufficient GIC's allegations that the Officers controlled and directed funds received under Diva's contract with Meristar. *See* 262 S.W.3d at 84–86. But the mere existence of a cause of action does not automatically satisfy jurisdictional due process concerns. A state is powerless to create jurisdiction over a nonresident by establishing a remedy for a private wrong and a mechanism to seek that relief. Instead, jurisdictional analysis always centers on the *defendant's* actions and choices to enter the forum state and conduct business. *See, e.g., Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (focusing the inquiry on the defendant's presence in, or contacts with, the forum state); *Retamco Operating,* 278 S.W.3d at 338 ("We focus on the defendant's activities and expectations when deciding whether it is proper to call the defendant before a Texas court."); *Moki Mac,* 221 S.W.3d at 575 ("[O]nly the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person."); *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784–85 (Tex.2005) ("[I]t is essential in each case that there be some act by which the *defendant purposefully avails*

itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (quoting *Hanson,* 357 U.S. at 253, 78 S.Ct. 1228)). The concept of minimum contacts is rooted in the notion that a defendant may reasonably be haled into the forum state's courts when it purposefully, not randomly or fortuitously, engages in activities there. *See, e.g., Michiana,* 168 S.W.3d at 785. Thus, merely pleading that Kelly and Hofstatter violated the Texas Trust Fund Act is not enough; GIC must also plead and, when **\*661** challenged by the defendants, present evidence that the Officers' relevant acts (i.e., those connected to GIC's claims) occurred, at least in part, in Texas.

The court of appeals also erred by allowing GIC's fraud claim to proceed despite the lack of allegations and evidence that any part of the claim originates from the Officers' conduct in Texas. *See* 262 S.W.3d at 86–87. The court reasoned that "[t]he Officers' alleged fraud sufficiently 'relates to' conduct purposefully directed toward Texas." *Id.* But we rejected the concept of directed-a-tort jurisdiction in *Michiana,* instead affirming the importance of the defendant's contacts with the forum state. *See* 168 S.W.3d at 788–92. While we noted that "on one occasion the United States Supreme Court found specific jurisdiction based on alleged wrongdoing intentionally directed at a forum resident," the defendant's conduct in that case still "constituted a substantial 'presence' in the state." *Id.* at 789 (discussing *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)). Here, as noted, GIC has not alleged that the Officers engaged in activities that constitute any presence—let alone a substantial presence—in this state.

## IV. Conclusion

Because GIC's pleadings lack Texas-specific allegations, the Officers negated all jurisdictional bases by proving that they do not live in Texas, and GIC has not presented any evidence to the contrary. [10] Accordingly, we reverse in part the court of appeals and render judgment dismissing GIC's claims against Kelly and Hofstatter for lack of personal jurisdiction.

[10]    Because we decide this case based on the lack of alleged minimum contacts with Texas, we do not discuss the fair-play-and-substantial-justice prong of personal jurisdiction.

**Parallel Citations**

53 Tex. Sup. Ct. J. 247

---

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 9

83 S.W.3d 789
Supreme Court of Texas.

BMC SOFTWARE BELGIUM, N.V., Petitioner,
v.
Michel MARCHAND, Respondent.

No. 00–1019.   |   Argued Sept. 5, 2001.   |   Decided
June 27, 2002.   |   Rehearing Denied Aug. 29, 2002.

Employee sued Houston based corporation and its foreign subsidiary for breach of contract, fraud, negligent misrepresentation, and declaratory relief. The 127th District Court, Harris County, Sharolyn Wood, J., denied foreign subsidiary's special appearance contesting jurisdiction, and foreign subsidiary appealed. The Court of Appeals affirmed and foreign subsidiary petitioned Supreme Court for review. The Supreme Court, James A. Baker, J., held that: (1) trial court did not have specific jurisdiction over foreign subsidiary; (2) trial court did not have general jurisdiction over foreign subsidiary; (3) foreign subsidiary was not the alter ego of its parent for jurisdictional purposes; and (4) trial court did not abuse its discretion in denying employee's request for a continuance of the special appearance hearing.

Court of Appeals reversed, and judgment rendered.

**Attorneys and Law Firms**

**\*792** Merritt B. Chastain, III, Thomas H. Wilson, Houston, Vinson & Elkins, for Petitioner.

Stuart M. Nelkin, Carol Nelkin, Nelkin & Nelkin, Houston, for Respondent.

**Opinion**

Justice BAKER delivered the opinion of the Court.

This is an interlocutory appeal from the denial of a foreign corporation's special appearance. A divided court of appeals affirmed the trial court's ruling. 80 S.W.3d 52. We conclude that the foreign corporation's contacts with Texas are insufficient to create either specific or general jurisdiction. We also conclude that the trial court did not abuse its discretion in denying the plaintiff's motion to continue the special appearance hearing. We therefore reverse the court of appeals' judgment and render judgment dismissing the plaintiff's claims against the foreign corporation for want of jurisdiction.

## *793 I. BACKGROUND

Michel Marchand, a Belgian citizen, was employed by Platinum Technologies in Belgium. In March 1996, Marchand began negotiating with Gerd Ordelheide and Adri Kok for employment with BMC Software Belgium, N.V. (BMCB). Ordelheide and Kok were directors of BMCB, a wholly-owned subsidiary of BMC Software, Inc. (BMCS), a Delaware corporation headquartered in Houston.

On March 29, 1996, Marchand and BMCB signed a letter agreement outlining the terms of Marchand's employment with BMCB, including the offer of options to purchase 20,000 shares of BMCS stock. The agreement did not specify when the options would be granted or when Marchand could exercise them. The letter agreement also referenced a "management agreement" that Marchand had apparently presented to BMCB. On June 13, 1996, BMCB and Marchand executed the management agreement between BMCB and a company called Procurement, N.V., of which Marchand was the sole officer and director. The record shows that Marchand asked BMCB to hire Procurement as a management company so that Marchand could work for Procurement as an independent contractor rather than directly for BMCB. Apparently, this arrangement enabled Marchand to reduce his Belgian tax liability. The management agreement was in German, and it stated that Belgian law applies and the court at Brussels had exclusive jurisdiction.

When Marchand actually began working for BMCB is unclear. But it is clear that in July 1997, BMCB discharged Procurement and Marchand. Marchand was never granted any options to purchase BMCS stock. He sued BMCB and BMCS for breach of contract, fraud, negligent misrepresentation, and declaratory relief. Marchand alleged both specific and general jurisdiction over BMCB. BMCB filed a special appearance, which the trial court denied. BMCB appealed the trial court's interlocutory order. *See* TEX. CIV. PRAC. & REM.CODE § 51.014(a)(7). The court of appeals affirmed, 80 S.W.3d at 55, and BMCB petitioned this Court for review.

## II. THIS COURT'S JURISDICTION

Until 1997, a trial court's order denying a special appearance was reviewable only on appeal after trial. *Canadian Helicopters Ltd. v. Wittig,* 876 S.W.2d 304, 307 (Tex.1994). But the Legislature amended section 51.014 of the Civil Practice and Remedies Code to permit an interlocutory appeal from a trial court's ruling on a special appearance.

Typically, a court of appeals judgment in an interlocutory appeal is conclusive and an appeal to this Court is not allowed. *See* TEX. GOV'T CODE § 22.225(b). However, because there is a

dissent in the court of appeals, we may exercise jurisdiction in this case. *See* TEX. GOV'T CODE § 22.225(c).

## III. APPLICABLE LAW

## A. SPECIAL APPEARANCE—STANDARD OF REVIEW

 **[1]**  **[2]**  The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute. *See McKanna v. Edgar,* 388 S.W.2d 927, 930 (Tex.1965). A defendant challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases. *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985). This Court has never clearly articulated the standard for reviewing a trial court's order denying a special appearance. The Fourth Court of Appeals has held that, because personal jurisdiction involves both legal and factual questions, appellate courts should review **\*794** the trial court's decision for an abuse of discretion. *See, e.g., Klenk v. Bustamante,* 993 S.W.2d 677, 681 (Tex.App.-San Antonio 1998, no pet.). However, other courts of appeals review the trial court's factual findings for legal and factual sufficiency and review the trial court's legal conclusions *de novo. See, e.g., E.L.M. LeBlanc v. Kyle,* 28 S.W.3d 99, 101 (Tex.App.-Texarkana 2000, pet. denied); *In re Estate of Judd,* 8 S.W.3d 436, 440–41 (Tex.App.-El Paso 1999, no pet.); *C–Loc Retention Sys., Inc. v. Hendrix,* 993 S.W.2d 473, 476 (Tex.App.-Houston [14th Dist.] 1999, no pet.); *Cadle v. Graubart,* 990 S.W.2d 469, 471 (Tex.App.Beaumont 1999, no pet.); *Ball v. Bigham,* 990 S.W.2d 343, 347 (Tex.App.Amarillo 1999, no pet.); *Garner v. Furmanite Australia Pty, Ltd.,* 966 S.W.2d 798, 802 (Tex.App.-Houston [1st Dist.] 1998, pet. denied); *Al–Turki v. Taher,* 958 S.W.2d 258, 260–61 (Tex.App.-Eastland 1997, pet. denied).

 **[3]**  **[4]**  **[5]**  **[6]**  **[7]**  We agree with the latter view and disapprove of those cases applying an abuse of discretion standard only.[1] Whether a court has personal jurisdiction over a defendant is a question of law. *See Hotel Partners v. Craig,* 993 S.W.2d 116, 120 (Tex.App.-Dallas 1994, writ denied) (stating that this Court's decision in *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991), suggests that personal jurisdiction is a legal question). However, the trial court frequently must resolve questions of fact before deciding the jurisdiction question. *See E.L.M. LeBlanc,* 28 S.W.3d at 101; *C–Loc Retention Sys.,* 993 S.W.2d at 476. If a trial court enters an order denying a special appearance, and the trial court issues findings of fact and conclusions of law, the appellant may challenge the fact findings on legal and factual sufficiency grounds. *See Hotel Partners v. KPMG Peat Marwick,* 847 S.W.2d 630, 632 (Tex.App.-Dallas 1993, writ denied). Our courts of appeals may review the fact findings for both legal and factual sufficiency. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996). This Court's review of the trial court's fact findings is limited to legal sufficiency. *Ortiz,* 917 S.W.2d at 772.

1    *See* *Whalen v. Laredo Nat'l Bancshares Inc.,* 37 S.W.3d 89, 91 (Tex.App.-San Antonio 2000, pet. denied); *Joe Guerra Exxon Station v. Michelin Tyre Pub. Ltd.,* 32 S.W.3d 383, 386 (Tex.App.-San Antonio 2000, no pet.); *Case v. Grammar,* 31 S.W.3d 304, 307–08 (Tex.App.-San Antonio 2000, no pet.); *Jones v. J.P. Sauer & Sohn,* 27 S.W.3d 157, 161 (Tex.App.-San Antonio 2000, pet. denied); *Eakin v. Acosta,* 21 S.W.3d 405, 407–08 (Tex.App.-San Antonio 2000, no pet.); *Long Distance Int'l, Inc. v. Telefonos de Mexico, S.A.,* 18 S.W.3d 706, 711 (Tex.App.-San Antonio 2000), *rev'd on other grounds,* 49 S.W.3d 347 (Tex.2001); *Transportes Aereos de Coahuila, S.A. v. Falcon,* 5 S.W.3d 712, 717 (Tex.App.-San Antonio 1999, pet. denied); *Jones v. Beech Aircraft Corp.,* 995 S.W.2d 767, 769–70 (Tex.App.-San Antonio 1999, pet. dism. w.o.j.); *Magnolia Gas Co. v. Knight Equip. Mfg. Corp.,* 994 S.W.2d 684, 689 (Tex.App.-San Antonio 1998, no pet.); *Klenk,* 993 S.W.2d at 681.

 **[8]    [9]    [10]**    Appellate courts review a trial court's conclusions of law as a legal question. *Hitzelberger v. Samedan Oil Corp.,* 948 S.W.2d 497, 503 (Tex.App.-Waco 1997, pet. denied). The appellant may not challenge a trial court's conclusions of law for factual insufficiency; however, the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness. *Templeton v. Dreiss,* 961 S.W.2d 645, 656 n. 8 (Tex.App.-San Antonio 1998, pet. denied); *Dallas County v. Sweitzer,* 881 S.W.2d 757, 763 (Tex.App.-Dallas 1994, writ denied). If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal. *Scholz v. Heath,* 642 S.W.2d 554, 559 (Tex.App.-Waco 1982, no writ).

 **\*795   [11]    [12]    [13]**    When a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied. *See* *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990); *Zac Smith & Co. v. Otis Elevator Co.,* 734 S.W.2d 662, 666 (Tex.1987); *In re W.E.R.,* 669 S.W.2d 716, 717 (Tex.1984). When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court. *Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989); *Zac Smith & Co.,* 734 S.W.2d at 666. For legal sufficiency points, if there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992).

## B. IN PERSONAM JURISDICTION

 **[14]**    The Texas long-arm statute governs Texas courts' exercise of jurisdiction over nonresident defendants. *See* TEX. CIV. PRAC. & REM.CODE §§ 17.041–.045. That statute permits Texas courts to exercise jurisdiction over nonresident defendants that "does business" in Texas, and the statute lists some activities that constitute "doing business." TEX. CIV. PRAC. & REM.CODE § 17.042. The list of activities, however, is not exclusive. We have held that section 17.042's broad language extends Texas courts' personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *U–Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977). Thus, we rely on precedent from the United States Supreme Court and other federal

courts, as well as our own State's decisions, in determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction. *See Guardian Royal,* 815 S.W.2d at 226; *U–Anchor Adver.,* 553 S.W.2d at 762.

 **[15]** **[16]** **[17]** **[18]** **[19]** Personal jurisdiction over nonresident defendants is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). A nonresident defendant that has "purposefully availed" itself of the privileges and benefits of conducting business in the foreign jurisdiction has sufficient contacts with the forum to confer personal jurisdiction. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (discussing the constitutional boundaries of personal jurisdiction). Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established "minimum contacts" with the forum state. *Guardian Royal,* 815 S.W.2d at 227. However, a defendant should not be subject to a foreign court's jurisdiction based upon "random," "fortuitous," or "attenuated" contacts. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174. Because of the unique and onerous burden placed on a party called upon to defend a suit in a foreign legal system, the minimum contacts analysis is particularly important when the defendant is from a different country. *CSR Ltd. v. Link,* 925 S.W.2d 591, 595 (Tex.1996) (citing *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)).

 **[20]** **[21]** **[22]** Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction. **\*796** *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Guardian Royal,* 815 S.W.2d at 226. Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *Guardian Royal,* 815 S.W.2d at 228. In contrast, general jurisdiction is present when a defendant's contacts in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *Guardian Royal,* 815 S.W.2d at 228; *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990).

# IV. ANALYSIS

In his original petition in the trial court, Marchand alleged the following to support jurisdiction over BMCB: (1) BMCB is operated by and is a wholly owned subsidiary of BMCS; (2) BMCS provides support to and uses its wholly owned subsidiaries such as BMCB to jointly market BMCS's products worldwide; (3) BMCS and BMCB have the same officers; (4) BMCB has continuous

and systematic contacts with BMCS; (5) BMCB uses stock in BMCS to entice employees to work for it; and (6) the stock allegedly offered to Marchand is located in Houston, Texas.

The court of appeals determined that the trial court could have reasonably concluded that BMCB failed to negate all possible bases for establishing specific jurisdiction. In doing so, the court of appeals explained that the evidence shows that BMCB and BMCS officers discussed Marchand and the stock option offer in Texas. 80 S.W.3d at 59–60. Furthermore, the court of appeals concluded that the record showed that BMCB had sufficient continuous and systematic contacts with BMCS and thus Texas to establish the trial court's general jurisdiction. In so concluding, the court of appeals relied upon alleged conversations in Texas about Marchand between BMCB and BMCS officers, BMCB's selling BMCS's software and services, BMCS's including its subsidiaries' financial performance on annual reports, and BMCB providing its employees BMCS stock options as part of an employee incentive plan. 80 S.W.3d at 58–59. Because the court of appeals determined the trial court could have found specific and general jurisdiction over BMCB, it did not reach BMCB's argument that the evidence is not legally sufficient to establish that BMCB was BMCS's alter ego. 80 S.W.3d at 59.

## A. SPECIFIC JURISDICTION

Marchand asserts that the trial court had specific jurisdiction over BMCB because BMCB committed a tort in whole or in part in Texas. *See* TEX. CIV. PRAC. & REM.CODE § 17.042(2). Specifically, Marchand alleges that Ordelheide and Max Watson, BMCS's chairman and chief executive officer, discussed in Texas the stock-options offer BMCB made to Marchand and, in this conversation, they planned to defraud him. Marchand argues that the discussion Ordelheide and Watson had in Texas forms the basis of his fraud and negligent misrepresentation claims about the stock options. In response, BMCB argues that there is no evidence in the record to support the trial court's implied fact findings to support specific jurisdiction. We agree with BMCB.

[23] Here, Marchand alleges that his fraud and negligent misrepresentation claims arise from the alleged Watson–Ordelheide conversation in Texas. *See Schlobohm,* 784 S.W.2d at 357 ("Where the activities of a defendant in a forum are isolated or disjointed ... jurisdiction is proper if the cause of action arises from a particular activity."). But they do not. The nature of the claims demonstrate that they can only arise from BMCB's contact **\*797** with Marchand, which all occurred outside of Texas. Even assuming Watson and Ordelheide talked in Texas about Marchand's employment and the stock options, Marchand was not a party to those conversations. BMCB negotiated with Marchand about his employment, and offered the stock options to Marchand, in Europe. Moreover, Marchand accepted the employment offer in Belgium and worked in Belgium. Consequently, BMCB made no representations to Marchand in Texas, and he did not rely to his detriment on the conversation in Texas. *See T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d

218, 222 (Tex.1992) (fraud requires showing that plaintiff acted in reliance on defendant's material misrepresentation); *Federal Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991) (negligent misrepresentation requires that the plaintiff justifiably rely on the defendant's representation). Therefore, Marchand's alleged damages arose outside of Texas. *See, e.g., Primera Vista S.P.R. de R.L. v. Banca Serfin, S.A. Institucion de Banca Multiple Grupo Financiero Serfin,* 974 S.W.2d 918, 926 (Tex.App.El Paso 1998, no pet.) (holding that specific jurisdiction did not exist where defendant deposited money in Texas but misrepresentations to plaintiffs about that money occurred elsewhere).

There is no evidence to support the trial court's conclusion that BMCB committed a tort in whole or in part in Texas so that specific jurisdiction exists. *See Guardian Royal,* 815 S.W.2d at 227; TEX. CIV. PRAC. & REM.CODE § 17.042(2); *see also Roberson,* 768 S.W.2d at 281. Accordingly, we conclude that the trial court lacked specific jurisdiction over BMCB.

## B. GENERAL JURISDICTION

Marchand also contends that the trial court has general jurisdiction over BMCB. Marchand relies on the alleged Watson–Ordelheide conversation and BMCB's purchasing products from BMCS in Texas. On the other hand, BMCB asserts that these events are not enough to establish general jurisdiction. We agree and conclude that neither of the events Marchand relies upon are continuous or systematic so as to establish general jurisdiction in Texas.

 **[24]**    **[25]**    General jurisdiction may only be exercised when the nonresident defendant's contacts in a forum are continuous and systematic. *Helicopteros,* 466 U.S. at 414–15, 104 S.Ct. 1868; *Guardian Royal,* 815 S.W.2d at 228; *Schlobohm,* 784 S.W.2d at 357. Though a single act may be enough to show general jurisdiction in some instances, the alleged conversation between Ordelheide and Watson in Texas is not enough here. *See Guardian Royal,* 815 S.W.2d at 230 n. 12. We have recognized that "[g]eneral jurisdiction requires a showing that the defendant conducted substantial activities within the forum, a more demanding minimum contacts analysis than for specific jurisdiction." *CSR Ltd.,* 925 S.W.2d at 595 (citing *Guardian Royal,* 815 S.W.2d at 228). For the reasons discussed above, the alleged Watson–Ordelheide conversation does not constitute "substantial activities" within the forum to meet the more onerous burden of proving general jurisdiction. *See Guardian Royal,* 815 S.W.2d at 228.

 **[26]**    Furthermore, BMCB's purchasing products from BMCS in Texas to distribute in Europe is not enough to establish general jurisdiction. In *Helicopteros,* the United States Supreme Court examined a Colombian corporation's contacts with Texas to decide if Texas courts could exercise general jurisdiction. *Helicopteros,* 466 U.S. at 415–16, 104 S.Ct. 1868. The nonresident defendant had purchased helicopters, equipment, and training services from **\*798** a Texas company, sent

its employees to Texas for training, and sent its chief executive officer to Houston for contract negotiation. *Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868. The Supreme Court held that these contacts were insufficient to warrant a Texas court's exercising general jurisdiction. *Helicopteros,* 466 U.S. at 415–16, 104 S.Ct. 1868 (reversing *Hall v. Helicopteros,* 638 S.W.2d 870 (Tex.1982)). The Court noted that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Helicopteros,* 466 U.S. at 418, 104 S.Ct. 1868.

This case is analogous to *Helicopteros.* Marchand's claims against BMCB do not arise from the purchases BMCB made from BMCS. To the contrary, Marchand's claims arise from his employment with BMCB in Belgium and the alleged misrepresentations BMCB made to Marchand concerning his employment. BMCB's unrelated purchases in Texas from BMCS are not the type of contacts that justify a finding that BMCB could have "reasonably anticipate[d] being haled into court" here. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *see also Helicopteros,* 466 U.S. at 418, 104 S.Ct. 1868.

There is no evidence to support the trial court's conclusion that BMCB's contacts with Texas were continuous and systematic so that they established general jurisdiction. *See Helicopteros,* 466 U.S. at 414–15, 104 S.Ct. 1868; *Guardian Royal,* 815 S.W.2d at 228; *Schlobohm,* 784 S.W.2d at 357; *see also Roberson,* 768 S.W.2d at 281. Thus, we conclude that the trial court lacked general jurisdiction over BMCB.

## C. ALTER EGO

Marchand's jurisdictional allegations in his original petition can be read to allege that the trial court has general jurisdiction over BMCB because it is BMCS's alter ego. In response, BMCB contends that there is no evidence to support a determination that it is BMCS's alter ego.

 **[27]**    **[28]**    **[29]**    Personal jurisdiction may exist over a nonresident defendant if the relationship between the foreign corporation and its parent corporation that does business in Texas is one that would allow the court to impute the parent corporation's "doing business" to the subsidiary. *Hargrave v. Fibreboard Corp.,* 710 F.2d 1154, 1159 (5th Cir.1983); *Walker v. Newgent,* 583 F.2d 163, 167 (5th Cir.1978). The rationale for exercising jurisdiction is that "the parent corporation exerts such domination and control over its subsidiary 'that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction.'" *Hargrave,* 710 F.2d at 1159 (citations omitted); *see also Conner v. ContiCarriers & Terminals, Inc.,* 944 S.W.2d 405, 418 (Tex.App.-Houston [14th Dist.] 1997, no writ). The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation. *Walker,* 583 F.2d at 167; *Conner,* 944 S.W.2d at 418–19; *see also Lucas v.*

*Texas Indus., Inc.,* 696 S.W.2d 372, 375 (Tex.1984). This is because Texas law presumes that two separate corporations are indeed distinct entities:

> The general rule seems to be that courts will not because of stock ownership or interlocking directorship disregard the separate legal identities of corporations, unless such relationship is used to defeat public convenience, justify wrongs, such as violation of the anti-trust laws, protect fraud, or defend crime.

*Bell Oil & Gas Co. v. Allied Chem. Corp.,* 431 S.W.2d 336, 339 (Tex.1968) (citations omitted).

 **\*799** **[30]** To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary. *Conner,* 944 S.W.2d at 418–19 (discussing *Hargrave,* 710 F.2d at 1160; *Walker,* 583 F.2d at 167). But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice. *See Hargrave,* 710 F.2d at 1160; *Conner,* 944 S.W.2d at 419; *see also Gentry v. Credit Plan Corp. of Houston,* 528 S.W.2d 571, 573 (Tex.1975).

 **[31]** We conclude that there is no evidence to support any implied findings by the trial court to support that BMCB was BMCS's alter ego so that general jurisdiction exists in Texas. In *Gentry,* this Court held that "[a] subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders." *Gentry,* 528 S.W.2d at 573. Though *Gentry* dealt with whether a subsidiary corporation should be regarded as its parent's alter ego for purposes of service of process, the Fifth Circuit and our courts of appeals have relied on its alter ego rule in determining personal jurisdiction. *See Walker,* 583 F.2d at 167; *Gutierrez v. Raymond Int'l, Inc.,* 484 F.Supp. 241, 253 (S.D.Tex.1979); *Conner,* 944 S.W.2d at 419; *3–D Elec. Co. v. Barnett Constr. Co.,* 706 S.W.2d 135, 139 (Tex.App.-Dallas 1986, writ ref'd n.r.e.). Accordingly, general jurisdiction does not extend to BMCB to the extent Marchand relies on BMCB and BMCS having duplicate officers.

In addition to alleging that BMCB and BMCS share the same officers, Marchand argues that the record shows the following to establish BMCB's alter-ego status: (1) BMCS's SEC documents incorporate BMCB's financial performance, and BMCS's annual report includes BMCB's financial performance on a consolidated basis; (2) BMCS gives BMCB financial assistance; (3) BMCS provides stock options for BMCB's employees; (4) BMCS treats BMCB's offices, employees, and accounts receivable as its own property; (5) BMCS personnel has offices at its subsidiary facilities; (6) BMCS performs human resources, accounting, risk management, and marketing services for BMCB; (7) BMCS recruits employees for BMCB and approves hiring and competition; (8) BMCB and BMCS use the same letterhead and use the terms "BMC" and "BMC Software"

interchangeably; and (9) Watson's deposition testimony shows that BMCB is a mere BMCS operation or department.

 **[32]**   There is no evidence in the record to support Marchand's assertions that BMCB is BMCS's alter ego. There are no SEC filings in the record, and nothing in BMCB's annual report supports a reasonable inference that BMCS considered its subsidiaries' revenue as its own or that it offered BMCB financial assistance. The annual report's listing international sales figures could represent either the subsidiaries' revenue or BMCS's revenue from selling its products *to* those subsidiaries. Moreover, the annual report's listing Belgium as a location of *both* International Offices and Independent Agents fails to show that BMCS treated its subsidiaries as mere departments or offices. BMCS's referencing its subsidiaries in its annual report is a common business practice, which the Internal Revenue Service, the SEC, and generally accepted accounting **\*800** principles recommend. *See Calvert v. Huckins,* 875 F.Supp. 674, 678–79 (E.D.Cal.1995). Finally, the annual report's stating that BMCS engaged in hedging transactions to protect against the volatility of foreign currency exchange rates is not evidence that BMCS engaged in risk management for BMCB.

 **[33]**   Additionally, the letter agreement between Marchand and BMCB is not evidence that BMCS typically recruits, controls, and approves personnel whom BMCB employs or that BMCS typically compensates BMCB employees with stock options. And, in any event, a parent company's offering a stock option plan to a subsidiary's employees is acceptable under IRS regulations and is not evidence of abnormal control over the subsidiary. *See In re Silicone Gel Breast Implants Prods. Liab. Litig. (MDL 926),* 837 F.Supp. 1128, 1136 (N.D.Ala.1993), *vacated in part on other grounds by,* 887 F.Supp. 1455 (N.D.Ala.1995).

Further, Watson's deposition testimony that BMCS employees were "from time to time ... in the offices of a variety of our subsidiaries" does not permit a reasonable inference that BMCS exerted such control over BMCB that the two entities ceased to be separate. *See Hargrave,* 710 F.2d at 1160; *Conner,* 944 S.W.2d at 418. Moreover, in discussing certain BMCS employees in his deposition, Watson identified a senior vice-president for worldwide marketing and a vice—president for human resources. But the existence of these two positions for BMCS is not evidence that BMCS performed marketing and human resources for its subsidiaries, or that, even if BMCS did perform such services, the subsidiaries were not charged for them. Similarly, BMCS and BMCB having letterhead with "BMC Software" is no evidence that the two entities do not observe corporate formalities, because both entities have "BMC Software" as part of their names.

In sum, the record does not reveal any evidence to support the trial court's conclusion that BMCB was BMCS's alter ego. *See Hargrave,* 710 F.2d at 1160; *Walker,* 583 F.2d at 167; *Conner,* 944 S.W.2d at 419; *see also Roberson,* 768 S.W.2d at 281. We therefore conclude that the trial court did not have general jurisdiction over BMCB based on BMCS's "doing business" in Texas.

## V. OTHER ISSUES

Before the special appearance hearing, Marchand objected to the hearing going forward because of BMCB's and BMCS's alleged failure to cooperate in discovery and requested that the trial court continue the hearing so that he could complete discovery. The trial court overruled the objection and denied the motion for continuance. Marchand asserts that, even if we reverse the court of appeals' judgment, we should remand his claims for further proceedings, because the trial court prevented him from conducting sufficient discovery before the special appearance hearing.

 **[34]**   **[35]**   **[36]**   This Court will not disturb a trial court's order denying a motion for continuance unless the trial court has committed a clear abuse of discretion. *Villegas v. Carter,* 711 S.W.2d 624, 626 (Tex.1986). A trial court "abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985). Here, the record shows that Marchand had ample time to conduct, and did conduct, discovery. BMCB filed its special appearance on January 29, 1999, and the trial court held the hearing seven months later on September 7, 1999. During that time, Marchand deposed Watson and served numerous written discovery requests on BMCS and BMCB. Although BMCB and BMCS objected to several discovery requests, the record does not reveal that Marchand ever filed a motion to compel **\*801** or otherwise attempted to obtain any discovery BMCB and BMCS did not provide. Based on the record, we cannot conclude that the trial court abused its discretion in overruling Marchand's objection to the special appearance hearing and denying his motion for a continuance to conduct further discovery.

## VI. CONCLUSION

We hold that there is no evidence to support the trial court's conclusion that BMCB's contacts with Texas were sufficient to confer either specific or general jurisdiction. In so holding, we also conclude that there is no evidence to support a finding that BMCB was BMCS's alter ego so that general jurisdiction in Texas exists. Finally, we hold that the trial court did not abuse its discretion in denying its motion to continue the special appearance hearing. Accordingly, we reverse the court of appeals' judgment and render judgment dismissing Marchand's claims against BMC Software Belgium, N.V. for want of jurisdiction.

**Parallel Citations**

45 Tex. Sup. Ct. J. 930

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 10

235 S.W.3d 163
Supreme Court of Texas.

PHC–MINDEN, L.P. d/b/a Minden Medical Center, Petitioner,

v.

KIMBERLY–CLARK CORPORATION, Respondent.

No. 05–0823.   |   Argued Nov. 16, 2006.   |   Delivered Aug. 31, 2007.

**Synopsis**

**Background:** In context of action against tampon manufacturer brought by representative of consumer's estate for products liability and other claims, tampon manufacturer filed third-party claim against Louisiana hospital for medical malpractice. The County Court at Law #2, Gregg County, F. Alfonso Charles, J., denied hospital's special appearance and determined that court had general jurisdiction. Hospital appealed, and the Tyler Court of Appeals, 202 S.W.3d 193, affirmed.

**Holdings:** On petition for review, the Supreme Court, Wallace B. Jefferson, C.J., held that:

[1] hospital's contacts with Texas were not continuous and systematic, so as to establish general jurisdiction;

[2] relevant time period for assessing hospital's contacts with Texas ended at time suit was filed, abrogating *MedCost, L.L.C. v. Loiseau,* 166 S.W.3d 421, *Schott Glas v. Adame,* 178 S.W.3d 307, and *AmQuip Corp. v. Cloud,* 73 S.W.3d 380; and

[3] hospital and its parent company did not operate as single business enterprise such that parent's contacts with Texas could be imputed to hospital.

Reversed and rendered.

**Attorneys and Law Firms**

**\*164** R. Brent Cooper, Diana L. Faust, Devon J. Singh, Cooper & Scully, P.C., Dallas, for petitioner.

**\*165** C. Michael Moore, David G. Cabrales, Locke Liddell & Sapp LLP, Dallas, James K. Horstman, Rodney E. VanAusdal, Iwan Cray Huber Horstman & VanAusdal, LLC, Chicago, IL, for respondent.

Mark P. McMahon, Erskine & McMahon, L.L.P., Kenneth Charles Cunningham, Director of Legal Services, Good Shepard Medical Center, Longview, Susan Cassidy Cooley, Schell & Cooley, L.L.P., Timothy D. Ryan, Shell, Mitchel & Cooley, L.L.P., Addison, Mary Olga Lovett, Andrew J. Wupper, Greenberg Traurig LLP, Gracelyn M. Sessions, Texas Children's Hospital, Houston, Stephen A. Madsen, Ryan D. Adair, Cantey & Hanger, Fort Worth, Mark A. Stinnett, Stinnett Thiebaud & Remington L.L.P., Dallas, for other interested parties.

Roger Townsend, Alexander Dubose Jones & Townsend LLP, C.W. "Rocky" Rhodes, Houston, for amicus curiae.

## Opinion

Chief Justice JEFFERSON delivered the opinion of the Court.

The United States Constitution prohibits a court from exercising jurisdiction over a party that lacks minimum contacts with the forum. Personal jurisdiction has been described as either specific—that is, based on contacts arising from the dispute at issue—or general, predicated on a party's "continuous and systematic" contacts with the forum. Minimum-contacts analysis is easily muddled, however, as courts frequently import contacts relevant to one type of jurisdiction when deciding the other. Additionally, courts sometimes impute contacts of related entities to each other, when mere relatedness is an insufficient basis on which to confer jurisdiction. Today, we must determine whether a Louisiana hospital, either independently or through its parent corporation, has continuous and systematic contacts with Texas. We conclude that it does not.

# I

## Factual and Procedural Background

While traveling through Louisiana on December 10, 2000, Texas resident Jajah Eddington sought medical care at MHC–Minden Hospital ("Minden Hospital"), a 159–bed acute care hospital located in Minden, Louisiana. Medical personnel treated Eddington's flu-like symptoms in the emergency room and advised her to consult her primary care physician if her condition did not improve. Four days later, Eddington was admitted to Good Shepherd Medical Center in Longview, Texas, where she ultimately was diagnosed with toxic shock syndrome. That infection led to her death on December 28, 2000.

DeWayne Eddington, individually and as next friend of Devvyn Eddington, and as representative of Jajah Eddington's estate, sued Kimberly–Clark Corporation asserting product liability, breach of warranty, and negligence claims. He alleged that Eddington's use of Kotex tampons led to the infection that caused her death. On February 28, 2003, Kimberly–Clark filed a third-party petition against PHC–Minden, L.P. ("Minden"), which owns Minden Hospital, asserting that Minden's negligence proximately caused Eddington's death.[1] Minden is a nonresident of Texas and a wholly owned subsidiary of Province Health Care ("Province"). Kimberly–Clark pleaded that Province, whose headquarters is in Tennessee, did business in Texas and that its forum-related acts **\*166** should be imputed to Minden because: (1) Province owns Minden; (2) Province and Minden share officers, directors, and "common departments or business"; (3) Province and Minden do not differentiate their operations and have failed to erect "formal barriers" between themselves; and (4) Province's officers and directors control Minden's policies. Minden filed a special appearance and, subject thereto, a general denial. The parties conducted extensive discovery relating to the jurisdictional issue. After a hearing, the trial court concluded it had general jurisdiction over Minden and denied the special appearance.

[1]    Kimberly–Clark also filed third-party claims against Good Shepherd Medical Center; Longview Emergency Medicine Associates; Schumacher Group of Louisiana; Dr. Russell Riggs; Dr. Rodney Slone; Dr. Don Ferguson; D. Lea, R.N.; C. Bennett, R.N.; and C. Coleman, R.N.

The court of appeals affirmed, reasoning that (1) Minden itself had "continuous and systematic contacts with Texas"; and (2) Minden and Province operated as a single business enterprise, and Minden, through Province, did business in Texas. 202 S.W.3d 193, 203–04. We granted Minden's petition for review to decide whether Texas courts have general jurisdiction over Minden.[2] 49 Tex. Sup.Ct. J. 950 (Aug. 25, 2006).

[2]    Charles W. "Rocky" Rhodes and Riata Energy, Inc. submitted amicus curiae briefs.

## II

### General Jurisdiction

**[1]** **[2]** **[3]** The Texas long-arm statute governs Texas courts' exercise of jurisdiction over nonresident defendants. *See* TEX. CIV. PRAC. & REM.CODE §§ 17.041–.045. That statute permits Texas courts to exercise jurisdiction over a nonresident defendant that "does business" in Texas, and the statute identifies some activities that constitute "doing business." *Id.* § 17.042. The list, however, is not exclusive. *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002). We have held that section 17.042's language extends Texas courts' personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *U–*

*Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977). Thus, we rely on precedent from the United States Supreme Court and other federal courts, as well as our own decisions, in determining whether a nonresident defendant has negated all bases of jurisdiction. *See BMC Software,* 83 S.W.3d at 795–796. Personal jurisdiction over nonresident defendants is constitutional when: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

In *Helicopteros Nacionales de Colombia, S.A. v. Hall,* the Supreme Court adopted the terms "specific" and "general" to describe the differing types of personal jurisdiction. *Helicopteros,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (citing Arthur T. von Mehren & Donald T. Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis,* 79 HARV. L.REV.. 1121, 1144–1164 (1966)). The Court defined specific jurisdiction as "arising out of or related to the defendant's contacts with the forum." *Id.* at n. 8. By contrast, the Court referred to general jurisdiction as "personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum." [3] *Id.* at n. 9 (citations omitted).

[3]   The use of the terms "specific" and "general" to connote differing types of personal jurisdiction has been criticized as contributing to the confusion among courts as to the quality and quantity of contacts required for each. *See* Mary Twitchell, *The Myth of General Jurisdiction,* 101 HARV. L.REV.. 610, 612–13 (1988) (suggesting that the "general/specific framework" has led to ambiguity and suggesting the terms "dispute-blind" and "dispute-specific" instead). Ironically, Professors von Mehren and Trautman suggested the terms "specific" and "general" to alleviate the confusion associated with the "in rem," "quasi in rem," and "in personam" jurisdictional terminology. von Mehren & Trautman, *Jurisdiction to Adjudicate,* 79 HARV. L.REV.. at 1135–36 (noting that "some of the terminology conventionally employed in Anglo–American discussions of jurisdiction to adjudicate is not very helpful").

**\*167** In *Helicopteros,* the Court concluded that Texas courts did not have general jurisdiction over a Colombian company, Helicol. One of Helicol's helicopters had been involved in a crash in Peru, and the survivors and representatives of the decedents sued Helicol in state district court in Harris County, Texas. Helicol filed a special appearance and moved to dismiss the case, but the trial court denied the motion. The court of appeals, however, agreed with Helicol that in personam jurisdiction over Helicol was lacking. *Helicopteros Nacionales De Colombia, S.A. v. Hall,* 616 S.W.2d 247 (Tex.App.-Houston 1981). Our Court reversed. *Hall v. Helicopteros Nacionales De Colombia, S.A.,* 638 S.W.2d 870 (1982).

The Supreme Court granted certiorari, and it summarized the pertinent jurisdictional facts:

> It is undisputed that Helicol does not have a place of business in Texas and never has been licensed to do business in the State. Basically, Helicol's contacts with Texas consisted of sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from

> Bell Helicopter for substantial sums; and sending personnel to Bell's facilities in Fort Worth for training.

*Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868. The Court concluded that the CEO's trip to Houston could not be described as a "continuous or systematic" contact. *Id.* Similarly, it held that Helicol's acceptance of checks drawn on a Houston bank was of "negligible significance." *Id.* at 416, 104 S.Ct. 1868. The Court held, relying on a 1923 unanimous opinion written by Justice Brandeis, that "purchases and related trips, standing alone, are not a sufficient basis for a State's assertion of jurisdiction." *Id.* at 417, 104 S.Ct. 1868 (citing *Rosenberg Bros. & Co. v. Curtis Brown Co.,* 260 U.S. 516, 43 S.Ct. 170, 67 L.Ed. 372 (1923)).

The point at which jurisdictional contacts reach a tipping point, however, has eluded precise formulation. Beyond stating that mere purchases and related travel are not enough, the Supreme Court has given little guidance on the appropriate inquiry for general jurisdiction, although its *Helicopteros* conclusion that general jurisdiction was improper suggests that the requisite level of contacts is fairly substantial. 16 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 108.41[3] (3d ed.2007); 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (2007) (noting that the Court's rejection of each contact and its failure to aggregate contacts "suggests very strongly that the threshold contacts required for a constitutional assertion of general jurisdiction over a nonresident defendant are very substantial, indeed"). *Perkins v. Benguet Consolidated Mining Co.,* the only case in which that court has upheld a finding of general jurisdiction, offers an insight into the nature of the contacts required. *Perkins,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). In assessing whether the nonresident defendant's Ohio contacts were sufficient to warrant a finding of general jurisdiction, the Court noted that the company's president, who was also the general manager and principal shareholder, **\*168** maintained an Ohio office in which he "did many things on behalf of the company." *Id.* at 447–48, 72 S.Ct. 413. He maintained company files in Ohio, carried on correspondence from there, drew and distributed salary checks from his Ohio office, used two Ohio bank accounts for company funds and had an Ohio bank act as transfer agent for the company's stock, held directors' meetings in Ohio, supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines there, and dispatched funds from Ohio bank accounts to cover purchases of machinery for such rehabilitation. *Id.* The Court concluded that the company "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company," and even though "no mining properties in Ohio were owned or operated by the company, many of its wartime activities were directed from Ohio and were being given the personal attention of its president in that State at the time he was served with summons." *Id.* at 448, 72 S.Ct. 413. The Court held that "under the circumstances above recited, it would not violate federal due process for Ohio either to take or decline jurisdiction of the corporation in this proceeding." *Id.*

A general jurisdiction inquiry, therefore, is very different from a specific jurisdiction inquiry and involves a "more demanding minimum contacts analysis," *CSR, Ltd. v. Link,* 925 S.W.2d 591, 595 (Tex.1996), with a "substantially higher" threshold, 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5. Usually, "the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction." 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5; *see also Hall,* 638 S.W.2d at 882 (Pope, J., dissenting) (noting that "substantial and continuous activity" required for general jurisdiction suggests that defendant "must establish some close substantial connection with the state approaching the relationship between the state and its own residents"); 16 MOORE'S FEDERAL PRACTICE § 108.41[3] (stating that general jurisdiction "typically requires the defendant to have an office in the forum state"); Lea Brilmayer, *A General Look at General Jurisdiction,* 66 TEX. L.REV. 723, 742 (1988) (proposing that "the basic inquiry must be whether the defendant's level of activity rises to the level of activity of an insider, so that relegating the defendant to the political processes is fair"); Charles W. "Rocky" Rhodes, *Clarifying General Jurisdiction,* 34 SETON HALL L.REV. 807, 811 (2004) (suggesting that a proper general jurisdiction query should evaluate whether the defendant engaged in activities in the forum state similar in frequency and nature to the activities of local businesses); Mary Twitchell, *The Myth of General Jurisdiction,* 101 HARV. L.REV.. 610, 635 (1988) (noting that "traditional indicia" of general jurisdiction are "a home base, an agent for the service of process, a local office, or the pursuance of business from a tangible locale within the state").

**[4]** General jurisdiction has been described as "dispute-blind," an exercise of the court's jurisdiction made without regard to the nature of the claim presented. Twitchell, *The Myth of General Jurisdiction,* 101 HARV. L.REV.. at 613. It involves a court's ability to exercise jurisdiction over a nonresident defendant based on any claim, including claims unrelated to the defendant's contacts with the state. 16 MOORE'S FEDERAL PRACTICE § 108.40. Some commentators suggest that courts assessing general jurisdiction employ an analytical **\*169** device to determine whether the jurisdiction is, in fact, dispute-blind. Twitchell, *The Myth of General Jurisdiction,* at 680; Rhodes, *Clarifying General Jurisdiction,* 34 SETON HALL L.REV. at 819. They propose that the court construct a hypothetical claim without any forum connection "to insure that any related forum activities of the defendant are not improperly infiltrating the dispute-blind query." *Clarifying General Jurisdiction,* 34 SETON HALL L.REV. at 819. For example:

> [A]re the corporate defendant's actual activities in California so pervasive and extensive that it should be amenable to the adjudicatory jurisdiction of California for a hypothetical employment discrimination claim filed by a New York citizen employed at corporate headquarters in New York? Or, with respect to a foreign corporation, do the corporation's actual California contacts support jurisdiction

> even for a hypothetical cause of action arising from its sale of a product in Germany that injured a German citizen?

*Id.* at 819–20. Such an inquiry properly frames the issue, as general jurisdiction is based solely on the defendant's "continuous and systematic" contacts with the forum. *Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868.

## A

## Minden's Contacts

 **[5]**    With this in mind, we turn to an analysis of Minden's Texas contacts, as the court of appeals concluded that Minden had "continuous and systematic contacts with Texas" sufficient to support general jurisdiction. 202 S.W.3d at 204. We first determine the appropriate time period for assessing contacts for purposes of general jurisdiction, an issue on which our courts of appeals are in conflict. Some examine the defendant's forum-related activities up to the time of the occurrence that prompted the suit. *See MedCost, L.L.C. v. Loiseau,* 166 S.W.3d 421, 434 (Tex.App.-Austin 2005, no pet.); *Schott Glas v. Adame,* 178 S.W.3d 307, 313–14 (Tex.App.-Houston [14th Dist.] 2005, pet. denied); *AmQuip Corp. v. Cloud,* 73 S.W.3d 380, 388 (Tex.App.-Houston [1st Dist.] 2002, no pet.). Others focus on contacts up to the time of filing suit. *See, e.g., Equitable Prod. Co. v. Canales–Trevino,* 136 S.W.3d 235, 237–38, 245 (Tex.App.-San Antonio 2004, pet. denied) (considering corporate defendant's relocation from Texas, which occurred after the cause of action accrued but before suit was filed, for purposes of determining jurisdiction); *see also Tuscano v. Osterberg,* 82 S.W.3d 457, 467 (Tex.App.-El Paso 2002, no pet.) (holding that jurisdictional contacts were "too attenuated in time," because such activities occurred more than "three years before service of this suit was effected"). Another—the court of appeals in this case—noted the conflict and assessed contacts under both timetables. [4] 202 S.W.3d at 203 ("A relevant continuous contact in this analysis includes those contacts over a period up to the date of injury ... or up to and including the date suit commenced....").

[4]    This conflict gives us jurisdiction over this interlocutory appeal. TEX. GOV'T CODE § 22.225(c).

 **[6]**    We conclude that the relevant period ends at the time suit is filed. As noted above, general jurisdiction is dispute-blind; accordingly, and in contrast to specific jurisdiction, the incident made the basis of the suit should not be the focus in assessing continuous and systematic contacts— contacts on which jurisdiction over any claim may be based. *See* Charles W. **\*170** "Rocky" Rhodes, *The Predictability Principle in Personal Jurisdiction Doctrine: A Case Study of the Effects of a "Generally" Too Broad, But "Specifically" Too Narrow Approach to Minimum Contacts,* 57 BAYLOR L.REV. 135, 238 (2005) (noting that "analyzing the contacts at the time

of accrual is not appropriate under the proper explanation of general jurisdiction as dispute-blind general adjudicative authority"); *see also* 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (noting that "a court should consider all of a defendant's contacts with the forum state prior to the filing of the lawsuit"). We also agree that "a mere one-time snapshot of the defendant's in-state activities" may not be sufficient, *see* Rhodes, *Predictability Principle,* 57 BAYLOR L.REV. at 239, and contacts should be assessed over a reasonable number of years, up to the date suit is filed, *see Access Telecom, Inc. v. MCI Telecomms. Corp.,* 197 F.3d 694, 717 (5th Cir.1999). This includes contacts at the time the cause of action arose, and it comports with the Supreme Court's guidance on the issue, as well as our prior caselaw. *See Helicopteros,* 466 U.S. at 409–11, 104 S.Ct. 1868 (evaluating contacts over the seven-year period before suit was filed); *American Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 807–08 (Tex.2002) (assessing contacts over the twenty-year period preceding suit).

 **[7]**   We now turn to Minden's contacts up to the time of suit. A general jurisdiction inquiry can be tedious, as it "demands ... that all contacts be carefully investigated, compiled, sorted, and analyzed for proof of a pattern of continuing and systematic activity." *Schlobohm v. Schapiro,* 784 S.W.2d 355, 359 (Tex.1990). In conducting this dispute-blind inquiry, Jajah's Eddington's status as a Texas resident, her treatment in Minden Hospital's emergency room, and her family's choice not to sue Minden are irrelevant. Instead, we focus solely on Minden's contacts with Texas. Minden is a nonresident limited partnership that owns a hospital licensed by the state of Louisiana. Minden's only facility is in Minden, Louisiana, and ninety percent of its patients reside within a twenty-five mile radius of Minden Hospital. Minden does not advertise in Texas. It owns no Texas property and has no Texas office or bank accounts, nor does it maintain a registered agent for service of process here. The court of appeals relied on three categories of contacts in determining that Minden's Texas contacts were continuous and systematic: (1) Minden employees' attendance at seminars in Texas; (2) Minden's purchases from vendors with Texas addresses; and (3) three contracts with Texas entities. We examine each in turn.

## 1. Texas Trips

The evidence showed that, since 1999, Minden employees attended two Province-sponsored meetings in Dallas. These isolated trips fall short of the "continuous and systematic contact" the Supreme Court requires. In *Helicopteros,* the Supreme Court rejected the notion that multiple trips to Fort Worth supported general jurisdiction, noting that the trips did not "in any way enhance[ ] the company's contacts with Texas." 466 U.S. at 418, 104 S.Ct. 1868; *see also Kulko v. California Superior Court,* 436 U.S. 84, 93, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978) (basing California jurisdiction on 3–day and 1–day stopovers in that State "would make a mockery of" due process limitations on assertion of personal jurisdiction); *Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 774 (Tex.1995) (concluding that attending a meeting in Texas, as well as periodic mailings to Texas members, "presented no evidence of general jurisdiction"). We agree with that analysis.

**\*171  2. Payments to Texas Vendors**

Since October 1, 1999, Minden paid $1,508,467.20 to 136 entities with Texas addresses. The largest payment, $515,650.15, was to Alcon Laboratories in Dallas, Texas, and the second largest, $209,997.36, to Centerpoint Energy in Houston, Texas. Most of the remaining payments are for less than $10,000.00 each. In *Helicopteros,* 466 U.S. at 418, 104 S.Ct. 1868, the Supreme Court held that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." And we have recognized that "purchases from Texas vendors will not alone support the exercise of general jurisdiction." *American Type Culture Collection,* 83 S.W.3d at 808. We conclude that the payments to Texas vendors do not support general jurisdiction over Minden in Texas.

**3. Contracts with Texas Entities**

The court of appeals also identified three contracts with a Texas connection: (1) a September 23, 2003 contract with Cox Business Services, a Tyler, Texas-based company, for internet service (at a charge of $59.95 per month) and a cable modem; (2) a July 2002 contract with Lone Star Research, located in The Woodlands, Texas, pursuant to which Lone Star Research would conduct a one-time marketing survey of 200 adult residents in Minden Hospital's service area; and (3) an April 2001 professional services agreement with Horizon Radiology, P.A., a Texas company, whereby Horizon would provide specialty coverage (via teleradiology equipment) to Minden Hospital, in exchange for $1600 per month.

We agree with the court of appeals that the 2003 Cox contract, entered into after suit was filed, is irrelevant to the jurisdictional inquiry here. 202 S.W.3d at 203. The 2002 Lone Star contract pursuant to which a Texas company conducted a marketing study of residents in Minden Hospital's service area—presumably Louisiana, as ninety percent of the hospital's patients live within twenty-five miles of the hospital—does not establish a continuous and systematic Texas contact. Lone Star agreed to conduct 200 telephone interviews and analyze the data within a week of the survey's completion, in exchange for $5,200. This type of sporadic Texas contact is not substantial enough for general jurisdiction.

Of the three contracts, the Horizon agreement has the most substantial connection to Texas. The agreement, signed in 2001 and renewed twice thereafter, required that Louisiana-licensed physicians (located in Texas) provide teleradiology services, for which Minden supplied the necessary equipment, in exchange for $1600 per month. Even this agreement, however, does not support general jurisdiction. Hiring a contractor to perform such limited services in the forum state does not equate to "continuous and systematic contacts."

Even when amassed, Minden's Texas contacts simply are not "continuous and systematic general business contacts" sufficient to support general jurisdiction, particularly when compared to the substantial, regular business activities conducted by the nonresident defendant in *Perkins.* *Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868; *Perkins,* 342 U.S. at 447–48, 72 S.Ct. 413. Instead, the facts here are more like those described in *Helicopteros:* the nonresident defendant had limited contacts with Texas but none sufficient to support general jurisdiction. Accordingly, the court of appeals erred in holding otherwise.

## *172 B

## Jurisdictional Veil–Piercing

[8]   As its second basis for general jurisdiction, the court of appeals imputed Province's Texas contacts to Minden, concluding the two entities operated as a single business enterprise and that Minden, through Province, did business in Texas. In 1925, the Supreme Court of the United States considered whether a North Carolina court had jurisdiction over a nonresident parent corporation whose subsidiary did business in North Carolina. *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 335, 45 S.Ct. 250, 69 L.Ed. 634 (1925). In affirming the district court's dismissal for lack of jurisdiction, the Court held:

> Through ownership of the entire capital stock and otherwise, the defendant dominates [its subsidiary], immediately and completely; and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals, as it does over those selling branches or departments of its business not separately incorporated which are established to market the [defendant's] products in other states. The existence of the [subsidiary] as a distinct corporate entity is, however, in all respects observed. Its books are kept separate. All transactions between the two corporations are represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations.

*Id.* The Court concluded that "the corporate separation, though perhaps merely formal, was real. It was not pure fiction." *Id.* at 337, 45 S.Ct. 250.

The Court has never disavowed *Cannon,* despite an opportunity to do so. Instead, it essentially echoed the *Cannon* rule in *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). *See* William A. Voxman, Comment, *Jurisdiction over a Parent Corporation in Its Subsidiary's State of Incorporation,* 141 U. PA. L.REV. 327, 339 (1992) (noting that *Keeton* footnote implicitly recognized *Cannon's* continuing validity). In that case, then-Justice

Rehnquist, writing for the Court, noted that "jurisdiction over a parent corporation [does not] automatically establish jurisdiction over a wholly owned subsidiary.... Each defendant's contacts with the forum State must be assessed individually." *Keeton,* 465 U.S. at 781 n. 13, 104 S.Ct. 1473; *see also* Voxman, 141 U. PA. L.REV. at 338 (noting that "[t]he clear implication of Rehnquist's assertion is that the nature of the parent-subsidiary relationship may well be a factor in determining whether jurisdiction comports with due process, but the existence of the relationship will not, in and of itself, be dispositive of the issue").

The Fifth Circuit Court of Appeals followed *Cannon* in *Hargrave v. Fibreboard Corp.:*

> *Cannon* ... stands for the proposition that so long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other. Cases in this circuit appear to have followed the *Cannon* rule in applying the Texas long-arm statute, although sometimes without explicit citation. We have noted often that 100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego relationship between two corporations. Generally, our cases demand proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes. The degree of control exercised by the parent must be greater than that normally associated with common ownership **\*173** and directorship. All the relevant facts and circumstances surrounding the operations of the parent and subsidiary must be examined to determine whether two separate and distinct corporate entities exist.

*Hargrave,* 710 F.2d 1154, 1160 (5th Cir.1983) (citations omitted). The court held that the two corporations at issue "maintained a degree of corporate separation that was more than superficial" and "[t]he policy making authority held and exercised by [the parent] was no more than that appropriate for a sole shareholder of a corporation" and not enough to warrant the extraterritorial exercise of jurisdiction over that shareholder. *Id.* at 1161. The court concluded: "The Lone Star of Texas may shine brightly throughout the world, but its long arm is not judicially all encompassing." *Id.*

We recently followed *Hargrave* (and, by implication, *Cannon* ) in explaining when the contacts of a related corporate entity may be considered for purposes of determining general jurisdiction. *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 795–796 (Tex.2002). We held that "[p]ersonal jurisdiction may exist over a nonresident defendant if the relationship between the foreign corporation and its parent corporation that does business in Texas is one that would allow the court to impute the parent corporation's 'doing business' to the subsidiary." *Id.* at 798 (citing *Hargrave,* 710 F.2d at 1159 and *Walker v. Newgent,* 583 F.2d 163, 167 (5th Cir.1978)). The rationale for exercising jurisdiction is that "the parent corporation exerts such domination and control over its

subsidiary 'that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction.' " *Id.* (quoting *Hargrave,* 710 F.2d at 1159 (citations omitted)). We required that the party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities prove this allegation, because Texas law presumes that two separate corporations are distinct entities. *Id.; accord* 4A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1069.4 (noting a "reluctance to exercise personal jurisdiction over a subsidiary merely because its parent corporation is doing business in the forum state"). We concluded that there was no evidence to support the trial court's finding of general jurisdiction over a Belgian subsidiary based on allegations it was the alter ego of its American parent. *BMC Software,* 83 S.W.3d at 801.

### 1. Single Business Enterprise

Here, the court of appeals held that Province and Minden operated as a single business enterprise—a theory we have never endorsed—and, therefore, Province's Texas contacts could be imputed to Minden. [5] 202 S.W.3d at 202; *see Southern Union Co. v. City of Edinburg,* 129 S.W.3d 74, 86–87 (Tex.2003) (noting that this Court "has never considered the 'single business enterprise' concept in any detail" and declining to decide "whether a theory of 'single business enterprise' is a necessary addition to Texas law regarding the theory of alter ego for disregarding corporate structure"). In doing so, the court of appeals examined eight factors as they related to Minden and Province: (1) common employees, (2) common offices, (3) centralized accounting, (4) payment of **\*174** wages by one corporation to another corporation's employees, (5) common business name, (6) services rendered by the employees of one corporation on behalf of another corporation, (7) undocumented transfers of funds between corporations, and (8) unclear allocation of profits and losses between corporations. 202 S.W.3d at 201–02. The court's analysis failed to recognize, however, that veil-piercing for purposes of liability ("substantive veil-piercing") is distinct from imputing one entity's contacts to another for jurisdictional purposes ("jurisdictional veil-piercing").

[5] The record contains no evidence regarding the structure of Province's ownership of Texas hospitals. That is, there is no evidence regarding whether those hospitals are owned directly by Province or instead by a wholly owned subsidiary like Minden. The parties assume that Province (rather than its subsidiaries) does business in Texas; for purposes of our analysis, we make the same assumption.

 **[9]** Courts have acknowledged that jurisdictional veil-piercing and substantive veil-piercing involve different elements of proof. *See, e.g., Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 425 (9th Cir.1977) (noting that undercapitalization, "which is important to deciding whether to pierce the veil raised by a subsidiary corporation in order to hold the parent corporation liable for failure of the subsidiary to meet its debts, may not be relevant to a showing that the two corporations are in fact one so as to establish that the out-of-state corporation—be it parent or subsidiary—is present within the forum for jurisdictional purposes"; instead, "the operative question is whether the two corporations are in fact mere 'divisions' or 'branches' of a larger whole"); *Daimler–Benz Aktiengesellschaft v. Olson,* 21 S.W.3d 707, 721 n. 5 (Tex.App.-Austin 2000, pet. dism'd w.o.j.) ("Although many of the factors relevant to

[determining whether subsidiaries' contacts should be imputed to parent] may also be relevant in determining whether a parent corporation should be liable for the actions of its subsidiary, the determination whether two corporate entities are one and the same for jurisdictional purposes is distinct."), *cert. denied,* 535 U.S. 1077, 122 S.Ct. 1960, 152 L.Ed.2d 1021 (2002); *see also* 2–32 WILLIAM V. DORSANEO, TEXAS LITIGATION GUIDE § 32.06 (2005). This makes sense in light of the fact that personal jurisdiction involves due process considerations that may not be overridden by statutes or the common law. *Cf. City of Monroe Employees Ret. Sys. v. Bridgestone Corp.,* 399 F.3d 651, 667–668 (6th Cir.2005) (refusing, in case involving jurisdictional allegations based on alleged "control person" under the securities laws, to "substitute our analysis of the securities laws' substantive bases for liability for the required, due-process based personal jurisdiction analysis"); *AT & T Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 591 (9th Cir.1996) (concluding that "liability is not to be conflated with amenability to suit in a particular forum. Personal jurisdiction has constitutional dimensions, and regardless of policy goals, Congress cannot override the due process clause, the source of protection for non-resident defendants."); *In re Baan Co. Sec. Litig.,* 245 F.Supp.2d 117, 129 (D.D.C.2003) (noting that liability under the Securities Act "cannot on its own support personal jurisdiction," as such an approach "impermissibly conflates statutory liability with the Constitution's command that the exercise of personal jurisdiction must be fundamentally fair"); *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 790–91 (Tex.2005) (rejecting theory that where defendant "directed a tort" was relevant inquiry for specific jurisdiction, as such a rule improperly "equat [ed] the jurisdictional inquiry with the underlying merits"); *Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 773 (Tex.1995) (observing that "[c]onspiracy as an independent basis for jurisdiction has been criticized as distracting from the ultimate due process inquiry: whether the out-of-state defendant's contact with the forum was such that it should reasonably anticipate being haled into a court in the forum state" and declining to recognize **\*175** personal jurisdiction based on conspiracy allegation); John A. Swain & Edwin E. Aguilar, *Piercing the Veil to Assert Personal Jurisdiction Over Corporate Affiliates: An Empirical Study of the Cannon Doctrine,* 84 B.U.L. REV. 445, 453 (2004) (noting that "the principle of limited liability is statutory and does not speak to judicial jurisdiction").

For this reason, fraud—which is vital to piercing the corporate veil under section 21.223 of the Business Organizations Code—has no place in assessing contacts to determine jurisdiction. *See* TEX. BUS. ORGS.CODE § 21.223. Similarly, some of the factors courts look to in determining whether an entity may be held liable as a "single business enterprise" are irrelevant to an analysis of jurisdictional contacts. For example, the court of appeals examined whether Province and Minden shared a common name and concluded that "[Minden's] partnership name and initials, PHC–Minden, L.P. can be construed as a reference to Province Healthcare Company." 202 S.W.3d at 201. Whether two related entities share a common name, however, does not affect whether each has sufficient contacts with the forum for jurisdictional purposes.

## 2. Factors

**[10]** Instead, we recently outlined the relevant factors for jurisdictional veil-piercing:

> To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary. But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice.

*BMC Software,* 83 S.W.3d at 799 (citations omitted). We also relied on our prior precedent, which held that "[a] subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders." *Gentry v. Credit Plan Corp. of Houston,* 528 S.W.2d 571, 573 (Tex.1975). A leading treatise suggests that in determining whether a subsidiary corporation is subject to the jurisdiction of a forum state because its parent corporation is present or doing business there, courts should determine whether the subsidiary is "separate and distinct from its parent corporation for personal jurisdiction purposes," taking into account the amount of the subsidiary's stock owned by the parent corporation, the existence of separate headquarters, the observance of corporate formalities, and the degree of the parent's control over the general policy and administration of the subsidiary. 4A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1069.4.

Here, the court of appeals cited the following as evidence that Province and Minden were a single business enterprise:

> the record shows that Province and [Minden] have at least one common employee and that Province pays certain [Minden] employees, although the salaries are intercompany payables. The names of the two companies are similar, and Province employees provide various services to assist [Minden] in its operations. Province exercises control over [Minden]'s revenues and expenditures and oversees [Minden]'s operations, financial performance, and completion of strategic initiatives. Further, Province audits [Minden]'s financial goals to determine if [Minden] will be able to meet these goals. Considering the totality of **\*176** this evidence, we conclude that Province and [Minden] have integrated their resources to achieve a common business purpose.

202 S.W.3d at 202.

**[11]** Upon closer examination, however, it is clear that Province does not exercise the sort of control over Minden that is required to fuse them for jurisdictional purposes. *BMC Software,* 83 S.W.3d at 799. Much of the evidence cited points to parental involvement —involvement consistent with its investor status—not atypical control. *See* 16 MOORE'S FEDERAL PRACTICE § 108.42[3][b]. "Appropriate parental involvement includes monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies." *Id.* What is lacking here is the "plus" factor, "something beyond the subsidiary's mere presence within the bosom of the corporate family." *Dickson Marine, Inc. v. Panalpina, Inc.,* 179 F.3d 331, 338 (5th Cir.1999); *see also Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.,* 230 F.3d 934, 943 (7th Cir.2000) (holding that "constitutional due process requires that personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary"); *De Castro v. Sanifill, Inc.,* 198 F.3d 282, 283–84 (1st Cir.1999) (requiring "strong and robust" evidence of parental control over subsidiary, such that subsidiary is "mere shell," before subsidiary's contacts could be imputed to parent). The two entities maintain separate headquarters, Minden in Louisiana and Province in Tennessee. Minden's Board of Governors approves Minden's budget and oversees day-to-day operations, and Minden alone establishes its policies and procedures for providing health care to patients. Province is not involved in Minden's physician recruitment, and the two entities share no directors. While Minden's chief executive officer, chief nursing officer, and chief financial officer receive their paychecks from Province, their salaries are intercompany payables; that is, the monies come from Minden's revenues. Similarly, while Province provides Minden's general liability insurance and a group health insurance policy for its employees, the policies are funded from Minden's revenues. There is no indication that Minden and Province have disregarded corporate formalities. The court of appeals cited evidence that two Minden employees received Province stock options, but we have said that "a parent company's offering a stock option plan to a subsidiary's employees is acceptable under IRS regulations and is not evidence of abnormal control over the subsidiary." *BMC Software,* 83 S.W.3d at 800. Put simply, we find no evidence of control other than that consistent with Province's investor status, and the court of appeals erred in imputing Province's Texas contacts to Minden.

## III

### Conclusion

Minden does not have continuous and systematic contacts with Texas, nor is there any basis for imputing Province's Texas contacts to Minden. We reverse the court of appeals' judgment and

render judgment dismissing the claims against Minden for want of jurisdiction. TEX.R.APP. P. 60.2(c).

## Parallel Citations

50 Tex. Sup. Ct. J. 1153

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.